John J. Kane (TX Bar No. 24066794)
R. Hale Neilson (TX Bar No. 24116820)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Tel.: (214) 777-4200
Fax: (214) 777-4299

***Counsel for HNGH Turtle Creek, LLC***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 21-31954-HDH-11** |
| | § | |
| **2999TC ACQUISITIONS, LLC,** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR.** | § | |
| | § | |

# HNGH TURTLE CREEK, LLC'S MOTION TO DISMISS DEBTOR'S BANKRUPTCY CASE OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY, WITH INCORPORATED BRIEF IN SUPPORT

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, DALLAS, TEXAS 75242 BEFORE CLOSE OF BUSINESS ON NOVEMBER 26, 2021, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

HNGH Turtle Creek, LLC ("**HN**") files this *Motion to Dismiss Debtor's Bankruptcy Case or, in the Alternative, for Relief from the Automatic Stay, with Incorporated Brief in Support* (the "**Motion**"), seeking dismissal of the above-captioned bankruptcy case filed by 2999 TC Acquisitions, LLC (the "**Debtor**"), or in the alternative, for relief from the automatic stay for cause under section 362(d)(1) and (d)(2) of the Bankruptcy Code, and in support of the Motion, respectfully states as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief sought herein are 11 U.S.C. §§ 1112(b), 305(a), 362(d)(1), 362(d)(2) and 105(a).

## SUMMARY

### A. DISMISSAL

2. By this Motion, HN seeks entry of an order dismissing the Debtor's bad faith bankruptcy case pursuant to 1112(b) of the Bankruptcy Code. This case is a classic example of a bad faith bankruptcy filing involving a single asset real estate debtor and its desperate attempt to avoid the realities of a two-party dispute. The Debtor is a single asset real estate debtor that owns one parcel of land located at 2999 Turtle Creek Boulevard in Dallas, Texas (the "**Property**"). The Debtor is managed by Timothy Barton, a self-proclaimed real estate developer with a growing track record of failed deals, bankruptcies, and unpaid legal fees. On information and belief, the Debtor has no other material assets, and few—if any—salaried employees other than Mr. Barton and possibly an assistant. The Debtor has no going-concern value to preserve. On information and belief, the Debtor has no liquidity, and cannot pay its debts as they come due. Moreover, the Debtor is incapable of restructuring its debts and paying its creditors through a workout or through the redevelopment of the Property. The Debtor defaulted under the terms of its loan documents more than a year ago. HN later agreed, through a delay agreement and then a formal forbearance agreement, to refrain from

exercising its remedies and foreclosing on the Property from October 1, 2020 through October 29, 2021. As a result, the Debtor has now had more time in forbearance than it did during the term of its initial note during which to develop or sell the Property, or refinance HN's debt.

3. The Debtor's bankruptcy—and more than a dozen other involving Barton—evidence Barton and the Debtor's bad faith. As material consideration for HN's forbearance, the Debtor agreed not to file for bankruptcy relief; provided HN with a deed in lieu of foreclosure; and contractually waived its right to the protections of the automatic stay solely as to HN. In July, 2021, Barton and the Debtor renewed those promises through an extension to their forbearance agreement despite evidence proving Barton and the Debtor had zero intention of complying with the contract's terms. Sure enough, at 1:00 pm on October 29, 2021, the Debtor defaulted under the forbearance agreement. On that same date, HN filed its deed in lieu of foreclosure with the County Clerk. Later that evening, the Debtor commenced this bankruptcy case in bad faith. Though this is a two party dispute, the Debtor seeks the protection of bankruptcy court so that it may dishonor its contractual obligations and delay HN's exercise of remedies despite no hope of a timely reorganization. Accordingly, HN seeks entry of an order of this Court dismissing the Debtor's bad faith filing pursuant to *Little Creek* and 1112(b) of the Bankruptcy Code.

## B. RELIEF FROM STAY

4. Alternatively, HN seeks relief from the automatic stay for cause pursuant to sections 362(d)(1) and (2) of the Bankruptcy Code so that it may exercise its rights and remedies under the forbearance agreement and applicable loan documents. Here, cause exists because of the Debtor's bad faith filing, and because the Debtor, a sophisticated party, knowingly and intelligently executed a contractual waiver of the automatic stay as to HN as material consideration for its forbearance following Debtor's earlier defaults. Contractual waivers of the automatic stay are enforceable in cases such as this, where a sophisticated Debtor bargains relief from stay in exchange for an out of court

opportunity to work out its debt.

5. Moreover, the Debtor lacks equity in the Property or shortly will, and lacks sufficient funds to make default interest payments on the more than $45,939,456 it owes to HN. The Property consists of a small developed office building on approximately 2.47 acres of oddly-sloped though well-located land. The Debtor undoubtedly acknowledges that the developed office building is a gross underutilization of the Property. Movant admits that the Property is well-located, and better suited for redevelopment. According to the Dallas Country Appraisal District, the 2021 tax appraised value for the Property is $14,500,000.[1] HN acknowledges, however, that if redeveloped, the Property could be worth considerably more than that, and is aware that at least one party has submitted a verbal offer to acquire the Property for approximately $36,000,000. That was, however, before the Debtor filed for bankruptcy relief. Given costs of a sale process, accruing default interest, and accruing costs and expenses of enforcement, any equity that the Debtor may have possessed in the Property will be eliminated and HN will not be adequately protected.

6. Moreover, the Debtor cannot reasonably reorganize. The Debtor has had more than a full year during which to sell the Property or refinance HN's debt. While the Debtor has been bragging about the impending redevelopment of the Property as a Mandarin Oriental Hotel for nearly two years, the Debtor has not moved a single shovel of earth on the Property. The Debtor's purported development is no closer to fruition than it was in 2019. In the interim, the Debtor's obligations under its loan documents has increased by more than $13 million, Covid-19 has wracked the hospitality industry, and costs of development have almost certainly increased dramatically as a result of supply chain pressures. The Debtor simply cannot get a deal done that will satisfy its debts to HN. The Debtor's bankruptcy case is not likely to provide any benefit to the Debtor's creditors, and will likely

[1] Dallas County Appraisal District, https://www.dallascad.org/AcctDetailCom.aspx?ID=001031000A0040000, visited Nov. 1, 2021.

render the Debtor administratively insolvent if it is not already. Accordingly, this Court should enter an order granting HN relief from the automatic stay for cause, and because the Debtor has no equity in the Property and the Property is not necessary to a reasonably contemplated and effectuated reorganization.

