**LIMITED LIABILITY COMPANY AGREEMENT**

**of**

**[PROJECT NAME] INVESTORS, LLC,**
**a Delaware limited liability company**

THE LIMITED LIABILITY COMPANY INTERESTS REFERENCED HEREIN HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. § 15b ET SEQ., AS AMENDED, OR QUALIFIED UNDER THE DELAWARE SECURITIES ACT OR ANY OTHER STATE SECURITIES LAWS. IT IS UNLAWFUL TO CONSUMMATE A SALE OR OTHER TRANSFER OF THESE SECURITIES OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFROM FROM ANY PERSON OR ENTITY, IN VIOLATION OF THE PROVISIONS OF THIS AGREEMENT AND/OR WITHOUT AN OPINION OF COUNSEL FOR THE COMPANY THAT THE PROPOSED SALE OR OTHER TRANSFER OF THIS SECURITY DOES NOT AFFECT THE AVAILABILITY TO THE COMPANY OF EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION, AND THAT SUCH PROPOSPED SALE OR OTHER TRANSFER IS IN COMPLIANCE WITH ALL APPLICABLE STATE AND FEDERAL SECURITIES LAWS AND THIS AGREEMENT.

**EXHIBIT "19"**

**TABLE OF CONTENTS**

Page

[TBD]

**Schedules and Exhibits**

| | |
|---|---|
| Schedule 2.1 | Member Initial Capital Contributions and Percentage Interests |
| Schedule 6.1(a)(2) | Detailed Description or Chart Showing Ownership of Sponsor Member |
| Exhibit A | Definitions |
| Exhibit B | Description of Major Decisions |
| Exhibit C | List of Major Decisions Already Approved |
| Exhibit D | Approved Business Plan |
| Exhibit E | Approved Project Budget |
| Exhibit F | Capital Accounts; Tax Allocations |

# LIMITED LIABILITY COMPANY AGREEMENT
# of
# [PROJECT NAME] INVESTORS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") is dated as of ______________, 20___ (the "**Effective Date**") and is made by and between [SPONSOR MEMBER LLC], a Texas limited liability company ("**Sponsor Member**") and [AXIOM MEMBER LLC], Delaware limited liability company ("**Axiom Member**"). The address, principal place of business, telephone, and email address of each Member are set forth in Section 14.2. Exhibit A to this Agreement sets forth the definitions of capitalized words and phrases used in this Agreement as well as rules for interpreting other words and phrases.

## RECITALS

WHEREAS, the purpose and business of the Company is to own, directly or indirectly, 100% of the membership interests in the Property Owner, as further described in Section 1.5 hereof;

WHEREAS, the purpose and business of the Property Owner is (i) to own a fee interest in the Property, (ii) to develop and construct on the Property [brief description of the development and construction project] (the "**Project**"), and (ii) to obtain a mortgage loan from the Senior Lender to be secured by such Property as further described in Section 1.5 hereof.

NOW THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Members hereby agree to the following:

## AGREEMENT

## ARTICLE 1
## FORMATION AND ORGANIZATION

Section 1.1. Formation. The Company was formed as a limited liability company on ______________, 20___ by the filing of its Certificate of Formation with the Delaware Secretary of State pursuant to the Delaware Act.

Section 1.2. Basic Rights of Members. The Members hereby enter into this Agreement to set forth certain rights and obligations of the Members, the procedures for managing and operating the Company and related matters. The Members intend and agree that this Agreement is for all purposes the "limited liability company agreement" of the Company as defined in the Delaware Act. Except to the extent stated in this Agreement, (a) the rights and obligations (i) of the Company and its Members and (ii) among the Members and (b) the management, operation, termination and dissolution of the Company shall be governed by the provisions of the Delaware Act.

Section 1.3. Name. The business of the Company shall be conducted under the name "[Project Name] Investors, LLC" or such other name as the Members may hereafter Approve as a Major Decision.

Section 1.4. Term. The existence of the Company commenced on the date of filing its Certificate of Formation and shall terminate on the twenty-fifth (25th) anniversary of the Effective Date



2999TC000618

("Term"), unless terminated or dissolved earlier pursuant to the terms of this Agreement.

Section 1.5. Business. The business of the Company is solely to (a) acquire, own, hold, manage, maintain, sell, exchange and otherwise use the limited liability company interests in the Property Owner, (b) acquire, own, hold, manage, maintain, operate, improve, develop, construct, lease sell, exchange, lease and otherwise use the Property for profit, directly or indirectly through the Property Owner, (c) borrow money and issue evidence of indebtedness to finance the activities set forth in clauses (a) and (b) above, either directly or indirectly through the Property Owner and (d) do any and all other acts or things that may be incidental or necessary to carry on the business of the Company as described in clauses (a), (b) and (c) above. The Company is not authorized to and shall not engage in any business other than as described in this Section.

Section 1.6. Principal Place of Business; Registered Office and Agent. The principal place of business of the Company shall be located at [Sponsor's business address] or at such other location as shall be Approved by the Members. The registered office of the Company in the State of Delaware shall be c/o [Capital Services Inc., 1675 S. State Street, Suite B, Dover, Delaware 19901] and the registered agent for service of process on the Company at its registered office shall be [Capitol Services, Inc].

## ARTICLE 2
## CAPITAL CONTRIBUTIONS

Section 2.1. Initial Capital Contributions. As of the Effective Date, the Members have contributed as capital to the Company the amounts set forth on Schedule 2.1 attached hereto (the "**Initial Capital Contributions**", and for each Member, its "**Initial Capital Contribution**").

(a) Of Sponsor Member's Initial Capital Contribution, a portion has been funded on the Effective Date in the form of cash, and the balance has been previously expended by Sponsor Member on Acquisition Costs approved by Axiom Member, as more particularly set forth on Schedule 2.1 attached hereto. Amounts previously expended on Acquisition Costs shall be deemed for all purposes to have been contributed to the Company on the Effective Date.

(b) Of Axiom Member's Initial Capital Contribution, a portion has been funded on the Effective Date in the form of cash, and the balance has been previously expended by Axiom Member on Acquisition Costs approved by Sponsor Member, as more particularly set forth on Schedule 2.1 attached hereto. Amounts previously expended on Acquisition Costs shall be deemed for all purposes to have been contributed to the Company on the Effective Date.

Section 2.2. Additional Capital Contributions. If the Company does not have sufficient funds to pay any reasonably necessary expenses on the Project (a "**Necessary Expense Shortfall**"), either Member may request in writing that the Members make additional Capital Contributions to the Company of an aggregate amount up to the amount needed to fund such Necessary Expense Shortfall pro rata in accordance with their respective Percentage Interests; provided, however, notwithstanding anything to the contrary in this Agreement, (i) Axiom Member may, but shall not be obligated to, contribute all or any portion of any requested additional Capital Contributions, (ii) Sponsor Member shall be required to fund its portion of additional Capital Contributions pro rata based on its Percentage Interest plus any amount of Axiom Member's portion which Axiom Member declines to fund (per its right to do so), and (iii) Axiom Member's Percentage Interest shall not be diluted for any reason. If Sponsor Member does not fund the requested additional Capital Contributions pursuant to this Section 2.2, Axiom Member shall be entitled to proceed as described in Section 2.3.

(a) Procedure for Funding Additional Capital Contributions. Additional Capital Contributions shall be funded within ten (10) Business Days (or such shorter time period as may be appropriate under the circumstances, but in no event less than five (5) Business Days) after the date of receipt of Notice of the request for such additional Capital Contributions, which Notice shall include a detailed written description of the Necessary Expense Shortfall required to be paid, together with supporting information and data which are reasonably available at such time. If Sponsor Member fails to fund its pro rata portion of the requested additional Capital Contribution plus the pro rata portion of Axiom Member (if and to the extent Axiom Member has declined to fund an Additional Capital Contribution) pursuant to this Section 2.2, Axiom Member shall be entitled to proceed as described in Section 2.3.

(b) Treatment of Additional Capital Contributions. Except for any Priority Additional Capital Contribution (as set forth in Section 2.3), additional Capital Contributions contributed by the Members pursuant to this Section 2.2 shall be treated for all purposes (including with respect to distributions to be made under Article 4) the same as the Initial Capital Contributions made by the Members in accordance with Section 2.1, as of the date of such contribution; provided however, in no event shall the Percentage Interests of the Members change or receive dilution in any respect as a result of additional Capital Contributions made or not made.

Section 2.3. Failure to Make Additional Capital Contributions. Axiom Member shall not be required to make additional Capital Contributions for any reason. If Sponsor Member (referred to in this Section 2.3 as the "**Non-Contributing Member**") does not fund the full additional Capital Contributions in accordance with Section 2.2 within the time specified, then Axiom Member (referred to in this Section 2.3 as the "**Contributing Member**") may, elect to make the additional Capital Contribution to the Company with respect to such capital call on behalf of itself and the Non-Contributing Member for all amounts requested pursuant to Section 2.2 (all such additional Capital Contributions made by Axiom Member being referred to, in the aggregate, as the "**Priority Additional Capital Contribution**"). If the Contributing Member makes a Priority Additional Capital Contribution pursuant to this Section 2.3, then the Contributing Member shall receive distributions with respect to the Priority Additional Capital Contribution as described in Section 4.1(c) and (d) before any distributions are made with respect to other Capital Contributions made by the Members pursuant to Sections 2.1 and 2.2 or any returns thereon.

Section 2.4. Deposit in Operating Account; Credit to Capital Account. Each Capital Contribution by a Member to the Company pursuant to Section 2.1, 2.2 or 2.3 shall be (a) wired to or deposited in the Operating Account of the Company by the Member and (b) credited to the Capital Account of that Member as of the date such Capital Contribution is received by the Company from the Member.

Section 2.5. Return of or on Capital Contributions. Except as otherwise expressly provided in this Agreement, (a) no Member shall receive any return or distribution of its Capital Contributions, (b) no Member shall receive any interest or other return on or with respect to its Capital Contributions and (c) no Member shall be entitled to withdraw any part of its Capital Contributions.

Section 2.6. No Deficit Restoration. No Member shall have any Obligation to restore any deficit in its Capital Account. No allocation to any Member of any loss or deduction, whether attributable to depreciation or otherwise, shall create any Obligation of that Member to the Company or any other Member, even if the allocation reduces such Member's Capital Account or creates or increases a deficit in its Capital Account. The Members intend and agree that no Member shall be

obligated to pay any deficit in its Capital Account to or for the account of the Company or any creditor of the Company.

Section 2.7. No Further Capital Contribution Requirements. Except as stated in this Agreement or as otherwise agreed by all of the Members, no Member shall be required to make any additional Capital Contribution to the Company.

Section 2.8. Guarantee and Indemnity Payments. Any payment made by a Member or any Affiliate thereof pursuant to any guaranty, indemnity or other agreement entered into pursuant to or in connection with the requirements of the Senior Loan Documents or any other Obligation of the Company, the Property Owner or a Member shall not be treated as a Capital Contribution or additional Capital Contribution by such Member and shall not entitle such Member or its Affiliate to reimbursement or indemnification by the Company, the Property Owner or any other Member or its Affiliates in any manner or form.

## ARTICLE 3
## FINANCING AND OTHER CAPITAL TRANSACTIONS

Section 3.1. Approved Financing. The Members hereby Approve the Property Owner's borrowing of up to $[          ] (the **"Senior Loan"**) from [Axiom Financial, LLC] (the **"Senior Lender"**) pursuant to the Senior Loan Documents.

Section 3.2. Execution of and Compliance with Senior Loan Documents.

(a) Execution. If the Senior Loan has been Approved as a Major Decision, the Manager is hereby authorized to execute and deliver all Senior Loan Documents evidencing or securing such Senior Loan. The Manager agrees to ensure that the Senior Loan Documents reflect in all material respects the terms and conditions Approved by the Members as a Major Decision.

(b) Compliance. The Manager shall use its good faith efforts to cause the Company and the Property Owner to comply with all covenants, terms, and conditions of all Senior Loan Documents to the extent that the Company and the Property Owner have the financial and other resources available to do so.

(c) Limitations on Debt. Except as Approved by the Members as a Major Decision and except for trade debt incurred in the ordinary course of business that is otherwise consistent with the Approved Budget and the Senior Loan Documents, neither the Company nor the Property Owner shall incur any debt, secured or unsecured, direct or contingent (including guaranteeing an Obligation of any Person) other than the Senior Loan.

(d) Closing Documents. The Manager agrees to deliver to the Axiom Member, upon request by the Axiom Member, promptly after the closing of the Senior Loan (1) a complete set of all applicable Senior Loan Documents and (2) a certificate in which the Manager represents to the Axiom Member that the Senior Loan Documents reflect in all material respects the terms and conditions approved by the Members as a Major Decision.

(e) Guarantees. Sponsor Principals shall provide all guarantees and other credit enhancements that are required by the Senior Lender under the Senior Loan Documents, including, without limitation any limited or springing recourse guarantee, environmental indemnity and completion guarantee.

Section 3.3. Additional Financing and Refinancing of Senior Loan.

(a) Additional Financing. Subject to Section 3.4, whenever Approved by the Members as a Major Decision, the Manager shall use its best efforts to cause the Company or the Property Owner to obtain new financing from, or to refinance all or part of the Senior Loan with, an institutional or other lender and in an amount and on such other terms and conditions as are Approved by the Members as a Major Decision.

(b) Guarantees. In addition to the guarantees and indemnities required pursuant to Section 3.2(e) above, the Sponsor Member and the Sponsor Principals shall provide such guarantees and other credit enhancements as are required by a new lender pursuant to the loan documents under any new financing or refinancing of Senior Loan, including any limited or springing recourse guarantee, environmental indemnity and, if applicable, completion guarantee. The Axiom Member and its Affiliates shall have no responsibility or obligation for providing any guarantees or other credit enhancements in connection with any new financing or refinancing of the Senior Loan.

(c) Transfers. The Sponsor Member shall utilize its commercially reasonable efforts to ensure that the loan documents under any new financing or refinancing of the Senior Loan permit (1) the Axiom Member or any Affiliate to have the right, but not the obligation, to remedy any default by the Company under the loan documents for the new financing or the refinancing of Senior Loan prior to Lender exercising any remedies thereunder resulting from such default; provided that (i) in the case of any such default that constitutes a payment default, the opportunity so afforded to the Axiom Member or any Affiliate to effect a remedy shall not be less than the period ending five (5) days from the date of notice thereof by the relevant lender to the Axiom Member and (ii) in the case of any other default, the opportunity so afforded to the Axiom Member or any Affiliate to effect a remedy shall be not less than the period ending thirty (30) days from the date of notice thereof by the relevant lender to the Axiom Member specifying such default or defaults, (2) Transfers between the Axiom Member and the Sponsor Member (whether voluntary or pursuant to any provision of this Agreement), (3) Transfers by the Axiom Member to its Affiliates, (4) any and all Transfers permitted pursuant to Section 8.2(a) of this Agreement, (5) the removal of the Sponsor Member as Manager as provided in Section 5.5, (6) pledge of the Axiom Member's Membership Interest at any time or from time to time to secure the issuance of commercial securities sponsored by an Axiom Affiliate or with respect to cash management facilities of an Axiom Affiliate without the consent of the relevant Lender and (7) the replacement of any property manager of the Property Approved by the Members as a Major Decision or by the Axiom Member in its sole discretion following the occurrence of a Removal Event or any uncured breach under the Property Management Agreement by the Property Manager (if the Property Manager is an Affiliate of the Manager), with any replacement to be selected by the Axiom Member subject to the reasonable approval of the relevant lender to the extent required under the loan documents for the new financing or the refinancing of Senior Loan.

Section 3.4. Acknowledgment of Affiliate Relationship between Axiom Member and Senior Lender. The Sponsor Member and the Sponsor Principals each expressly acknowledge and agree that (a) the Senior Lender providing the Senior Loan for the Project is an Axiom Member Affiliate, (b) the terms of the Senior Loan are the same or better than current market terms, including without limitation (1) the terms of the conditions to making of the Senior Loan, (2) any required loan-to-value ratio, debt service coverage ratio, debt yield, or like condition, (3) the term of the Senior Loan and any extension rights, (4) the interest rate, (5) any prepayment rights, (6) any origination, exit and other fees, (7) any material financial and performance covenants, and (8) any required reserves, holdbacks and/or escrows, and (c) notwithstanding any other provision of this Agreement, any other agreement, or applicable law: (1) the

Axiom Member and Senior Lender are separate and distinct legal entities with different investment goals and objectives, (2) the Senior Loan Documents are legal, valid, and binding obligations of the Company and/or the Property Owner and, where applicable, the Sponsor Member and the Sponsor Principals, enforceable against each of them in accordance with their respective terms, (3) the Senior Lender may exercise all of its rights, privileges, and benefits and enforce all remedies and other provisions under the Senior Loan Documents without regard to the fact that the Axiom Member is a Member of the Company, the Sponsor Member is a Member of the Company, or the Sponsor Principals are Affiliates of the Company, (4) no act or failure to act by the Senior Lender shall be attributed to the Axiom Member or considered or deemed to be the act or failure to act of the Axiom Member or a breach or failure by the Axiom Member of any provision of this Agreement or of any fiduciary, contractual, good faith, fair dealing, or other express or implied covenant or other Obligation of the Axiom Member to the Company, the Property Owner, any Member, any Affiliate of a Member or Third Party, (5) no act or failure to act by the Axiom Member shall be attributed to the Senior Lender or considered or deemed to be the act or failure to act of Senior Lender, (6) the Axiom Member shall have no duty or other Obligation to cause or permit the Company and/or the Property Owner to default or fail to comply with any provision of the Senior Loan Documents, and (7) neither the Company nor the Property Owner, any Member, Sponsor Principals or Affiliate of any of them shall assert any claim, counterclaim, defense allegation, offset, action or liability against the Axiom Member, the Senior Lender, or any of their Affiliates based on or involving the relationship of the Axiom Member and the Senior Lender or arising or based upon any other matter whatsoever relating to the matters set forth in this Section 3.4.

## ARTICLE 4
## DISTRIBUTIONS

Section 4.1. Distributions of Available Cash from Operations and Net Capital Transaction Proceeds.

(a) Timing. Distributions shall be made to the Members only after the Company and Property Owner have paid all Company Costs then. Distributions of Available Cash from Operations shall be made on a monthly basis on each Distribution Date and at such other times as the Members shall determine as a Major Decision. Distributions of Net Capital Transaction Proceeds shall be made promptly after the Company receives such Net Capital Transaction Proceeds.

(b) General Priority Rules. All distributions of Available Cash from Operations and Net Capital Transaction Proceeds shall be made in the order of priority shown in subsections (c) and (d), respectively. The Members identified at each level of priority shall (1) receive distributions at the same time without preference or priority of one Member over another until all Members at that level have received the full amount to which they are entitled and before any distributions are made or paid to any Members for amounts in a lower level of priority and (2) if distributions at a priority level described in subsection (c) or (d) are not sufficient to pay each Member the full amount to which it is entitled, distributions shall be made to each Member on a *pro rata* basis in the same ratio that its Capital Contributions to the Company bears to all Capital Contributions made by all Members referred to in that priority level.

