# AMENDED AND RESTATED COMPANY AGREEMENT OF 29999TC ACQUISITIONS, LLC A DELAWARE LIMITED LIABILITY COMPANY

**April 16, 2021**

THE MEMBERSHIP INTERESTS OF29999TC ACQUISITIONS, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, N PURSUANT TO THE PROVISIONS OF ANY STATE SECURITIES ACT.



**EXHIBIT "22"**

This Amended and Restated Company Agreement (this "Agreement") of 2999TC Acquisitions, LLC f/ka MO 2999TC, LLC, ("Company") is executed as of April 16, 2021 (the "Effective Date") by the persons who sign and are identified as "Members" and "Manager" in this Agreement. This Agreement replaces in full the Company Agreement executed September 9, 2019 including any amendments thereto.

## RECITALS

WHEREAS the Company was formed in September 2019 for the purpose of acquiring and developing the Property as further described herein.

WHEREAS 2999 Turtle Creek, LLC, a Delaware limited liability company (the Original Lender") made a loan to Company in the original principal amount of $32,500,000.00 evidenced by, among other things a Secured Promissory Note, dated September 20, 2019, in the principal amount of $32,500,000.00, and such Note was transferred and conveyed to HNGH Turtle Creek, LLC ("Current Lender") which currently holds the Note. The Note is secured by a deed of trust on the Property recorded as document number 201900253450 in the real property records of Dallas County, Texas.

WHEREAS the Company seeks to admit a new member, Tall Ship DTC, LLC, an Wyoming limited liability company, ("Tall Ship") in exchange for certain capital contributions from Tall Ship along with certain other agreed covenants, rights, and obligations in order for the Company to pay off the Note to the Current Lender including accrued interest and related costs totaling approximately $40 million ("Current Debt").

WHEREAS Tall Ship or is related entities has entered into a loan purchase agreement to acquire Current Debt including the Note and related loan documents and agreements from the Current Lender (collectively, "Current Loan Agreement") upon which Tall Ship become the successor to the Current Lender.

WHEREAS the Members of the Company wish to amend the Company Agreement of the Company in this Agreement for the primary purpose of defining the terms under which the Company and its Members and Tall Ship agree to admit Tall Ship as a Class A (defined herein) Member in exchange for the Tall Ship Contribution (defined herein) that will be used to pay off the Current Debt and to pay for certain predevelopment costs along with other agreed provisions.

WHEREAS the primary intent ("Primary Intent") of the Members is to utilizes the Company for the purpose of paying off and/or refinancing the Current Debt and managing the Property until such time that Members or their affiliates/related entities form a separate entity structure to obtain certain operational efficiencies prior to and for the purpose of owing the Property (which will be assigned and transferred by the Company) and developing the Project including acquiring the necessary construction funding under which the members therein will be bound by substantially the same terms of this Agreement either by way of restatement or assignment primarily related to the management, financing, ownership interests, development, and distributions as stated herein along with the Special Provisions (as described in section 3.09).

## AGREEMENT

NOW THEREFORE for good and valuable consideration the acceptance and sufficiency of which is acknowledged, the Company, its Members, and Managers agree as follows:

## ARTICLE I
## DEFINITIONS

1.01 Definitions. As used in this Agreement, the following terms have the following meanings:

"Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person; (ii) any person that, directly or indirectly, owns or controls 10% or more of the outstanding voting securities or beneficial interests of such other person; (iii) any officer, director, trustee member, manager or general partner of such person; (iv) if such other person is an officer, director, member or manager, trustee or partner of another entity, then the entity for which that person acts in any such capacity; (v) any spouse or issue of the person or any person who is of a relationship described in Section 267 (b) of the Internal Revenue Code substituting 10% in place of 50%, where applicable, and (vi) an entity formed which is to be owned directly or indirectly for the benefit of any of the persons described in subparagraph (v) above. For purposes of this paragraph and for determining when a person is directly or indirectly controlling, controlled by or under, controlled with any other person, the term control shall refer to an interest of 10% or more of the outstanding voting securities or beneficial interest of such person.

"Agreement" has the meaning set forth in the preamble which may also be referred to as the "Regulations" or "Bylaws" of the Company.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member as permitted herein, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent the Class A Members consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired

without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Delaware are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member and shall include all Initial Contributions and Additional Contributions

"Cash Portion of the Capital Account" shall mean the cash value of a Member's Capital Account as may be adjusted herein and at Exhibit A.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Class" means the specific group of Members as designated herein under which each Class may have different rights, obligations, and ownership interests as described herein. Each Class shall own a certain Percentage Interests of the Company which shall total one hundred percent (100%) as further identified in Exhibit A.

"Company" means 2999TC ACQUISITIONS, LLC, a Delaware limited liability company.

"Competing Business" shall mean any partnership, entity, association, joint venture, company, or agreement for the construction, development, sales, marketing, promotion, representation, or management of a project involving either a hotel or residential condominiums or both within a ten (10) mile radius of the Property.

"Distributable Cash" shall have the meaning ascribed to such term in Section 5.02(a).

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Delaware Code" means the Delaware Code as it applies to Delaware Limited Liability Companies as may be amended from time to time, and any successor to such Act.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however,

this term does not include a person who ceases to be a Member as a result of bankruptcy, default, or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the Delaware Code, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) three percent (3%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Majority"/"Majority in Interest"/"Majority of the Members"/"Simple Majority" means the consent or approval of one or more of the Members which are entitled to vote having among them more than fifty percent (50%) of the applicable Class Membership Interests, where a consent within the Class is required, or otherwise having among them more than fifty percent (50%) of the ownership interests entitled to vote in the Company.

"Managing Member(s)" shall be the Members 2999TC Acquisitions MZ, LLC and Tall Ship DTC, LLC which shall have the same rights, authorities, and obligations as a "Manager."

"Manager(s)" shall be those persons or legal entities that are not Members which may be appointed by each Managing Member to serve as a Manager in place of and at the direction of such Managing Member and which may only be removed by such Managing Member without consent of any other Managers or Members. Each Managing Member may appoint a single Manager. Where a Managing Member has not appointed a Manager, then such Managing Member serve as the Manager. Unless otherwise provided herein, any authority or action taken by the Manager shall require the unanimous consent of the Managers. Where a Managing Member has appointed a Manager, only such Manager shall have the right to vote or consent to any action to be taken by the Managers. Unless otherwise and specifically stated herein, any right, consent, or action to be taken by a single "Manager" shall mean such right, consent, or action taken upon the consent of all Managers and where consented the Operational Manager shall actually perform such action including the execution of any agreements and documents regardless of any conflict herein. Managers shall owe fiduciary duties to the Company and Members.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement with such admittance being contingent upon the Member contributing their required Capital Contribution and consenting to the terms of this Agreement, but does not include any person who has ceased to be a Member of the Company. Each

Member will be designated as a Class A Member, a Class B Member, or a Class C Member which corresponds with such classifications of the Membership Interests as defined herein.

"Membership Interest" means the Percentage Interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve. Membership Interests may be divided into one or more Classes. The holders of record of the different Classes of Membership Interests shall have such rights and obligations associated with such Membership Interests as are provided in this Agreement. Each Class shall own a designated percentage of the Company with the total of all Classes of Membership Interests equaling 100% of the Membership Interests of the Company and any issuance of any new Membership Interests in any Class shall cause a proportionate reduction of all Members' Membership Interests within that Class without affecting the proportionate ownership of any Member in a separate Class or the total ownership interests of any Class.

(i) Class A Membership Interests. Class A Membership Interests are voting Membership Interests of the Company. Any decisions of the Class A Members shall be made by a vote pursuant to which all of such Class A Members shall be allocated votes in proportion to their Percentage Interests of the Class A Members. Unless otherwise specified herein, the unanimous consent of the Class A Members and Managers/Managing Members, present or not present, is required to approve a decision of the Company subject to the rights and authority granted herein to the Manager(s) and/or any officer and as may be further restricted herein.

(ii) Class B Membership Interests. Class B Membership Interests are non-voting Membership Interests and shall have no right to vote on any matter except as expressly set forth in this Agreement or which is required by the Delaware Code only to the extent the Delaware Code prohibits this Agreement from amending such voting rights.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio of ownership interests of the Members. As used herein, Percentage Interest may refer to the ratio of ownership within a Class or the ratio of ownership of the Company for each Class. The sum of the Percentage Interests of each Class shall be one hundred percent (100%). The sum of the Percentage Interests of the Members within each Class shall total one hundred percent (100%) for each Class. The Percentage Interest of ownership in the Company for each Member shall be determined by (a) multiplying the Percentage Interest of the Class owned by such Member by (b) the Percentage Interest of the Company owed by that same Class.

