# FUNDING AGREEMENT

This Funding Agreement ("**Agreement**") is entered into on this 30th day of July 2021 ("**Effective Date**"), by and between **Nitya Capital, LLC**, a Texas limited liability company, ("**Nitya**") and **2999 TC Acquisitions MZ, LLC** ("**2999TC MZ**" or the "**Company**"; collectively with Nitya, the "**Parties**").

## RECITALS

WHEREAS, 2999TC Acquisitions, LLC, f/k/a MO 2999TC, LLC ("**Owner**") is the owner of approximately 2.473 acres of land located at 2999 Turtle Creek Boulevard, Dallas, Texas, as more particularly described on Exhibit A attached hereto (the "**Property**"), on which Property Owner is developing a mixed-use luxury hotel and condominium development under the Mandarin Oriental Hotel brand consisting of 27 story tower with 177 ultra-luxury hotel rooms and 85 ultra-luxury private residences ("**Project**").

WHEREAS, 2999 Turtle Creek, LLC, a Delaware limited liability company ("**Original Lender**"), made a loan to Owner in the original principal amount of $32,500,000.00 (the "**Loan**"), which Loan (i) is evidenced by, among other things, a Secured Promissory Note, dated September 20, 2019, in the original principal amount of $32,500,000.00 (the "**Note**"), (ii) secured by that certain Deed of Trust, Security Agreement and Fixture Filing, dated September 20, 2019, recorded in the real property records of Dallas County, Texas under Clerk's File No. 201900253450 and (iii) guaranteed by that certain Guaranty, dated September 20, 2019 (the "**Guaranty**"), by Timothy Lynch Barton , an individual ("**Barton**"; the Note, Deed of Trust and Guaranty, together with all other documents evidencing or executed in connection with the Loan, including the Forbearance Agreement (defined below), are referred to herein as the "**Loan Documents**").

WHEREAS, HNGH Turtle Creek, LLC (together with its successors and assigns as holders of the Note, "**Current Lender**") is the current owner and holder of the Note and has succeeded to all right, title and interest of Original Lender in, to and under the Deed of Trust, Guaranty and other Loan Documents.

WHEREAS, Borrower defaulted in its obligations under the Loan Documents by failing to make certain payments, and Borrower and Current Lender entered into a Forbearance and Payoff Agreement, dated March 1, 2021 (the "**Forbearance Agreement**"), pursuant to which, inter alia, (i) Current Lender agreed to a forbearance from the exercise of its remedies under the Loan Documents as a result of such defaults, (ii) the maturity date of the Loan was extended to July 31, 2021 ("**Initial Maturity Date**"), and (iii) Borrower was granted the option (the "**Extension Option**") of extending the Maturity Date for a period of ninety (90) days (the "**Extended Maturity Date**") by paying before the Initial Maturity Date (A) an extension deposit in the amount of $784,074 and (B) accrued but unpaid interest on the Loan in the amount of $744,422.00 (collectively, the "**Extension Deposit**").

WHEREAS, as of the Effective Date, the outstanding principal balance of the Loan is $39,748,171.

WHEREAS JMJ Development, LLC ("**JMJ**") is a fee developer which is a related entity of Company which is also controlled by Barton.



EXHIBIT "23"

WHEREAS, Owner is solely owned by the Company, the Company is solely owned by Five Star TC, LLC ("**Five Star**"), and each of Owner, the Company and Five Star are controlled by Barton (Owner, Company, Five Star, JMJ, and Barton, collectively, the "**Ownership Group**").

WHEREAS, the Company estimates that the cost to develop the Project (inclusive of the costs of acquisition of the Property) is $388,424,286.

WHEREAS, the Company estimates that, in order for Owner to obtain construction financing from a third party construction lender, the Company will be required to make total equity contributions to Owner in the amount of $96,896,121 ("**Total Contributions**"), which Total Contributions will include the payoff of the Loan.

WHEREAS, the Company intends that $9,689,612 of the Total Contributions will be funded by the Class A members of the Company and $87,206,509 of the Total Contributions will be funded by the all Class B members of the Company (with "Class A" and "Class B" being such classes of membership interests as defined in the limited liability company agreement of Company, and such respective membership interests being hereafter referred to as the "**Class A Interests**" and "**Class B Interests**"). Upon the funding of the Total Contributions, the Class A members shall own 10% of the total membership interests in the Company and the Class B members shall own a total of 90% of the total membership interests in the Company.