## BACKGROUND

### A. THE PRE-PETITION INDEBTEDNESS

7. On September 20, 2019, HN's predecessor in interest, 2999 Turtle Creek LLC, made a loan to the Debtor in the principal amount of $32,500,000.00 evidenced by that certain Secured Promissory Note dated as of September 20, 2019 (the "**Note**"). A true and correct copy of the Note is attached hereto as **Exhibit A**. The Note is secured by the Property, including all improvements and fixtures, as evidenced by that certain Deed of Trust, Security Agreement and Fixture Filing made as of September 20, 2019 (the "**Deed of Trust**"), and recorded in the real property records of Dallas County, Texas. A true and correct copy of the Deed of Trust is attached hereto as **Exhibit B**. The Debtor's obligations under the Note and Deed of Trust are guaranteed by Mr. Barton pursuant to a Guaranty dated as of September 20, 2019 (the "**Guaranty**"). A true and correct copy of the Guaranty is attached hereto as **Exhibit C**. HN is the holder of the Note, Deed of Trust, and Guaranty, as acknowledged by the Debtor and Barton in the Forbearance Agreement defined below.

8. The Note matured on October 1, 2020, and Debtor failed to qualify for a maturity date extension under the terms and conditions of the Note because of its numerous prior defaults. In 2020, the Debtor defaulted at least eight times under the terms and conditions of the Note. As Debtor admitted in that certain Forbearance and Payoff Agreement made effective on March 1, 2021 (the "**Forbearance Agreement**" and with the Note, Deed of Trust, and Guaranty and other related documents, the "**Loan Documents**"), it defaulted under the Note by its:

> (i) failure to pay the real estate taxes in connection with the Property due on or about February 1, 2020; (ii) failure to replenish the interest reserve in the amount of

> $1,376,916.67; (iii) failure to pay a portion of the monthly interest payment due on June 1, 2020 in the amount of $11,194.45; (iv) failure to pay monthly interest payments due on July 1, August 1, September 1, and October 1 [2020]; (v) failure to pay the principal amount of $32,500,000 as of October 1, 2020, and (vi) failure to pay property taxes totaling $337,827.55 for the Property which were owed and due to be paid by January 31, 2021.

FORBEARANCE AGREEMENT, Recital C. A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit D**. Following the Debtor's maturity date default, HN began collecting default interest pursuant to the terms and conditions of the Note.

9. Despite the Debtor's many defaults, HN agreed to temporarily delay foreclosing on the Property in early January, 2021, in exchange for an immediate partial interest payment by the Debtor of $100,000, plus an additional $100,000 payment on February 2, 2021 (the "**Delay Payments**") at a time when interest was accruing at rate of more than $600,000 per month. Thereafter, the Debtor and HN negotiated and entered into the Forbearance Agreement.

10. Under the Forbearance Agreement, the Debtor's outstanding defaults and accrued default interest were converted into principal payment obligations under the Note effective as of December 31, 2020. Accordingly, effective on December 31, 2020, the principal balance of the loan and Note became $40,073,171. That amount, in addition to any accrued and unpaid interest or other obligations under the Forbearance Agreement, came due on July 31, 2021. Though the Debtor once again failed to satisfy its debts at maturity, HN allowed it to exercise its extension option under the Forbearance Agreement. The three-month forbearance extension pushed the maturity date to October 29, 2021, more than 1 full year after the initial Note maturity date.

11. So long as the Debtor did not default under the Forbearance Agreement, the applicable interest rate during the forbearance period would remain at 8%. If, however, the Debtor defaulted under the Forbearance Agreement, HN would be entitled to recover unpaid interest accrued at the Note default rate of 24% from January 1, 2021 forward. FORBEARANCE AGREEMENT, § 3(a)-

(b).[2] On October 29, 2021, the Debtor defaulted under the Forbearance Agreement. HN exercised its Deferred Rights and was therefore owed not less than $45,939,456 on the Petition Date.

12. Given Barton's long history contesting stay motions, HN anticipates that Barton will claim the Property is worth considerably more than HN's debt. HN has, however, obtained two third-party valuations of the Property and at least two verbal bids from credible third-parties interested in acquiring HN's secured claim, Note and Loan Documents. A Broker Opinion of Value provided to HN by Newmark suggests the value of the Property is around $35.4 million. An appraisal provided by Cushman Wakefield suggested the value of the Property was around $44 million. Even so, that appraisal was provided prior to Covid-19. Given the effects of Covid-19 on the hotel and hospitality industry, and increased costs of development on account of supply chain pressures, the value of the Property for a hotel redevelopment has likely stagnated or declined. Corroborating that point, HN has received two credible offers for the acquisition of its secured claim, Note, and Loan Documents during the ten days preceding the filing of this Motion, including one offer *after* the Petition Date. Neither offer exceeded $37 million suggesting the Property is worth considerably less than the $45,939,456 owed by Barton and the Debtor to HN. Given the continued accrual of default interest on the Note, there is no equity, or there will soon be no equity, in the Property.

### B. CONSIDERATION FOR FORBEARANCE

13. Given the Debtor's numerous prior defaults and established litigious behavior, HN required valuable consideration in exchange for forbearance. In addition to interest payments and Mr. Barton's ratification of his Guaranty, the Debtor agreed to provide HN a deed in lieu of foreclosure. Thereafter, Debtor executed a special warranty deed and transferred the deed into escrow (the "**Deed**

[2] As set forth in Section 3(a) of the Forbearance Agreement, HN agreed to refrain from collecting default interest from January 1, 2021 forward "provided no Forbearance Default … occurs." HN's rights to retroactively enforce its default remedies under the Note are defined in the Forbearance Agreement as the "Deferred Rights", and HN's agreement to defer, and not waive, those rights was defined as the "Forbearance Covenant." As set forth in Section 3(b), upon the occurrence of a "Forbearance Default," HN could exercise its Deferred Rights and accrue and collect default interest under the Note from January 1, 2021 forward.

**in Lieu**"). The Deed in Lieu was to be released to HN upon a forbearance default, upon which HN had "the right to elect in Lender's sole discretion to record the Deed [in Lieu] in the real property records of Dallas County, Texas to effect the transfer of the Property to Lender." FORBEARANCE AGREEMENT, § 9(a).

14. To be clear, the parties anticipated that the Forbearance Agreement would provide the Debtor an extended out-of-court workout opportunity *as an alternative to* a bankruptcy proceeding. Instead of foreclosing on the Property and precipitating a bankruptcy filing, HN agreed to provide the Debtor an additional five to eight months in order to achieve an out of court workout that would enable the Debtor to satisfy HN in full either through a sale, refinance, or otherwise. If the Debtor failed, HN would be able to record its Deed in Lieu thereby resolving the debts owed by Barton and the Debtor to HN without either party incurring the costs and expenses of further legal proceedings.