(c) Specific Payment Priorities for Available Cash From Operations. Available Cash from Operations shall be distributed to the Members in the following order of priority to the extent such amounts have not already been paid or returned pursuant to Section 4.1(d):

(1) First, if Axiom Member has made any Priority Additional Capital Contributions, to Axiom Member in an amount equal to the Priority Preferred Return on any unreturned Priority Additional Capital Contributions of Axiom Member;

(2) Then, if Axiom Member has made any Priority Additional Capital Contributions, to Axiom Member until Axiom Member has received a return of all of its Priority Additional Capital Contributions;

(3) Then, to Axiom Member, until Axiom Member has been distributed in full an amount equal to the Preferred Return on any unreturned Capital Contributions;

(4) [Then, to Axiom Member, until Axiom Member has received a return of all of its Capital Contributions;]

(5) [Then, to Sponsor Member, until Sponsor Member has received a return of all of its Capital Contributions;]

(6) Then, pro rata to the Members according to their Percentage Interests, until Axiom Member has been distributed in full an amount necessary to achieve an IRR of ________ percent (___%) on its Initial Capital Contribution;

(7) Then, ________ percent (___%) to Sponsor Member and ________ percent (___%) to Axiom Member, until Axiom Member has been distributed in full an amount necessary to achieve an IRR of ________ percent (___%) on its Initial Capital Contribution set forth in Section 2.1; and

(8) Finally, the balance, if any, ________ percent (___%) to Sponsor Member and ________ percent (___%) to Axiom Member.

(d) Specific Payment Priorities for Net Capital Transaction Proceeds. Net_Capital Transaction Proceeds shall be distributed to the Members as set forth in Section 4.1(c) to the extent such amounts have not already been paid or returned pursuant to Section 4.1(c).

## ARTICLE 5
## MANAGEMENT OF COMPANY

Section 5.1. Role of Members.

(a) The Manager shall manage and conduct the day-to-day operations and related contractual, financial, and other affairs of the Company, the Property Owner, and the Property in accordance with the terms of this Agreement and, except for Major Decisions, make all decisions with respect thereto. Each Member shall othwerise have all the rights, powers, duties, and obligations of a member under the Delaware Act and as provided by other applicable law.

(b) Proof of Authority. In dealing with the Manager acting on behalf of the Company or the Property Owner, no Person shall be required to inquire into the authority of the Manager to bind the Company or the Property Owner. Persons dealing with the Company or the Property Owner are entitled to rely conclusively on the power and authority of the Manager as set forth in this Agreement or in any power of attorney, resolution, or other document delivered by the Manager. This Section shall not, however, relieve the Manager of any Obligation to the Company, the Property

Owner, or the Members resulting from or arising out of any action by the Manager without any Approval of the Members required under this Agreement.

Section 5.2. Major Decisions.

(a) Definition. Major Decisions requiring the Approval of the Members are set forth and described in Exhibit B to this Agreement.

(b) Proposal. Either Member may propose to adopt, modify, or revoke a Major Decision at any time. Whenever a Member proposes to adopt, modify, or revoke a Major Decision, it shall deliver a written Notice to the other Member (1) describing the proposal in sufficient detail and (2) containing sufficient information to permit the other Member to make an informed decision on the proposal and shall subsequently provide to the other Member such additional information as the other Member may reasonably request.

(c) Review. Each Member shall promptly consider and evaluate each proposal to adopt, modify, or revoke a Major Decision and shall promptly give its decision (set forth in writing) after it has analyzed all relevant information or data required to be delivered to it under Section 5.2(b). The Parties expressly acknowledge that any approval of a proposed Major Decision is subject to the standards stated in Section 9.1(c). A Member who disapproves a Major Decision shall briefly state in a written Notice to the other Member the specific reasons for its disapproval and, to the extent appropriate, the changes in the proposed Major Decision that would make it acceptable.

(d) Approval. The adoption, modification, or revocation of a Major Decision requires the Approval of each Member who is entitled to Approve a Major Decision. As of the Effective Date, the Sponsor Member and the Axiom Member are each entitled to Approve a Major Decision. The Sponsor Member shall no longer have the right to Approve a Major Decision under the circumstances described in Section 5.5. Any Major Decision Approved in accordance with this Section shall bind the Company and its Members, unless it is later amended, modified, or revoked as a Major Decision.

(e) Major Decisions Already Approved. Exhibit C attached to this Agreement describes specified Major Decisions that have already been approved by the Members as of the Effective Date.

(f) No Action Unless Major Decision Approved. Neither the Manager nor any other Member shall have any right or power either on behalf of the Company or the Property Owner or on its own behalf to make any commitment or engage in any undertaking or action that requires Approval of a Major Decision unless or until such Major Decision has been Approved in writing by each Member.

(g) Deadlock. A "Major Decision Deadlock" shall be deemed to exist if, after receiving a Notice proposing a Major Decision: (1) the Members entitled to vote on a proposed Major Decision have failed for any reason to mutually agree on accepting or rejecting the Major Decision for at least thirty (30) days after the Major Decision was initially proposed and (2) one Member has notified the other Member in writing (a "**Deadlock Notice**"), given at any time before or after (i) the end of such 30-day period or (ii) delivery of the written Notice required under Section 5.2(c)), that continuing failure to agree on the proposed Major Decision will constitute a Major Decision Deadlock for purposes of this Agreement unless the Major Decision is agreed upon by the later of (y) five (5) days after the other Member's receipt of the Deadlock Notice or (z) the end of the 30-day period described above.

(h) Implementation. The Manager shall implement fully each Major Decision Approved by the Members in accordance with this Section and shall outline the status of implementation of Major Decisions as part of its Monthly Statement pursuant to Section 11.3(a).

(i) Amendment, Modification, or Revocation. Once a Major Decision has been Approved as described in subsection (d), it cannot be amended, modified, or revoked unless each Member entitled to Approve Major Decisions has Approved that course of action as a Major Decision.

Section 5.3. Agreements with Affiliates of Sponsor Member.

(a) Approval. Any agreement (**"Affiliate Agreement"**) between the Company or the Property Owner and a Person who is an Affiliate of the Sponsor Member (**"Sponsor Affiliate"**), and any amendment or modification of or waiver of any provision or right arising under an Affiliate Agreement, must be Approved by the Axiom Member prior to such Affiliate Agreement or amendment, modification, or waiver thereof being effective or binding upon the Company or the Property Owner.

(b) Action under Affiliate Agreement. Any approval, consent, decision, waiver, notice of default, or termination, or other action by or on behalf of the Company or the Property Owner under an Affiliate Agreement must be Approved by the Axiom Member. The Axiom Member, in its sole and absolute discretion, may on behalf of the Company or the Property Owner or in its own name implement, enforce, or take any termination or other enforcement action that arises under each Affiliate Agreement, without the participation or Approval of the Sponsor Member.

(c) Replacement. If the Sponsor Member is removed as the Manager pursuant to Section 5.5, the Axiom Member shall have the sole right and authority to act on behalf of the Company and the Property Owner without the participation or Approval of the Sponsor Member (1) to terminate all Affiliate Agreements with each Sponsor Affiliate (with no termination or any other type or form of penalty, fee, or other compensation being paid to the Sponsor Affiliate) upon written Notice to the Sponsor Member and the Sponsor Affiliate and (2) to replace it with an agreement with another Person who is not an Affiliate of Sponsor Member. Each Affiliate Agreement shall provide for the termination right described in this subsection.

(d) Enforcement. The Axiom Member, in its own name or through or on behalf of the Company or the Property Owner and at the expense of the Company, shall have the sole right and authority to enforce the provisions of any Affiliate Agreement against the Sponsor Affiliate by all appropriate methods, including the commencement of legal or other proceedings against the Sponsor Affiliate, without the participation or Approval of the Sponsor Member. Any breach of subsection (a), (b), or (c) above shall result in such action, amendment, modification, or waiver being null and void. The costs and expenses related to a breach or enforcement of this Section 5.3 shall be borne by the breaching Member and not by the Company, the Property Owner, or any other Member.

Section 5.4. Manager.

(a) Appointment. The Members hereby appoint the Sponsor Member as the initial Manager of the Company. The Sponsor Member hereby agrees to serve in that capacity pursuant to the terms and conditions of this Agreement.

(b) General Duties. The Manager is authorized and directed to carry out the Approved Business Plan, the Approved Budget, and such other Major Decisions that have been

Approved by the Members. In addition, the Manager shall have the responsibility, obligation, and authority to conduct the day-to-day operations of the Company and the Property Owner and to make and implement decisions on behalf of the Company and the Property Owner with respect to the day-to-day operations of the Company and the Property Owner, in each case so long as its actions are in accordance and consistent with the terms of this Agreement, the Approved Business Plan, the Approved Budget and such other guidelines or policies as have been previously Approved by the Members as a Major Decision for the operation, development, and maintenance of the Company, the Property Owner and the Property.

(c) Specific Duties of Manager. The Manager agrees that, in addition to any obligations and responsibilities set forth elsewhere in this Agreement, the Manager shall be responsible to carry out and implement, in each case pursuant to and in accordance with the terms of this Agreement and Applicable Law, the following items:

(1) preparing the Business Plan pursuant to Section 5.7 and the budgets pursuant to Section 5.8;

(2) causing the Company and the Property Owner to comply with the provisions of the Senior Loan Documents, any leases, any property management or service agreements covering the Property, and all other agreements and contracts binding on the Company, the Property Owner, or the Property;

(3) causing the Company and the Property Owner to comply with all environmental, health and safety, antidiscrimination, antitrust, zoning and other legal requirements applicable to the Company, the Property Owner, or the Property;

(4) paying (or causing to be paid), prior to delinquency, all insurance premiums, debts, and other obligations of the Company and the Property Owner, including amounts due under any loans to the Company or the Property Owner previously Approved in accordance with this Agreement and costs of the operation and maintenance of the Property;

(5) performing all other services reasonably necessary or required for the ownership, maintenance, marketing, and operation by the Company and the Property Owner of the Property or otherwise required to be performed by the Manager pursuant to this Agreement;

(6) preparing and distributing to Axiom Member of the Monthly Statements and the Quarterly Transaction Reports described in Section 11.3;

(7) preparing and distributing to Axiom Member of the Annual Report of the Company described in Section 11.4;

(8) notifying the Axiom Member in writing promptly upon becoming aware of any material non-compliance, default, or breach under any contract binding upon or affecting the Company, the Property Owner, or the Property by the Company, the Property Owner, or the other Person(s) who are parties to such contract;

(9) distributing to the Axiom Member of (i) all material operating, financial, and other reports and statements and all other documents and Notices sent by or on behalf of the Company, the Property Owner, or the Manager to any Lender simultaneously with the

delivery of such request to the Lender, and (ii) notices of default and all other material notices, demands, requests, documents, and other written communications received by the Company, the Property Owner, or the Manager from any Lender to the Company, the Property Owner, or any Person or agent acting on behalf of the Lender promptly upon receipt (but in no event later than two (2) Business Days following receipt);

(10) within two (2) Business Days following receipt, distributing to the Axiom Member (i) all operating, financial, and other reports and statements and all other documents and material notices sent to the Company, the Property Owner, or the Manager by any property manager or developer for the Property and (ii) notices of default and all other material notices, demands, requests, documents, and other written or material oral communications sent by or on behalf of the Company, the Property Owner, or the Manager to any property manager or developer for the Property;

(11) notifying the Axiom Member in writing simultaneously with any notification to any insurance carrier who insures the Company, the Property Owner, or the Property and to the Axiom Member regarding any occurrence, claim, or potential claim that may be covered by insurance;

(12) applying for and using reasonably diligent efforts to obtain any and all necessary consents, approvals, and permits required for Project construction, any future renovation or rehabilitation thereof, and for the occupancy and operation of the Project;

(13) supervising and managing the performance of all contractors performing construction and related work including direct observation, inspection, and supervision during the progress thereof, making final inspection of the completed work, and approving bills for payment; obtaining the necessary receipts, releases, waivers, discharges, and assurances to keep such Property free from mechanics' and materialmen's liens and other claims;

(14) verifying that appropriate insurance (including any required by the terms of the Senior Loan) is maintained by each contractor performing work on such Property under a contract with the Company or the Property Owner;

(15) monitoring the performance of the architect, construction consultant, and all other third party consultants;

(16) obtaining and maintaining insurance for the Company, the Property Owner and the Property as described in each Approved Budget and in accordance with the requirements of the Senior Loan;

(17) simultaneous, written notification to the Axiom Member of any lawsuit, arbitration, or other legal or equitable proceeding that has been commenced or threatened against the Company, the Property Owner, the Property, or any Member; and

(18) taking any other action that is reasonably requested by the Axiom Member and that does not require approval as a Major Decision.

(d) Fidelity Insurance. The Manager, at the expense of the Company and the Property Owner, shall maintain in effect a fidelity insurance policy naming the Company as loss payee,

affording coverage for all directors, officers, employees, and Affiliates acting on behalf of the Manager.

(e) Expenses. The amounts expended by any Member to comply with its Obligations pursuant to this Agreement shall not be treated or deemed to be a Capital Contribution by that Member to the Company or the Property Owner under this Agreement, unless that treatment has been expressly authorized under this Agreement or Approved by the Members as a Major Decision.

(f) Resignation. The Manager then serving may not resign without the consent of the Axiom Member. Upon such resignation, the Axiom Member shall be entitled to elect either to become the Manager or to hire another Person (who may be an Axiom Affiliate) in its sole discretion who will serve as the Manager at the cost and expense of the Company and on terms reasonably acceptable to the Axiom Member and that are otherwise consistent with the terms of this Agreement.

Section 5.5. Removal of Manager.

(a) Grounds for Removal. Subject to the notice and cure rights described in subsection (b) below, the Axiom Member shall have the right to remove the Manager for cause by delivering to it a written Notice of removal and stating the grounds for removal, which must be based upon or related to one or more of the following (each, a "**Removal Event**"):

(1) the material breach of any provision of this Agreement by the Manager (including, without limitation, any provision concerning bankruptcy, minimum Sponsor Member or Sponsor Principal equity, or Transfers);

(2) the Manager causes or permits the Company or the Property Owner to sign any document, make any payment, or take any other action that requires the approval as a Major Decision without first obtaining such approval in accordance with Section 5.2;

(3) any fraud, gross negligence, or willful misconduct by the Manager, Sponsor Principals, or any Affiliate thereof in its or their performance of duties, obligations, or covenants under this Agreement;

(4) a default or event of default (in each case, after any required notice of default has been given and any applicable grace period has expired), by the Company or the Property Owner under any Senior Loan Document, lease, or other material agreement of the Company or the Property Owner other than a default or event of default that is directly caused by the Axiom Member;

(5) any intentional breach or unintentional material breach by the Sponsor Member or any Sponsor Principal of any representation or covenant by any of them set forth in this Agreement;

(6) any default (after any required notice of default has been given and any applicable grace period has expired) under any guaranty or other credit enhancement provided by Sponsor Member or any Sponsor Principal pursuant to the Senior Loan Documents, or the failure to provide any guaranty, indemnity, or other credit enhancement required by this Agreement; or

(7) the failure to approve a Business Plan pursuant to Section 5.7 or the failure to comply with a then-effective Business Plan.

(b) Notice and Cure Periods. If (1) the cause or grounds for removal under subsection (a)(1) or (6) is based solely upon an unintentional breach of this Agreement or negligence, (2) such breach or negligence can be cured within thirty (30) days after the date of receipt by the Manager of the Notice of removal, and (3) the Manager gives the Axiom Member a written undertaking to cure such matter within such 30-day period, then the Manager shall have such 30-day period in which to cure the cause or grounds for removal or, if the Manager requests additional time for completing the cure, such additional time as shall be Approved by the Axiom Member but in no event more than ninety (90) days after the receipt by the Manager of the original Notice of removal from the Axiom Member; provided, however, such extension of the cure period shall not be granted if the Axiom Member reasonably determines that such extension will jeopardize the ability of the Company or the Property Owner to timely cure a default under any Senior Loan. The costs and expenses of any such cure (A) shall be paid solely, fully, and directly by the Manager from its own funds and not by the Company, the Property Owner, or any other Member and (B) shall not be treated as an additional Capital Contribution or loan to the Company, the Property Owner, or any other Member. If any cost or expense related to any such cure is paid or required to be paid by the Company, the Property Owner, or Axiom Member, Sponsor Member shall, from its own funds, promptly reimburse the full amount so paid by such Person, together with interest on that amount at a rate equal to the Priority Preferred Return.

(c) Effect of Removal. If the cause or grounds for removal of the Manager is not cured within the time period permitted in subsection (b) above or is not otherwise afforded any Notice, grace, or cure period with respect to such action or occurrence, the Sponsor Member shall automatically be removed as the Manager and shall be replaced in that capacity by the Axiom Member, unless the Axiom Member sends written Notice waiving such termination. The Axiom Member shall thereafter have sole authority to act as Manager of the Company. Upon removal pursuant to this Section 5.5, (1) the Sponsor Member shall no longer have any power or authority to act as Manager pursuant to this Agreement and shall no longer be permitted to participate in any managerial decision affecting the Company, the Property Owner or the Property, including without limitation any Major Decision, and (2) distributions pursuant to Sections 4.1[(c)(7), (c)(8), (d)(7), and (d)(8)] shall be made in accordance with the respective Percentage Interests of the Members. In addition, the Axiom Member shall, and shall cause its Affiliates to (i) use commercially reasonable efforts to obtain the release of any Affiliate of Sponsor Member as guarantor under any guarantees or indemnities executed in connection with any Senior Loan, at no unreimbursed cost to the Company, the Property Owner, or Axiom Member, and (ii) if the Axiom Member is unsuccessful in obtaining such release despite such efforts, then an Axiom Indemnitor shall indemnify and hold harmless the Sponsor Member and its Affiliates with respect to any and all Losses arising only from events occurring after removal of Sponsor Member as the Manager. The Sponsor Member shall, however, continue to have all other rights and Obligations of a Non-Manager Member under this Agreement.

Section 5.6. Removal of Persons Affiliated with Manager. The Axiom Member on its own behalf or on behalf of Company shall have the right in its sole and absolute discretion to terminate any Affiliate Agreement and replace any property/construction/development manager, leasing agent, or any other Person who has previously been retained by the Company to perform services with respect to the Property or the Company and who is Affiliated with the Sponsor Member if the Sponsor Member is removed as the Manager as described in Section 5.5. The foregoing right may be exercised whether or not such Sponsor Affiliate is in default under any agreement or with respect to any Obligation it owes to the Company or the Property.

Section 5.7. Business Plan.

(a) Approved Business Plan. Attached as Exhibit D to this Agreement is the initial Approved Business Plan for the Property.

(b) Revised Business Plan. At least sixty (60) days prior to the end of the time period covered by the Approved Budgets in the first Approved Business Plan and each subsequent Approved Business Plan (such end of the time period being referred to herein as the "**Plan Modification Deadline**"), the Manager shall evaluate the existing Approved Business Plan for the Property and prepare and submit to the Axiom Member any modifications or amendments (if any) that it proposes to make to the existing business plan, together with a detailed written analysis as to why such modifications or amendments are necessary, appropriate, and advantageous. The Axiom Member shall either approve in writing the proposed amendments and modifications with respect to the existing business plan or provide comments to the Manager either orally or in writing or both no later than thirty (30) days after the submission of the proposed changes. If requested by the Axiom Member, the Manager shall meet with the Axiom Member to discuss the proposed amendments and modifications, shall furnish promptly any additional information or explanations requested by the Axiom Member, and shall make any amendment or modification in accordance with the comments or directions of the Axiom Member. The Manager shall submit to the Axiom Member the revised business plan reflecting all agreed upon changes no later than fifteen (15) days after the Axiom Member response. The Axiom Member shall then Approve the revised business plan or submit its final objections to and comments on the proposed amendments or modifications to such business plan to the Manager no later than ten (10) days before the Plan Modification Deadline.