"Operational Manager" means the Manager or Managing Member which shall represent the Company and take the lead in and direct the development and operation the Project including planning, coordinating, and initiating certain actions in the furtherance of the development and operation of the Project as further directed by the Manager(s). However, the Operational Manager shall have no additional authority to act on behalf of

or bind the Company except as consented to by the Managers as provided herein. The initial Operational Manager shall be 2999TC Acquisitions MZ, LLC ("2999 MZ") or such related or affiliate entity of 2999 MZ as designated by 2999 MZ or as may otherwise be agreed to by the Managers.

"Permitted Transferee" means (i) any Person directly or indirectly controlling, controlled by or under common control with the Member; or (ii) any trust for the Member, the Member's spouse or children or any other person who is of a relationship described in Section 267(b) of the Internal Revenue Code substituting 80% in place of 50%, where applicable, provided the Member is the sole acting trustee of the trust (with the understanding that when the Member is no longer the sole acting trustee this may be an unauthorized transfer thereafter). For purposes of this paragraph and for determining when a Person is directly or indirectly controlling, controlled by, or under control with any other Person, the term control shall refer to an interest of 80% or more of the outstanding voting interests or beneficial interest of such Person.

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Preferred Capital Contribution" means the Capital Contributions designated as a Preferred Capital Contribution as provided herein which shall be paid before any other distributions to the Members and which shall earn a Preferred Return along with any other rights and benefits that may be afforded to a Member's Preferred Capital Contribution which may vary between Members as agreed to herein including but not limited to section 3.09 (Special Provisions).

"Preferred Return" means an annual rate of return of ten percent (10%), accrued and compounded annually, on the total unrecovered Preferred Capital Contributions in addition to any other distributions defined herein. Preferred Returns shall begin to accrue on the later of the Effective Date of this Agreement or the date the Preferred Capital Contribution is remitted to the Company. Unless otherwise agreed to, accrued but unpaid Preferred Returns shall compound on an annual basis.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.'

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment. For the purposes of a Transfer of a Membership Interest, a "Transfer" shall include the transfer of any ownership interests or other rights in the Member entity, including its ownership structure where multiple entities are involved, which results or could result in any change of control of such Member entity.

"Unanimous Consent" means the consent or approval of, as applicable, either (i) all the Members which are entitled to vote having among them all of the applicable Class

Membership Interests, where a consent within the Class is required, or otherwise all of the Membership Interests in the Company or (ii) all Managers. Unless otherwise stated in this Agreement, approval, consent, and synonyms thereof shall mean "Unanimous Consent."

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 Formation. The Company has been organized as a Delaware limited liability company by filing a Certificate of Formation with the Secretary of State of Delaware, which may be amended or restated from time to time.

2.02 Name. The name of the Company is "2999 TC ACQUISITIONS, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Manager may select from time to time.

2.03 Registered Office and Registered Agent. The registered office of the Company required by the Delaware Code to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Manager may designate from time to time in the manner provided by law.

2.04 Principal Office and Other Offices. The principal office of the Company in the United States shall be at such place as the Manager may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices as the Manager may designate from time to time.

2.05 Purposes. The sole business and purpose to be conducted or promoted by the Company is the ownership of real property located at 2999 Turtle Creek Blvd., Dallas, Dallas County, Texas which consists of approximately 2.47 acres and a 37,000 square foot building (which may be demolished and otherwise remodeled) ("Property") and to take such action necessary, including acquiring any necessary debt and equity funding, to construct and develop a mixed use project including a luxury hotel and residences which is planned to consist of a 27-story single tower with a total of 563,976 square feet containing a five-star hotel and private residences including ``76 ultra-luxury hotel rooms, 85 ultra-luxury private residences, full service food and beverage operations, luxury spa, fitness area, recreational facilities with separate guest and resident pools amenity decks, and a parking garage (collectively, "Project") at an estimated development cost of $387,241,651 ("Development Cost"), which may be adjusted based on final development plans, including by engaging certain development and other companies to develop the Project and to engage in any lawful act or activity for which limited liability companies may be organized under the Delaware Code that is related or incidental to and necessary, convenient or advisable for the accomplishment of the foregoing objective and purpose. So long as the existing improvements are not being demolished or remodeled, then 2999 MZ and its related

persons and entities may continue to occupy and utilize the improvements in its sole discretion without compensation to the Company. Notwithstanding the foregoing, the Members' Primary Intent is to limit such purposes of the Company to those activities stated in the Recitals, which are hereby incorporated into this Agreement, until a new ownership structure is established for the purpose stated in the Recitals, but any activities performed by the Company and its Manager (which is consented to as may be required herein) on behalf of the Company which is outside the scope of the Primary Intent which otherwise conforms with purpose of the Company as stated in this section shall not be a breach of this Agreement.

2.06 Powers. The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the Delaware Code, (ii) any other laws in the State of Delaware, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 Foreign Qualification. Prior to the Company's conducting business in any jurisdiction other than Delaware, the Manager shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Manager, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 Term. The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Delaware, and will continue until the Company terminates under the terms of this Agreement.

2.09 Mergers and Exchanges. The Company may be a party to a merger, an exchange, or acquisition under the Delaware Code, subject to the requirements of this Agreement.

2.10 Outside Activities. Neither this Agreement nor the relationship created hereby will preclude or limit, in any respect, the right of any Member or Manager or any Affiliate of any Member or Manager to engage, directly or indirectly, through participation, investment, employment, consulting, lending, or otherwise ("Participation"), in any opportunity or business of any type except as otherwise provided herein. For separate consideration the sufficiency, receipt and acceptance of which is acknowledged by the Members upon execution of this Agreement and unless otherwise consented to by the Manager, each Member while a current Member, including its officers, directors, owners, members, and managers ("Related Persons") which shall continue upon becoming a Former Member, shall be prohibited from any Participation in a Competing Business within a ten (10) mile radius of the Property for a period of 1 year except for those Members and its Related Persons which are owned or controlled by Timothy Barton. This provision shall survive the termination of such Former Member's agreement herein.

2.11 Hotel Brand. The Company has entered into and executed certain agreements and

documents with the Mandarin Oriental Hotel Company and affiliates along with all corresponding documents including but not limited to the following: Onshore Management Agreement; Offshore Management Agreement; License Agreement; Technical Services Agreement; Residences Marketing Agreement; Residences Property Management Agreement; Franchise Exemption Acknowledgment; Subordination and Non-Disturbance Agreement.

2.12. **Capital Structure.** Capital structure for the funding of the Development Cost is estimated and planned to consist of the following unless otherwise consented to by all Managers and Class A Members with a maximum debt to equity ratio of 65% debt and 35% equity with equity consisting of Preferred Capital Contributions, non-preferred/regular Capital Contributions, and mezzanine debt:

| Type | Amount | % of Tot. Development Cost |
|---|---|---|
| Senior Loan | $251,707,073.00 | 65.0% |
| Mezzanine Loan | $72,607,810 | 18.8% |
| Equity* | $62,926,768 | 16.3% |
| (Capital Contributions) | | |
| Total Capital | $387,241,651 | 100.0% |

*Following the Return of Contributions described in section 3.09 (Special Provisions) and any adjustments to the Capital Contributions described in Exhibit A.