WHEREAS, as of the Effective Date, Five Star has contributed the sum of $22,139,408 to the Company and is the owner of 100% of the current Class A membership interests in the Company. Currently Company has no Class B members.

WHEREAS, the Company desires to obtain a loan from Nitya for the funding of payments coming due under the Loan and certain other Project costs, and upon and subject to the terms and provisions of this Agreement, Nitya is willing to make such loan and provide such funds.

## AGREEMENT

NOW, THEREFORE, for the mutual promises set forth herein and for other good and valuable consideration, the receipt, sufficiency and acceptance of which is hereby acknowledged by the Parties, the Parties hereto agree as follows:

1. **Debt Financing.** Subject to the terms and conditions of this Agreement, including Sections 3 and 4 hereof, Nitya shall make a loan (the "**Nitya Loan**") of up to Five Million and 00/100 Dollars ($5,000,000.00) (the "**Nitya Loan Amount**") to Company as follows:

    a. Before the Initial Maturity Date, Nitya shall loan to the Company the amount of the Extension Deposit (the "**Initial Advance**"). Immediately upon receipt of the Extension Deposit, the Company shall cause Owner to exercise the Extension Option and shall fund the Extension Deposit to the Escrow Account (as defined in the Forbearance Agreement) established by Lender, together with any other amounts then required to be funded under the Forbearance Agreement, in satisfaction of the requirements for extension set forth in the Forbearance Agreement. Alternatively, Owner and Company may elect for Nitya to wire the Initial Advance directly to the Escrow Account as the Extension Deposit prior to the expiration of the Maturity Date. Promptly after the exercise of such option, the Company shall confirm to Nitya in writing that the Initial Maturity Date has been extended to the Extended Maturity Date.

b. From time to time following the Extended Maturity Date, within three (3) business days following receipt of a disbursement request from the Company, provided such request is delivered on or before the date that is ninety (90) days following the Effective Date, Nitya will make advances of the remaining portion of the Nitya Loan Amount ("**Additional Advances**") to the Company for the purposes set forth in the budget attached hereto as Exhibit E (the "**Budget**"). For the avoidance of doubt, in no event shall Nitya have any obligation to disburse any portions of the Nitya Loan Amount pursuant to this Section 1.b. (i) for any purpose not set forth in the Budget or in any amount in excess of the amount set forth in the Budget or (ii) in response to any disbursement request delivered by Company more than ninety (90) days following the Effective Date.

2. **Nitya Loan Documents**. Concurrently with the execution and delivery of this Agreement, and as a condition of any obligation of Nitya to disburse any portion of the Nitya Loan, (a) the Company shall execute and deliver to Nitya a promissory note ("**Nitya Note**") evidencing the Nitya Loan in the form attached hereto as Exhibit B, (b) Barton and JMJ (collectively, "**Guarantors**") shall execute and deliver to Nitya either (i) separate guaranties which jointly and severally obligate each Guarantor to fully repay the Nitya Loan or (ii) a single guaranty that jointly and severally obligates each Guarantor to repay the Nitya Loan in the form attached hereto as Exhibit C (whether clause (i) or clause (ii), the "**Nitya Loan Guaranty**"; together with this Agreement, the Nitya Note, and Nitya Loan Guaranty, "**Transaction Documents**").

3. **Conditions to Funding**. Notwithstanding anything to the contrary contained herein, it shall be a condition precedent to Nitya's obligation to fund the Initial Advance or any other disbursement of the Nitya Loan that the following conditions are satisfied as of the date of such funding:

a. All of the Company's representations and warranties herein (including, without limitation, those set forth on Exhibit D) shall be true and correct at the time Company requests any portion of the Loan and on the scheduled disbursement date.

b. All of the representations and warranties of any member of the Ownership Group made to or for the benefit of Current Lender in the Loan Documents are true and correct.

c. There shall be no default in the observance or performance of any of the terms, covenants or conditions contained herein or in the other Transaction Documents, and no Event of Default shall be in existence.

d. With respect to any request for an Additional Advance, the Company has delivered to Nitya, not less than five (5) business days prior to the requested disbursement date, a written request for disbursement that identifies in reasonable detail the purpose of such funding request and includes a certification by an officer or authorized representative of the Company that (i) such request for Additional Advance complies with the Budget, (ii) all proceeds of the Nitya Loan previously disbursed by Nitya to the Company were used and applied in accordance with this Agreement, and (iii) the remaining portion of the Nitya Loan to be disbursed by Nitya in accordance with the Budget, together with separate funds available to the Company from Five Star, are sufficient to fund all costs and expenses that the

Company reasonably and in good faith anticipates will be required to be funded prior to the Extended Maturity Date.

e. As of the date of such disbursement, (i) no receiver, liquidator or trustee shall have been appointed for any entity within the Ownership Group, and no petition requesting any such appointment shall have been filed; and (ii) no petition in bankruptcy or for reorganization or for protection under any debtor relief laws shall have been filed by or against any member of the Ownership Group.