15. The scope of the "last chance" period provided by HN was significant. In the Forbearance Agreement alone, HN provided the Debtor with up to eight months to develop the Property, find a buyer, or refinance HN's debt. Further, when the Forbearance Agreement was executed, HN had already refrained from foreclosing on the Property for five months—from the October 1, 2020 Note maturity date through February 29, 2021. In total, HN provided the Debtor an aggregate of *13 months* of forbearance, a period longer than the initial term of the Note.

16. In order to memorialize their understanding and the concept of the Debtor's "last chance," the Debtor and Mr. Barton agreed to specific "Bankruptcy Covenants" set forth in the Forbearance Agreement. Among those Bankruptcy Covenants is a contractual waiver of the automatic stay, solely as to HN. Specifically, HN and the Debtor agreed as a material inducement to HN's entry into the Forbearance Agreement, that:

> In the event of the filing of any petition for bankruptcy relief filed by or against Borrower or Guarantor, subject to the approval of a court of competent jurisdiction, Borrower and Guarantor consent to the entry of an order granting Lender relief from the automatic stay of Section 362 of the Bankruptcy Code and shall not assert or

> request any other party to assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has under the Loan Documents or any other rights Lender has against any Borrower or against any property owned by any Borrower.

FORBEARANCE AGREEMENT, § 14(a).

17. The Debtor unequivocally bargained for and supports stay relief in favor of HN. Both Mr. Barton and the Debtor agreed that consent to stay relief was material consideration that induced HN to enter into the Forbearance Agreement. Moreover, Mr. Barton and the Debtor "acknowledge and agree…that this [Forbearance Agreement] may be deemed ***conclusive evidence*** as to such negotiated ongoing intention of [Mr. Barton and the Debtor]" for the stay waiver to "remain the primary element in determining if cause exists for granting" relief from stay. FORBEARANCE AGREEMENT, § 14(d) (emphasis added). Mr. Barton was fully aware of what his bargain meant. As detailed below, Mr. Barton is a frequent participant in bankruptcy cases, including no fewer than sixteen cases pending before the Northern District of Texas in 2020 and 2021. Mr. Barton was fully aware of the implications of the automatic stay, and fully aware that by consenting to HN's relief from the stay, HN would be entitled to foreclose on the Property, record its Deed in Lieu, or enforce other rights and remedies allowed under the Loan Documents.

## C. SOPHISTICATED PARTY KNOWINGLY AND INTENTIONALLY WAIVED AUTOMATIC STAY

18. The Debtor and Mr. Barton are sophisticated, intelligent parties, with experience in the commercial real estate market and in bankruptcy. Moreover, the Debtor and Mr. Barton were represented by counsel at the time they entered into the Forbearance Agreement. Mr. Barton and the Debtor read, reviewed, and understood the terms and conditions of the Forbearance Agreement. In fact, the Forbearance Agreement was jointly drafted by counsel for HN and counsel for the Debtor. As illustrated by the Forbearance Agreement, the Debtor and Mr. Barton readily admit to each of those facts.

19. For instance, Section 12(c) of the Forbearance Agreement notes that "The Parties have reviewed this Agreement with independent legal advisors of their choosing as to the advisability of making the agreements, waivers, and releases provided for herein, and with respect to the advisability of executing this Agreement, and with respect to the meaning and operation of every waiver contained herein." In Section 17, Mr. Barton and the Debtor admit that they "have thoroughly read and reviewed the terms and provisions of the Agreement and are familiar with the same" and that "the terms and provisions contained [in the Forbearance Agreement] are clearly understood by the Parties and have been fully and unconditionally consented to by the Parties…." Mr. Barton and the Debtor continue, admitting that they "had the full benefit and advice of counsel and accountants of their own selection in regard to understanding the terms, meaning and effect of this Agreement…." In Section 18, Mr. Barton and the Debtor acknowledge that the language used in the Forbearance Agreement was "chosen jointly by the Parties to express their mutual intent…."

20. The Debtor and its principal, Mr. Barton, cannot now argue that they did not intend to waive the automatic stay as to HN, or that they were unaware of its inclusion in the Forbearance Agreement. As evidenced therein, the Debtor agrees that the stay waiver should constitute "cause" for relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code.

### D. OCTOBER 29, 2021 – BAD FAITH FILING

21. During the weeks preceding the October 29, 2021 Forbearance Agreement maturity date, HN repeatedly inquired as to whether the Debtor would be able to satisfy the Note. Mr. Barton and the Debtor repeatedly made vague references to potential purchasers and refinance partners. None of the Debtor's purported options were, in fact, real. Suspecting as much, HN attempted to negotiate alternative business proposals with Mr. Barton and the Debtor, but those were rejected. More than a year after the initial Note maturity Date, Mr. Barton and the Debtor were still incapable of paying the Note, selling the Property, or refinancing the debt.

22. On October 29, 2021, the Debtor defaulted on the Forbearance Agreement and Note by failing to pay all amounts due and owing at maturity. HN immediately sought to enforce its rights and remedies under Section 9(a) of the Forbearance Agreement by recording its Deed in Lieu in the Dallas County records. HN submitted the Deed in Lieu for recording *before* the Debtor filed its petition for bankruptcy relief in the evening of October 29, 2021 (the **"Petition Date"**). The County Clerk recorded the filed Deed in Lieu at 1:36 pm on November 1, 2021. By filing its Deed in Lieu before the Debtor filed its bankruptcy petition, HN took ownership of the Property in satisfaction of its outstanding claims against Mr. Barton and the Debtor. At the time HN filed the Deed in Lieu, it was owed not less than $45,939,456 by the Debtor and Barton. By filing and recording the Deed in Lieu, HN's claims are deemed satisfied in full. If, however, this Court determines that the Debtor retains ownership of the Property, then HN's claim is reinstated in full, and this case should be dismissed because it was unequivocally filed in bad faith.

***(i) Timothy Barton and JMJ Development***

23. The Debtor is a single asset real estate special purpose entity. It falls under a group of entities overseen by Mr. Barton doing business as JMJ Development. JMJ Development holds itself out as an experienced and reliable real estate developer with special expertise in the Dallas-Fort Worth market.[3] Mr. Barton is the Chief Executive Officer of JMJ Development. While Mr. Barton presents himself as an accomplished real estate developer, his business affairs are in disarray. Mr. Barton is currently a defendant in numerous civil lawsuits and adversary proceedings related to his purported developments. Stunningly, from 2020 through 2021, Mr. Barton and his "development" entities have been involved in no fewer than *sixteen* bankruptcy proceedings. At least three of those bankruptcy proceedings (including this one), involve litigation associated with the Property.