(c) Failure to Agree on Proposed Amendments and Modifications to Business Plan. If the Axiom Member fails for any reason to Approve all or part of a proposed amendment or modification to the Approved Business Plan by the Plan Modification Deadline, the portions of the proposed amendments or modifications that have been Approved shall become effective on the Plan Modification Deadline. The portions of the prior Business Plan that are equivalent to the portions of the proposed business plan that were not Approved shall remain in effect and shall be carried over into the following Fiscal Year. Any Company Costs in the portion(s) of the prior Business Plan so carried over, shall be increased by the percentage increase in the Consumer Price Index during the prior Fiscal Year. The portions of the proposed Business Plan that are not in the prior Business Plans and have not been Approved, shall be deemed not Approved and shall not be part of the Approved Business Plans until such time as they have been Approved by the Members. The portions of the proposed Business Plan that have been Approved, together with the portions of the existing Business Plan that are so carried over, shall constitute the Approved Business Plan for the following Fiscal Year.

(d) Format. The Business Plan shall be prepared in accordance with a format approved by the Axiom Member, and shall include, as and when appropriate from time to time given the current phase of the Project, a development and construction plan, a proposed marketing and leasing plan, leasing guidelines, a description of anticipated capital improvements, repairs, and maintenance, a schedule for refinancing the Senior Loan, a plan for sale of the Project or any component thereof, the expected sales price on the projected date of disposition, and such other information as the Axiom Member shall reasonably request.

(e) Implementation. The Manager shall use its commercially reasonable efforts to implement and comply with the Approved Business Plan.

Section 5.8. Budget.

(a) Initial Approved Budget. Attached as Exhibit E to this Agreement is the initial Approved Budget for the Project.

(b) New Budgets. At least sixty (60) days before the Plan Modification Deadline, the Manager shall prepare and submit to the Axiom Member for its approval updated operating and capital expenditure budgets for the Company, the Property Owner, and the Property, projecting all revenues expected to be received and all costs and expenses expected to be incurred during the following Fiscal Year, including repair and maintenance costs, together with projected leasing activity and occupancy, if any. The Manager shall explain in footnotes to each proposed budget in reasonable detail any assumptions used in projecting such costs, including all operational costs, real estate taxes, insurance and general and administrative costs, and proposed capital expenditures, and a comparison of projected revenues and expenses against the prior Fiscal Year's actual costs (including an explanation of material deviations). Such budget shall be supplemented by such information as the Axiom Member may reasonably request from time to time. Such proposed budget shall, upon its Approval by the Axiom Member, become the "Approved Budget" for the Company, the Property Owner, and the Property.

(c) Failure to Agree on Updated Budgets. If the Axiom Member fails for any reason to Approve all or part of a proposed amendment or modification to any Approved Budget by the Plan Modification Deadline, the portions of the proposed amendments or modifications that have been Approved shall become effective on the Plan Modification Deadline. The portions of the last Approved Budget that are equivalent to the portions of the proposed budget that were not Approved shall remain in effect and shall be carried over into the following Fiscal Year. Any Company Costs in the portion(s) of the prior Approved Budget so carried over shall be increased by the percentage increase in the Consumer Price Index during the prior Fiscal Year. The portions of the proposed budget that are not in the last Approved Budget and have not been Approved, shall be deemed not Approved and shall not be part of the Approved Budget until such time as they have been Approved by the Members. The portions of the proposed budget that have been Approved, together with the portions of the existing Approved Budget that are so carried over, shall constitute the Approved Budget for the following Fiscal Year.

(d) Implementation. The Manager shall use commercially reasonable efforts to avoid causing the actual costs of ownership, operation, and management of the Company, the Property Owner, or the Property to exceed the Approved Budget for the Company, such Property Owner, or such Property, as applicable, either in total or in any one accounting category or line item. Any expense in connection with the ownership, development, construction, operation, and management of the Property causing or likely to cause a variance of the lesser of (1) $25,000 or (2) five percent (5%) or more in any one Approved Budget category or line item for a particular year-to-date or cause the Approved Budget "total" line item to be exceeded by seven and one-half percent (7.5%) or more shall be promptly explained to the Members by the Manager as a part of the Manager's Monthly Statement pursuant to Section 11.3. All payments of Company Costs must be charged to the proper accounting category as Approved by the Members. The Manager shall secure the prior written Approval of the Axiom Member before expending, obligating the Company or the Property Owner for or approving any expenditure in connection with the ownership, operation, and management of the Property, the Property Owner, or the Company that would result in an Approved Budget line item or category being exceeded ("**Cost Overrun**") by the lesser of (1) [$25,000] or (2) [five percent (5%)] or more in that line item or category of the Budget or category of an Approved Budget or an Approved Budget "total" line item to be exceeded by [seven and one-half percent (7.5%)] or more unless such Cost Overrun is caused by or results from a Fixed Cost described in subsection (e) or an Emergency Cost described in subsection (f). If the Manager pays any Company Cost in excess of the amounts permitted by the Budget without so obtaining the Approval of the Axiom Member, such action shall be deemed a breach of this Agreement and (x) the

Manager shall promptly deliver to the Axiom Member a Notice describing the nature and amount of any Cost Overrun that has been so paid and (y) such breach shall constitute a Removal Event pursuant to Section 5.5.

(e) Fixed Cost. The Manager may make or cause to be made any expenditure not contemplated by an Approved Budget that is an expense of the following type (**"Fixed Cost"**): (1) a cost or expense that the Manager cannot reasonably control, including, but not limited to, utility costs, insurance premiums, and real estate taxes or (2) is incurred pursuant to and in accordance with any lease, contract, or agreement that (x) was previously Approved by the Members, (y) is binding on the Company or the Property Owner, and (z) is not being paid to the Sponsor Member, the Sponsor Principals, or any of their Affiliates.

(f) Emergency Cost. Where emergency action is necessary to prevent imminent risk to health and safety to Persons on or about the Property, imminent property damage, imminent imposition of criminal or civil sanctions against the Company, the Property Owner, or any Member, or the filing of a Lien against the Property by a Third Party (an **"Emergency Cost"**), either Member may make, or cause to be made, expenditures not contemplated by the Approved Budget if (1) any expenditure made without the Approval of the Axiom Member is, in the Manager's good faith judgment, commercially reasonable and necessary under the circumstances set forth above and (2) the Manager endeavors diligently and in good faith (y) to notify the Axiom Member of any such emergency and (z) obtain verbal Approval for any required expenditure.

(g) Notice of Permitted Payments. The Manager shall promptly give Notice to the Axiom Member of payment of any Cost Overrun permitted by subsection (d), any Fixed Cost permitted by subsection (e) or any Emergency Cost permitted by subsection (f) and shall include reference to each such payment in its next Monthly Statement pursuant to Section 11.3, together with explanatory notes on the reason for such cost overruns.

Section 5.9. Other Disclosures. The Manager shall keep the Axiom Member informed of any material fact, information, project, litigation, employee relations, or other matter of which the Manager has actual knowledge (either directly or through an Affiliate) and which could reasonably be expected to have a material impact on the operations or financial position of the Property, the Property Owner, or the Company. The Manager shall provide all material information relating to the Property or the management or operation of the Property as any Member may reasonably request from time to time.

Section 5.10. Power of Attorney. Each Member hereby irrevocably constitutes and appoints the Manager as its true and lawful attorney-in-fact, with full power of substitution, in its name, place, and stead to make, execute, sign, acknowledge, record, and file, on its behalf and on behalf of the Company or the Property Owner, the following:

(a) A Certificate of Formation, a Certificate of Doing Business Under an Assumed Name, a Certificate of Qualification to Do Business, and any other certificates or instruments that may be required to be filed by the Company, the Property Owner, or any of the Members under the laws of the State of Delaware and any other jurisdiction whose laws may be applicable to the operation and maintenance of the Property;

(b) A Certificate of Cancellation of the Company or the Property Owner and such other instruments as may be deemed necessary or desirable by the holder of such power upon the dissolution of the Company or the Property Owner; and

(c) Any amendment of the instruments described in subsections (a) and (b) above, provided such amendments are either required by law to be filed or have been authorized by the particular Member or Members whose authorization is required.

The foregoing grant of authority (1) shall survive the Transfer by a Member of the whole or any portion of its Membership Interest, (2) is a special power of attorney coupled with an interest, is irrevocable and shall survive the bankruptcy or liquidation of any Member granting such power, (3) may be exercised by any replacement to the initial Manager serving in such capacity pursuant to the terms of this Agreement, and (4) may be exercised by the holder on behalf of each Member by a facsimile signature or by listing all of the Members executing any instrument with a single signature as attorney-in-fact for all of them. The provisions of this Section shall survive the expiration or other termination of this Agreement. The Manager shall give Notice to the other Members at least three (3) Business Days prior to the exercise of any authority described in this Section stating the purpose of that exercise.

Section 5.11. Fees to Members.

(a) Sponsor Member Fees. [TBD]

(b) Axiom Member Fees.

(1) On the Effective Date, the Axiom Member shall receive an origination fee payable by the Company in an amount equal to [______ percent (____%)] of the Initial Capital Contributions contributed by the Axiom Member to the Company in accordance with Section 2.1.

(2) [TBD].

(c) Axiom Member Approval. Except as expressly set forth in this Section 5.11 and as otherwise Approved by the Axiom Member, in no event shall the Sponsor Member or any Affiliate receive payment of any fee prior to the Axiom Member's withdrawal as, or ceasing to be, a Member.

Section 5.12. Role of Non-Manager Member. Except to the extent expressly provided by this Agreement or the Delaware Act, a Non-Manager Member shall not participate in the management or control of the Company's business, nor shall it transact any business for the Company, nor shall it have the power to act for or bind the Company, such power being vested solely and exclusively in the Manager as provided in this Agreement.

## ARTICLE 6
### REPRESENTATIONS AND COVENANTS

Section 6.1. Representations of Sponsor Member. The Sponsor Member hereby represents and warrants to the Axiom Member that:

(a) Formation and Capitalization of Company:

(1) All amounts described in Section 2.1 were contributed, paid or expended out of the personal funds or the liquid assets of the Persons shown on Schedule 6.1(a)(2) and none of those amounts were borrowed from an Affiliate of the Sponsor Member or a Sponsor Principal or any other Person in any manner or form.

(2) The Persons listed on Schedule 6.1(a)(2) collectively own one hundred percent (100%) of the equity and other ownership interests in the Sponsor Member, the Sponsor Principals are the only members, partners, shareholders, managers, officers, employees, or agents of the Sponsor Member, and the Sponsor Principals are the only Persons who can direct or Control the management and operations of the Sponsor Member. Schedule 6.1(a)(2) contains a detailed written statement or chart describing the entire direct and indirect ownership structure of the Sponsor Member. No other Person has, directly or indirectly, any ownership or other equity, profits, voting, or other comparable interest of any kind or nature in the Sponsor Member in any form, including the following: (i) any option or other contractual right to acquire any direct or indirect ownership or equity interest in the Sponsor Member or any constituent member, partner, or shareholder, (ii) any right to receive or participate in profits or distributions from the Sponsor Member, or (iii) any right to vote or otherwise participate in or direct the management or control of the Sponsor Member.

(3) The Sponsor Member and the Sponsor Principals have delivered or caused to be delivered to the Axiom Member all organizational documents of the Sponsor Member and of the constituent members, partners, or shareholders of the Sponsor Member and all material agreements to which any of them or any Affiliate is a party relating to the Property and the other transactions described in this Agreement, including a fully executed copy of the Contract of Sale, together with all amendments and modifications thereto.

(4) The Sponsor Member, the Sponsor Principals, and their Affiliates have not had and do not have any written or oral agreement with any Person or any Obligation to any other Person with respect to the acquisition of the Property or the other transactions described in this Agreement that will or may result in any Obligation on the part of the Company or any Member or its Affiliate other than the agreements described in the Contract of Sale.

(5) The Sponsor Member, the Sponsor Principals, and their respective Affiliates have not received and are not entitled to receive any payment or other form of consideration of any kind relating to the acquisition, financing, ownership, or operation of the Property or the formation of the Company or the Property Owner and related negotiations among the Members and their Affiliates, the obtaining of the Senior Loan, the acquisition and operation of the Property, or the other transactions described in this Agreement.

(b) Formation and Capitalization of Sponsor Member:

(1) The Sponsor Member is a limited liability company duly organized and validly existing under the laws of the State of [Texas] with full power and authority and legal right to be a Member of the Company and to carry on its business in the manner and in the locations in which such business has been and is now being conducted by it, to execute and deliver this Agreement and to perform its Obligations hereunder.

(2) No consent of or approval or permission by any Third Party is required as a condition to the entering into of this Agreement by the Sponsor Member or any constituent member, partner, or shareholder of the Sponsor Member other than such written consent, permission, or approval as has been previously obtained, a copy of which has been delivered to the Axiom Member.

(3) The execution and delivery of this Agreement has been duly authorized by the Sponsor Member, this Agreement has been duly executed and delivered by the Sponsor

Member, and this Agreement constitutes the valid and binding Obligation of the Sponsor Member, enforceable against it in accordance with its terms.

(4) Neither the execution and delivery of this Agreement nor compliance with its terms will (whether before or after any applicable notice, cure or grace period) result in any breach or violation of the terms, conditions, or provisions of, or conflict with or constitute a default under, or result in the creation of any Lien upon any property or assets of the Sponsor Member or any Sponsor Principal pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness, agreement, or other instrument or contract to which the Sponsor Member or any Sponsor Principal may be party or by which it or any of its properties or assets may be bound, or violate any provision of law or any applicable order, writ, injunction, judgment, or decree of any court, or any order or other public regulation of any governmental commission, bureau, or administrative agency.

(5) No judgments are presently outstanding and unsatisfied against the Sponsor Member or any Sponsor Principal or any of their assets. Neither the Sponsor Member nor any Sponsor Principal nor any of their assets is involved in any litigation at law or in equity, or in any arbitration or other proceeding before any court, or by or before any governmental or administrative agency, which judgment, litigation, or proceeding could, solely with respect to any Sponsor Principal, reasonably be anticipated to have a material adverse effect on the Sponsor Principals or their property and assets. No such material judgment, litigation, or proceeding is, to the best of the Sponsor Member's knowledge, threatened against the Sponsor Member or any Sponsor Principal and, to the best of the Sponsor Member's knowledge, no investigation looking toward such a proceeding has begun or is contemplated.

(6) No order, permission, consent, approval, license, authorization, registration, or validation of, or filing with, or exemption by, any governmental agency, commission, board, or public authority is required to authorize, or is required in connection with the execution, delivery and performance by the Sponsor Member of this Agreement or the taking of any action contemplated by this Agreement in each case which has not already been obtained and delivered to the Axiom Member.

(7) To the best of the Sponsor Member's knowledge, all information, documents, and other materials provided by the Sponsor Principals or the Sponsor Member or by any other Person at the direction of the Sponsor Principals or Sponsor Member or any Affiliate thereof to the Axiom Member or its Affiliates, employees, attorneys, agents, or consultants in connection with the formation of an equity investment in the Company and the acquisition and financing of the Property are complete and accurate in all material respects.

(8) The Sponsor Member (i) is familiar with the business proposed to be conducted by the Company and the Property Owner, (ii) has been advised that its interest in the Company may not be sold, transferred, or otherwise disposed of except as provided herein, (iii) understands that its interest in the Company has not been registered under the Securities Act, or any State securities laws, in reliance on an exemption for private offerings or the fact that it is not a security, and if its interest in the Company is a security, the Sponsor Member may not be able to resell it unless it is registered under the Securities Act and applicable State securities laws or unless an exemption from such registration is available, (iv) is a "sophisticated investor" with substantial prior experience in high risk business investments of the type described in this Agreement and is aware of and familiar with the risks associated with a private limited liability

company and would qualify as an "accredited investor" as such term is defined in Rule 501 of Regulation D, as enacted pursuant to Sections 3(b) and 4(2) of the Securities Act, (v) is familiar with the type of investment which its interest in the Company constitutes and has reviewed the acquisition of such interest with its tax and independent legal counsel and investment representatives to the extent it deems necessary, (vi) was not solicited to invest in the Company through means of any general solicitation or general advertising, and (vii) has been given the opportunity to ask questions of, and receive answers from, knowledgeable representatives of the Company, and all such questions have been answered to the Sponsor Member's satisfaction.

(9) Sponsor Member is a United States person within the meaning of Section 7701(a)(30) of the Code.

(c) Condition of the Company, the Property Owner, and the Property. To the actual knowledge of the Sponsor Member:

(1) Except as set forth in any appraisal, environmental, geotechnical, engineering, architectural, title, and other reports relating to such Property and delivered to the Axiom Member, there are no material defects in the physical condition of the land, buildings, and other improvements constituting the Property.

(2) There are no existing violations of any law, ordinance, regulation, license, permit, or authorization issued with respect to the Property or the operations of the facilities and services therein that have not been already corrected and no such violation exists which could have a material adverse effect on the operation, the anticipated operation or the value of the Property.

(3) Neither Sponsor Member nor Sponsor Principals (or any affiliate or subsidiary thereof) has entered into any contract or agreement with respect to the Property, the Property Owner, or the Company except on arm's length terms at market rates and disclosed to and Approved by the Axiom Member.

(4) There is no pending or threatened litigation or like proceeding against the existing or prior owner of the Property relating to the Property.

(5) The Property complies in all material respects with all applicable environmental laws and regulations, including those relating to air, soil, and water quality and storage, handling, and disposal of hazardous substances and wastes, except to the extent described in the environmental reports relating to such Property and delivered to the Axiom Member.

(d) The Sponsor Member has delivered to the Axiom Member a true, correct, and complete copy of the Contract of Sale, with all modifications and amendments thereto.

(e) Neither the Sponsor Member nor the Sponsor Principal or any Affiliate thereof, will receive any fee or other compensation in connection with the acquisition, development, construction, operation, management, disposition, or financing of the Property or the Property Owner, except as expressly set forth in this Agreement.

Section 6.2. Representations of Axiom Member. The Axiom Member represents and warrants to the Sponsor Member that:

(a) The Axiom Member is a limited liability company duly organized and validly existing under the laws of the State of [Delaware] with full power and authority and legal right to be a Member of the Company and to carry on its business in the manner and in the locations in which such business has been and is now being conducted by it, to execute and deliver this Agreement, and to perform its Obligations hereunder.

(b) The execution and delivery of this Agreement has been duly authorized by the Axiom Member. This Agreement has been duly executed and delivered by the Axiom Member and constitutes the valid and binding Obligation of the Axiom Member, enforceable against it in accordance with its terms.