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Contributions, and Percentage Interests.** The persons listed on Exhibit A as Class A Members have been or are otherwise admitted to the Company as a Member with all rights related thereto in accordance with its Class, effective as of the Effective Date and receipt of their Capital Contributions As set forth opposite the name of each Member listed on Exhibit A is such Member's Current Total Capital Contributions, its Total Company Membership Interest Percentage, Class, and Class Membership Interests Percentage as of the Effective Date and upon contribution of its Total Capital Contributions. The Classes listed on the table thereafter shall own the Percentage Interests in the Company as stated therein. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. The Company currently has not Class B Members

3.02 Admission of Additional Members.

Additional Members may be admitted to the Company including as additional Class A Members or Class B Members, (collectively, "Additional Members") on such terms and conditions as shall be determined by the Unanimous Consent of the Class A Members and the Manager. The Percentage Interests of the Membership Interests for the Members within the Class shall be reallocated proportionally based on the amount of the total Capital Contributions of the Members within that Class following the Initial Capital Contributions of Additional Members. Likewise, only where an additional Class A Member is admitted shall the Percentage Interest of ownership in the Company for each Class be reallocated based proportion of the total Capital Contributions

of each Class following the receipt of the Capital Contributions of the additional Class A Member. Otherwise, the admission of any Additional Member in any other Class SHALL NOT REDUCE the total Percentage Interest of the Company owned by all Class A Members except upon Unanimous Consent of the Class A Members. The Class B Members shall have no right to consent or approve the admission of any other Member including a Member in their same Class regardless of whether their Membership Interests in their Class or in the Company may be diluted. Where any new Member is being admitted or contributing Additional Capital Contributions, Members within such Class shall be given the opportunity to deliver to the Company such Additional Capital Contributions in order to maintain its Membership Interests percentage in the Company and in the Class on such terms as defined by the Manager. The terms of admission or issuance must specify the Percentage Interests and the Capital Contributions applicable thereto and the time for remittance.

The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Manager and Class A Members may create any new Class and shall reflect such creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by all Manager(s) and all Class A Members.

3.03 Member Rights Specified in Agreement. Except as approved by the Manager and all Class A Members, no Member shall have the right (a) to sell, transfer, pledge, encumber, or assign any of its Membership Interests in the Company including any rights or obligations related thereto; (b) to require partition of the Property of the Company; (c) to compel the sale of Company assets; (d) encumber the Property in any way, (e) to cause the winding up of the Company. Any action or transaction by a Member in violation of this section 3.03 shall be void and of no force and effect.

3.04 Representations and Warranties. Each Member and Manager hereby represents and warrants to the Company and each other Member and Manager that, if that Member or Manager is a business entity: (a) that such Member or Manager is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that such Member or Manager is duly qualified to do business in the jurisdiction of its principal place of business; (c) that such Member or Manager has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, embers, Manager or other representative of that Member or Manager necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that such Member or Manager authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that such Member or Manager is a party or by which it is bound.

3.05 No Authority. Except as otherwise specifically provided in this Agreement, no Member (other than a Managing Member, Manager, or an officer duly appointed pursuant to the terms herein) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06 Liability to Third Parties. No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

Notwithstanding the foregoing, in the event of any guaranties required by any creditors of the Company shall be provided for by the Manager of the Company and any of the Members.

3.07 **Withdrawal.** Except as provided herein, no Member may withdraw without the consent of the Manager.

3.08 **Investment Representations.** Each Member hereby represents and warrants as follows:

(a) Such Member is acquiring such Member's Membership Interests for investment solely for such Member's own account and not for distribution, transfer or sale to others in connection with any distribution or public offering.

(b) Such Member is financially able to bear the economic risk of an investment in the Company and has no need for liquidity in this investment. Furthermore, the financial capacity of such Member is of such a proportion that the total costs of such Member's investment in the Company is not material when compared with such Member's total financial capacity.

(c) Such Member has such knowledge, experience and skill in financial and business matters in general and with respect to investments of a nature similar to an investment in the Company so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, this investment. Such Member acknowledges and understands that the purchase of such Member's Membership Interests involves an investment in a new business that has no previous operating experience, and, therefore, this is a speculative investment with no assurance of success.

(d) Such Member: (i) has received all information that such Member deems necessary to make an informed investment decision with respect to an investment in the Company; (ii) has had the unrestricted opportunity to make such investigation as such Member desires pertaining to the Company and an investment therein and to verify any information furnished to such Member; (iii) has had the opportunity to ask questions of representatives of the Company concerning the Company and such Member's investment, and (iv) has had or had the opportunity to have an attorney of the Member's own choosing review the terms of this Agreement and the investment of such Member.

(e) Such Member understands that such Member must bear the economic risk of an investment in the Company for an indefinite period of time because (i) the Membership Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and applicable state securities laws and (ii) the Membership Interests may not be sold, transferred, pledged or otherwise disposed of except in accordance with this Agreement and then only if they are subsequently registered in accordance with the provisions of the Securities Act and applicable state securities laws or registration under the Securities Act or any applicable state securities laws is not required.

(f) Such Member understands that the Company is not obligated to (i) register the Membership Interests for resale under the Securities Act or any applicable state securities laws or (ii) supply such Member with information or assistance in complying with any exemption under the Securities Act or any applicable state securities laws. Upon the request of the Company, such Member will provide the Company with an opinion of counsel satisfactory to the Company that a proposed resale of the Membership Interests complies with the Securities Act or any applicable state securities laws.

3.09 **Special Provisions.** In exchange for and as additional consideration for Tall Ship making its Capital Contribution ("Tall Ship Contribution")which shall consist either of (1) $55,000,000.00 in cash or (2) $55,000,000.00 in cash less the purchase price under the Current Loan Agreement paid to the Lender ("Purchase Price") plus the contribution of the Current Loan Agreement to the Company upon which the obligations of the Company including any guarantor and related entities shall automatically be extinguished with the capital account of Tall Ship being credited for the full amount of the Purchase Price so that its capital account totals $55,000,000.00 upon which the Company shall issue to Tall Ship of the Class A Membership Interests (as further defined on Exhibit A) and the other voting Members and Manager(s) consent to the admission of Tall Ship as a Member with all rights related thereto including the following special provisions incorporated from the term sheet executed on February 15, 2021 by the Members on behalf of the Company and Tall Ship Management, LLC ("Term Sheet") (which was assigned by Tall Ship Management, LLC to Tall Ship DTC, LLC) which describe certain terms under which Tall Ship DTC, LLC is making the Tall Ship Contribution as an investment to the Company and being granted membership interests in the Company and where this section conflicts within any other terms of this Agreement, this section shall control:

(a) **Use of Tall Ship Contribution.** The Company shall use the proceeds of the Tall Ship Contribution as follows:

i. Pay off of the existing debt including related costs and expenses to Current Lender estimated to be approximately $40 million or such lesser amount that may be negotiated by Company and/or Tall Ship as agreed to by Current Lender.

ii. Predevelopment costs and expenses of the Project in accordance with the seven month preconstruction budget which includes an initial thirty day budget as attached hereto as Exhibit B.

(b) **Partial Return of 2999TC Acquisition MZ, LLC Contribution.** Upon the closing and funding of the earlier of a Mezzanine Loan or a Senior Loan for the purpose of financing construction of the Project (excluding acquisition of the Property) which is estimated to be $251,707,073.00 or such other amount as agreed to by the Managers and Class A Members, 2999 MZ shall be returned Fourteen Million and 00/100 Dollars ($14,000,000.00) ("2999 MZ Return") of 2999 MZ's Total Capital Contribution (as defined in Exhibit A) from such financing for reimbursement of mortgageable expenses paid and as such the total Capital Contributions as defined in Exhibit A shall be likewise reduced however the Membership Interests and Class Interests shall not be adjusted which shall remain at 10.0% and which never be reduced below 10.0% without consent of 2999 MZ. In the event that the 2999 MZ Return cannot be paid in full by the Company or can only be partially paid as provided above, then the Company shall make other arrangements to acquire such funds as provided in this Agreement including section 4.04 but excluding the sale of any assets, and nonetheless such amount shall be treated as a loan in such event which shall earn a rate of interest at the General Interest Rate (as defined herein) which shall be paid back to 2999 MZ as soon as funds are available including from any loan and in all events shall be paid back in in full before any other distributions are made to the Members.

(c) **Incentive Plan.** 2999TC MZ shall receive a portion of the distributions to be paid

to Tall Ship based on Tall Ship receiving the following total annual distributions based on the Tall Ship Contribution ("Tall Ship Distribution"):

i. Where the Tall Ship Distribution is less than or equal to 10.00%, then 2999TC MZ shall receive 0.00% of the Tall Ship Distribution;

ii. Where the Tall Ship Distribution is greater than 10.00% but less than or equal to 15.00%, then 2999TC MZ shall receive 10.00% of the Tall Ship Distribution;

iii. Where the Tall Ship Distribution is greater than 15.00% but less than or equal to 20.00%, then 2999TC MZ shall receive 20.00% of the Tall Ship Distribution; and

iv. Where the Tall Ship Distribution is greater than 20.00% then 2999TC MZ shall receive 30.00% of the Tall Ship Distribution.