4. **Equity Funding by Nitya.**

a. In addition to the funding of the Loan, the Parties anticipate that (i) Nitya may elect to acquire an equity interest in the Company and, in connection therewith, make one or more capital contributions to the Company, in an amount up to Sixteen Million Sixty-Nine Thousand Seven Hundred Four and No/100 Dollars ($16,069,704.00), and (ii) in connection with such equity investment, Nitya may in addition convert the amount of any portion of the Nitya Loan disbursed to the Company into a capital contribution to the Company pursuant to a separate conversion agreement, on terms and conditions to be agreed upon between Nitya and the Company should Nitya decide to invest in the Company, such that, after giving effect to the transactions described in the clauses (i) and (ii), Nitya would own 50% of the Class A Interests and certain Class B Interests. For the avoidance of doubt, Nitya shall have no obligation to invest in, or make any capital contribution to, the Company, it being understood and agreed that any such investment shall be contingent on Nitya's completion of due diligence of the Project satisfactory to Nitya and the execution of a membership interest purchase agreement or similar agreement satisfactory to both Parties.

b. Following the Effective Date, the Company will deliver to Nitya all materials related to the Property and the Project in the possession or control of the Ownership Group that Nitya reasonably requests to allow Nitya to evaluate a potential equity investment in the Project. In addition, the Parties will discuss and cooperate with respect to capital outreach efforts to obtain additional Class B investors to adequately capitalize the development of the Project.

c. Notwithstanding the foregoing or anything herein to the contrary:

i. Prior to September 15, 2021, (A) the Company agrees that it shall reserve 25% of the total Class A Interests ("**Reserved Interests**") and neither the Company, nor any other member of the Ownership Group, shall, without approval of Nitya, consummate any transaction with any party other than Nitya or its affiliates for the sale or issuance of the Reserved Interests; and (B) no member of the Ownership Group shall consummate a transaction with any party other than Nitya or its affiliates for the sale or issuance of any Class A Interests other than the Reserved Interests unless (A) such sale or issuance is to a bona fide third party, (B) the Company has first delivered written notice to Nitya setting forth the terms and provisions of such sale or issuance, which terms and provisions have been accepted by such third party, and (C) Nitya has failed to notify the Company in writing that it

agrees to acquire such interests on such terms and provisions within ten (10) days.

ii. From and after September 15, 2021, and continuing through October 15, 2021, no member of the Ownership Group shall consummate a transaction with any party other than Nitya or its affiliates for the sale or issuance of any Class A Interests unless (A) such sale or issuance is to a bona fide third party, (B) the Company has first delivered written notice to Nitya setting forth the terms and provisions of such sale or issuance, which terms and provisions have been accepted by such third party, and (C) Nitya has failed to notify the Company in writing that it agrees to acquire such interests on such terms and provisions within ten (10) days.

iii. From and after the Effective Date, and continuing through October 15, 2021, no member of the Ownership Group shall consummate a transaction with any party other than Nitya or its affiliates for the sale or issuance of any Class B Interests unless (A) such sale or issuance is to a bona fide third party, (B) the Company has first delivered written notice to Nitya setting forth the terms and provisions of such sale or issuance, which terms and provisions have been accepted by such third party, and (C) Nitya has failed to notify the Company in writing that it agrees to acquire such interests on such terms and provisions within five (5) business days.

The rights and obligations defined in this Section 4.c are contingent upon the timely funding of the Initial Advance and any Additional Advances, as provided in Section 1 and subject to the terms and conditions to funding set forth in Section 3.

5. **Disclosure**. Company acknowledges that Nitya is relying on Company's representations and warranties made herein as a material inducement for entering into this Agreement, and Nitya would not have entered into this Agreement without such representations and warranties.

6. **Title to Property**. Company represents and warrants that Owner holds full legal, equitable and indefeasible fee simple title to the Property, subject only to the Deed of Trust and the Permitted Exceptions (as used in the Deed of Trust). 2999TC shall not sell, pledge, or encumber the Property without the prior written consent of Nitya.