24. As evidenced below, Mr. Barton and his entities have established and repeatedly

[3] JMJ Development, https://www.jmjdevelopment.com/hospitality/, last visited November 2, 2021.

implemented a scheme of lies, litigation, and bankruptcy to delay, frustrate, and confound lenders. Mr. Barton and his entities obtain short-term financing in order to acquire undeveloped or underdeveloped real property. Mr. Barton and his entities promptly default under the terms of their notes, often never making a single payment due thereunder. Mr. Barton and his entities then spend some time negotiating a potential forbearance, and then default under the terms of the forbearance. When the lenders attempt to foreclose on their collateral, Barton causes his entities to sue the lenders to enjoin the pending foreclosure. When Barton and his entities' frivolous suits inevitably fail, Barton, as President, causes his entities to file for bankruptcy relief to buy additional time under protection of the automatic stay. Below are examples of Mr. Barton's bad faith scheme to abuse his lenders.

***(ii) In re Dallas Real Estate Investors, LLC – Suits Alleging Barton's Fraud Related to the Property and a Frisco Development***

25. On June 22, 2021, Mr. Barton caused Dallas Real Estate Investors, LLC to file for bankruptcy relief, commencing Case No. 21-41488 before Judge Morris. Mr. Barton is President of the single asset real estate debtor ("**DREI**") which purportedly owns a $10,000,000 interest in a Frisco development. DREI's 20 Largest Creditor List contains material overlap with the Debtor's. Palisades TC, LLC, the Debtor's purportedly largest unsecured creditor (or an affiliate of the Debtor's purportedly largest creditor) is a senior secured lender or equity interest holder in DREI, and obtained sanctions against DREI for violating a Judge Morris order. The DREI suit is home to two removed civil lawsuits in which Palisades TC, LLC alleged that Barton, DREI, and Five Star MM, LLC—a purported equity interest holder of the Debtor—committed breaches of contract, breaches of fiduciary duties, and fraud related to the Frisco development *and the Property*. A copy of Palisades' original complaint against Barton and Five Star MM, LLC related to the Property is attached hereto as **Exhibit E**.

***(iii) In re 2999 TC LP, LLC – A Plan Conditioned on the Debtor's Success?***

26. On October 16, 2020, Barton caused 2999TC LP, LLC ("**299TCLP**") to file for

bankruptcy relief, commencing Case No. 20-43204 before Judge Mullin. Mr. Barton is President of 2999TCLP, which is a direct or indirect equity interest holder of the Debtor. Mr. Barton appears to have filed 2999TCLP for bankruptcy relief to avoid judgment by a Mr. Hodges, who purportedly loaned money to 2999TCLP to assist with the acquisition of the Property in exchange for perfected liens on certain unrelated collateral. According to Hodges' original petition, Barton and 2999TCLP failed to uphold their end of the bargain, never pledged promised collateral, and failed to pay debts when due. A copy of Hodges' original petition, without exhibits, is attached hereto as **Exhibit F**.

27. Importantly, 2999TCLP's Third Amended Plan of Reorganization, which is attached hereto as **Exhibit G**, is entirely conditioned on this Debtor's successful refinance of the HN debt and recapitalization of the direct and indirect owners of the Property. 2999TCLP's Third Amended Plan, filed August 24, 2021, and Second Amended Plan, filed June 28, 2021, perfectly illustrate Barton's deceitfulness and inability to consummate a refinancing transaction. Though filed months before the Forbearance Agreement maturity date, the Second and Third Amended Plan contemplate that *THIS DEBTOR* will effectuate a refinancing transaction *six to nine months* after the plans' Effective Date. The Effective Date is 30 days after Judge Mullin enters an order confirming the plan. The confirmation hearing for the Third Amended Plan is not even set until November 11, 2021. If confirmed on that date, Barton expects that *THIS DEBTOR* will refinance HN's debt around August, 2022. That means that even before Barton entered into the July Forbearance Agreement extension, he had devised a strategy to delay HN's exercise of its rights and remedies for nearly another year after the Forbearance Agreement maturity date. Mr. Barton committed fraud. He clearly never intended to perform under the Forbearance Agreement, and yet promised consideration to HN in order to induce HN's extension.

***(iv) In re AVG West, LLC – Default and Bankruptcy to Avoid Foreclosure***

28. On November 4, 2020, Barton caused AVG West, LLC ("**AVG West**") to file for

bankruptcy relief, commencing Case No. 20-43414 before Judge Mullin. Mr. Barton is President of AVG West, which is a single asset real estate debtor that owns an undeveloped piece of land in Winter Haven, Florida. On October 1, 2020, AVG West's senior secured creditor was awarded summary judgment in a state court foreclosure proceeding following AVG West's default on note payment obligations. Foreclosure was scheduled to occur on November 5, 2020. Barton caused the Debtor to file for relief on the eve of foreclosure. In order to consummate its plan of reorganization, AVG West was obligated to obtain additional financing to fund development or to sell some or all of the property in order to satisfy its creditors.

***(v) In re BM318, LLC – Default and Bankruptcy to Avoid Foreclosure***

29. On September 1, 2020, Barton caused BM318, LLC ("**BM318**") to file for bankruptcy relief, commencing Case No. 20-42789 before Judge Mullin. Mr. Barton is President of BM318, which is a single asset real estate debtor that owned undeveloped land in Parker County, Texas. As appears common for Barton's entities, BM318 borrowed money pursuant to a short term note in order to acquire the undeveloped land, only to promptly default on payment obligations thereunder. After the lender posted BM318's property for foreclosure on a third occasion, Barton caused BM318 to sue the lender seeking to enjoin the foreclosure. When BM318 was denied injunctive relief, it filed for bankruptcy relief to avoid foreclosure. During bankruptcy, BM318 proved incapable of developing the property, but did enter into a sale transaction pursuant to which the buyer paid a portion of the first lien debt at closing, and assumed the remainder.

***(vi) In re JMR100, LLC – Default and Bankruptcy to Avoid Foreclosure***

30. On September 1, 2020, Barton also caused JMR100, LLC ("**JMR100**") to file for bankruptcy relief, commencing Case No. 20-42790 before Judge Morris. Mr. Barton is President of JMR100, which is a single asset real estate debtor that also owned undeveloped land near Aledo in Parker County, Texas. Like BM318, JMR100 borrowed money pursuant to a short-term note in order

to acquire undeveloped land, only to promptly default on payment obligations thereunder. When JMR100's lender posted the property for foreclosure, JMR100 sued the lender in an effort to enjoin the foreclosure. When the court ruled against JMR100, Barton caused it to file for bankruptcy relief to avoid the foreclosure. During bankruptcy, JMR100 proved incapable of refinancing its debt, developing the property for profit, or selling the property to pay off its creditors. Eventually, Barton caused JMR100 to dismiss its case by agreement with its lender in order to proceed with out of court remedies.