(c) Neither the execution and delivery of this Agreement nor compliance with its terms will result in any breach of the terms, conditions, or provisions of, or conflict with or constitute a default under, or result in the creation of any Lien upon any property or assets of the Axiom Member pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness, agreement, or other instrument to which the Axiom Member may be party or by which it or any of its properties or assets may be bound, or violate any provision of law or any applicable order, writ, injunction, judgment, or decree of any court, or any order or other public regulation of any governmental commission, bureau, or administrative agency.

Section 6.3. Representations Regarding Brokerage Commissions. Each Member (a) represents and warrants to each other Member that neither it nor its Affiliates have dealt with any brokers, investment bankers, consultants, or other Third Parties who are entitled to receive a commission or compensation in connection with the formation and capitalization of the Company and the Property Owner (including obtaining or arranging the Axiom Member's equity investment) or the negotiation or completion of this Agreement and the other transactions described in this Agreement (including the acquisition of the Property and obtaining the Senior Loan) with the exception of [________________] who has been retained by [________________] and (b) agrees to indemnify, defend and hold the Company, the Property Owner, and each other Member harmless from and against any Losses for or relating to any claims for commissions or any other fees due in connection with the transactions described in this Agreement and arising or resulting from such Member's actions.

Section 6.4. Covenants of Sponsor Member and Sponsor Principals. The Sponsor Member and the Sponsor Principals jointly and severally represent and agree for the benefit of the Axiom Member that:

(a) Each of them recognizes that (1) the Axiom Member and its Affiliates have expressed to them the importance of the identity and capabilities of the Sponsor Principals to the operational and financial success of the Company, the Property Owner, and the Project and of the identity of all direct and indirect owners of the Sponsor Member to the investment by the Axiom Member in the Company, the Property Owner, and the Project, (2) the direct and indirect restrictions on Transfer of the Membership Interest of the Sponsor Member and the ownership and other interests in the Sponsor Member have been a material inducement for the Axiom Member's entry into this Agreement, and (3) each of them will comply strictly with the restrictions on Transfer set forth in Article 8.

(b) Except to the extent permitted by Article 8, the Sponsor Member and the Sponsor Principals will not (1) Transfer any of their direct or indirect equity interests in the Company or the Sponsor Member, (2) grant any option or other contractual right to acquire any of their direct or

indirect interests in the Company, the Property Owner or the Sponsor Member or any of their interest in the equity or profits of the Company, the Property Owner, or the Sponsor Member, (3) give or agree to give any other Person the right to vote or take other action with respect to their equity interests in the Company, the Property Owner, or the Sponsor Member, or (4) give or agree to give any other Person the right to control the management and affairs of the Company, the Property Owner, or the Sponsor Member.

Section 6.5. Limitation of Liability of Axiom Member and Affiliates. The Sponsor Member and each Sponsor Principal, for itself or himself and on behalf of its or his Affiliates (collectively, "**Claiming Parties**"), hereby agrees that if the Claiming Parties, together or individually, make or assert any claim of any nature whatsoever, whether legal or equitable, including claims based on federal or state law, against the Axiom Member or its Affiliates arising out of or relating to (i) this Agreement, (ii) the formation or operation of the Company or the Property Owner, (iii) any loans made to the Company or the Property Owner, (iv) the negotiations and representations of the Parties preceding or following the execution of this Agreement, (v) any alleged breach, default, or violation of this Agreement or any provision hereof, or (vi) the proposed transactions described in this Agreement, then the following limitations on the liability of the Axiom Member, its Affiliates, and its direct and indirect members, shareholders, partners, officers, directors, and employees, and on the relief available to the Claiming Parties, shall apply: (1) under no circumstances shall the Claiming Parties (x) assert any claim or commence any legal or equitable action or proceeding against any Axiom Affiliate unless expressly authorized by this Agreement, (y) be entitled to any form of injunctive or other equitable relief unless expressly authorized by this Agreement, or (z) be entitled to any lost profits or consequential, special, or punitive damages; and (2) any judgment against the Axiom Member or its Affiliates shall be enforceable against them only to the extent of the Membership Interests of the Axiom Member in the Company and the value of those Membership Interests. The provisions of this Section shall survive the expiration or other termination of this Agreement and the dissolution and winding up of the Company.

Section 6.6. Single Purpose Entity Requirements. The Members acknowledge that the existing Senior Lender requires (and any future Lender may require) that the Property Owner be a bankruptcy-remote, single purpose entity for legal and financial reasons. Notwithstanding anything to the contrary in this Agreement, the Manager hereby agrees that it shall cause the Property Owner to comply with the special purpose entity covenants set forth in the Senior Loan Documents. In addition, each Member acknowledges and agrees that it is in each Party's best interest to cause the Property Owner to comply with such covenants.

## ARTICLE 7
### BUY-SELL PROCEDURES; SALE OF PROPERTIES

Section 7.1. Buy-Sell Procedures.

(a) Each Member shall have the right, subject to the last sentence of this subsection, to initiate and complete the buy-sell procedures described in this Article ("**Buy-Sell Procedures**") at any time upon the occurrence of a Major Decision Deadlock. In addition, any time upon the occurrence and continuation of a Removal Event (whether or not the Axiom Member has elected to remove the Sponsor Member as Manager), the Axiom Member (and not the Sponsor Member) shall have the right to initiate the Buy-Sell Procedures. No Member shall have the right to initiate the Buy-Sell Procedures in Article 7 while a Major Default by such Member has occurred and is continuing.

(b) The Member who elects to initiate the Buy-Sell Procedures ("**Offeror**") shall give

written Notice (the "**Buy-Sell Notice**") to the other Member ("**Offeree**"), which Notice shall (1) specify a price for the Property and all other assets of the Company (including the Company's membership interest in the Property Owner and excluding the amount of Available Cash from Operations and Net Capital Transaction Proceeds received by the Company and distributable under Section 4.1) (the "**Offer Price**") and (2) specifically request Offeree to respond to the Buy-Sell Notice as required under Section 7.1(c). The Buy-Sell Notice must be delivered in accordance with the notice requirements of Article 14.

(c) The Offeree shall have twenty (20) days from the date of the Buy-Sell Notice ("**Outside Response Date**") to send a written response ("**Response Notice**") to the Offeror, which Response Notice sets forth Offeree's election (1) to be the "Seller" under the Buy-Sell Procedures and to sell its entire Membership Interest (together with any Affiliate's interests) in the Company to the Offeror or (2) to be the "Purchaser" under the Buy-Sell Procedures and to purchase the entire Membership Interest in the Company owned by the Offeror and any Affiliates. The Response Notice may not contain any conditions or qualifications to such election and must contain one of the following statements:

(i) In response to the Buy-Sell Notice, **[Insert name of Offeree]** hereby irrevocably elects to sell its (and any Affiliate's) Membership Interests to **[Insert name of Offeror]**; or

(ii) In response to the Buy-Sell Notice, **[Insert name of Offeree]** hereby irrevocably elects to purchase the Membership Interests of **[Insert name of Offeror and any Affiliate].**

(d) If the Offeree elects to be Purchaser, its Response Notice shall constitute its legally binding obligation to complete the purchase described in Sections 7.1, 7.2 and 7.3 and shall not be effective unless the required escrow deposit is delivered on or prior to the Outside Response Date, in an amount equal to ten percent (10%) ("**Deposit**") of the amount payable to the Seller as determined in subsection (g) below. The Deposit shall be delivered to the Escrow Agent. The Escrow Agent shall hold the Deposit in an interest-bearing, segregated account at a federally insured financial institution.

(e) If the Offeree elects in its Response Notice to be the Seller or if the Offeree does not comply with any applicable requirement of subsection (c) or (d) above in a timely manner, then (1) the Offeree shall be designated the Seller and the Offeror shall be designated the Purchaser and (2) the Offeror as Purchaser shall deliver the Deposit to the Escrow Agent within five (5) days after the earlier of (y) the Outside Response Date or (z) the date of the Response Notice designating the Offeror as the Purchaser. The Purchaser's delivery of the Deposit to the Escrow Agent shall constitute its legally binding obligation to complete the purchase as described in this Article. If the Offeror fails to pay the Deposit as required by the preceding sentence, then the rights of the Members under this Section 7.1 shall be as they were prior to the delivery of the Buy-Sell Notice, except that (i) the Offeror shall forfeit its right to initiate the Buy-Sell Procedures or to give a Buy-Sell Notice for a period of six (6) months from the date on which the Offeror was required to pay the Deposit and (ii) if a Major Decision Deadlock caused the Offeror to elect to initiate the Buy-Sell Procedures, then the Offeree shall have the unilateral right to vote on the Major Decision that gave rise to the Major Decision Deadlock which caused the Offeror to elect to initiate the Buy-Sell Procedures.

(f) The Purchaser shall fix a closing date ("**Closing Date**"), which must be a Business Day not later than forty-five (45) days following the Outside Response Date. The Purchaser shall notify the Seller in writing of the Closing Date not less than ten (10) days prior thereto. If the Purchaser does not fix the Closing Date within thirty-five (35) days following the Outside Response Date, then the

Closing Date shall automatically be the fortieth (40th) day following the Outside Response Date; *provided, however*, that if that date is not a Business Day, then the Closing Date shall be the next Business Day.

(g) The Members agree that, on the Closing Date:

(1) If the Sponsor Member is the Seller, the Axiom Member shall pay to the Sponsor Member the amounts the Sponsor Member would have received if the Property and all other assets of the Company had been sold for an amount equal to the Offer Price on the date of such payment, and the proceeds of such sale (net of liabilities that would have been paid out of such proceeds, including any Senior Loan and all other debts and obligations of the Company or the Property Owner (including Company Costs) and any amounts due to a Member or its Affiliates, if such sale had actually occurred) were distributed in accordance with the provisions of Section 4.1(d) of this Agreement and the Sponsor Member shall thereupon cease to be a Member of the Company.

(2) If the Axiom Member is the Seller, the Sponsor Member shall pay to the Axiom Member the amounts the Axiom Member would have received if the Property and all other assets of this Company had been sold for an amount equal to the Offer Price on the date of such payment, and the proceeds of such sale (net of liabilities that would have been paid out of such proceeds, including the Senior Loan, all other debts and obligations of the Company or the Property Owner (including Company Costs) and any amounts due to a Member or its Affiliates, if such sale had actually occurred) were distributed in accordance with the provisions of Section 4.1(d) of this Agreement. The Axiom Member shall thereupon cease to be a Member of the Company.

(h) If the Purchaser defaults in its obligation to complete the transaction by the Closing Date, the Seller shall (1) have the right, to be exercised by Notice to the Purchaser and completed within thirty (30) days of the original Closing Date determined under subsection (f), to become the Purchaser at a price equal to at least 90% of the original Offer Price, (2) be entitled to retain the Deposit (together with the interest thereon) as liquidated damages, which the Parties acknowledge to be a fair calculation of the damages suffered as a result of the Purchaser's default, in lieu of any other legal and equitable remedies, (3) be entitled to pursue any and all remedies available under this Agreement or through court or other appropriate legal proceedings, whether at law or in equity and/or (4) if a Major Decision Deadlock caused initiation of the Buy-Sell Procedures, then the Seller shall have the unilateral right to vote on the Major Decision that gave rise to the Major Decision Deadlock which caused the initiation the Buy-Sell Procedures.

(i) If the Seller defaults in its obligation to complete the transaction by the Closing Date for any reason other than a default of the Purchaser, then (1) the Purchaser shall (A) have the right to the immediate return of the Deposit (together with the interest thereon) and (B) be entitled to all available legal and equitable remedies against the Seller, including specific performance of the Seller's obligation to complete the transaction and recovery of all Losses of Purchaser caused by Seller's default (including attorney's fees and costs paid or incurred in any legal or equitable action) and (2) if a Major Decision Deadlock caused the initiation of the Buy-Sell Procedures, then the Purchaser shall have the unilateral right to vote on the Major Decision that gave rise to the Major Decision Deadlock which caused the initiation the Buy-Sell Procedures.

(j) A Member who defaults in its obligation to complete the transaction by the

Closing Date shall lose its rights to give a Buy-Sell Notice for a period of twelve (12) months after its failure to perform its obligations under this Section 7.1.

(k) If the Sponsor Member initiates the Buy-Sell Procedures with respect to the Company and thereafter defaults in its obligation to complete the transaction by the Closing Date as either Purchaser or Seller for any reason other than solely due to a material default by the Axiom Member, such default shall constitute a Removal Event.

Section 7.2. Release or Indemnification of Guarantors. Once the Purchaser is selected under the Buy-Sell Procedures, the Purchaser shall use good faith efforts to replace and to obtain the release, at the cost and expense of the Company, of the other Member and/or their Affiliates as guarantors under any limited or springing recourse guarantee or environmental indemnity delivered in connection with any Senior Loan. Notwithstanding the foregoing, if the Purchaser is unable for any reason to arrange for such replacement and release, the Purchaser shall arrange for a creditworthy Affiliate of the Purchaser, reasonably acceptable to the Seller, to indemnify such guarantors against any liability arising under any such guarantee from and after the Closing Date with respect to actions taken by the Company, the Property Owner, the Purchaser, or their Affiliates.

Section 7.3. Other Buy-Sell Requirements.

(a) Each Member expressly agrees and acknowledges that TIME IS OF THE ESSENCE with respect to all time requirements, delivery and payment dates, and other deadlines set forth in Section 7.1. In that regard, all payments and other actions or documents required to be paid, delivered, received or taken on or prior to a specified date shall be so paid, delivered, received or taken on or prior to the specified or required date unless such date is extended in writing by the Member entitled to such performance or payment and failure to make such payment or performance by such date shall be a default under this Agreement by such party.

(b) On the Closing Date, (1) the Seller shall convey to the Purchaser good and marketable title to its Membership Interests, and shall cause and arrange for any of its Affiliates that hold Membership Interests to convey good and marketable title to those Membership Interests, in each case free and clear of all Liens except for those securing Senior Loan, (2) the Purchaser shall accept the conveyance of Membership Interests from Seller (and any Affiliate) and assume all obligations with respect to those Membership Interests accruing or arising after the date of the conveyance, (3) the Purchaser shall deliver to the Seller an opinion of counsel in form and substance reasonably satisfactory to the Seller and its counsel and covering the due authorization, execution and delivery by the Purchaser of the documents and consents evidencing and authorizing the purchase of the Membership Interests, (4) the Seller shall deliver to the Purchaser an opinion of counsel in form and substance reasonably satisfactory to the Purchaser and its counsel and covering the due authorization, execution and delivery by the Seller of the documents and consents evidencing and authorizing the sale of the Membership Interests, and (5) Seller and Purchaser shall each sign and deliver to the other an assignment and assumption agreement with respect to the Membership Interests.

(c) The Company shall distribute to its Members in accordance with Section 4.1 the amount of any Available Cash from Operations and Net Capital Transaction Proceeds that it holds one (1) Business Day prior to the Closing Date. If the Company is prohibited by the terms of any Senior Loan or any other agreement of the Company from making such a distribution, the Purchaser shall pay to Seller on the Closing Date (in addition to the other amounts payable under this Article) the amount that would have been distributed to Seller under Section 4.1 had such distribution been permitted.

(d) Between the date of the Buy-Sell Notice and the Closing Date under Section 7.1, the Manager shall conduct the business, operations, and financial affairs of the Company and the Property Owner only in the ordinary course and consistent with the prior practices of the Company and the Property Owner in accordance with this Agreement, the Approved Business Plan, the Approved Budget, and all other applicable Major Decisions of the Members.

(e) If the Purchaser is not the Manager, the Purchaser shall automatically without any further action or Approval by any other Member become the Manager immediately after it has qualified as the Purchaser pursuant to Section 7.1. If the Purchaser breaches its obligation to purchase the Membership Interest of the Seller pursuant to this Article, the Seller shall become the Manager under this Agreement.

(f) Any risk of casualty, condemnation, or loss prior to the Closing Date shall be borne by the Purchaser, who shall succeed to all rights to insurance proceeds (other than loss of rent proceeds allocable to any period prior to the Closing Date) or condemnation awards, without credit or offset against any amounts owed by Purchaser to Seller.

(g) The cost of any new or downdated title insurance policy or endorsements to any existing title insurance policy on the Property, in either case desired by the Purchaser or, if applicable, required by the Senior Lender or new financing, shall be paid by the Purchaser as its own cost and expense.

(h) The cost of any transfer taxes required to be paid in connection with any sale under Section 7.1 shall be paid by the Members in proportion to their respective Percentage Interests. The cost of any fees or expenses incurred in connection with (1) obtaining the consent of the Lender under the Senior Loan Documents or (2) amending the Senior Loan Documents to ensure compliance with all applicable requirements and conditions of any Senior Loan Documents in effect at the time of the Transfer shall be Company Costs and paid by the Company. Except as expressly set forth in this Agreement, the payment of the fees and disbursements of each Member's attorneys shall be the sole responsibility of that Member and no other Member or the Company shall be required to pay or bear any part of those fees and expenses directly or indirectly. All other costs shall be borne by the party who customarily bears such costs in the location of the principal place of business of the Company.

(i) In no event shall any Member be required to repay or to cause the Company to repay any indebtedness of the Company or the Property Owner at the Closing.

(j) Each Member agrees to cooperate and to take all reasonable actions and execute all documents reasonably necessary or appropriate to facilitate and accomplish the transactions described in or contemplated under Sections 7.1, 7.2 and 7.3.

## ARTICLE 8
### TRANSFERS OF MEMBERSHIP INTERESTS AND INTERESTS IN MEMBERS

Section 8.1. General Restriction. No Transfer of all or part of a Membership Interest in the Company or of any direct or indirect ownership or other economic, profits, voting or other equity interest of any kind in a Member or any constituent shareholder, member, or partner thereof shall be made or become effective unless the Transfer is permitted under this Article and until all requirements and conditions stated in this Article, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member(s). Any Transfer in violation of this Article

shall be invalid, ineffective, and not enforceable for any purpose. No authorization, consent, or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

Section 8.2. Permitted Transfers.

(a) Axiom Member. Upon fifteen (15) days prior written notice to the Sponsor Member, all or part of the Axiom Member's Membership Interest or all or part of the direct or indirect membership interests in the Axiom Member may, at any time, without the consent or approval of any other Member, be Transferred to any Person(s).

(b) Sponsor Member. Neither the Sponsor Member's Membership Interest nor any part of the direct or indirect ownership or other interests in either Sponsor Member or the Property Manager may be Transferred without the prior written consent of the Axiom Member, which consent may be granted or withheld by the Axiom Member in its sole and absolute discretion, other than to (1) the Axiom Member or an Affiliate pursuant to the Buy-Sell Procedures or any other provision of this Agreement or through any other direct agreement with the Axiom Member or any Affiliate and (2) one or more Permitted Affiliates of the Sponsor Member, in each case to the extent permitted or not prohibited under the Senior Loan Documents.

Section 8.3. Compliance with Senior Loan Documents. Notwithstanding any provision to the contrary contained in this Agreement, no Transfer of Sponsor Member shall be made or be effective unless (i) it complies with all applicable requirements and conditions of any Senior Loan Document in effect at the time of the Transfer and does not violate them or (ii) the loan is being paid off at the time of the Transfer. Sponsor Member shall, and shall cause any Affiliate with a Membership Interest to, deliver to the Company and each non-transferring Member at least five (5) Business Days prior to the effective date of any Transfer a written certification stating that (a) any necessary consent of the relevant lender to the Transfer has been obtained (together with a complete copy of the Senior Lender's consent) or (b) no consent of the relevant lender to the Transfer is required.