Where multiple distributions are made throughout the year then the above referenced distributions shall be reconciled at the end of each calendar year and adjusted in order to reflect the share of the Tall Ship Distribution owed to 2999TC MZ, if any, and if no distribution is to be made to Tall Ship at such time or the distribution to Tall Ship is not sufficient to pay that portion of the distribution owed to 2999TC MZ then such amounts owed to 2999TC MZ shall be paid out of the next available distribution to Tall Ship.

(d) Origination Fee. The Company shall pay an origination fee equal to one percent (1.0%) of the Tall Ship Contribution to Tall Ship or its designee or assigns.

(e) Due Diligence Fee. Upon execution of the Term Sheet, the Company remitted a due diligence fee equal to Seventy-Five Thousand and 00/100 Dollars ($75,000.00) ("Due Diligence Fee") which was contributed to or loaned by 2999TC MZ. Upon the receipt of the Tall Ship Contribution, 2999TC MZ shall be reimbursed the Due Diligence Fee and as such, the Capital Account of 2999TC MZ shall not include any amount contributed to the Company for the purpose of paying the Due Diligence Fee.

(f) Asset Management Fee. Upon completion of the Project and the date the hotel within the Project commences operations which generate income to the Company, the Company shall pay to Tall Ship, or its designee, a separate asset management fee ("Asset Management Fee") equal to the market rate for a Project of this size and nature for the purposes of managing certain assets of the Company related to the Project in accordance with terms of a separate asset management agreement executed by and between the Company and Tall Ship or its designee as consented to by the Managers and Class A Members.

(g) Right of First Refusal. Tall Ship shall have the right of first refusal to match the terms of any offer of any third party to provide equity or debt financing to the Company subject to the maximum total Capital Contribution restriction of Tall Ship as defined in section 4.02. The Operational Manager shall provide the terms of any such offer to Tall Ship and Tall Ship shall have five (5) business days to match the offer and agree to provide the financing on the same terms. In the event Tall Ship fails to respond within five (5) business days then the Operational Manager on behalf of the Company without further consent of the Managers or

Members may accept the offer from the third party and enter into a binding agreement on behalf of the Company on such terms. Where terms of this Right of First Refusal conflict with any other terms of this Agreement, the terms of this Right of First Refusal shall control.

(h) Preferred Contribution. The Tall Ship Contribution shall be a Preferred Capital Contribution which shall have certain additional rights and benefits as specifically defined in this Agreement.

(i) Consent. Where consent of Tall Ship as the Managing Member and/or Class A Member is required including for any Manager appointed by Tall Ship, such consent shall not be unreasonably withheld or delayed so long as the action to be consented to conforms and is consistent with a Project plan approved by the Managers and the Budget (as further described in section 6.14 and any applicable provisions in this Agreement).

(j) Success Fee. The Company shall pay to JP FUND LLC ("Advisor") the fees from the Tall Ship Contribution as required under the executed Exclusive Advisory and Consulting Agreement (attached hereto as "Exhibit C") the obligations of which are assigned to the Company. The $25,000 consulting fee paid to Advisor by 2999TC MZ will be deducted from any Success Fees and refunded to 2999TC MZ upon the Company's receipt of the Tall Ship Contribution.

(k) Development

i. Development Agreement. The Company shall enter into a development agreement ("Development Agreement") with certain affiliates / related entities of Tall Ship and 2999TC MZ upon terms agreed to by the Manager and Class A Members. The Company shall pay a development fee equal to five percent (5.0%) of the total of all hard and soft costs excluding land acquisition and financing as defined in the Budget with 65% of such fee being paid to the 2999TC MZ affiliate and 35% of sch fee being paid to the Tall Ship Affiliate. The Development Agreement shall further require and describe the terms of the General Contractor Agreement, a Completion Guaranty to be provided by the General Contractor, a Contractor Surety.

ii. Development Budget. The co-developers identified in the Development Agreement shall prepare a development budget which shall be submitted to the Company for approval by the Manager and Class A Members. Upon approval, "Budget" as defined in section 6.14 will include the approved Development Budget.

ii. General Contractor. Moss Construction has selected to be the General Contractor on the Project as may be further described in the Development Agreement and General Contractor Agreement. The selection of the General Contract is contingent upon the Company negotiating and entering into a General Contractor Agreement with Moss Construction on terms acceptable to the Manager and Members.

iii. Construction Manager. The Company plans to select Portman Architects and along with a separate construction management company experienced in the vertical development of mixed use hotel and residential projects to

be agreed to by the Members to serve as co-construction managers on the Project as may be further described in the Development Agreement and construction management agreement(s) . The selection of such co-construction managers is contingent upon the Company negotiating and entering into a construction management agreement with them on terms acceptable to the Manager and Members.

iv. Architect. FAB Studio i has selected to be the Architect on the Project as may be further described in the Development Agreement and architect agreement(s). The selection of the architect is contingent upon the Company negotiating and entering into an architecture agreement with FAB Studio on terms acceptable to the Manager and Members.

v. The Class A Members and Managers shall review and approve all development related agreements including the GMP Contract, other general contractor agreements, architect agreements, construction management agreements, major subcontractor agreements, and any other similar agreements prepared and to be utilized in connection with the development and construction of the Project.

(l) Representations of the Company. 2999TC MZ and the Company and 2999TC MZ on behalf of the Company represent and warrant to Tall Ship the Company is duly organized, validly existing, and in good standing under the law of the state of Delaware; (b) entering into this Agreement does not conflict or violate any other contract or obligation of the Company; (c) that it has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions and consents of the current Members as necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken;

(m) Acknowledgment of Tall Ship. Tall Ship acknowledges and agrees that it has received and reviewed all requested documents as part of its due diligence prior to executing this Agreement and as such, acknowledges that it is relying on its own investigation and expertise in entering into this Agreement and has not relied on any assertions or representations of any other Member or their related persons or entities. Tall Ship further acknowledges and agrees that no other representations or warranties have been made to Tall Ship except as specifically stated herein.

(n) Term Sheet. This Agreement incorporates all binding terms under the Term Sheet including as amended herein and supersedes and replaces the Term Sheet in its entirety and as such, the Term Sheet shall no longer be enforceable or binding against any party.

3.10 Profit Participation. Upon Unanimous Consent of the Mangers and Class A Members, the Company may create and implement a profit participation plan in order to incentivize and reward key employees, contractors, and related parties with a share of the profits of the Company without the issuance of any membership interests or granting any voting or consent rights in the Company.

ARTICLE IV
CAPITAL CONTRIBUTIONS

4.01 **Required Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the required Capital Contribution as further described herein and described for that Member in Exhibit A. This Agreement may define the Initial Capital Contributions and Membership Interests of Members not yet identified which may be admitted in the future.

4.02 Additional Contributions.

(a) In the event the Company requires additional capital ("Additional Capital Contributions") to develop the Project, operate the Company, fulfill the Purpose of the Company, or continue in its business affairs as determined by the Manager, then the Manager shall seek to fund such capital requirements in the following order:

i. The Manager shall use its best efforts to fund the additional capital requirements through debt financing from one or more third parties on terms agreeable to the Manager as consented to by the Class A Members;

ii. If such debt financing is not available or the terms not consented to as required above, then the Manager may request that the Class A Members and/or Class B Members voluntarily contribute such required additional capital as deemed necessary upon request of the Manager within the period requested by the Manager and otherwise thirty (30) days of after written notice from the Manager to the Members stating that the Manager has determined that the Company does not have sufficient capital to pay its business obligations and accordingly, additional Capital Contributions are needed to satisfy such obligations. The written notice shall set forth the amount of additional Capital Contribution requested. Any or all of the Members may contribute Additional Capital Contributions in proportion to their Membership Interests in the Company. Although no Members shall be required to make an Additional Capital Contribution in response to a request for voluntary contributions, contributions made to the Company resulting from the elective Additional Contributions of any other Member or of the Initial Capital Contributions of any new Member shall result in the proportionate reduction of the Membership Interests in the Company and its Class of any Member which elects not to make a voluntary Additional Capital Contribution (collectively, "Dilution Event").

iii. If the Manager is unable to raise the necessary capital from either of the foregoing procedures, then the Manager shall issue a capital call requiring the Members to contribute Additional Capital Contributions in proportion to their Membership Interests in the Company as necessary to fulfil the capital requirements of the Company. Where a Member is unable or unwilling to contribute any required Additional Capital Contribution such Member may choose to obtain a loan from a Member which shall be secured by its Membership Interests or from an outside lender in which case it may pledge the distribution rights only to any portion of its Membership Interests as collateral for the loan which shall exclude any

voting rights or rights to participate in the management of the Company (which shall control in the event of any conflict) unless specifically authorized by the Manager. Otherwise, any Member's failure to contribute the required Additional Capital Contribution shall result in a a Dilution Event.

iv. Otherwise, if the Manager is unable to raise the necessary capital then without further consent of the Members so long as the rights and interests of the Class A Members are not diluted or encumbered, the Manager may seek and acquire either additional financing in whatever form and upon terms the Manager reasonably determines in its sole discretion is best for the Company whether in the form of a loan from whatever source identified by the Manager including any other Member (as further provided in section 4.04 below) or equity from additional investors (who shall be admitted as Class B Members or such other non-voting Class as created in accordance with this Agreement and which may result in the dilution of the Members who are not Class A Members) and which may include a reasonable finder's fee to any finder which assists in acquiring such financing

(b) The Manager with Unanimous Consent of the Class A Members may designate any Additional Capital Contributions as Preferred Capital Contributions.