7. **Compliance With Governmental Requirements**. Company represents that, to Company's actual knowledge, each member of the Ownership Group Company is in compliance with all requirements of all applicable federal, state and local laws, statutes, ordinances, codes and regulations applicable to such party or the Property ("**Applicable Laws**"), including, without limitation, all Applicable Laws relating to the environmental, health and safety ("**Environmental Laws**"), and is not the subject of any federal, state or local investigation evaluating whether any remedial action is necessary to respond to a release of any toxic or hazardous waste or substance to the environment. Company (i) has received no written notice of any violation of Applicable Laws by the Property, Company, any other entity in the Ownership Group (including Guarantors) that has not been cured, (ii) there is no actual or threatened claim, action, suit, investigation or proceeding, including, without limitation, any condemnation proceeding, relating to or otherwise affecting the Property or the interest of the Ownership Group therein; (iii) there are no outstanding judgments against the Property, Company, any other entity in the Ownership Group (including Guarantors). Company shall comply with all Applicable Laws during the term of the Nitya Loan.

8. **Compliance with Governmental Requirements**. Owner and Company shall timely comply with all governmental requirements and other Applicable Laws, including but not limited to, zoning requirements and building restrictions.

9. **Compliance with Loan Documents**. From and after the date hereof, Company shall (a) cause Owner to comply in all material respects with the terms and provisions of the Loan Documents, and (b) shall promptly notify Nitya of any default thereunder. Owner shall not amend or modify any of the Loan Documents in any material respect without the prior written consent of Nitya, not to be unreasonably withheld, conditioned or delayed.

10. **Notices by Governmental Authority, Condemnation.** Company shall timely comply with and furnish to Nitya, within five (5) business days of (a) receipt by any member of the Ownership Group, true and complete copies of any written notice or claim by any governmental authority pertaining to the Property, Owner or Company or (b) obtaining actual knowledge of any breach of Applicable Laws by or with respect to the Ownership Group or the Property. Company shall immediately notify Nitya of any notice of any actual or threatened taking or eminent domain action or proceeding affecting the Property or any event of default asserted by the Current Lender (including, without limitation, any Event of Default, as defined in the Deed of Trust) on or after the date of this Agreement.

11. **Costs and Expenses**. Company shall pay, or cause to be paid, when due all costs and expenses required by this Agreement.

12. **Good Standing**. Each of the Parties shall maintain its existence and good standing under the laws of the state in which it was formed.

13. **Default**. Any one or more of the following events shall constitute an "**Event of Default**" by Company if, unless otherwise stated herein, such event is not cured within thirty (30) days following the receipt of written notice from Nitya (unless a different cure period is provided or referenced below):

a. Default in the due observance or performance of any of the terms, covenants or conditions contained in this Agreement or the Transaction Documents.

b. Any representation or warranty made by a Party which is incorrect in any material respect at the time when made or at the time when reaffirmed or deemed reaffirmed by the terms of this Agreement or any Transaction Document (which shall be an immediate Event of Default without any opportunity to cure).

c. Any default by Owner of any of the Loan Documents (including, without limitation, any Event of Default, as defined in the Deed of Trust) which is not otherwise cured as, and within the cure period (if any), provided therein and such cure is accepted by Current Lender (which shall be an immediate Event of Default without any opportunity to cure).

d. A failure by Company acting on behalf of Owner to pay or cause to be paid, prior to delinquency, all taxes and charges, ad valorem and personal property taxes, and other governmental charges of any kind and nature whatsoever (which shall be an immediate Event of Default without any opportunity to cure).

e. If a receiver, liquidator or trustee for any entity within the Ownership Group shall be appointed and such receiver, liquidator or trustee is not discharged within thirty (30) days

after appointment (which shall be an immediate Event of Default without any opportunity to cure).

f. If a petition in bankruptcy or for reorganization or for protection under any debtor relief laws shall have been filed by any member of the Ownership Group (which shall be an immediate Event of Default without any opportunity to cure), or an involuntary petition under any debtor relief laws shall have been filed against any member of the Ownership Group and, provided such petition was not filed by any member of the Ownership Group or any affiliate thereof, the same is not withdrawn, dismissed, canceled or terminated within thirty (30) days (which shall be an immediate Event of Default without any opportunity to cure).

g. If any member of the Ownership Group is adjudicated a bankrupt or insolvent, or makes an assignment for the benefit of creditors or files or consents to the filing of a petition in bankruptcy or for protection under any debtor relief laws or commences or consents to the commencement of any proceeding under the United States Bankruptcy Code or any other federal or state law, now or hereafter in effect, relating to the reorganization of such member, or the arrangement or rearrangement or readjustment of the debts of any such member or having the effect of enjoining or staying the exercise of rights or remedies by creditors (which shall be an immediate Event of Default without any opportunity to cure).

h. If any member of the Ownership Group or any of its members shall cause, institute or fail to contest any proceeding for the dissolution or termination of such member (which shall be an immediate Event of Default without any opportunity to cure).