***(vii) In re LDG001, LLC – Default and Bankruptcy to Avoid Foreclosure***

31. On October 5, 2020, Barton caused LDG001, LLC ("**LDG001**") to file for bankruptcy relief, commencing Case No. 20-43110 before Judge Mullin. Mr. Barton is President of LDG001, which is a single asset real estate debtor that owned undeveloped land near Venus, Texas. As with BM318 and JMR100, Barton caused LDG001 to enter into a short-term note to acquire undeveloped land, only to promptly default for non-payment. When the lender moved to foreclose on the property, Barton caused LDG001 to sue the lender to enjoin the foreclosure. Yet again, Barton's efforts failed. When the court ruled against LDG001, Barton caused the entity to file for bankruptcy relief. During LDG001's bankruptcy case, Barton and LDG001 proved incapable of refinancing the debt despite a purportedly large equity cushion. Moreover, Barton and LDG001 proved incapable of identifying and securing a purchaser for the real property asset. Eventually, LDG001 reached an agreement with its senior secured lender pursuant to which it dismissed the case to pursue out of court remedies.

***(viii) In re Mansions Apartment Homes at Marine Creek, LLC – Bad Faith Filing, More Frivolous Litigation, a Chapter 11 Trustee, and a Fraudulent Transfer***

32. On November 30, 2020, Barton caused Mansions Apartment Homes at Marine Creek, LLC ("**Mansions**") to file for bankruptcy relief, commencing Case No. 20-43643 before Judge Morris. Mr. Barton is President of Mansions, which is a single asset real estate debtor that owned approximately 40 acres of undeveloped land in Fort Worth, Texas. Its senior secured lender, Happy

State Bank, provided $5,400,000 of financing to acquire and develop the land. After two and a half years, Mansions remained entirely undeveloped. Mansions defaulted under its note, and Happy State Bank threatened foreclosure. While Mansions superficially negotiated terms of a potential forbearance, it fraudulently transferred a portion of Happy State Bank's collateral to an affiliate for no consideration. During the course of negotiations, Mansions presented Happy State Bank with four documents evidencing four separate ownership structures for Mansions. Given Barton's inability to identify Mansions' ownership structure with any certainty, Happy State Bank withdrew from forbearance negotiations and pursued foreclosure.

33. As is clearly Barton's *modus operandi*, Barton caused Mansions to sue Happy State Bank in an effort to enjoin the foreclosure. When the court denied Mansions injunctive relief, Barton caused Mansions to file for bankruptcy relief. This time, Happy State Bank filed a motion to dismiss the case as a bad faith filing under *Little Creek* and section 1112(b) of the Bankruptcy Code. A copy of Happy State Bank's motion to dismiss is attached as **Exhibit H**. After due consideration and a contested evidentiary hearing, Judge Morris agreed that the case was filed in bad faith and, at the behest of the United States Trustee, removed Barton from a decision-making role and appointed a Chapter 11 Trustee to oversee management of Mansions and Mansions' bankruptcy case.

***(ix) D4MC, LLC – Malfeasance, Disqualification of Counsel, Pending Dismissal***

34. In its petition for relief, Mansions noted that it was also known as D4MC. Importantly, however, Barton was also President of a separate and distinct legal entity named D4MC, LLC. After Mansions defaulted on its obligations Happy State Bank, Barton caused Mansions to transfer approximately one third of its acreage to D4MC, LLC for no consideration and without Happy State Bank's knowledge or consent. After getting caught, and following the appointment of a Chapter 11 Trustee in the Mansions bankruptcy case, Barton caused D4MC to convey the acreage back to Mansions. In doing so, Barton and D4MC claimed that the conveyance of the acreage by

Mansions to D4MC had been "in error." Two months later, Barton caused D4MC to file for bankruptcy relief, commencing Case No. 21-41371 before Judge Morris.

35. Mr. Barton is President of D4MC, which was a single asset real estate debtor for the brief period in which it owned Mansions' acreage. At the time of its filing, Barton attested that D4MC, LLC possessed only about $150 of assets, but had incurred $2.1 million of liabilities to lenders, insiders, and professional firms. Among the insider claimants was JMJ Development, LLC, who paid Joyce Lindauer to represent D4MC, LLC. The United States Trustee identified the blatant conflict and successfully moved to prevent Mrs. Lindauer from representing the debtor. After floundering in bankruptcy thereafter, Barton and JMJ Development moved to dismiss D4MC, LLC's bankruptcy case. A hearing on Barton's motion to dismiss is scheduled for December 15, 2021.

***(x) Wall007 LLC – Wall017 LLC – A Seven Debtor Procedural Morass With a Consistent Story***

36. As this court is well aware, Barton's entities have also been subject to involuntary bankruptcy proceedings. On April 8, 2020, petitioning creditors filed involuntary Chapter 7 petitions against Wall007 LLC and six other "Wall" entities managed by Barton. As the all too familiar story goes, senior secured lenders provided financing to Barton entities so that they could acquire and seek to develop land in Texas. Barton's entity then promptly defaulted on the notes evidencing the loans. After Barton's entities failed to perform, the senior secured lenders sought relief from a court in order to obtain the benefit of their bargain through the liquidation of their collateral. Barton, acting in a manner all too consistent with nearly all of his deals, contested the senior secured lender's rights to enforce their remedies against their collateral. While the Wall involuntary cases were ultimately dismissed for procedural reasons, the Wall cases and Barton's treatment of his entities' obligations to senior secured creditors evidence a thorough pattern of bad faith and unfair dealing.

***(xi) Sixteen Bankruptcy Cases in the Past Year – Barton's Abusive Scheme to Cause Delay***

37. As detailed above, Barton is a habitual bankruptcy filer. In the past 18 months, Barton has been involved in at least sixteen bankruptcy proceedings that HN's counsel could readily identify. Every single proceeding involves substantially the same fact pattern. Barton, as President of a single asset real estate entity, obtains short team real estate financing in order to acquire for development a piece of land. Barton's entity then defaults on its obligations under the note. Barton's entity then enters into specious negotiations with the lender to obtain an initial delay, with no real intent to perform. When Barton and his entity inevitably default, the lender pursues foreclosure. In order to prevent foreclosure, Barton causes his single asset real estate entity to file for bankruptcy relief. When Barton's cases are distilled, it is quite clear that he is a dishonest bad actor who abuses the bankruptcy process as a "get out of jail free" card to absolve his entities from promises made to their lenders.

38. This case is no different, though there is concrete evidence that Barton planned this bankruptcy filing months ago in total disregard of the terms and conditions he agreed to in the Forbearance Agreement. As evidenced by the plan Joyce Lindauer filed in the 2999TCLP bankruptcy case, Barton anticipated breaching the Forbearance Agreement by failing to sell the Property or refinance the HN debt before the October 29, 2021 Forbearance Agreement maturity date. Barton should not benefit from his dishonesty and fraud. This court should dismiss this case for bad faith.