Section 8.4. Permitted Affiliates of Sponsor Member.

(a) Scope. Subject to the further requirements of subsection (b) and provided such Transfer is permitted under the Senior Loan Documents, the following Persons are "Permitted Affiliates" of the Sponsor Member to whom Transfers may be made without the consent of the Axiom Member as required under this Article:

(1) The Sponsor Principals and any Person 100% of whose outstanding securities and other indicia of ownership and all economic, profits, voting, and other equity interests are directly or indirectly owned, Controlled, and held with power to vote by the Sponsor Principals;

(2) the spouse, divorced spouse, parents, brothers, sisters, children (natural or adopted), stepchildren, and grandchildren (but not other members of the extended family) of a Sponsor Principal; and

(3) trusts, private foundations, or other estate-planning entities or techniques that are for the sole benefit of one or more Persons described in clause (2).

(b) Limitations. A Person described in subsection (a) only shall be a Permitted

Affiliate if and so long as all conditions stated below have been satisfied or have been waived in writing by the Axiom Member:

(1) After the Transfer to the Permitted Affiliate, the Sponsor Principals shall continue to have (A) the sole and exclusive Control of the Sponsor Member and sole and exclusive authority to approve or vote on Major Decisions and all other matters affecting the Company on behalf of the Sponsor Member, and (B) at least a fifty percent (50%) direct or indirect ownership, economic, and beneficial interest in the Sponsor Member;

(2) the Axiom Member has not notified the Sponsor Member in writing that it has reasonably determined that the Permitted Affiliate is a competitor of the Axiom Member or any Axiom Affiliate in any significant market or activity;

(3) if an individual, the Permitted Affiliate is a U.S. citizen or resident;

(4) if a legal entity of any type, the Permitted Affiliate is formed or organized under the laws of any state of the United States and complies with such purpose;

(5) the Axiom Member has not notified the Sponsor Member in writing that it has reasonably determined that one or more Transfers are part of a series of Transfers to a Person who is not a Permitted Affiliate; and

(6) the Permitted Affiliate is not a Prohibited Person.

(c) Notice and Cure. When a specified Person no longer qualifies as a Permitted Affiliate of the Sponsor Member, the Sponsor Member and the Sponsor Principals shall cause that Person to Transfer the Membership Interest such Person holds in the Company or the ownership or other interests such Person holds in the Sponsor Member (or constituent shareholder, partners or members of the Sponsor Member) to be Transferred, within thirty (30) days after learning that such Person is no longer a Permitted Affiliate, to another Person who is a Permitted Affiliate.

Section 8.5. Partial Transfers. If a Member Transfers less than all of its Membership Interest in the Company or if all or part of the direct or indirect ownership or other interests in a Member are Transferred:

(a) such Member shall continue to be a Member of the Company, shall be solely and fully liable and responsible for all Obligations under the Agreement relating to the Membership Interest that it continues to hold, as well as the Membership Interest that it had Transferred and shall be solely and exclusively entitled to receive the full amount of distributions to which it was originally entitled under this Agreement;

(b) if such Member has the right to vote on Major Decisions, it shall continue to have the sole and exclusive right to approve Major Decisions and to take other actions required or permitted under this Agreement;

(c) any Transferee of a partial Membership Interest from such Member shall not be admitted as or deemed to be a Member of the Company for any purpose; and

(d) the Company and the remaining Members shall have no Obligation (including for payment of distributions) to the Transferee of such Member.

Section 8.6. Transfer of Entire Member Interest. If a Member proposes to Transfer its entire Membership Interest in the Company to another Person as permitted by this Article, the Transfer shall not be completed or effective until all of the requirements stated below have been satisfied:

(a) the Transferee has prepared, signed, and delivered to the Company and each other remaining Member an assignment and assumption agreement in which (1) the Transferring Member assigns its entire Membership Interest in the Company to the Transferee, (2) the Transferee assumes all obligations of the Transferring Member under the Agreement from and after the effective date of the Transfer and (3) the Transferring Member and the Transferee agree to pay all costs and expenses (including attorney's fees) incident to the Transfer, including those incurred by the Company and any non-Transferring Member;

(b) the only business purpose of the Transferee shall be to own the Membership Interests and the applicable organizational document will comply with all Senior Loan Document requirements, and shall include the affirmative and negative covenants substantially in similar form and substance as the covenants set forth in Section 6.6;

(c) upon the Transfer of its entire Membership Interest in the Company and the admission of such Member's Transferee as a substitute Member pursuant to this Article, a Member shall be deemed to have withdrawn from the Company;

(d) distributions payable on and after the date of the Transfer shall be payable solely to the Transferee and the Transferring Member shall have no claim to such distributions (unless otherwise provided in any contract or agreement between the Transferor and Transferee) even if all or a portion of such amount relates to a period prior to the Transfer; and

(e) the Transferee shall deliver to the Transferor an opinion of counsel in form and substance reasonably satisfactory to the Transferor and its counsel and covering the due authorization, execution, and delivery by the Transferee of the documents and consents evidencing and authorizing the Transfer of the Membership Interest in the Company.

Section 8.7. Additional Restrictions. Notwithstanding any provision to the contrary contained in the Agreement, no Transfer by a Member of any or all of its Membership Interest in the Company to another Person shall be made or be effective if the Transfer would or would likely (1) cause the Company to be treated as an association taxable as a corporation for federal income tax purposes, (2) cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code, or (3) violate the Securities Act of 1933, as amended, or any other applicable federal or state securities laws, rules or regulations.

## ARTICLE 9
### RIGHTS AND DUTIES OF MEMBERS

Section 9.1. Relationship of Members. Each Member agrees that, to the fullest extent permitted by Section 18-1101 and other provisions of the Delaware Act and except to the extent expressly stated in this Agreement:

(a) The Manager shall have the same fiduciary duty, responsibility, and obligation to the Company and to each other Member of loyalty, care, good faith, and fair dealing as are imposed on a general partner in a general partnership formed under Delaware law.

(b) No Member other than the Manager shall have any fiduciary or other implied duty, responsibility or obligation of loyalty, care, good faith, or fair dealing to the Company or any other Member.

(c) Any consent, approval of a Major Decision, election to exercise rights under the Buy-Sell Procedures, determination or other action by a Member shall be given, taken, or withheld in the sole and absolute discretion of that Member in the best interests of itself and its Affiliates and without regard to the best interests of the Company or another Member and its Affiliates or the financial, tax, or other effect on the Company or another Member or its Affiliates.

Section 9.2. Limitation of Authority. No Member shall have authority to bind or act for the Company, the Property Owner, or another Member or incur or assume any Obligation or behalf of the Company, the Property Owner, or any other Member or to act as the agent, representative, or attorney-in-fact for any other Member, the Property Owner, or the Company except to the extent expressly provided in (a) this Agreement or (b) as expressly set forth as a Major Decision, Approved by the Members.

Section 9.3. Limitation of Members' Liability. No Member shall be responsible or liable for the Obligations of the Company or the Property Owner except to the extent expressly required by the Delaware Act, this Agreement, or any other agreement to which the Member is a party.

Section 9.4. Other Activities. The Manager shall be required to manage the Company as its sole and exclusive activity and function. Subject to Section 6.7, Affiliates of the Members may have other business interests and may engage in other activities in addition to those relating to the Company, including the making or management of other investments (debt and equity). Each Member recognizes that Affiliates of the Members have an interest in investing in, owning, operating, transferring, leasing, and otherwise using real property and interests therein for profit, and engaging in any and all related or incidental activities and that each will make other investments consistent with such interests and the requirements of any agreement to which they or their Affiliates are a party. Except as provided in Section 6.7 and except to the extent stated in another agreement to which a Member is a party or by which it is bound: (1) neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to any other ventures or activities in which the Sponsor Member, the Axiom Member, or Affiliates of any Member are involved or to the income or proceeds derived from those ventures or activities; (2) the pursuit of other ventures and activities by the Sponsor Member, the Axiom Member, or Affiliates of any Member, even if competitive with the business of the Company or the Property Owner, is hereby consented to by all other Members and shall not be deemed wrongful or improper under this Agreement or applicable law; and (3) no Affiliate of a Member shall be obligated to present any particular investment opportunity to the Company, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each such Affiliate shall have the right to take for its own account, or to recommend to others, any such particular investment opportunity, and no provision in this Agreement shall limit or restrict in any manner whatsoever the activities of any Axiom Affiliate.

Section 9.5. Confidentiality. Neither the Sponsor Member, nor Sponsor Principal, nor any of their Affiliates shall disclose the terms of this Agreement without the prior written consent of the Axiom Member except (a) to its attorneys, accountants, and other advisors, (b) to the extent required by law to any governmental agency or unit or in any Court proceeding, (c) to prospective assignees of Membership Interests or interests in the Sponsor Member who agree to maintain the confidentiality of the provisions of this Agreement, or (d) to an existing or prospective lender to the Company or the



2999TC000647

Property Owner. In addition, the Sponsor Member and Sponsor Principals shall not disclose the fact that the Axiom Member or its Affiliates are Members or investors in the Company or the Property Owner in advertising, press releases, or other comparable statements to the public without the prior written consent of the Axiom Member. The provisions of this Section shall survive the expiration or other termination of this Agreement. Except as may be required by securities or other laws, this Section 9.5 shall not apply to tax matters and such tax matters may be disclosed.

Section 9.6. No Partition. Each Member hereby irrevocably waives any and all right that it may have to maintain any action for partition of all or any portion of the Property.

## ARTICLE 10
## INDEMNIFICATION

Section 10.1. Indemnification by Company. The Company as Indemnitor shall, subject to the limitations stated below and those set forth in Section 10.4, indemnify, defend, and hold harmless each Member and its Affiliates as Indemnitees to the fullest extent permitted by applicable law against all Losses of those Indemnitees caused by, resulting from, or arising out of the participation by any Indemnitee in the activities of the Company as Members. The Indemnitor shall be required to indemnify the Indemnitee pursuant to this Section only if (a) the Indemnitee acted in good faith, in a manner required or permitted by the terms of this Agreement, (b) the Indemnitee is not obligated to indemnify the Company, the Property Owner, other Members, or their Affiliates against Losses arising out of the same action or inaction pursuant to Section 10.2, and (c) with respect to any criminal action or proceeding, the Indemnitee did not have reasonable cause to believe that its conduct was unlawful. The termination of a lawsuit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that an Indemnitee did not meet those standards. Any indemnification by the Company permitted under this Section shall be made solely out of the assets of the Company. No Member shall be obligated to make any Capital Contributions or loans to the Company to enable the Company to provide such indemnification.

Section 10.2. Indemnification by Sponsor Member. Sponsor Member, as Indemnitor, shall indemnify, defend, and hold harmless the Company, the Property Owner, and Axiom Member and its Affiliates, as Indemnitees, to the fullest extent permitted by applicable law against all Losses of those Indemnitees caused by, resulting from, or arising out of (a) losses, damages, liabilities, costs, and expenses (including attorneys' fees) incurred as a result of the violation, default, or breach by the Indemnitor of this Agreement, (b) the failure of the Indemnitor or any of its Affiliates (including a Sponsor Principal, if applicable) to comply with the requirements of or default under any guaranty, indemnity agreement, or other like instrument given by any of them under or in connection with any Senior Loan or any other financing obtained by the Company or the Property Owner, or (c) the fraud, intentional violation of law, willful or intentional misconduct, or gross negligence of the Indemnitor or any of its Affiliates (including a Sponsor Principal, if applicable) that causes the Company or the Property Owner to breach or default under any Senior Loan or any other agreement to which the Company or the Property Owner is a party.

Section 10.3. Indemnification by Transferring Member. Any Member that Transfers all or any portion of its Membership Interest and any Sponsor Principal who Transfers all or any part of its ownership or other interests in the Sponsor Member shall in each case as Indemnitor indemnify, defend, and hold harmless the Company, the Property Owner, each other Member, and their Affiliates as Indemnitees to the fullest extent permitted by applicable law against all Losses of those Indemnitees caused by, resulting from, or arising out of (i) any failure by the Indemnitor to comply with any federal,

state, local, or foreign securities, antitrust, or other laws or regulations applicable to such Transfer (including those relating to payment of transfer taxes) or (ii) any breach, default, or violation of any Senior Loan or any future financing caused by or attributable to such Transfer.

Section 10.4. Limitations on Indemnification. No Indemnitor shall be obligated to indemnify an Indemnitee pursuant to this Article to the extent that (a) the Indemnitee has committed by way of action or omission any fraud, intentional violation of law, gross negligence, or willful misconduct, (b) the Loss to the Indemnitee was caused by, resulted from, or arose out of a breach, default, or violation by the Indemnitee of this Agreement, and the breach, default, or violation was intentional, willful, or grossly negligent, (c) the Loss to the Indemnitee was caused by, resulted from, or arose out of the requirements of any guaranty, indemnity agreement, or other like instrument given by the Indemnitee in connection with any Senior Loan or any future financing obtained by the Company or the Property Owner (whether or not the Loss was caused by, resulted from, or arose out of any breach or other failure by the Indemnitee thereunder).

Section 10.5. Indemnification Procedures and Restrictions.

(a) If a claim or assertion of liability is made by a Third Party against a possible Indemnitee that, if prevailed upon by any such Third Party, may result in that Party being entitled to indemnification as an Indemnitee pursuant to this Article ("**Claim**"), the Indemnitee will upon learning of the Claim give to each possible Indemnitor immediate written Notice of the Claim and request the Indemnitors to defend the Claim at the Indemnitors' sole cost and expense with counsel reasonably acceptable to the Indemnitee. Failure to so notify the Indemnitors will not relieve the Indemnitors of any liability that the Indemnitors may have to such Indemnitee except to the extent that such failure actually and materially prejudices the Indemnitors' legal position. Counsel for the Company (past or present) shall not represent any Member or its Affiliates in the assertion or defense of any Claim or in any dispute with another Member or its Affiliates. The Indemnitors shall have the obligation to defend the Indemnitee against the Claim if such Indemnitee is entitled to indemnification pursuant to this Article. The Indemnitors shall give written Notice within five (5) Business Days to the Indemnitee of acceptance or rejection of the defense of the Claim and the name of the counsel selected by the Indemnitors to defend the Claim. If an Indemnitor refuses or fails for any reason to defend an Indemnitee in violation of this Section, or places qualifications or conditions on the acceptance of the obligation to defend such Claim, the Indemnitee (provided Indemnitor may participate in the defense of such claim) (1) shall have the right to defend the Claim with legal counsel it selects and (2) after any final non-appealable judgment or binding settlement or dismissal, if the Indemnitor is the Company, the Property Owner or another Member, shall be paid or reimbursed the full amount of all costs and expenses (including attorneys' fees) which the Indemnitee incurred in defending itself before any distributions are made pursuant to Article 4. Even if the defense of the Claim is unconditionally accepted, the Indemnitee shall be entitled to participate with the Indemnitors in the defense and also will be entitled at its option (and expense) to employ separate counsel for the defense. Each Indemnitor and Indemnitee shall cooperate with each other in the defense of a Claim and shall make its relevant records available to the other with respect to the defense except to the extent that any such Person shall reasonably determine (based upon advice of counsel) that making all or any portion of its relevant records available to another Person would constitute a waiver and result in the loss of the attorney-client privilege or the attorney work-product privilege between such Person and its legal counsel; *provided, however*, that each Member recognizes and agrees that legal work and legal services performed in connection with the Property and the operation and management of the Company and the Property Owner (whether or not legal counsel was engaged by the Members) is performed on behalf of the Company, the Property Owner and its Members, so that neither any Member, the Property Owner

nor the Company shall be entitled to withhold from any Member records relating to work or services that is performed on behalf of the Company or the Property Owner or in connection with the Property.

(b) No Indemnitee shall be entitled to indemnification under this Article if it has entered into any written settlement or compromise of any Claim without the prior written consent of the Indemnitors. If a bona fide settlement offer is made with respect to a Claim and the Indemnitors desire to accept and agree to the offer, the Indemnitors will give written Notice to the Indemnitee to that effect ("**Settlement Notice**"). If the Settlement Notice (1) includes a full, unconditional release of the Indemnitee, which release is enforceable in the reasonable opinion of the Indemnitee's counsel, (2) does not have any material adverse effect on the Indemnitee (it being understood and agreed by the Members, however, that use of Available Cash from Operations or Net Capital Transaction Proceeds that would otherwise be available for distribution to Members pursuant to Article 4 shall be deemed to constitute a material adverse effect for purposes of this provision) and (3) the Indemnitee fails to consent to the settlement offer within ten (10) Business Days after receipt of the Settlement Notice or rejects the settlement offer, then the Indemnitee shall thereafter be solely responsible for continuing the defense of such Claim. In that event, the maximum liability of the Indemnitors as to such claim will not exceed the amount of such settlement offer.

(c) Funds of the Company shall not be used for indemnification except to the extent that the Company or the Property Owner is an Indemnitor and is the only responsible Party to provide indemnification under this Article. Any payment of Losses or any other amounts by any Member as Indemnitor pursuant to this Article shall not be treated or deemed to be a Capital Contribution by that Member under this Agreement. No payment by a Member or its Affiliates of amounts pursuant to any guaranty, indemnity agreement or other like instrument given by any of them in connection with any Senior Loan or any future financing obtained by the Company or the Property Owner shall be treated or deemed to be a Capital Contribution or other loan or contribution of any kind to the Company by or on behalf of that Member under this Agreement. Each Member, for itself and on behalf of its Affiliates, hereby irrevocably and unconditionally waives and releases any subrogation or similar right that any of them would otherwise have against the Company or the Property Owner because or as a result of a payment made by any of them pursuant to any such guaranty, indemnity agreement or other like instrument unless and until each lender under such Senior Loan or future financing has been paid in full in cash.

Section 10.6. Use of Distributions to Satisfy Indemnification Obligations. If a Member as Indemnitor fails for any reason to pay an amount owed to the Company, the Property Owner, another Member or its Affiliates or Affiliates as Indemnitees pursuant to the indemnification provisions of this Article, the Company shall deduct the amount owed (including accrued interest at the lesser of 18% per annum or the highest lawful rate) from cash distributions otherwise payable to the Indemnitor pursuant to Article 4 and shall pay the amount so deducted directly to the Indemnitee in satisfaction of the Indemnitor's obligation. The amount so deducted shall nevertheless be treated for all purposes as having been distributed to the Indemnitor pursuant to this Agreement. In addition, if a Member as Indemnitee satisfies any Claim with its own funds and the Indemnitor breaches its Obligations to Indemnify the Indemnitee pursuant to this Article, the amounts so funded by the Indemnitee with respect to such Claim (at the option of each Indemnitee) shall be deemed to be a Capital Contribution made by such Indemnitee to the Company for all purposes of this Agreement.

Section 10.7. Indemnification Not Exclusive. The indemnification rights described in this Article shall be in addition to any other rights that an Indemnitee may have under any other agreement between the Members and/or for the Company or the Property Owner, pursuant to any law or

regulation or through insurance and shall continue as to an Indemnitee who is no longer a Party and shall inure to the benefit of its Permitted Successors.