(c) Under no circumstances shall a Dilution Event cause the total Class A Percentage Interest in the Company a to be diluted without the unanimous consent of the Class A Members and the Manager although the Class A Membership Interests in the Company and within Class A may be diluted as described in this section.

(d) The Manager shall notify the current Members of any pending Dilution Event ("Notice of Dilution") and the amount of such Additional Contributions necessary to protect against such Members' interests being diluted. Such Members may elect to protect against the dilution of their Membership Interests by notifying the Company of their intent to contribute such Additional Contributions necessary to preserve their membership interests within five business (5) days of such Member(s) receiving notice of the Dilution Event. Such Members shall then have fifteen (15) days to contribute such Additional Contributions to the Company following the receipt of the Notice of Dilution else such Member shall waive the right to protect against being diluted as to that specific Dilution Event.

(e) Under no circumstances shall the total Capital Contributions of Tall Ship as stated on Exhibit A increase by more than $10,000,000.00 without consent of 2999TC MZ and its Manager, if any.

(f) Prior to the execution of this Agreement, 2999 MZ advanced to the Company under the provisions of 4.04 of the original Company Agreement (which is substantially similar to section 4.04 herein) Six Million and 00/100 Dollars ($6,000,000.00) ("2999 MZ Advance") for certain carrying costs and related expenses including as related to the Current Debt and mortgageable items. Notwithstanding any conflicting provision herein, the 2999 MZ Advance shall

be paid back to 2999 MZ upon the funding of the Senior Loan and if proceeds are not sufficient to pay back the 2999 MZ Advance in full, then the Company shall make other arrangements to acquire such funds as provided in this Agreement including section 4.04...

4.03 Return of Contributions. Except as defined in this Agreement including in Article V, no Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.

4.04 Loans by Members. Subject to section 4.02 and Article VI below, if the Company does not have sufficient cash to pay its obligations, , any Member that may agree to do so, with the consent of the Manager, may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 Capital Accounts. A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and/or (ii) the Fair Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code) or (iii) property contributed by that Member that is converted to "cash" during the term of this Agreement all as set forth on Exhibit A;

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the Fair Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member

and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01 Allocations.

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests existing as of the date such allocation is made.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Manager may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Manager take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

5.02 Distributions.

(a) From time to time the Manager upon the Unanimous Consent of the Class A Members, subject to Article VI below, shall determine in their reasonable judgment to what

extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service (including payments on loans by Members to the Company), acquisitions, and a reasonable contingency reserve (hereinafter, "Distributable Cash"). If any such Distributable Cash exists, the Manager shall, subject to Article VI below, cause the Company to distribute the Distributable Cash to the Members, in accordance with their Class and Percentage Interests that exist as of the date of such distribution, as follows and in the following order:—

i. Any and all accumulated and accrued Preferred Returns of Tall Ship;

ii. Any and all Capital Contributions of Tall Ship;

iii. Proportionately to any Preferred Returns of the other Members until all such returns have been paid in full.

iv. Proportionately to any Preferred Capital Contributions of the other Members ~~until all such capital contributions have been paid in full.~~

v. Proportionately to the non-preferred Capital Contributions of the Members until all such Capital Contributions have been paid in full.

vi. Finally, remaining distributions shall be paid to all Members in proportion to their Membership Interests in the Company including as defined in the Incentive Plan.

Notwithstanding the above, no distributions shall be paid until the Project is generating income or otherwise has closed on the sale of a sufficient number of residences sufficient to create Distributable Cash. The distributions made under this section for the purpose of paying back Capital Contributions shall not result in the reduction of any the Membership Interests of the Class A Members or their Class Interests. The Manager may require all loans to Members including any rate of return on such loans be paid prior to distributing any Distributable Cash.

(b) From time to time the Manager, subject to Article VI below, also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Manager may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Manager take action to authorize such a distribution pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

## ARTICLE VI
## MANAGEMENT

6.01 Management by Manager. Except for situations in which the approval of the Class A Members is required by this Agreement or by nonwaivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Manager shall have the sole and exclusive control of the management, business and affairs of the Company, and the Manager (which requires consent of all Managers unless otherwise stated herein) shall make any and all decisions and take any and all actions on behalf of the Company without further consent of the Members or any other persons unless otherwise required in this Agreement, including but not limited to the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company which not inconsistent with the approved Project Plan that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion so long as any resulting financial obligations of the Company are included within and do not exceed the Budget (except entering into any contract with or a sale to any related entity of any Member that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder, .

(b) entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project.

(c) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money for liabilities and expenses approved in the Budget;

(d) maintaining the assets of the Company in good order;

(e) collecting sums due the Company;

(f) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company in accordance with the approved Budget;

(g) utilizing for Company purposes any asset of the Company in the normal course of business;

(h) borrowing money or otherwise committing the credit of the Company for Company activities to further the Purpose and voluntary prepayments or extensions of debt only upon the Unanimous Consent of the Class A Members ;

(i) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants so long as any related contract entered into by the Company with such persons is not breached or terminated;

(j) obtaining and maintaining insurance for the Company;

(k) (intentionally deleted) .

(l) disposition of Company personal property in the ordinary course of business at fair value;

(m) [intentionally deleted];

(n) delegating its authority to the Operational Manager of President;

(o) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt only upon the Unanimous Consent of the Class A Members;

(p) incurring any debt or liability (or agreeing to incur any debt or liability)on behalf of the Company only upon the Unanimous Consent of the Class A Members;

(q) determining the amount and timing of distributions of Company cash and

other property as provided in paragraph 5.02 of this Agreement only upon the Unanimous Consent of the Class A Members;

(r) appoint officers of the Company and provide such officers with authorities, powers, and any type of compensation or remuneration only upon the Unanimous Consent of the Class A Members;

(s) sell or issue additional Membership Interests and admit Members of the Company subject to the restrictions in this Agreement and only upon the Unanimous Consent of the Class A Members; and

(t) where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company only upon the Unanimous Consent of the Class A Members.

Without the need to obtain any additional consent of the Managers or Members regardless of any conflicting term in this Agreement, the Operational Manager or President (to the extent delegated by the Operational Manager or approved by the Members) shall have the authority to manage the daily affairs of the Company in the normal course of business including but not limited to those activities in this section 6.01 subsections (c) through (g), (i), (j), and (l) and incurring liabilities and spending money on behalf of the Company in the ordinary course of business that is in accordance with the Budget and Project Plan as approved by all Managers and the Class A Members or as required in any contract entered into by the Company upon consent of the Managers and Class A Members. The President is authorized to perform any and all activities which have been delegated to the Operational Manager under this Agreement. The President may only be removed upon consent of all Managers upon written notice to the President for any reason.

6.02 Restrictions. Notwithstanding the provisions of paragraph 6.01 of this Agreement, or anything else in this Agreement, the Manager may not cause the Company to do any of the following without first obtaining unanimous consent of the Class A Members and the Managers or such other consent required by the Delaware Code (to the extent such consent may not be amended by this Agreement):

(a) do any act in violation of this Agreement;

(b) amend this Agreement, except as expressly permitted by this Agreement;

6.03 Conflicts of Interest. Notwithstanding any conflicting provision herein, the Manager, and its Related Persons, may at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company or under contract with the Company (so long as such contracts with the Company on terms substantially similar to an arms length transaction at fair value), with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04 Contracts or Transactions with Interested Officers. Any of the following contracts shall be valid upon the approval of the Manager: (a) between the Company and one or more of its Managers, Members or officers, (b) between the Company and an entity or other organization in which one or more of the Company's Manager, Members or officers is a managerial official or has a financial interest, and/or (c) between the Company, and any of its Affiliates, or the Affiliate(s) of any of its Manager, Members, or officers.