14. **Remedies**. Without limiting any other remedies that may be available to Nitya under the Transaction Documents, upon the occurrence of an Event of Default, at the option of Nitya, Nitya may:

a. Declare the Nitya Loan (or so much thereof as has been disbursed), together with all interest accrued thereon, in which event all such amounts shall become immediately due and payable.

b. Exercise any rights or remedies available to Nitya under the Transaction Documents, including the Nitya Loan Guaranty.

c. Institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement set forth herein or in the other Transaction Documents;

d. Terminate this Agreement, or terminate any further obligation of Nitya to disburse Additional Advances; and/or

e. Pursue such other rights and remedies as may be available at law or in equity.

15. **Cure**. Upon an Event of Default, Nitya may extend the cure period as necessary for the Company to cure such default, provided that in no event shall Nitya be obligated to accept any cure, it being understood and agreed that any acceptance of any proposed cure of an Event of Default shall be in Nitya's sole discretion, or else may terminate this Agreement pursuant to Section 5 and be entitled to pursue its actual damages but in no event shall it be entitled to receive any consequential damages, special damages, punitive damages, or lost profits or revenues or the like even if the party has been advised of the likelihood of the occurrence of such damages (except

where such default is the result of fraud, willful misconduct, or any criminal conduct) or be entitled to specific performance.

16. **Modifications**. Except as otherwise provided herein, no provision of this Agreement may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver or termination is sought to be enforced.

17. **Confidentiality**. Each Party shall (and, as to Company, Company shall cause each member of the Ownership Group to) hold the terms of this Agreement and any and all information provided by or on behalf of one Party to the other hereunder in strict confidence, shall not use such information except in connection with the transactions contemplated herein or in the other Transaction Documents, and shall not disclose such information except (i) to the directors, employees, agents, representatives, consultants and contractors of such recipient and its affiliates who have a need to know such information in connection with the transactions contemplated herein or in the other Transaction Documents and are bound to maintain such information in confidence in accordance with this Section. The provisions of this Section 17 shall survive any termination of this Agreement.

18. **Severability**. In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein; provided, however, if the disregard of such provision would frustrate the intent and purposes of this Agreement, either Party may petition any court having jurisdiction in equity to render a judgment modifying the disregarded provision of this Agreement so as to carry out such intent and purposes.

19. **Time of Essence**. Time is of the essence in performance of this Agreement by the Parties. As used herein, "**business day**" means a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in Dallas, Texas are authorized or required by law to be closed. Unless otherwise provided, the term "**days**" when used herein means calendar days.

20. **Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement.

21. **Captions**. The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

**22. APPLICABLE LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN SUCH STATE WITH EXCLUSIVE FORUM AND JURISDICTION BEING IN THE COURTS OF DALLAS COUNTY, TEXAS.**

23. **Notices**. All notices by either Party to the other Party pursuant to any provisions of this Agreement must be in writing. Such notices shall be given at such addresses as provided by each party to one another by personal delivery, expedited delivery service with proof of delivery, registered or certified mail, return receipt requested, or by email transmission (provided that such email transmission is confirmed by any other method of notice provided herein or delivery confirmation of such email along with a read receipt is received by the sending party) Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery; in the case of expedited delivery service or mail, as of the date of deposit with

a reputable overnight courier service or an official depository of the United States Postal Service; or in the case of an email transmission, upon receipt.

24. **Counterparts.** This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement.

25. **Company Representations and Warranties.** The representations and warranties set forth on Exhibit D attached hereto are incorporated herein by reference as if fully stated herein.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**NITYA**

Nitya Capital, LLC

By: ______________________
Name: Swapnil Agarwal
Its: President

**COMPANY**

2999TC Acquisitions MZ, LLC

By: ______________________
Name: Tim Barton
Its: President