## REQUEST FOR RELIEF

### A. THE COURT SHOULD DISMISS THE CASE PURSUANT TO §§ 1112(b) AND 305(a)

39. Pursuant to section 1112(b), a court must—barring unusual circumstances—dismiss a bankruptcy case if cause exists to do so, and if dismissal is in the best interest of the debtor's creditors. 11 U.S.C. § 1112(b). Section 305(a) allows a court to dismiss a case if dismissal is in both the best interest of the debtor and the creditors. 11 U.S.C. § 305(a).

#### *(i) Cause – Lack of Good Faith Filing*

40. The Bankruptcy Code does not define "cause" under section 1112(b), but provides a non-exhaustive list of grounds for dismissal for cause. 11 U.S.C. § 1112(b). Section 1112(b)(4) states that the term "cause" includes, among other things, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4). In addition, the Fifth Circuit recognizes that cause exists where a case is not filed in good faith. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir.1986); *In re Humble Place Joint venture*, 936 F.2d 814, 816-17 (5th Cir. 1991) (affirming dismissal based on *Little Creek* lack of good faith factors).

41. As recognized by the Fifth Circuit, findings of lack of good faith in proceedings contemplating dismissal under 1112(b) "have been predicated on certain recurring but non-exclusive patterns, and . . . are based on a conglomerate of factors rather than on any single datum." *In re Little Creek Dev. Co.*, 779 F.2d at 1072. The court further noted that "[s]everal, but not all of the following conditions usually exist":

> The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. § 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debtor and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals.

*Id.* at 1072-73; *see also In re 1701 Commerce, LLC*, 477 B.R. 652, 658 (Bankr. N.D. Tex. 2012) (analyzing the *Little Creek* factors and determining that the case was filed in bad faith); *In re Trammell*, 399 B .R. 177, 181 n.5 (Bankr. N.D. Tex. 2007). Needless to say, the Fifth Circuit all but perfectly described this case.

42. Little Creek factors supporting dismissal include: (i) there are no employees except for the principals; (ii) there is little or no cash flow and no available source of income to sustain a plan of

reorganization; (iii) there are only a few unsecured creditors whose claims are relatively small; (iv) the debtor and one creditor may have proceeded to a stand-still in state court litigation and the debtor has lost or has been required to post a bond which it cannot afford; and (v) there are allegations of wrongdoing by the debtor or its principals. *Little Creek*, 779 F.2d 1068.

43. As per the Fifth Circuit in *Little Creek* and *Humble Place*, HN is not required to prove each bad faith factor in order to establish that the Debtor's bankruptcy case is a bad faith filing. Even so, nearly every bad faith factor is present in this case. On information and belief: (i) the Debtor has no known employees other than Tim Barton, the President and principal of the Debtor; (ii) the Debtor has no operations; (iii) because it has no operations, the debtor has no cash flow from which to service its debts or sustain a plan of reorganization; (iv) the Property is the Debtor's only asset of value; (v) the Debtor either does not, or will not have any equity in the Property; and (vi) the Property was transferred to HN via a filed Deed in Lieu, and the bankruptcy was filed to stay or avoid the transfer.

44. Further, HN challenges the Debtor's List of 20 Largest Unsecured Creditors. As indicated above, the Debtor's purported creditors largely consist of professional firms, which similarly appear on many of the above-listed Barton bankruptcy cases. Further, HN understands that the Palisades entity referenced as the Debtor's largest unsecured creditor is actually a direct or indirect equity interest holder of the Debtor, not an unsecured creditor. Thus, the Debtor's creditors are few in number, relatively small, and almost certainly misrepresented by the Debtor.

45. When determining whether bad faith exists under *Little Creek*, this Court should also heavily weigh Barton's pattern of dishonest, if not fraudulent, behavior, and his wanton use of bankruptcy as a means of causing delay in two-party disputes in single asset real estate cases. Barton has established a clear pattern of behavior, and should not benefit from his use of bankruptcy as a scheme to punish lenders. For the foregoing reasons, cause exists to dismiss the case for bad faith.

***(ii) Best Interests of the Debtor and Creditors***

46. Dismissal of this bankruptcy is in the best interest of both the Debtor and its creditors. The Debtor cannot service its debts, as evidenced by its lack of operations and defaults under loan documents and forbearance agreement. If HN's pre-petition filing of its Deed in Lieu is upheld, the Debtor has no other assets to reorganize or sell of any material value, and so the case should be dismissed to avoid the incurrence of unnecessary costs and expenses. If HN's filing of the Deed in Lieu is avoided, then HN's $45,939,456 claim is reinstated, and continues to accrue default interest at the Note rate post-petition. Default interest continues to accrue post-petition at the *per diem* rate of $30,626.30. While Barton will likely argue that there is equity in the Property, he ignores the realities of this case. A 120 day sale process will result in the accrual of $3,675,156.44 of interest. A well marketed sale process during that time will likely cost approximately 5% of the current balance, or $2,296,973. Thus, to even break even, the Debtor would have to sell the Property for not less than $51,911,584. To put it bluntly, that is extremely unlikely. That Debtor is far more likely to become deeply administratively insolvent during the course of this case, further burdening the Debtor, and Barton, with no hope of repayment.

47. As noted by the Fifth Circuit, in such circumstances "resort to the protection of the bankruptcy laws is not proper…because there is no going concern to preserve, there are no employees to protect, and there is no hope for rehabilitation, except according to the debtor's 'terminal euphoria.'…Neither the bankruptcy courts nor the creditors should be subject to the costs and delays of a bankruptcy proceeding under such conditions." *In re Little Creek Dev. Co.*, 779 F.2d at 1073. This Court should follow Fifth Circuit precedent and dismiss this bankruptcy case.

**B. RELIEF FROM THE AUTOMATIC STAY**

48. As an alternative to dismissal, this Court should grant HN relief from the automatic stay so that it may exercise its rights and remedies under its Loan Documents. Here, cause exists to lift the automatic stay under section 362(d)(1) of the Bankruptcy Code. In addition, this Court should

lift the stay under section 362(d)(2) of the Bankruptcy Code because there is no equity in the Property and it is not necessary to a reasonably contemplated reorganization.

***(i) Relief from Stay "For Cause" – 362(d)(1)***

49. HN requests relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code "for cause, including the lack of adequate protection of an interest in property of such party in interest." Although the Bankruptcy Code does not define "cause" under section 362(d)(1), the Fifth Circuit determined that the statute affords "flexibility to the bankruptcy courts" when determining whether cause exists. *In re Mirant*, 440 F.3d 238 (5th Cir. 2006); *In re Northwest Timberline Enters., Inc.*, 348 B.R. 412 (Bankr. N.D. Tex. 2006). Further, courts may look to section 1112(b) of the Bankruptcy Code for examples of cause for the purposes of motions for relief from stay. *In re 51-53 West 129th Street HDFC, Inc.*, 475 B.R. 391, 399 (Bankr. S.D.N.Y. 2012).