Section 10.8. Insurance. The Company may purchase and maintain insurance on behalf of any Indemnitee if approved as a Major Decision. If insurance is obtained for any Indemnitee, it shall be obtained on the same basis for all other Indemnitees who have comparable risks.

Section 10.9. Survival of Indemnification Obligations. The indemnification obligations under this Article shall survive the Transfer of Membership Interests by any Member, the sale of the Property by the Company, or the dissolution of the Company.

## ARTICLE 11
## FINANCIAL AND ACCOUNTING MATTERS

Section 11.1. Books and Records. The Manager shall maintain or cause to be maintained, at the expense of the Company and in a manner customary and consistent with good accounting principles, practices and procedures, office records, books and accounts (which shall be and remain the property of the Company) in which shall be entered fully and accurately each and every financial and other transaction with respect to the operations of the Company and ownership and operation of the Property. Bills, receipts, vouchers and other appropriate evidence of revenues and expenses of the Company shall be maintained on file by the Manager. The Manager shall maintain all records, books and accounts of the Company in a safe manner and separate from any other records, books and accounts. All records, books and accounts shall be prepared and maintained by the Manager at the principal place of business of the Company or any other Approved place or places. Each Member or its duly authorized representative shall have the right to inspect, examine, copy and audit all records, books and accounts at the Company's office during reasonable business hours.

Section 11.2. Bank Accounts.

(a) Working Capital Accounts. On the Effective Date, the Manager shall establish an operating account on behalf of and in the name of the Property Owner (the "**Working Capital Account**"). Through the use of signature cards, authorized representatives of each of the Manager and Axiom Member shall have access to the Working Capital Account and its contents. The Manager shall deposit and shall cause the Company and/or the Property Owner, each property or asset manager employed by or on behalf of the Company and, to the extent required under the Senior Loan Documents, the tenants under all leases with the Property to deposit all revenues and receipts of the Property, including cash balances derived from rents or occupancy payments or otherwise arising from ownership or leasehold interest of the Property, into the Working Capital Account. Payment of the Company Costs of the Property Owner shall be made from the Working Capital Account.

(b) Operating Account. After payment of applicable Company Costs, any amount remaining in the Working Capital Account shall be distributed to an account in the name of the Company and managed by the Manager (the "**Operating Account**"). Through the use of signature cards, authorized representatives of each of the Manager and the Axiom Member shall have access to the Operating Account and its contents.

Section 11.3. Monthly and Quarterly Reports. The Manager shall prepare:

(a) Monthly reports (each, a "**Monthly Statement**") (1) outlining in reasonable detail the status of implementation of all Major Decisions that have not been fully implemented and (2)

itemizing in reasonable detail all revenues and expenses of the Company and the Property Owner which arose or were paid or received during the preceding calendar month, together with an explanation for any variances from the Approved Budget for that period; and

(b) Quarterly reports (each, a "**Quarterly Transaction Report**") describing the execution of all leases and other agreements by or on behalf of the Company or the Property Owner, progress of any construction, renovation, repair, or other activities described in the Business Plan, and other material transactions occurring during the prior quarter and other material aspects of the operations of the Company, the Property Owner, and the Property for the prior quarter.

The Manager shall deliver each Monthly Statement and Quarterly Transaction Report to the Axiom Member within twenty-five (25) days after the end of the relevant period. Each Monthly Statement and Quarterly Transaction Report shall be designed so as to clearly and efficiently communicate to the Axiom Member all relevant information in such form, format, and media as the Members may reasonably request. Each Quarterly Transaction Report shall be signed and certified by the Sponsor Principals.

Section 11.4. Annual Reports. As soon as practicable (but in no event later than sixty (60) days after the end of each Fiscal Year during the term of this Agreement), the Manager shall, arrange for and furnish to the Axiom Member annual financial statements (each, an "**Annual Report**") for such Fiscal Year accurately reflecting the financial condition and the results of operation of the Property, including statements and calculations of Available Cash from Operations, Net Capital Transaction Proceeds, and Company Costs, all prepared in accordance with GAAP and the applicable provisions of this Agreement and, if required by either Member or by the Senior Loan Documents, audited and certified by the Accountant.

Section 11.5. Reports under Senior Loan Documents. The Manager shall send to the Axiom Member all financial or other reports or written data sent to the Senior Lender pursuant to the Senior Loan Documents.

Section 11.6. Reports under Property Management Agreement, Development Agreement, or Construction Contract. The Manager shall send to the Axiom Member all reports and statements that the property manager is required to produce or generate pursuant to the requirements under any property or asset management agreement or the developer or construction general contractor is required to produce or generate pursuant to the requirements under any development agreement or construction contract.

Section 11.7. Information Requests. The Manager on behalf of the Company shall provide to the Axiom Member: (1) within twenty-five (25) days after the end of each calendar quarter, an estimate of the Company's gross assets as of such quarter-end and gross income for the year through such quarter-end as determined for purposes of Section 856(c) of the Code, and (2) all information reasonably requested by the Axiom Member related to the business and operation of the Company, the Property Owner or the Property.

## ARTICLE 12
## TAX MATTERS

Section 12.1. Taxation as Partnership. The Members intend and hereby agree that the Company shall be treated as a partnership, the Members shall be treated as partners, and the Axiom Member's interest shall be treated as a partnership interest for federal, state, local, and foreign income

tax purposes. No Party shall take any action that is inconsistent with the foregoing or that would otherwise result in the Company being taxed other than as a partnership. The Manager shall prepare and file with the IRS and other necessary tax authorities all documents necessary, if any, to confirm and maintain this classification as a partnership. This classification as a partnership is solely for income tax purposes and the Company, its Members and their Affiliates shall not be treated or deemed to be partners or a partnership for any other purpose.

Section 12.2. Capital Accounts; Tax Allocations. Exhibit F attached to this Agreement provides for the maintenance of Capital Accounts for each Member and allocation of profits, losses and other tax items to the Members.

Section 12.3. Partnership Represenative; Tax Audits. The Manager is hereby designated as the "partnership representative" for purposes of Section 6221 through 6241 of the Code and corresponding provisions of applicable state law, and, as such, shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to (i) sign consents, enter into settlement and other agreements with such authorities with respect to any such examinations or proceedings and (ii) to expend the Company's funds for professional services incurred in connection therewith. All tax audits and tax litigation shall be conducted under the direction and control of the Manager as partnership representative. The Manager shall take commercially reasonable measures to inform the other Members of any material decision or action it takes as "partnership representative" and shall obtain the consent of the Axiom Member prior to taking any material action as partnership representative.

Section 12.4. Tax Elections. The Manager shall have the exclusive right to make any determination whether the Company shall make available elections (including any election pursuant to Section 754 of the Code relating to certain adjustments to the basis of the Company's property) for federal, state or local income tax purposes. The Manager shall determine any issue regarding or affecting the reporting or characterization for tax purposes of items of income, gain, loss or deduction of the Company. Notwithstanding anything herein to the contrary, the Manager (i) shall obtain the consent of the Axiom Member prior to making any material tax election or tax determination or filing its annual federal income tax return, (ii) will not make any election or cause any person to make any election that would result in the Property Owner being treated as anything other than a disregarded entity for U.S. tax purposes (or as a partnership if it has more than one member) without the approval of the Axiom Member, (iii) upon the request of the Axiom Member, the Manager shall cause the Company to make the election pursuant to Section 754 of the Code relating to certain adjustments to the basis of the Company's Property and (iv) elect the alternative depreciation system (ADS) for the Company's depreciable assets.

Section 12.5. Tax Returns. All U.S. federal, state, and local income tax returns of the Company and the Property Owner shall be prepared by the Accountant under the direction of the Manager. The Manager shall cause the Accountant to submit to Axiom Member no later than December 1st of each year an estimate of projected taxable income (loss) for that year. The Manager shall cause the Accountant to submit drafts of all tax returns (including all related schedules and exhibits and upon request, copies of all supporting workpapers) to the Members, together with a request for comments on their contents, at least thirty (30) days prior to the required filing date (including extensions). All tax returns shall be subject to the final approval of the Axiom Member and the Manager shall file or cause to be filed all such tax returns required to be filed by or on behalf of the Company or the Property Owner. All costs and expenses associated with the preparation and filing of tax returns and other tax

work required or permitted by this Article shall be Company Costs and shall be paid or reimbursed by the Company. The Manager shall cause the Company to furnish each Member, within seventy-five (75) days following the end of each Fiscal Year, a Schedule K-1 for such Fiscal Year.

Section 12.6. Withholding Taxes. The Sponsor Member shall take all such actions reasonably necessary for the Company and the Property Owner to comply with any withholding or comparable tax requirements under federal, state, local and foreign law and shall remit any amounts withheld to, and file required forms with, the applicable jurisdictions. All amounts withheld and any other amounts paid by the Company for any Member on account of any tax (including interest or penalties thereon) shall be treated as having been distributed to the Member with respect to whom the withholding was made or paid. If a Member receives an amount that should have been withheld or the Company pays any tax on behalf of a Member that is not withheld from a distribution, the Sponsor Member may, at its option, (a) require that Member to reimburse the Company for such withholding or other tax paid or (b) reduce any subsequent distributions to that Member by the amount of the required withholding or other tax paid. Each Member agrees to furnish the Company with such representations and forms as the Sponsor Member shall reasonably request to assist in complying with the Company's withholding obligations. A Member subject to withholding shall pay or reimburse to the Company all identifiable costs or expenses of the Company caused by or resulting from withholding (or the failure to provide for such withholding) with respect to that Member. Any tax, penalty, addition to tax or additional amount attributable thereto which is assessed or collected from the Company or a subsidiary pursuant to Sections 6221-6235 of the Code shall be treated as having been paid on behalf of the Member to whom the related income was allocated and shall be subject to this Section 12.6. A Member's obligation to indemnify the Company under this Section 12.6 shall survive the transfer or redemption of a Member's Membership Interest and the liquidation and winding up of the Company.

## ARTICLE 13
## DISSOLUTION AND WINDING UP

Section 13.1. Events Resulting in Dissolution. The Company shall dissolve pursuant to the Delaware Act only if one or more of the following events occurs:

(a) The sale of all or substantially all of the Property or the Company's interest in the Property Owner, *provided, however*, that if such sale is made on the terms that the Company or the Property Owner takes a note or other indebtedness of the purchaser for part of the purchase price, no dissolution shall occur until such time as the Company or the Property Owner cease to be the holder of such note or indebtedness or such note or the indebtedness evidenced by such note has been paid in full;

(b) The unanimous agreement in writing by the Members to dissolve the Company;

(c) The voluntary or involuntary dissolution of both Members; or

(d) Any other event that requires the Company's dissolution under the Delaware Act.

Section 13.2. Procedure.

(a) Upon the dissolution of the Company, the Manager shall wind up the affairs of the Company and shall be referred to below as the "Authorized Member." The Members shall continue

to receive allocations of Net Income and Net Losses and distributions of Available Cash from Operations and Net Capital Transaction Proceeds during the period of liquidation of the Company in the same manner and proportion as though the Company had not dissolved. The Authorized Member shall have full right and unlimited discretion to determine in good faith the time, manner and terms of any sale or sales of the Property or the Property Owner pursuant to such liquidation, having due regard for the relevant market and general financial and economic conditions.

(b) Following the payment of all debts and liabilities of the Company and all expenses of liquidation, and subject to the rights of the Authorized Member to set up such cash reserves in an amount and for so long as it may deem reasonably necessary as determined by the Authorized Member in good faith for the payment of contingent or unforeseen Obligations of the Company (including indemnification obligations), which will continue after the sale of the Property, the proceeds of the liquidation and any other funds of the Company shall be distributed in accordance with Section 4.1(d). Any cash reserves referred to in this Section shall be released and distributed as soon as practicable after the date that corresponding liabilities reserved against are satisfied, discharged, or otherwise terminated.

(c) Within a reasonable time following the completion of the liquidation of the Property by the Property Owner and the liquidation of all other assets of the Company, the Authorized Member shall deliver to each of the Members a statement prepared by the Accountant, which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and each Member's portion of distributions payable pursuant to this Agreement.

(d) Upon the completion of the liquidation of the Company and the distribution of all Company funds, the Company shall terminate and the Authorized Member shall have the authority to execute and record a certificate of cancellation of the Company as well as any and all other documents required to complete the dissolution and termination of the Company.

## ARTICLE 14
## NOTICES

Section 14.1. Notices. All notices, consents, requests for approval, demands, waivers, or other communications (collectively referred to as a "**Notice**") required to be sent or otherwise applicable under this Agreement shall be in writing and shall be sent to each applicable Party, its or their legal counsel at the addresses set forth below. A Notice that complies with the requirements of this Section shall be deemed to have been duly received: (a) when delivered personally; (b) three (3) Business Days after being mailed, registered or certified mail, return receipt requested and with postage prepaid by the sender; (c) one (1) Business Day after being delivered to a reputable overnight courier service, marked for next day delivery and with delivery charges prepaid by the sender; or (d) on the date of sending by printable document format via e-mail if sent during business hours on a Business Day (otherwise on the next Business Day), if the Notice is also sent by any means described in clause (a), (b) or (c) above.

Section 14.2. Addresses for Notices. Notices shall be sent and addressed as follows:

(a) To the Company:

c/o [Sponsor Member]

__________________

________________
Attention: _______________
Email: ________________

(b) To Sponsor Member:

________________
________________
________________
Attention: _______________
Email: ________________

with a copy to:

________________
________________
________________
Attention: _______________
Email: ________________

(c) To Axiom Member:

c/o [Axiom Financial, LLC]
16990 Dallas Pkwy., Suite 150
Dallas, Texas 75248
Attention: _______________
Email: ________________

with a copy to:

Platt Cheema Richmond PLLC
1201 N. Riverfront Blvd., Ste. 150
Dallas, TX 75207
Attention: Jesse Shallcross
Email: jshallcross@pcrfirm.com

Section 14.3. Notice of Deadline. Any Notice given pursuant to this Agreement that sets forth a deadline or other time period within which the recipient must respond shall state in capital letters at the top of the first page of the Notice and, if delivered in an envelope or other container or package, on the envelope or container: "URGENT – CORRESPONDENCE CONTAINS DEADLINE FOR RESPONSE" or words comparable in meaning. The failure of a Notice to comply with the requirement in the preceding sentence shall not, however, affect the validity of the Notice unless the recipient can demonstrate clearly that the failure to so comply was a material factor in the recipient's failure to respond by the deadline stated in the Notice.

Section 14.4. Change of Address. Each Party and its Permitted Successors shall have the right from time to time and at any time during the term of this Agreement to change its address for Notices or facsimile number by giving Notice of such claim to each other Party as provided in Section 14.2. Each Party shall have the right to specify as its address any other address located within the United States of

America.

## ARTICLE 15
### MISCELLANEOUS

Section 15.1. Entire Agreement. This Agreement, together with all Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to its subject matter. This Agreement supersedes any prior agreement or understanding among the Parties with respect to its subject matter, but shall not amend, modify, supersede or in any way affect any other agreement or understanding among the Members or their Affiliates that do not relate to the subject matter of this Agreement.

Section 15.2. Amendments. No provision of this Agreement may be amended, supplemented or waived except in a written instrument signed by all the Members and, if the change adversely affects the Sponsor Principals, by the Sponsor Principals as well.

Section 15.3. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Members and their Permitted Successors.

Section 15.4. No Third Party Beneficiaries. The capital contribution and indemnification requirements and all other terms and provisions of this Agreement are for the sole and exclusive benefit of the Parties and their Permitted Successors and shall not be deemed to create any rights for the benefit of any other Person except for any Axiom Affiliate pursuant to Section 6.5 and Article 10.

Section 15.5. Governing Law. This Agreement and the rights of the Parties shall be governed by, interpreted, and enforced in accordance with the internal laws of the State of Delaware without regard to principles of conflicts of laws.

Section 15.6. Jurisdiction; Choice of Forum. Each Party hereby irrevocably (a) submits to the exclusive jurisdiction of any Delaware State, Texas State, or Federal Court sitting in the County of New Castle, Delaware or County of Dallas, Texas, in any action or proceeding arising out of or relating to this Agreement, the relations between the Parties and any matter, action, or transaction described in this Agreement, (b) agrees that any such courts shall have exclusive jurisdiction over such actions or proceedings, (c) waives the defense of inconvenient forum to the maintenance and continuation of such action or proceeding, (d) consents to the service of any and all process in any such action or proceeding by the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in Article 14 and (e) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 15.7. WAIVER OF JURY TRIAL. EACH MEMBER AND SPONSOR PRINCIPAL, FOR ITSELF AND ON BEHALF OF ITS AFFILIATES, HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT, OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DESCRIBED IN THIS AGREEMENT OR DISPUTE BETWEEN THE PARTIES (INCLUDING DISPUTES WHICH ALSO INVOLVE OTHER PERSONS).

Section 15.8. Severability. If any provision of this Agreement or the application of such provision to any Party or circumstance shall be held invalid or unenforceable, the remainder of this Agreement or the application of that provision to another Party or circumstance shall not be affected thereby.

Section 15.9. Cumulative Remedies. Except to the extent expressly stated in this Agreement, (a) no remedy conferred upon the Company or any Party pursuant to this Agreement is intended to be exclusive of any other remedy available under this Agreement or applicable law and (b) each remedy shall be cumulative and shall be in addition to every other remedy available under this Agreement or applicable law now or in the future.

Section 15.10. Representation by Counsel. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

Section 15.11. No Waiver. No waiver by a Party or the Company of any default, breach or violation of this Agreement shall be deemed to be a waiver of any other default, breach or violation of any kind or nature, whether or not similar to the default, breach or violation that has been waived or failure to enforce a particular provision in one instance shall not be deemed a waiver or modification of rights or preclude the enforcement thereafter. No acceptance of payment or performance by a Party or the Company after any such default, breach or violation shall be deemed to be a waiver of any default, breach or violation of this Agreement, whether or not such Party or the Company knows of such default, breach or violation at the time it accepts such payment or performance. Subject to any applicable statutes of limitation, no failure or delay on the part of a Party or the Company to exercise any right it may have under this Agreement shall prevent its exercise by such Party or the Company, and no such failure or delay shall operate as a waiver of any default, breach or violation of this Agreement.

Section 15.12. Counterparts. This Agreement may be executed in several counterparts. If so executed, each of such counterparts shall be deemed an original for all purposes and all counterparts shall, collectively, constitute one agreement. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart and photocopies may be used.

Section 15.13. Email Signature. Any Party may deliver its signature to this Agreement or any Notice or other document described in this Agreement or relating to the Company or the Property by email transmission to the proper recipient. Any document signed by a Party by pdf email transmission and reasonably believed by the recipient to have been sent by or on behalf of that Party shall (a) be binding upon and fully enforceable against that Party as though it had delivered a manually-signed counterpart to the recipient, (b) be accepted by any Court as equivalent to a manually-signed counterpart for purposes of any evidentiary rule and (c) no Party will object to the effectiveness or validity of such email signature.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be executed by a duly authorized officer, all as of the day and year first above written.