6.05 Intentionally Omitted.

6.06 **Vacancies; Removal; Resignation.** A vacant Manager position may only be filled by the Managing Member which appointed such Member. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07 **Compensation.** For their services in the management of the Company and its operations, the Manager may receive compensation, if any, as may be designated from time to time by the Unanimous Consent of the Class A Members and approved by the Managers.

6.08 **Reimbursement.** The Manager is not required to advance any funds to pay costs and expenses of the Company. However, subject to Section 6.02, in the event the Manager advance such funds, including through its related entity, the Manager shall be entitled to be reimbursed for the reasonable and necessary out-of-pocket costs and expenses incurred in the course of their service hereunder which shall be treated as a loan to the Company and which may earn interest at the General Interest Rate and which shall be reimbursed prior to any distribution to the Members. Such expenses include any funds expended or liabilities incurred by the Manager or its related entities on behalf of and related to the Project prior to the formation of the Company which are hereby conveyed to and assumed by the Company unless the Manager agrees to include such expenses as part of its Capital Contribution.

6.09 **Meetings.** Where the affirmative vote, consent or approval of the Manager is required and the Company has more than one Manager, the following shall control::

(a) Unless otherwise waived by a single Manager, or required by law or provided in the this Agreement, the presence and participation (which may be conducted remotely including by email correspondence or telephone or similar means) of all Company Managers (or otherwise the Managing Member which appointed such Manager acting in such Manager's place) defined in this Agreement shall be necessary to constitute a quorum for the transaction of business by the Manager, and the action taken upon the Unanimous Consent of the Managers at a meeting at which a quorum is present (including by email or other correspondence) shall be the act of the Manager. A Manager who is present at a meeting of the Managers where action on any Company matter is taken shall be presumed to have assented to the action unless such Manger's dissent is (i) made in writing delivered by email or other written correspondence delivered to and received by the Company and/or other Mangers, (ii) entered in the minutes of the meeting, (iii) such written dissent to such action is filed with the person acting as secretary of the meeting before the adjournment thereof, (iv) such dissent is delivered to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Manager may be held at such place or places as shall be determined from time to time by resolution of the Manager. At all meetings of the Manager, business shall be transacted in such order as shall from time to time be determined by resolution of the Manager. Attendance of a Manager at a meeting shall constitute a waiver of notice of such

meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Manager were elected, the Manager may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Manager shall be held at such times and places as shall be designated from time to time by resolution of the Manager. Notice of such regular meetings shall not be required.

(e) Special meetings of the Manager may be called by any Manager on at least 24 hours' notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

(f) Email or other written correspondence conducted between all Managers including their designees which evidences the active participation and input of all Managers shall be deemed a permitted Special Meeting of the Manager with any notice provision being waived and the failure to participate or respond to any such correspondence by a Manager shall not be deemed as consent to any proposed or requested action or course of conduct notwithstanding any conflicting provision in this Agreement. Any action or proposed course of conduct which is clearly and knowingly consented to by all Managers through such emailed or written correspondence shall be deemed to be the Unanimous Consent of the Managers in accordance with section 6.11.

6.10 Approval or Ratification of Acts or Contracts by Members. The Manager in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members entitled to vote, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by upon the unanimous consent of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11 Action Without Meeting. In addition to 6.09, any action permitted or required by the Delaware Code, the Certificate of Formation or this Agreement to be taken at a meeting of the Manager may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all Managers unless only a majority of the Managers are required by this Agreement in which case such consent in writing shall be signed by the necessary number of Managers. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram, electronic mail, or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as the required vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Delaware, and the execution of such consent shall constitute attendance or

presence in person at a meeting of the Manager. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 Action by Telephone Conference or Other Remote Communications Technology. Subject to the requirements of the Delaware Code, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, the Manager may participate in and hold a meeting of the Manager by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system (which may be evidenced by their participation) and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 Action by Electronic Mail (Email). Any action or course of conduct conducted through email correspondence between all Managers including their designees which evidences the active participation and input of all Managers shall be deemed as a permitted action under section 6.11 which shall require no advance notice. Where any proposed action or course of conduct requires the consent or approval of the Managers and where the Operational Manager requests such consent, approval or affirmative vote of the Managers by email correspondence and such email sent to a receiving Manager (i) describes in sufficient detail the proposed action or course of conduct, (ii) the email is sent to the current email address known to the Operational Manager to be primarily used by the receiving Manager to conduct Company business, (iii) the receiving Manager has voted on other matters or approved or denied consent for certain proposed actions in the past by sending email from such email address; (iv) such receiving Manager has not objected to the use of email for such purposes, (iv) the Operational Manager received delivery confirmation (including automatic system responses) of the emailed request or acknowledgement of receipt of the email by the receiving Manager, and (v) other than confirming receipt, the receiving Manager fails to respond to the request for consent or approval or to vote on a matter following the expiration of the third (3rd) business day after the second emailed request is sent to and received by the receiving Member at the same email address in the same manner described herein, THEN such Manager's failure to respond shall be deemed such Manager's affirmative vote, consent, and approval of the proposed action or course of conduct on such matters. Any action or course of conduct which clearly demonstrates implied consent by a Manager including through such emailed or written correspondence shall be deemed to be the consent of such Manager under section 6.11.

6.14 Budget. The Operational Manager has drafted and attached an initial seven month preconstruction budget including a thirty day budget (collectively, "Budget") which has been approved by the Members and which is or shall be attached hereto as Exhibit B which is hereby adopted and approved on behalf of the Company. Any other budget or revision to this Budget shall require the Unanimous Consent of the Managers and Class A Members as reasonably determined to be in the best interest of the Company and any singular Manager, or any officer of the Company as delegated to by the Manager, shall have the power to spend money or incur

liabilities in the ordinary course of business in accordance with the approved Budget.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 Confidential Information. Any Manager or Member may disclose to the Members and Managers, from time to time, information regarding the business, affairs, and financial condition of the Company. Accordingly, the Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is identified as "trade secret" or which a reasonable person would understand to be confidential, such information shall be confidential and the release of such information is presumed to be damaging to the Company or persons with which it does business. Each Manager and Member shall hold in strict confidence any information it receives regarding the Company, including the terms of this Agreement, unless such information is clearly not confidential and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Manager promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. All Former Members and Manager shall continue to be bound by this provision.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 Meetings.

(a) A quorum shall be present at a meeting of Members entitled to vote if the holders of a Simple Majority of those Members (other than Class A Members) entitled to vote are represented at the meeting in person or by proxy except for Class A Members for which a quorum shall also require the presence of all Class A Members. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the Delaware Code (which is not permitted to be amended by this Agreement) or this Agreement, the affirmative vote of all Class A Members along with a Simple Majority of all other voting Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement. Notwithstanding the forgoing, any act requiring the consent of the Class A Members shall require the Unanimous Consent of all Class A Members unless otherwise specifically stated in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Delaware as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Simple Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the Class A Members. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Manager or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(e) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(f) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Manager declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(g) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02 Voting List. The Manager shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, with the Percentage Interests held by each and if not, such list shall be those Members as defined herein on Exhibit A. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03 Proxies. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be

treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Manager, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Manager, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 Conduct of Meetings. All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 Action by Written Consent Without Meeting.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by written consent of all Class A Members and a Simple-Majority of all other Members who are entitled to vote and where only the consent of the Class A Members is required then the Unanimous Consent of the Class A Members, or other such consent as specifically required herein, setting forth the action so taken. Every written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A facsimile, electronic mail, or similar transmission by a Member, or a photographic, photostatic, facsimile, electronic mail, or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Manager. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Manager.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Delaware as a result of the taking of the action shall

state, in lieu of any statement required by the Delaware Code concerning any vote of Members, that written consent has been given in accordance with the provisions of the Delaware Code and that any written notice required by the Delaware Code has been given.