50. In this case, cause exists because HN is not adequately protected. If the Deed in Lieu is avoided, HN's claim is reinstated and HN is entitled to collect post-petition default interest, fees, and expenses up to the value of its collateral. Even so, HN asserts that there is either no equity in the Property, or shortly will be no equity in the Property. Upon the exhaustion of any equity, the Debtor must provide HN with adequate protection payments to prevent the diminution of HN's interest in its collateral. *See Bluebird Partners, L.P. v. First Fidelity Bank*, 85 F.3d 970, 972 (2d. Cir. 1996). The Debtor has no money, no source of revenue, and no assets to liquidate in order to funds adequate protection payments other than the Property.

51. Because there is no equity in the Property and any source of revenue for the debtor is speculative at best, cause for relief exists because there is a "a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *51-53 West 129th Street HDFC, Inc., 475 B.R. at 399* (citing *In re Inwood Heights Housing Dev. Fund Corp.*, 2011 WL 3783324,

*6-7 (Bankr. S.D.N.Y. 2011) and holding cause listed in § 1112(b)(4)(A) applied to motions for relief from stay); *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985).

52. A substantial or continuing loss to or diminution of the estate occurs when an estate suffers losses, as opposed to gains, and when any sources of potential revenue are speculative at best. *See In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 562-64 (Bankr. M.D. Pa. 2007); *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003); *In re Motel Properties, Inc.*, 314 B.R. 889, 894 (Bankr. S.D. Ga. 2004). "Negative Cash Flow and an inability to satisfy current expenses constitute a loss to or diminution of the estate." *Motel Properties*, 314 B.R. at 894. Likewise, the accrual of considerable attorneys' fees in an otherwise administratively insolvent estate evidences diminution and continuing losses to the estate. *In re Brutsche*, 476 B.R. 298, 305 (Bankr. D. N.M. 2012). Here, the Debtor has no hope of actually developing the Property, selling the Property for more than HN's secured claim, or refinancing HN's debt. The Debtor is simply accruing costs and expenses that it cannot pay, causing a substantial or continuing loss to or diminution of the estate. Accordingly, cause exists for relief from stay.

53. Further, cause exists for relief from stay because of the Debtor's bad faith filing. As the Fifth Circuit reasoned, "resort to the protection of the bankruptcy laws is not proper," when "the debtor has one asset, such as a tract of undeveloped or developed real property...there are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments. . ." *Little Creek*, 779 F.2d at 1073. The Firth Circuit further acknowledged that "neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions." *Id.* This Court may therefore lift the automatic stay "for cause" because the *Little Creek* factors establish cause.

54. Further, cause exists for relief from stay because the Barton and the Debtor provided HN with a waiver of the automatic stay as consideration for eight months off additional forbearance under the Forbearance Agreement. As evidenced in Sections 14(a) and (d) of the Forbearance Agreement, Barton and the Debtor agreed to waive the automatic stay against HN, agreed not to contest HN's request for relief from the stay, and agreed not to seek the implementation of the stay or to cause any other party to seek the implementation of the automatic stay against HN. FORBEARANCE AGREEMENT, §§ 14(a), (d). Importantly, Barton and the Debtor further agreed that the waiver should constitute "cause" for relief from stay. This Court should bind Barton and the Debtor to their own agreements. Barton and the Debtor were provided substantially all of the protections a bankruptcy could afford during their eight months of forbearance under the Forbearance Agreement. They have had every opportunity to reorganize, and have utterly failed to do so.

55. While there is little case law under the Fifth Circuit addressing the enforceability of stay waivers, one case from Houston addressed the enforceability of a stay waiver. *See In re Lopez-Granadino*, 2008 WL 694698 (Bankr. S.D. Tex. 2008). In *Lopez-Granadino*, the court considered whether to enforce a pre-petition waiver of the automatic stay in the debtor's Chapter 13 bankruptcy proceeding. While limiting its decision to the specific facts of the case, the court declined to grant the debtor's motion to extend the stay in part on account of the stay waiver. *Id.* In so ruling, the court noted: (i) the case was the debtor's third bankruptcy filing in the past five years; (ii) the debtor failed to make timely payments in prior cases; (iii) the debtor was in arrears in the current case; and (iv) the debtor failed to present sufficient evidence to show her case was filed in good faith or that she could make all necessary payments. *Id.* The facts on which the *Lopez-Granadino* court conditioned its ruling are largely applicable here.

56. The most factually analogous case addressing the enforceability of pre-petition stay waivers in bankruptcy proceedings involved a single asset real estate chapter 11 case filed in Florida

by debtor that owned a single tract of undeveloped land. *See In re University Commons, L.P.*, 200 B.R. 255 (Bankr. M.D. Fla. 1996). Prior to the bankruptcy filing, the debtor defaulted under its obligations to its senior secured lender. The parties then negotiated an out of court forbearance agreement pursuant to which the debtor would have a certain period of time by which to refinance the lender's debt or sell the property and pay off the lender. Included in the settlement agreement was a contractual waiver of the automatic stay should the borrower later file for bankruptcy relief. The borrower defaulted and the lender sought to foreclose on its collateral. The borrower then filed for bankruptcy relief. *Id.* When determining whether to enforce the stay waiver the court considered *Little Creek* factors and noted that the debtor filing was arguably in bad faith. *Id.* The debtor was a single asset debtor with no employees, no real operations, and engaged in a two party dispute and a workout outside of bankruptcy. The debtor's filing was, for all intents and purposes, an effort to skirt the forbearance agreement to which the parties had previously agreed. *Id.* For those reasons, the court enforced the stay waiver and granted relief from stay. *Id.*

57. Enforcing a contractual stay waiver in the context of forbearance is consistent with other common law. For instance, the Seventh Amendment to the United States Constitution provides litigants with a right to a jury trial. Even so, jury trial waivers are not *per se* unenforceable. Under federal law, parties to a contract may waive the Seventh Amendment right to a jury trial by a prior written agreement entered into knowingly and voluntarily. *BMC Software, Inc. v. Int's Bus. Machines Corp.*, No. H-17-2254, 2018 WL 7291425, at *3 (S.D. Tex. 2018) (citing *Whitney Nat'l Bank v. Air Ambulance by B&C Flight Mgmt*, No. H-04-2220, 2006 WL 3741903, at *3 (S.D. Tex. 2006); *Bethany Hldgs Grp.*, LLC, 801 F. Supp. 2d 224, 229 (S.D. N.Y. 2011)).