**SPONSOR MEMBER:**

[SPONSOR MEMBER],
a ___________________

By: ______________________
Name: __________________
Title: ___________________

**AXIOM MEMBER:**

[AXIOM MEMBER],
a ___________________

By: ______________________
Name: __________________
Title: ___________________

**JOINDER BY THE COMPANY:**

[PROJECT NAME] INVESTORS LLC,
a Delaware limited liability company

By: [SPONSOR MEMBER],
a ___________________,
its Manager

By: ______________________
Name: __________________
Title: ___________________

**SCHEDULE 2.1**

**Member Initial Capital Contributions and Percentage Interests**

[INSERT TABLE HERE]

**SCHEDULE 6.1(a)(2)**

**Detailed Description or Chart Showing Direct and Indirect Ownership**
**of Sponsor Member & Constituent Members, Partners, and Shareholders**

(attached hereto)

[SPONSOR MEMBER TO PROVIDE]

# EXHIBIT A

## Definitions

"Accountant" means the Approved firm of independent certified public accountants engaged from time to time by the Company for purposes of reviewing or auditing the financial statements of the Company and/or the Property Owner or other information with respect to the Property and performing such other duties requested by any Member including the preparation of required tax returns.

"Acquisition Costs" means those Approved costs and expenses of the Company in connection with the acquisition of the Property, including the acquisition purchase price, costs of entity formation, costs of financing, title insurance, escrow, survey, legal, engineering, architectural, environmental, appraisal and other related costs, fees or expenses.

"Affiliate" means (1) any officer, director, employee, shareholder, partner or member of a specified Person, (2) any Person Controlling, Controlled by or under Common Control with a specified Person, (3) any officer, director, employee, shareholder, partner or member of any Person in a Control relationship with a specified Person described in the preceding clause (2), (4) in case of a specified individual, his or her spouse, domestic partner, divorced spouse, parents, cousins, uncles, aunts, stepparents, brothers, sisters, children (natural or adopted), stepchildren, grandchildren and other members of the individual's extended family or (5) a Person in which any Person described in the preceding clauses (1) through (3) has an ownership or beneficial interest (whether a direct, indirect, residual or contingent interest) or as to which such Person serves as a trustee, general partner, managing member or in a similar fiduciary or decision-making capacity.

"Affiliate Agreement" is defined in Section 5.3(a).

"Agreement" means this Limited Liability Company Agreement, as it may be amended, modified or supplemented from time to time in accordance with its terms.

"Annual Report" is defined in Section 11.4.

"Applicable Laws" shall mean, with respect to any Person and/or Property, all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders applicable to any such Person and/or Property.

"Approve", "Approved" or "Approval" shall refer to the approval of or consent to a proposed decision, action, report, budget, election or any other matter that must be or has been approved by or consented to by both Members as a Major Decision, by either Member acting alone as permitted by any provision of this Agreement or all Members if required by this Agreement.

"Approved Budget" means the initial capital expenditure and operating budget for the Company, the Property Owner, and the Property attached as Exhibit E to this Agreement or such other Budget that is Approved by the Members as a Major Decision in accordance with Section 5.8 of this Agreement.

"Authorized Member" is defined in Section 13.2(a).

"Available Cash from Operations" means all cash, funds, revenues and proceeds of the Company (other than Net Capital Transaction Proceeds and proceeds from any Company indebtedness) on hand and available for distribution from time to time after: (1) payment of all Company Costs that are due and payable as of such date, (2) provision for the payment of all Company Costs that the Company is obligated to pay within ninety (90) days of such date, and (3) provision for payment of such other amounts as the Members shall Approve as a Major Decision.

"Axiom Affiliate" means any Affiliate of the Axiom Member.

"Axiom Indemnitor" means a creditworthy Affiliate of Axiom Member designated by Axiom Member in its sole and absolute discretion.

"Axiom Member" is the Person identified in the introductory paragraph of this Agreement, together with its transferees and assigns to the extent permitted by this Agreement.

"Bankruptcy Proceeding" means (1) the filing by a specified Person of a petition for its bankruptcy or reorganization under the U.S. Bankruptcy Code or the laws of any state of the United States, (2) the commencement against a specified Person with or without its consent or approval of any proceeding seeking its bankruptcy, liquidation or reorganization, appointment of a receiver or trustee of its assets, or comparable relief, which proceeding has not been dismissed or discontinued within ninety (90) days after its filing, (3) the conversion at any time of an involuntary proceeding of the type described in clause (2) into a voluntary proceeding with the consent of a specified Person, (4) the entry by a court of competent jurisdiction of a final and unappealable order granting any relief of the type described in clause (1) or (2) above, (5) the admission in writing by a specified Person of its inability to pay its debts generally as they become due and (6) the making by a specified Person of a general assignment for the benefit of its creditors.

"Borrower" is defined in Section 3.4(a).

"Business Day" means Monday through Friday of each week, unless such day is a legal holiday recognized as such by the State of Texas or the State of Delaware.

"Business Plan" means a written business plan that sets forth (1) the goals and objectives of the Members for the Property Owner and the Property, including the sale and refinancing objectives and projections and targeted dates, (2) the strategy and tactics for achieving those goals and objectives and for maximizing the revenues, profits and cash flow from such Property Owner and such Property, (3) the program and services required for operating and maintaining the Property Owner and the Property, (4) a description of the anticipated leasing activity and (5) the proposed activities of the Manager and Sponsor Principals in connection with such Business Plan. The initial Approved Business Plan is attached to this Agreement as Exhibit D and any amendments will be made pursuant to Section 5.7(b).

"Buy-Sell Notice" is defined in Section 7.1(b).

"Buy-Sell Procedures" is defined in Section 7.1(a).

"Calendar Quarter" means each period of three calendar months commencing on January 1, April 1, July 1 and October 1.

"Capital Account" is defined in Section 1.1 of Exhibit F.

"Capital Contributions" means the aggregate amounts contributed to the capital of the Company by any Member pursuant to Article 2 of the Agreement.

"Capital Funding" is defined in Section 3.4(a).

"Claim" is defined in Section 10.5(a).

"Claiming Party" is defined in Section 6.5.

"Closing Date" is defined in Section 7.1(f).

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any succeeding law).

"Company" means the limited liability company formed pursuant to this Agreement.

"Company Costs" means all of the costs and expenditures of any kind and payments thereof made or to be made by the Company or the Property Owner with respect to its operations and maintenance, including, without limitation, all amounts then due for principal, interest, fees and other amounts required under the Senior Loan, which are specified or reflected in an Approved Budget then in effect or hereafter Approved as a Major Decision or otherwise permitted under the terms of this Agreement.

"Control", "Controlling" and "Controlled by" means the ability, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, to direct or cause the direction of the management and policies of a Person (including by being a general partner, a managing member, a manager, an officer or a director of the Person in question).

"Contract of Sale" is defined in the Recitals.

"Contributing Member" is defined in Section 2.3.

"Cost Overrun" is defined in Section 5.8(d).

"Deadlock Notice" is defined in Section 5.2(g).

"Delaware Act" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to that Act.

"Deposit" is defined in Section 7.1(d).

"Distribution Date" means the [ ] day of each calendar month.

"Effective Date" is defined in the Introduction to this Agreement on page 1.

"Emergency Cost" is defined in Section 5.8(f).

"Escrow Agent" means a nationally recognized title insurance company or such company's authorized agent.

"Escrow Agreement" means an escrow agreement entered into by the Company, its Members and the Escrow Agent, for the purpose of having the Escrow Agent hold in escrow temporarily the amounts of any deposits required to be made pursuant to Sections 7.1.

"Executive Order" shall mean an Executive Order of the President of the United States of America.

"Fiscal Year" of the Company means the 12-month period ending December 31 of each year; provided that the initial Fiscal Year shall be the period beginning on the Effective Date and ending on December 31 of the same year and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation, dissolution and termination of the Company is completed and ending on the date that such final liquidation, dissolution and termination is completed. To the extent any computation or other provision of the Agreement provides for an action to be taken on a Fiscal Year basis, an appropriate proration or other adjustment shall be made in respect of the initial and final Fiscal Years to reflect that such periods are less than full calendar year periods.

"Fixed Cost" is defined in Section 5.8(e).

"GAAP" means generally accepted accounting principles applicable to Persons operating in the United States.

"Governmental Authority" shall mean any court, agency, board, bureau, commission, department, office or other authority of any nature whatsoever of any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"Government Lists" shall mean, collectively, (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, and (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order.

"Indemnitor" means either the Company, or a Member, obligated to indemnify, defend and hold harmless an Indemnitee pursuant to Article 10.

"Indemnitee" means either the Company, the Property Owner, a Member, a Sponsor Principal, or other Person that an Indemnitor is obligated to indemnify, defend, and hold harmless pursuant to Article 10 as well as all present and former directors, officers, shareholders, partners, members, employees, agents (including accountants, attorneys and other professional advisers), and other Affiliates of the specified Indemnitee.

"Initial Capital Contribution" is defined in Section 2.1.

"IRR" means the discount rate, which shall be compounded monthly and expressed as a percentage based on a year of 365 or 366 days, as the actual case may be, at which the net present

value, as of the date a Member makes each Capital Contribution to the Company pursuant to the Agreement, of the sum of all future distributions to such Member pursuant to Article 4 of the Agreement with respect to that Capital Contribution equals the amount of that Capital Contribution. A Member shall be deemed to have received a specified IRR, compounded monthly, with respect to a Capital Contribution it made to the Company upon its receipt of a cumulative amount of distributions pursuant to Article 4 that causes (1) the net present value of the aggregate of all distributions pursuant to Article 4 to such Member with respect to that Capital Contribution, discounted at the specified annual IRR compounded monthly, from the date of each such distribution back to the date on which such Capital Contribution was made (or deemed to be made pursuant to this Agreement), reduced by (2) the amount of such Capital Contribution, to equal zero.

"IRS" means the U.S. Internal Revenue Service or any successor agency or department with primary responsibility for adopting, interpreting, and enforcing provisions of the Code.

"Legal Successor" means the legal representative, heir, legatee, successor or assign of any Person who is legally incompetent or has died.

"Liens" means any mortgage, deed of trust, pledge, lien, encumbrance, charge or security interest, other than liens for taxes not yet due and payable or for taxes that the taxpayer is contesting in good faith through appropriate proceedings.

"Loan Documents" means any note, loan agreement, mortgage, deed of trust or other written agreement or document evidencing or securing any loan to which the Company or the Property Owner is a party, including, without limitation, the Senior Loan Documents.

"Losses" means the dollar amounts of all costs, claims, suits, actions, losses, liabilities, obligations, reasonable fees and expenses of any kind or nature, including costs and expenses of accountants, attorneys and other professionals, judgments, fines, penalties, settlements and all other costs and expenses of any nature or type actually paid or incurred by a specified Person, including, in the case of the Axiom Member, all costs and expenses paid or incurred by the Axiom Member in enforcing the noncompetition covenant set forth in Section 6.7 or amounts expended in connection with curing or preventing any default under the Senior Loan Documents if such default was or would be caused by or is related to a default by the Guarantor under any applicable guaranty or indemnity and in the case of the prevailing Party, all costs and expenses paid or incurred by the prevailing Party in litigating against the other Party or its Affiliate.

"Major Decision" means the decisions, consents and approvals listed in Exhibit B to the Agreement which all require the approval of each Member entitled to approve them pursuant to Section 5.2 of the Agreement.

"Major Decision Deadlock" is defined in Section 5.2(g).

"Major Default" means (1) with respect to the Sponsor Member, (a) the occurrence and continuation of a Removal Event in accordance with Section 5.5(a), (b) a default that is continuing by the Sponsor Member in violation with the restrictions in Section 8.2(b) regarding the Transfer of the Membership Interests of the Sponsor Member or the Transfer of the ownership interests in the Sponsor Member; (2) with respect to the Axiom Member, a default that is continuing by the Axiom Member in violation with the restrictions in Section 8.2(a) regarding the Transfer of the Membership Interests of

the Axiom Member or the Transfer of membership interests in the Axiom Member; and (3) with respect to a Member, a Bankruptcy Proceeding has been commenced or filed against a Member and has not been dismissed or discharged within ninety (90) days after it was commenced or filed.

"Manager" means the Manager designated and serving in that capacity in accordance with Section 5.4 at the time of any specified action or determination.

"Members" means the Sponsor Member and the Axiom Member and their Affiliates which own a Membership Interest (if any) and their Permitted Successors in its or their capacities as members in the Company.

"Membership Interest" means the interest of a Member in the Company, including such Member's right (1) to a distributive share of the assets or property of the Company as set forth in Articles 4 and 13, (2) to allocations of items of income, gain, loss, deduction and credit of the Company as set forth in Article 12 and Exhibit F of this Agreement, (3) to participate in the management and operation of the Company in accordance with the terms set forth in Article 5 and elsewhere in this Agreement, and (4) to inspect the books and records of the Company as provided in Section 11.1 and such other rights to participate in the management and operation of the Company as are expressly set forth in this Agreement.

"Monthly Statement" is defined in Section 11.3(a).

"Net Capital Transaction Proceeds" means the available net proceeds (after making required payments of Senior Loan and Company Costs) from (1) any financing or refinancing of the Property or any part thereof other than the Senior Loan, which is in place as of the Effective Date, and (2) any sale, disposition, taking or loss (including the proceeds from any conveyance in lieu thereof or title or casualty insurance policies, other than rental income insurance) of the Property or any part thereof, less payment of all costs and other expenses related thereto, any amounts expended to repair or replace any part of the Property taken or destroyed and any other obligations of the Company or the Property Owner then due.

"Net Income" and "Net Losses" mean for purposes of the tax provisions in Article 12 and Exhibit F, the net income or losses of the Company as determined in accordance with the method of accounting followed by the Company for federal income tax purposes, including for all purposes: (1) any income exempt from tax; (2) any expenditures of the Company which are described in Section 705(a)(2)(B) of the Code or are treated as Section 705(a)(2)(B) expenditures under Treasury Regulation § 1.704-1(b)(2)(iv)(i); and (3) any adjustments to the book value of any Company asset pursuant to the Treasury Regulations; *provided, however*, if any property is carried on the books of the Company at a value that differs from that property's adjusted basis for tax purposes, then any gain, loss, depreciation and amortization with respect to such property shall be computed with reference to the book value of such property, consistently with the requirement of Treasury Regulation § 1.704-1(b)(2)(iv)(g); and provided, further, that any item allocated under Section 1.3 of Exhibit F shall be excluded from the computation of Net Income and Net Losses.

"Non-Contributing Member" is defined in Section 2.3.

"Non-Manager Member" means the Axiom Member unless it becomes the Manager pursuant to Section 5.5 and the Sponsor Member if it ceases to be the Manager pursuant to Section 5.5, and their Permitted Successors in their capacity as Non-Manager Members of the Company.

"Notice" is defined in Section 14.1.

"Obligation" means any contractual, legal, financial or other obligation or liability of a specified Person, whether fixed, contingent, matured or unmatured.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Offer Price" is defined in Section 7.1(b).

"Offeree" is defined in Section 7.1(b).

"Offeror" is defined in Section 7.1(b).

"Operating Account" is defined in Section 11.2(b).

"Outside Response Date" is defined in Section 7.1(c).

"Parties" means the Members and Sponsor Principals who have signed the Agreement.

"Patriot Act" shall mean, collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56), as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"Patriot Act Offense" shall mean (i) any violation of the laws of the United States of America or of any of the several states, or any act or omission that would constitute a violation of such laws if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or money laundering, including any offense under (a) the laws against terrorism; (b) the laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or (e) the Patriot Act, or (ii) the conspiracy to commit, or aiding and abetting another to commit, any violation of any such laws.

"Percentage Interest" means the percentage interest of each Member for purposes of certain distributions and allocations as set forth in this Agreement. The values of the Percentage Interests of the Members are as set forth in Schedule 2.1.

"Permitted Affiliate" is defined in Section 8.4(a).

"Permitted Successor" means the heirs, legatees, administrators, personal representatives, successors, and assigns of a specified Party to the extent that a Transfer of that Party's Membership Interest in the Company or of an ownership or other beneficial interest in that Party is permitted by the terms of this Agreement or has been Approved by the other Parties to the extent required by this Agreement.

"Person" means an individual or a general partnership, limited partnership, corporation, professional corporation, limited liability company, limited liability partnership, joint venture, trust, business trust, cooperative or association or any other legally-recognized entity.

"Plan Modification Deadline" is defined in Section 5.7(b).

"Preferred Return" means at any date an amount equal to a cumulative annual return of [    ]%, compounded annually, on the basis of a three hundred and sixty (360) day year and on an amount equal to (a) each dollar of the Capital Contributions (other than Priority Additional Capital Contributions) of a Member plus (b) the amount of any accrued but unpaid Preferred Returns, from the first day that such dollar is contributed to the Company by such Member or such Preferred Return is earned until the date that such amount is returned to such Member pursuant to Section 4.1(c) or (d), such amounts to be calculated on a daily basis.

"Priority Additional Capital Contribution" is defined in Section 2.3.

"Priority Preferred Return" means at any date an amount equal to a cumulative annual return of [    ]%, compounded annually, on the basis of a three hundred and sixty (360) day year and on an amount equal to (a) each dollar of the Priority Additional Capital Contributions of a Member plus (b) the amount of any accrued but unpaid Priority Preferred Return, from the first day that such dollar is contributed to the Company by such Member or such Priority Preferred Return is earned until the date that such amount is returned to such Member pursuant to Section 4.1(c) or (d), such amounts to be calculated on a daily basis.

"Prohibited Person" shall mean any Person (a) listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders; (b) that is owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224; (c) with whom the Axiom Member or Sponsor Member is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including Executive Order No. 13224; (d) who commits, threatens, conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (e) that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or at any replacement website or other replacement official publication of such list; (f) that is subject to trade restrictions under United States law, including, without limitation, the Patriot Act, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder; (g) that is listed on any Government List; (h) that has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense; (i) that is currently under investigation by any Governmental Authority for alleged criminal activity; or (j) who is an Affiliate of any Person that is described by or that satisfies any of clauses (a) through (i) above.

"Project" is defined in the Recitals.

"Property" means (1) the real estate, buildings, and other improvements known as "___________", consisting of _____________, located at ______________________________, (2) all personal property located now or hereafter at the foregoing real property being acquired by the Company or the Property Owner for the purpose of [developing, constructing, renovating, maintaining, and operating] the real estate, buildings, and other improvements referred to in clause (1), (3) all easements, licenses and other rights relating to any of the foregoing, and (4) all other assets or property of whatever kind or nature owned by the Company or the Property Owner from time to time.

"Property Management Agreement" means that certain Property Management Agreement dated as of [_______], 20[__], between the Property Owner and the Property Manager.

"Property Manager" means [__________] or any successor Approved by the Members.

"Property Owner" means [Property Owner LLC, a Texas limited liability company.]

"Quarterly Transaction Report" is defined in Section 11.3(b).

"Removal Event" is defined in Section 5.5(a).

"Response Notice" is defined in Section 7.1(c).

"Senior Lender" is defined in Section 3.1.

"Senior Loan" means the Senior Loan described in Article 3, any refinancing or restructuring by the Company or the Property Owner of the Senior Loan Approved as a Major Decision, and any other indebtedness for money borrowed by the Company or the Property Owner Approved as a Major Decision.

"Senior Loan Agreement" means that certain [_________] dated [________], by and between the Property Owner and Senior Lender.