8.06 Action by Telephone Conference or Other Remote Communications Technology. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07 Action by Electronic Mail (Email). Email correspondence conducted by the Members (who are entitled to vote on a specific matter and in the event of the Class A Members then all such Class A Members) including their designees which evidences the active participation and consent of all such Members shall be deemed a permitted action of the Members under section 8.05 of the Members without any notice requirements and the failure to participate or respond to any such correspondence by a Member shall not be deemed as consent to any proposed or requested action or course of conduct under this Agreement UNLESS the emailed request for consent, approval, or affirmative vote which is sent to the Member (i) describes in sufficient detail the proposed action or course of conduct, (ii) the email is sent to the current email address known to the sender to be primarily used by the receiving Member related to Company business, (iii) the receiving Member has voted on other matters or approved or denied consent for certain proposed actions in the past by sending email from such email address without such Member objecting to the use of email for such purposes, (iv) the sender received delivery confirmation of the emailed request or acknowledgement of receipt of the email sent, and (v) the receiving Member fails to respond to the request for consent or approval or to vote on a matter following the expiration of the third (3rd) business day after the second emailed request is sent to and received by the receiving Member at the same email address, THEN such Member's failure to respond shall be deemed such Member's affirmative vote, consent, and approval of the proposed action or course of conduct such matter EXCEPT where the proposed action involves the admission of an additional Member, revision to this Company Agreement, or dilution of such Member's Membership Interests then such failure to respond shall be deemed such Member's rejection, objection to, disapproval of, and vote against such proposal. . Any action or course of conduct which clearly demonstrates implied consent by a Member including through such emailed or written correspondence shall be deemed to be the consent of such Member as required in this Agreement.

8.08 Classes of Members; Voting. Upon Unanimous Consent of the Managers and Class A Members, the Manager may from time to time establish additional classes or groups of Members. One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Manager

## ARTICLE IX
## OFFICERS

9.01 Qualification. Subject to Section 6.02, the Manager may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Delaware, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them. Subject to Section 6.02, the Manager may assign titles to particular officers. Unless the Manager decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Manager pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Manager. Any number of offices may be held by the one person. Unless otherwise modified by the Manager and Class A Members, the following officers shall have the following scope of authority:

(a) President. The President, if appointed, shall be the chief executive officer of the Company and, subject to the provisions of this Agreement, shall have such authority and powers as delegated by the Operational Manager (with such rights and authority limited to those of the Operational Manager or as otherwise delegated by the Managers) and general supervision of the affairs of the Company as normally inherent to the position, shall have general and active control of all its business except where such powers or authorities are exclusively reserved to the Manager. To the extent the Managers and/or Class A Members have consented to such action, the President shall have general authority to take such action as permitted by the Managers (so long as such action is expressly consented to by the Managers); execute bonds, deeds, loans, and contracts and other documents in the name of the Company; to cause the employment or appointment of such employees and agents of the Company as the proper conduct of operations may require, and to fix their compensation, subject to the provisions of this Agreement; to remove or suspend any employee or agent who shall have been employed or appointed under his authority or under authority of an officer subordinate to him; to suspend for cause, pending final action by the authority which shall have elected or appointed him, any officer subordinate to the President; and, in general, to exercise all the powers and authority usually appertaining to the chief executive officer of a corporation, except as otherwise provided in this Agreement. The Manager shall have the right to appoint or replace the President upon the consent of the Class A Members.

(b) Vice President. The Vice President shall have only such powers and perform only such duties as the Manager may from time to time prescribe or as the President may from time to time delegate to such Vice President. Upon any incapacity (physical or mental as reasonably determined by a health professional) or death of the President, the Vice President may act in place of the President and shall have all powers and authority of the President which shall automatically terminate upon the recovery by the President of the incapacity or appointment of a new President. The Manager shall

have the right to appoint or replace the Vice President upon the consent of the Class A Members.

(c) Secretary. The Secretary shall attend all meetings of the Members and record all votes and the minutes of all proceedings in a book to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the members and shall perform such other duties as may be prescribed by the President under whose supervision the Secretary shall be. The Manager shall have the right to appoint or replace the Secretary upon the consent of the Class A Members.

(d) Treasurer. The Treasurer, shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements of the Company and shall deposit all monies and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Manager. The Treasurer shall disburse the funds of the Company as may be ordered by the Manager, taking proper vouchers for such disbursements, and shall render to the President and the Manager, at meetings of the Members and/or Managers , or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Company, and shall perform such other duties as the Manager may prescribe. If required by the Manager, the Treasurer shall give the Company a bond in such form in such sum, and with surety or sureties as shall be satisfactory to the Manager for the faithful performance of the duties of such office and for the restoration to the Company, in case of the Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the Treasurer's possession or under the Treasurer's control belonging to the Company. The Treasurer or the President may open bank accounts and shall each be signatory on all bank accounts. The Manager shall have the right to appoint or replace the Treasurer upon the consent of the Class A Members.

9.02. **Compensation**. No salaries or other compensation will be paid to any of the officers and/or agents of the Company or to the Manager. Election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03. **Resignation**. Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal**. Any officer may be removed as such, either with or without cause, upon Unanimous Consent of the Mangers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

## ARTICLE X
## INDEMNIFICATION

10.01 **Right to Indemnification**. Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is

involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is (i) the legal representative, (ii) is or was a Member or Manager of the Company or (iii) while a Member or Manager of the Company is or was serving at the request of the Company in connection of furthering the Company's purpose, as a Manager, director, officer, partner, venturer, proprietor, legal representative, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise (collectively, "Indemnified Person") shall be indemnified by the Company to the fullest extent permitted by the Delaware Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against claims, judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with any Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability. The right to be indemnified by the Company excludes Indemnified Person's breach of this Agreement; claims asserted by a Member, Manager or the Company against the Indemnified Person; and acts or omissions of the Indemnified Person that are knowingly, fraudulently, criminally, or grossly negligently committed by the Indemnified Person outside the scope of their authority.

10.02 Advance Payment. The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of detailed invoices and supporting documentation substantiating the expenses, and a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 Indemnification of Officers, Employees and Agents. The Company, by adoption of a resolution of the Class A Members and approval of the Manager, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Manager under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Manager, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer,

proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Manager under this Article.

10.04 Appearance as a Witness. Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 Nonexclusivity of Rights. The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Manager or otherwise.

10.06 Insurance. The Manager on behalf of the Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 Member Notification. To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 Savings Clause. If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law. The rights and obligations related to any Member, Manager, officer, or employee under this Article X Indemnification shall survive the termination or resignation of any such Member, Manager, officer, or employee.

## ARTICLE XI
## TAXES

11.01 Tax Returns. The Manager shall cause to be prepared and filed all necessary federal

and state income or franchise tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 Tax Elections. The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Manager may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 "Tax Matters Partner." Where the Company has a single Manager, the Manager shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; and otherwise, the "tax matters partner" shall be a Member that is designated as such by the Class A Members. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of the Managers and Class A Members, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code. The Manager may delegate and designate any other Member as the tax matter's partner which may be revoked by the Manager for any reason upon written consent upon which the Manager shall continue being the tax matters partner.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members and its Manager. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 Accounts. The Manager shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Manager determine. The Manager may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Manager's investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01 **Limited Right to Transfer.** No Member or Assignee shall make any Transfer of all or any part of its Membership Interests, whether now owned or hereafter acquired, except (a) with the consent of the Class A Members and the Manager; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; (d) to a Permitted Transferee, or (e) upon winding up or termination, as provided by paragraph 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*. Notwithstanding the foregoing, a Class A Member may transfer all its Membership Interests along with all rights and obligations without consent of the Managers or other Members to a related entity as part of the formation of a new entity structure to fulfill the purposes of the Primary Intent as further described in the Recitals and the Purpose section of this Agreement.

13.02 Rights of an Assignee.

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee. If the Assignor Member or Assignee does not make such

contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03 **Legal Opinion.** For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Manager that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Manager, however, may waive the requirements of this paragraph.

13.04 Admission as Substituted Member. An approved Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Contribution so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement and any other requirements provided herein; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Manager, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Contributions after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Contributions of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member.** In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 Third Party Offer. In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the Class A Members and if the selling Member is a Class A Member then to the other Class A Member(s). Upon the receipt of an offer from a third party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to the Manager and Class A Member(s). The Class A Member(s) will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling

Member in writing that the Class A Member(s) intend to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If the Class A Member(s) fails to give notice within fifteen (15) days of its intention to purchase such Membership Interests, then the Manager shall be deemed to have declined to exercise its option to purchase such interests and the selling Member may offer such interests to the other Members upon the same terms as was offered to the Class A Members. If more than one of the Class A Members or, if applicable, more than one of the other Members desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give timely notice of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer subject to the terms of this Agreement and subject to the approval of the Manager and Class A Members who may refuse to approve any such transfer on their sole discretion.