58. A contractual waiver of the right to a jury trial is enforceable in federal court, "particularly in contracts between sophisticated commercial parties, when the waiver is made knowingly, intentionally, and voluntarily." *Seven Seas Petrol., Inc. v. CIBC World Mkts Corp.*, 2012 WL

175415, No. 4:08-3048 at *2 (S.D. Tex. 2012) (citing *see Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007); *Whitney Nat'l Bank*, 2006 WL 3741903, at *3); When a party is represented by counsel, circumstances may unquestionably indicate the party's knowing and voluntary waiver of the right to a jury trial. *Jennings v. McCormick*, 154 F.3d 542, 545 (5th Cir. 1998) (citing *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 116 (5th Cir. 1987); *Southland Reship, Inc., v. Flegel*, 534 F.2d 639, 644 (5th Cir. 1976)).

59. Factors considered by courts deciding whether a waiver was made knowingly, intentionally, and voluntarily include: "(1) whether there was gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had an opportunity to negotiate contract terms; and (4) whether the clause containing the waiver was inconspicuous." *Id.* (citing *Whitney Nat'l Bank*, 2006 WL 3741903, at *3).

60. A mere difference in bargaining power does not render a jury waiver unenforceable; the disparity in bargaining power must be extreme. *Westside–Marrero Jeep Eagle, Inc. v. Chrysler Corp.*, 56 F.Supp.2d 694, 707, 709 (E.D. La. 1999) ("To invalidate a waiver provision ... the bargaining differential must be the kind of 'extreme bargaining disadvantage' or 'gross disparity in bargaining position' that occurs only in certain exceptional situations."). When the party opposing the waiver has business experience or is a corporate entity, enforcement of the waiver is favored. *BMC Software*, 2018 WL 7291425, at *4 (citing *Westside-Marrero*, 56 F.Supp.2d at 706). As for negotiation, the issue turns on whether the terms of the agreement were negotiable, not whether the party opposing the waiver actually attempted to negotiate. *Id.* at *3. Moreover, if the party opposing the waiver was the party that drafted the agreement, enforcement of the waiver is supported. *See Id.* Finally, where a waiver provision is conspicuous, enforcement of the waiver is favored. *Id.* at *4. Courts generally consider "(1) the placement of the waiver within its paragraph; (2) the size and style of the print; and (3) the location of the provision within the entire document." *See Id.* (collecting cases).

61. Applying similar factors in this case, and given the context in which the stay waiver was provided, the stay waiver is entirely enforceable. Barton and the Debtor are sophisticated parties familiar with bankruptcy and the implications of a waiver of the automatic stay. They were represented by counsel. The Forbearance Agreement containing the stay waiver was jointly drafted by HN, Barton, and the Debtor's counsel. Barton and the Debtor acknowledge reading and understanding the provisions of the Forbearance Agreement, and consulting counsel regarding same. The stay waiver was included in a Forbearance Agreement, not an original loan document, and were bargained for items of consideration provided in exchange for eight months of additional forbearance. This Court should therefore enforce the stay waiver and grant HN relief from the automatic stay for cause.

***(ii) No Equity and No Reorganization – 362(d)(2)***

62. This Court should also grant HN relief from the automatic stay pursuant to section 362(d)(2) because the Debtor lacks equity in the Property and the Property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). First, there is either no equity in the Property or shortly will be no equity in the Property. While the Debtor has not filed it Schedules, and so has provided no evidence of value, HN has obtained a Broker Opinion of Value and an Appraisal for the Property. Based on those analyses, the Property is likely worth between $35 million and $44 million. As of the Petition Date, Barton and the Debtor owed HN more than $45 million.

63. Second, the Property is not necessary to an effective reorganization. Upon a showing that the Debtor lacks equity in the property, the burden shifts to the Debtor to establish that the Property is "necessary to an effective reorganization." *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 375 (1988). The Debtor must show that the Property "is essential for an effective reorganization *that is in prospect*." *Id.* at 375-76 (emphasis in original). A showing that the Debtor needs the Property for reorganization to be conceivable is insufficient. *See id.* The Debtor must prove that there is a "reasonable possibility of a successful reorganization within a reasonable

time." *Id.* at 376. A debtor does not have a reasonable possibility of successful reorganization within a reasonable time when the debtor merely owns land that does not produce a steady stream of income. *See Little Creek*, 779 F.2d at 1073.

64. As thoroughly detailed throughout this Motion, the Debtor has had more than 2 years to develop the Property, find a buyer, or refinance HN's debt. The Debtor is no closer to success today than it was when it first executed the Note. There is no reorganization in prospect. The Debtor's filing was nothing more than a delay tactic to deprive HN its right to foreclose or file and record its Deed in Lieu. HN therefore requests that this Court grant it relief from the automatic stay.

## C. WAIVER OF THE 14-DAY STAY PURSUANT TO RULE 4001(A)(3)

65. HN requests relief from stay to pursue all of its rights and remedies with respect to the Property as soon as possible to avoid further diminution of its interests. Allowing HN to exercise its rights will resolve substantially all of the Debtor's legitimate claims on an expedited basis. HN therefore requests that the Court waive the 14-day stay on lift stay orders set forth in Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure. An additional 14-day stay would unnecessarily delay HN from exercising its rights against its collateral.

**WHEREFORE**, HN Capital request that the Court enter an order dismissing the Debtor's bankruptcy case pursuant to section 1112 of the Bankruptcy Code or, alternatively, enter an order granting HN relief from the automatic stay so that it may effectuate its remedies under the Forbearance Agreement, Note, Loan Documents, and applicable law without further delay and interference by Barton, the Debtor, or any Barton-affiliated entity.

DATED: November 4, 2021

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: */s/ John J. Kane*
John J. Kane (TX Bar No. 24066794)
R. Hale Neilson (TX Bar No. 24116820)
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Tel.: (214) 777-4200
Fax: (214) 777-4299
E-mail: jkane@krcl.com
E-mail: kwoodard@krcl.com
E-mail: hneilson@krcl.com

***Counsel to HNGH Turtle Creek, LLC***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 4, 2021, a true and correct copy of the foregoing document was filed with the Court and served (i) via the Court's electronic case filing system (ECF) upon all parties receiving such electronic service in this proceeding, and (ii) via e-mail on the parties listed below.

Joyce W. Lindauer
JOYCE W. LINDAUER ATTORNEY, PLLC
1412 Main Street, Suite 500
Dallas, TX 75202
E-mail: joyce@joycelindauer.com

United States Trustee
1100 Commerce Street
Room 976
Dallas, TX 75202
E-mail: ustpregion06.da.ecf@usdoj.gov

*/s/ John J. Kane*
John J. Kane