"Senior Loan Documents" means the Senior Loan Agreement and each note, mortgage, deed of trust, pledge agreement, assignment of rents or membership interests, and all other documents evidencing or securing the Senior Loan.

"Sponsor Affiliate" is defined in Section 5.3(a).

"Sponsor Member" is the Person identified in the introductory paragraph of this Agreement, together with its transferees and assigns to the extent permitted by this Agreement.

"Sponsor Principals" means [________], an individual, and [________], an individual.

"Term" is defined in Section 1.4.

"Third Party" means the Senior Lender and any other Person who is not a Party to this Agreement and not an Affiliate of a Party to this Agreement.

"Third Party Capital Provider" is defined in Section 3.4(a).

"Third Party Participant" is defined in Section 6.7(a).

"Third Party Participant Term Sheet" is defined in Section 6.7(a).

"Third Party Term Sheet" is defined in Section 3.4(a).

"Transfer" and related usages of that term means any sale, transfer, assignment, pledge, hypothecation or other disposal of all or any part of a Membership Interest (including economic interests) or any direct or indirect ownership interest in a Member in any manner, whether directly or indirectly by Transfer of all or a portion of any type of equity, profits, distribution, or other ownership interest, and shall include the ability to approve or have any right to vote on, consent to, or veto any decision or matter set forth in this Agreement and a right to receive any share or portion of payments of dividends, distributions, or profits. The term "Transfer" shall not include for any purpose the transfer of shares of capital stock or equity of any Affiliate of the Axiom Member in public or private sales.

"Treasury Regulations" means the Income Tax Regulations and Procedures and Administration Regulations promulgated under the Code, as amended from time to time.

"Uncontrollable Expenses" shall mean, the following expenditures to the extent necessary to preserve the Property: (1) taxes, (2) utility charges, (3) insurance and (4) payments due under any Senior Loan, including any fees, costs or other charges and including establishing any reserves required by the Senior Loan (or payment of any other scheduled payment under such Senior Loan, including without limitation, the entire amount of the Senior Loan at maturity).

"Working Capital Account" is defined in Section 11.2(a).

**Rules of Interpretation**

The following rules shall be applied by the Members and all other Persons (including judges) in the determination, evaluation, interpretation and enforcement of the provisions of this Agreement, unless another provision of the Agreement expressly applies another rule:

(a) The provisions of all Exhibits and Schedules to the Agreement are incorporated into and made an integral part of the Agreement as though they had been fully set forth in the actual text of the Agreement.

(b) Any financial or accounting term used, but not otherwise defined, in this Agreement shall have the meaning given to it under GAAP.

(c) Any reference to a right, benefit, action, decision, or other item or matter in this Agreement is intended to allow its making, taking, or other exercise to the fullest extent permitted by the Delaware Act or other applicable law.

(d) The word "including" is not limiting and shall be construed as meaning "including, without limitation."

(e) The word "or" is not exclusive.

(f) The singular includes the plural and the plural includes the singular.

(g) The masculine gender includes the feminine and neuter and vice versa.

(h) References to a law include any rule or regulation issued under the law, any amendment to a law, rule or regulation, any successor law, rule or regulation and all applicable judicial interpretations of any such law, rule or regulation.

(i) The caption headings of Articles and Sections in the Agreement are for convenience only and do not necessarily define, modify, extend, limit, or describe the scope or intent of any of the terms of this Agreement.

(j) The Agreement shall be interpreted and enforced in accordance with its provisions and without the aid of any custom or rule of law requiring or suggesting construction against the party drafting, commenting on, or causing the drafting or redrafting of, the provision in question.

(k) If appropriate, in light of the context in which it is used, the word "Company" shall refer to both the Company and the Property Owner.

**EXHIBIT B**

**Description of Major Decisions**

Any decision, approval, or consent with respect to the following matters regarding the Company and/or the Property Owner is a Major Decision that requires the approval of both Members pursuant to Section 5.2 unless such matter has already been expressly Approved in the Business Plan or Budget then in effect:

(a) approval of the terms and conditions of any indebtedness (including the Senior Loan) of the Company and/or the Property Owner for money borrowed by the Company and/or the Property Owner;

(b) approval of the terms and conditions of any modification, amendment or refinancing of any Senior Loan;

(c) approval of any action or inaction by the Company and/or the Property Owner that would violate an affirmative or negative covenant or other provision of a Senior Loan Document, lease, or other material agreement binding on the Company, the Property Owner, or the Property or that would be a significant accounting decision;

(d) except as contemplated by Article 13 (regarding liquidation and dissolution of the Company and/or the Property Owner) or Section 5.2(g), approval of the sale or other disposition of any portion or all of the Property other than sale or disposition of personal property being replaced in the ordinary course of business, the merger or consolidation of the Company and/or the Property Owner with any other Person or the liquidation or dissolution of the Company and/or the Property;

(e) acquisition of any additional property other than in the ordinary course of business;

(h) changing the name or the nature of the business of the Company or the Property Owner;

(i) approval, amendment, or modification of any Business Plan or Budget or taking any action that is inconsistent with or prohibited by the same;

(j) other than the creation of trade receivables in the ordinary course of business and provided in any Approved Budget, making by the Company or the Property Owner of any loan or incurring any debt whatsoever, or extending credit or acting as guarantor or surety to, for, or on behalf of any other Person;

(k) commencing or threatening any legal proceeding or litigation of any type on behalf of the Company, the Property Owner, or the Property seeking in excess of $500,000;

(l) settling, compromising or taking any other material action with respect to any litigation or legal proceeding of any type by, against, or involving the Company, the Property Owner, or the Property for an amount exceeding $500,000;

(m) filing any insurance claim expecting to exceed $100,000 or the reduction of any levels of insurance held by the Company and/or the Property Owner;

(n) creation of any Lien on the Property not contemplated by the Senior Loan;

(o) issuance or sale of additional Membership Interests or admission of a new member in the Company or the Property Owner other than in accordance with Article 7 or 8 of the Agreement;

(p) filing or commencement of any Bankruptcy Proceeding by or on behalf of the Company or the Property Owner; consenting to the institution or continuation of any involuntary Bankruptcy Proceeding against the Company or the Property Owner or the conversion of an involuntary proceeding into a voluntary proceeding; the admission in writing by the Company or the Property Owner of its inability to pay its debts generally as they become due; or the making by the Company or the Property Owner of a general assignment for the benefit of its creditors;

(q) expending any funds in a manner that is inconsistent with any Approved Budget then in effect;

(r) approval of any action described in this Agreement that refers to action by "the Members", "both Members", or "each Member" or contains language comparable to those phrases;

(s) approval of the terms and conditions of any indemnification agreement to be signed by or on behalf of the Company or the Property Owner;

(t) approval of any amendment of this Agreement or of the organizational documents of the Property Owner;

(u) approval or implementation of any modification or termination of, or waiver under, any agreement or other document described above whose approval constitutes a Major Decision; and

(v) making any decision, approval or consent or taking any action that is not described above and that (1) is not in the ordinary course of business of the Company or the Property Owner or (2) a Member reasonably expects is likely to materially and adversely affect the Company, the Property Owner, the Property, any Member or the business or operations of the Company or the Property Owner.

# EXHIBIT C

## List of Major Decisions Already Approved

As of the Effective Date, both Members pursuant to Section 5.2(e) have approved the following Major Decisions:

(a) Acquisition of the Property pursuant to the Contract of Sale.

(b) Obtaining the Senior Loan pursuant to the Senior Loan Documents.

(c) Approval of initial Business Plan.

(d) Approval of initial Budget.

(e) Approval of [__________] as the Company's Accountant.

(f) Approval of [__________] as the Company's Legal Counsel.

(g) Approval of [__________] as the Project's construction general contractor.

(h) Approval of [__________] as the Project's chief architect or design professional.

(i) Approval of [__________] as the Property Manager.

**EXHIBIT D**

**Approved Business Plan**

(attached hereto)

**EXHIBIT E**

**Approved Budget**

(attached hereto)

# EXHIBIT F

## Capital Accounts; Tax Allocations

Section 1.1 Capital Account. Capital Account means, with respect to each Member, the account established and maintained for the Member on the books of the Company in compliance with Treasury Regulation §§1.704-1(b)(2)(iv) and 1.704-2, as amended. This Section shall be interpreted and applied in a manner consistent with such Treasury Regulations. Subject to the preceding sentence, each Member's Capital Account will initially equal the amount of cash and fair market value of property contributed (as of the date of such contribution, net of liabilities secured by the property that the Company is considered to assume or take subject to under Code Section 752) by such Member to the Company. Throughout the term of the Company each Member's Capital Account will be (a) increased by the amount of (1) income and gains allocated to such Member pursuant to the following provisions of this Exhibit and (2) the amount of any cash and the fair market value of any property subsequently contributed by such Member to the Company (as of the date of such contribution, net of liabilities secured by the property that the Company is considered to assume or take subject to under Code Section 752), and (b) decreased by the amount of (1) losses and deductions allocated to such Member pursuant to the following provisions of this Exhibit and (2) the amount of distributions of cash and the fair market value of distributions of property (as of the date of such distribution, net of liabilities secured by the property that the Member is considered to assume or take subject to under Code Section 752) distributed to such Member.

Section 1.2 Capital Account Adjustments for Revaluations. Whenever the Company would be permitted to adjust the Capital Accounts of the Members pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(f) to reflect revaluations of the Property, the Company, with the prior written consent of the Members, may so adjust the Capital Accounts of the Members. In the event that the Capital Accounts of the Members are adjusted pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(f) to reflect revaluations of the Property (a) Net Income and Net Loss shall be determined in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, (b) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Code Section 704(c), and (c) the amount of upward and/or downward adjustments to the book value of the Property shall be treated as income, gain, deduction and/or loss for purposes of applying the allocation provisions of this Exhibit.

Section 1.3 Allocations of Net Income and Net Losses. The Company shall allocate all Net Income and Net Loss among the Members (and shall not specially allocate items thereof without the consent of Axiom Member) in such a manner as to produce this result (to the extent possible): after the allocation of Net Income and Net Loss (and other items of book income, gain, loss, and deduction as determined pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv) for the Fiscal Year, the Capital Account of each Member increased by the sum of such Member's share of partnership minimum gain (within the meaning of Treasury Regulation Section 1.704-2(d)) plus such Member's share of partner nonrecourse debt minimum gain determined in accordance with Treasury Regulation Section 1.704-2(i)(5) shall equal the amount that would be distributed to the Member pursuant to Section 4.1(d) upon a Hypothetical Liquidation. For this purpose,

(a) *"Hypothetical Liquidation"* means:

(1) a sale of all of the Company's assets for an amount equal to (and producing gross proceeds before reduction by liabilities equal to) the *"book value"* of these assets,

(2) the proceeds were first applied to the discharge of Company liabilities at face amount (whether secured or unsecured) (or, in the case of property encumbered by nonrecourse liabilities, an amount equal to the greater of the amount of these nonrecourse liabilities or the book value of the property), and

(3) the remaining net cash proceeds were held for distribution pursuant to Section 4.1(d) except in the year in which substantially all of the Property is disposed of.

(b) *"Book value"* means "book value" as used in Treasury Regulations Section 1.704-1(b)(2)(iv).

Section 1.4 Other Allocation Provisions.

(a) Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations 1.704-2(f), notwithstanding anything to the contrary in this Exhibit, if there is a net decrease in "partnership minimum gain" (within the meaning of Treasury Regulation § 1.704-2(d)) for a Fiscal Year, then there shall be allocated to each Member items of income and gain for such Fiscal Year equal to such Member's share of the net decrease in partnership minimum gain (within the meaning of Treasury Regulation § 1.704-2(f), provided, that if the Company has any discretion as to an exception set forth pursuant to Treasury Regulation § 1.704-2(f)(5), the Members may exercise such discretion on behalf of the Company). In the event that the application of the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members, the Members may request that the IRS waive the minimum gain chargeback requirement pursuant to Treasury Regulation § 1.704-2(f)(4). Any Member's share of Company Minimum Gain shall be determined in accordance with Treasury Regulation §1.704-2(g)(1). The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulation § 1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(b) Member Minimum Gain Chargeback. If during a Fiscal Year there is a net decrease in partner nonrecourse debt minimum gain (as determined in accordance with Treasury Regulation § 1.704-2(i)(3)), then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of that partner nonrecourse debt minimum gain (determined in accordance with Treasury Regulation §1.704-2(i)(5)) as of the beginning of the Fiscal Year shall, subject to the exceptions in Treasury Regulation §1.704-2(i)(4) (including the exceptions analogous to those in Treasury Regulation §1.704-2(f)(2), (3), (4) and (5), provided, that if a limited liability company has any discretion as to the exception set forth pursuant to Treasury Regulation §1.704-2(f)(5) as made applicable by Treasury Regulation §1.704-2(i)(4), the Members may exercise such discretion on behalf of the Company), be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in the partner nonrecourse debt minimum gain. In the event that the application of the partner nonrecourse debt minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members, the Members may request that the IRS waive the minimum gain chargeback requirement pursuant to Treasury Regulation §§1.704-2(f)(4) and 1.704-2(i)(4). The foregoing is intended to be the "chargeback of partner recourse debt minimum gain" required by Treasury Regulation §1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(c) Nonrecourse Deductions. Notwithstanding anything to the contrary in this Exhibit, nonrecourse deductions shall be allocated to the Members in accordance with their Percentage Interests. Nonrecourse deductions shall have the meaning set forth in Treasury Regulation §1.704-2(b)(1).

(d) Qualified Income Offset. If, during any Fiscal Year, a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases a deficit balance in the Member's Adjusted Capital Account, there shall be allocated to the Member items of income and gain (consisting of a pro rata portion of each item of Company income (including gross income, and gain for such year), in an amount and manner sufficient to eliminate such deficit as quickly as possible. The foregoing is intended to be a "qualified income offset" provision as described in Treasury Regulation § 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation. A Member's "Adjusted Capital Account," at any time, shall equal the Member's Capital Account at such time (i) increased by the sum of (A) the amount of the Member's share of partnership minimum gain as defined in Treasury Regulation §1.704-2(g)(1) and (3), (B) the amount of the Member's share of partner nonrecourse debt minimum gain as defined in Treasury Regulation §1.704-2(i)(5), and (C) any amount of the deficit balance in its Capital Account the Member is obligated to restore on liquidation of the Company, and (ii) decreased by reasonably expected adjustments, allocations and distributions described in Treasury Regulation §§1.704-1(b)(2)(ii)(d)(4), (5) or (6). The foregoing is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(e) Member Nonrecourse Deductions. Notwithstanding anything to the contrary in this Exhibit, to the extent required by Treasury Regulation §1.704-2(i), any items of income, gain, loss or deduction of the Company that are attributable to a nonrecourse debt of the Company that constitutes partner nonrecourse debt as defined in Treasury Regulation §1.704-2(b)(4) (including chargebacks of partner nonrecourse debt minimum gain) shall be allocated in accordance with the provisions of Treasury Regulation §1.704-2(i). This Section 1.4(e) is intended to satisfy the requirements of Treasury Regulation §1.704-2(i) (including the partner nonrecourse debt minimum gain chargeback requirements) and shall be interpreted and applied in a manner consistent therewith.

(f) Loss Limitation. Notwithstanding anything to the contrary in Section 1.3:

(1) The Net Losses allocated pursuant to Section 1.3 of this Exhibit to any Member for any Fiscal Year shall not exceed the maximum amount of Net Losses that may be allocated to such Member without causing such Member to have a negative balance in its Adjusted Capital Account at the end of such Fiscal Year.

(2) If some but not all of the Members would have deficits in their Adjusted Capital Accounts as a consequence of allocations of Net Losses pursuant to Section 1.3, the limitations set forth in this Section 1.4(f) shall be applied by allocating Net Losses pursuant to this Section 1.4(f)(2) only to those Members who would not have a deficit in their Adjusted Capital Account as a consequence of receiving such an allocation of Net Losses (the allocation of such Net Losses among those Members to be in accordance with their Percentage Interests).

(3) If no other Member may receive an additional allocation of Net Losses pursuant to Section 1.4(f)(2), such additional Net Losses not allocated pursuant to Section 1.4(f)(2) shall be allocated solely to those Members who bear the economic risks for such additional Net Losses within the meaning of Section 704(b) of the Code and the Treasury Regulations thereunder.

(g) Reversal of Regulatory Allocations. To the extent that any item of income, gain, loss or deduction has been specially allocated pursuant to paragraphs (a), through (e) of this Section 1.4 and such allocation is inconsistent with the way in which the same amount otherwise would have been allocated under Section 1.3, subsequent allocations under Section 1.3 of this Exhibit shall be made, to the extent possible and without duplication pursuant to a manner consistent with the Treasury Regulations under Code Section 704(b), which negate as rapidly as possible the effect of all such inconsistent allocations under such paragraphs (a) through (e).

(h) Distributions of Property. Solely for the purpose of adjusting the Capital Accounts of the Members, and not for tax purposes, if any property is distributed in kind to any Member, the difference between its fair market value (as determined in the reasonable judgment of the Members) and its book value at the time of distribution shall be treated as gain or loss recognized by the Company and allocated pursuant to the provisions of Section 1.3 of this Exhibit.

(i) Transfer of Membership Interest. Except to the extent otherwise required by the Code and Treasury Regulations, if a Membership Interest or part thereof is transferred in any Fiscal Year, the items of income, gain, loss, deduction and credit allocable to such Membership Interest or such Members, as the case may be, for such Fiscal Year shall be apportioned between the transferor (or Contributing Member) and the transferee (or Non-Contributing Member) using the closing of the books method under Section 706 of the Code.

(j) Order of Allocations. Any allocations made pursuant to this Exhibit shall be made in the following order of priority: (i) Section 1.4(a); (ii) Section 1.4(b); (iii) Section 1.4(d); (iv) Section 1.4(e); (v) Section 1.4 (c); (vi) Section 1.4(g); and (vii) Section 1.3, as modified by Section 1.4(f).

Where any provision depends on the Capital Account of any Member, that Capital Account shall be determined after the operation of all preceding provisions for the Fiscal Year.

Section 1.5 Allocations for Income Tax Purposes. The income, gains, losses, deductions and credits of the Company for federal income tax purposes shall be allocated in the same manner as the corresponding items were allocated pursuant to Sections 1.3 and 1.4 of this Exhibit; provided that solely for federal income tax purposes and not for book or Capital Account purposes, income, gain, loss and deduction shall be allocated as follows: in the case of property contributed in kind and in the case of other property, to the extent applicable, in accordance with the principles of Code Sections 704(b) and 704(c) and the Treasury Regulations promulgated under such Code Sections.

Section 1.6 Distributions of Nonrecourse Liability Proceeds. If during a Fiscal Year the Company makes a distribution to any Member that is allocable to the proceeds of any nonrecourse liability of the Company that is allocable to an increase in Company Minimum Gain pursuant to Treasury Regulation §1.704-2(h), then the Company shall elect, to the extent permitted by Treasury Regulation §1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in Company Minimum Gain.

Section 1.7 Limitations for Axiom Member. Notwithstanding anything to the contrary in this Agreement, with regard to any Fiscal Year, the Axiom Member shall not be allocated taxable income (or gross income) or Net Income in excess of the sum of the distributions of Priority Preferred Return actually made to the Axiom Member for such Fiscal Year.