13.07 Reasonable Expenses. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01 Termination of Marital Relationship.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to

purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member.** Commencing upon the death of a Member, the Manager shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the Manager. Upon the expiration of ninety (90) days after the death of a Member, the remaining Members may purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the Manager does not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Manager or the other Members in accordance with the option or obligation established by this paragraph.

14.03 **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Manager to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Manager ); provided, however, the exercise of said option shall require the approval of the Manager. In the event that notice of the exercise of such option is given by the Manager to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article. If the Company refuses to exercise such Option, then the Manager followed by the other Members shall have the right to purchase such interests in accordance with the procedure established in section 13.06.

14.04 **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05 **Option by Other Members.** If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company. Likewise if the Members fail or decline to exercise an option to purchase a Membership Interest as provided in this Agreement, then the Company shall have the option to purchase such interests upon the same terms.

14.06 **Exercise of Option.** Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price

anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07 **Determination of Fair Value.** The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of the Class A and Class B Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest (or any other asset) is to be determined under this Agreement, the Fair Value shall be the amount agreed upon by the Class A Members and Manager, however, such determination cannot be agreed within thirty (30) days, the Manager shall select a qualified independent appraiser to make such determination, and the Manager shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08 Fees and Expenses of Appraiser. In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option.** In the event that a Member, including the Manager, has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and such option shall be deemed to have been declined by such Member.

14.10 Terms of Purchase.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid

in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

14.11. **Member Entity.** For the purposes of this ARTICLE XIV BUYOUT OF MEMBERSHIP INTEREST only, where "Member" is an entity owned 100% by an individual person, whether directly or through one or more entities, or whether as such person's separate or community property, then "Member" as used in this article refers to that individual person.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If this Agreement is amended to require any Member to contribute any Additional Capital Contribution and if such Member does not contribute such an Additional Capital Contribution, within thirty (30) days after receipt of written notice after the time required all or any portion of a Capital Contribution that a Member is required to make as provided in this Agreement, the Member shall not be liable for such unpaid Capital Contribution, however, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) permitting the Manager or the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Manager or the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(vii) the Manager or the Lending Member shall have the right to vote on behalf of the Defaulting Member without any input or consent from the Defaulting Member and the Defaulting Member's voting rights and any other rights bestowed upon it by this Agreement shall be suspended until such time the Defaulting Member has cured the default.

(b) exercising the rights of a secured party under the Uniform Commercial Code of the State of Delaware (without recourse to such Defaulting Member for any deficiency);

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(d) suspending the rights of the Member including voting rights;

(e) subordination of the Defaulting Member's Membership Interest to the nondefaulting Member; or

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV.

15.02 Security. Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds

thereof, all under the Uniform Commercial Code of the State of Delaware. It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Delaware. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Delaware with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Manager or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Manager or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 Compromise or Release. The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the Delaware Code or this Agreement may be compromised or released only with the approval of the Manager.

15.04 **Expulsion**. A Member may be expelled from the Company upon approval by the Manager and Unanimous Consent of the Class A Members if that Member (a) has willfully violated any provision of this Agreement which is not cured within ten (10) days following written notice; (b) committed a criminal act or moral turpitude or fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) knowingly (or should have known) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall also be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01 in addition to exercising any other remedy available at law and/or in equity which shall be cumulative. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 Event Requiring Termination. The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Unanimous Consent of the Class A Members and Majority of any other Class of Members entitled to vote with consent of the Manager;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a nonwaivable event under the terms of the Delaware Code which requires the Company to be terminated; or

16.02 **Business May Be Continued.** Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Manager consents to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the unanimous consent of the the Class A Members, Majority of Members of any other Class entitled to vote, and the Manager consents to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Manager shall act as liquidator or may appoint one or more Manager, officers, or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Delaware Code. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Manager. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the Delaware Code to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the

establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the Fair Value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the Fair Value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Class A and Class B Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Manager (or such other person or persons as the Delaware Code may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

ARTICLE XVII
AMENDMENT OR MODIFICATION

17.01 Amendment or Modification. This Agreement may be amended or modified from time to time only with a written instrument executed by all Class A Members and a Super Majority of all other Members entitled to vote and approval of all Managers.

ARTICLE XVIII
GENERAL PROVISIONS

18.01 Construction. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02 Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Manager must be given to the Manager at the following address:

2999TC Acquisitions MZ, LLC
Attn: Tim Barton, President
2999 Turtle Creek Blvd,
Dallas, Texas 75219_

Tall Ship DTC, LLC
Attn: Carlos Montoya
1244 N. Stone St, Suite #3
Chicago, Illinois

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04 Entire Agreement; Supersedes Other Agreements. This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05 Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06 Binding Effect. Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the Delaware Code to assignees.

18.07 Governing Law. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08 Severability. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09 Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10 Waiver of Certain Rights. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11 Indemnification. To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12 Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 Compliance with Regulation D of the Securities Act of 1933. The OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. The INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGER (WHICH, IN THE DISCRETION OF THE MANAGER, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. The OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 Notice to Members. By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 Limitation of Liability. Pursuant and to the limits of any governing state securities act the liability of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

19.04 Ratification. All actions previously taken prior to the Effective Date of this Amended and Restated Company Agreement by the Company and its previous managers, Members, and officers on behalf of the Company including but not limited to agreements, loans, payments, liabilities, and investments, are hereby ratified and consented to.

*[Signatures appear on the following page]*

IN WITNESS HEREOF, the Members have adopted and executed this Company Agreement as of the Effective Date.

MEMBERS

2999TC Acquisitions MZ, LLC
a Delaware limited liability company

By: ________________________
Name: Timothy Barton
Its: President

Tall Ship DTC, LLC
An Wyoming limited liability company

By: ________________________
Name: ________________________
Its: ________________________

EXHIBIT A
Members of 2999TC ACQUISITIONS, LLC

| Member's Name | Total Current Capital Contributions | Type of Contribution (Preferred / Normal) | Total Co. Membership Interest % | Class | Class Membership Interest % |
|---|---|---|---|---|---|
| 2999TC Acquisitions MZ, LLC | $21,000,000.00* | Preferred | 10.0 | A | 90.0 |
| Tall Ship DTC, LLC | $55,000,000.00 | Preferred | 90.0 | A | 90.0 |
| Class B Members - None | | | | B | |

*The Total Current Capital Contributions of 2999TC Acquisitions MZ, LLC is subject to revision by 2999TC Acquisitions MZ, LLC based on the final accounting provided to the Company of all contributions it has made since the formation of the Company and as such, the Membership Interest Percentage and Total Company Membership Interests of the above Members shall be likewise be adjusted.

EXHIBIT B

Pre-Development Budget

[See Attached Budget]

# EXHIBIT C
## Exclusive Advisory and Consulting Agreement

(See Attached Agreement)

IN WITNESS HEREOF, the Members have adopted and executed this Company Agreement as of the Effective Date.

MEMBERS

2999TC Acquisitions MZ, LLC
a Delaware limited liability company

By:
Name: Timothy Barton
Its: President

Tall Ship DTC, ~~LLC~~ LLC
An ~~Illinois~~Wyoming limited liability company

By:
Name:
Its:

EXHIBIT A
Members of 2999 TC ACQUISITIONS, LLC

| Member's Name | Total Current Capital Contributions | Type of Contribution (Preferred / Normal) | Total Co. Membership Interest % | Class | Class Membership Interest % |
|---|---|---|---|---|---|
| 2999TC Acquisitions MZ, LLC | $20,51,0050,000.00* | Preferred | 27.200510.0 | A | 27.200590.0 |
| Tall Ship DTC, LLC | $55,000,000.00 | Preferred | 72.799590.0 | A | 72.799590.0 |
| Class B Members - None | | | | B | |
| Class C Members – None | | | | C | |

Commented [VM4]: Confirm

*The Total Current Capital Contributions of 2999TC Acquisitions MZ, LLC is subject to revision by 2999TC Acquisitions MZ, LLC based on the final accounting provided to the Company of all contributions it has made since the formation of the Company and as such, the Membership Interest Percentage and Total Company Membership Interests of the above Members shall be likewise be adjusted.

EXHIBIT B
Pre-Development Budget

[See Attached Budget]

EXHIBIT C
Exclusive Advisory and Consulting Agreement

(See Attached Agreement)