FILED
4/20/2020 11:40 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JAVIER HERNANDEZ DEPUTY

DC-20-05864

CAUSE NO. ____________

| | | |
|---|---|---|
| 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | DALLAS COUNTY, TEXAS |
| | § | |
| | § | |
| HNGH Turtle Creek, LLC, William L. Hutchinson, and Vipin Nambiar, | § | |
| | § | |
| | § | |
| Defendants. | § | 14TH JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION AND**
**REQUEST FOR DISCLOSURES**

COMES NOW 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC ("***2999 Acquisitions***" "***Plaintiff***") and hereby files its Original Petition and Request for Disclosures (the "***Petition***") against Defendants HNGH Turtle Creek, LLC ("***HNGH***"), William L. Hutchinson ("***Hutchinson***"), and Vipin Nambiar ("***Nambiar***" and together with Hutchinson and HNGH, "***Defendants***"), by showing the Court the following:

## INTRODUCTION

Plaintiff files this suit to bring a halt to a manufactured event of default based on delayed payment on commercial property taxes during the unprecedented pandemic that has shut down business operations and life as we know it. Defendants exceeded their authority and worked collaboratively to deceptively obtain secret information about Plaintiff's business dealings, use that information to surreptitiously acquire a lender interest in Plaintiff's hospitality project involving prime real estate in the Turtle Creek area of Dallas, and then use the economic impact of the novel coronavirus pandemic to pounce on Plaintiff and threaten to foreclose on Plaintiff's property with no lender agreement with Plaintiff. Defendants have no right to do this and Plaintiff

has been forced to bring this lawsuit to obtain relief.

## I. DISCOVERY CONTROL PLAN AND RULE 47 STATEMENT

1. Pursuant to Rule 190 of the Texas Rules of Civil Procedure, Plaintiff intends that discovery be conducted under Level 2. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs state that they seek monetary relief over $1,000,000.

## II. THE PARTIES

2. Plaintiff 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC is a Delaware limited liability company with its principle place of business located at 13901 Midway Road, STE 102-243, Dallas, Texas 75244.

3. Defendant HNGH Turtle Creek, LLC is a Delaware limited liability company. HNGH does not have a registered agent in the State of Texas and is not registered to do business in the State of Texas. HNGH, therefore, may be served through the Texas Secretary of State, with copies to be mailed by the Secretary of State deliverable to its registered agent in the State of Delaware, Capital Services, Inc., 1675 S State Street, STE B, Dover, Delaware 19901.

4. On information and belief, Defendant William L. Hutchinson is a citizen of the State of Texas and a resident of Dallas County and may be served at 3100 Monticello Drive, STE 300, Dallas, Texas or wherever else he may be found.

5. On information and belief, Defendant Vipin Nambiar is a citizen of the State of Texas and a resident of Dallas County and may be served at 5722 W Amherst Avenue, Dallas, Texas 75209.

## III. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this matter because the amount in controversy is in excess of the minimum jurisdictional limits of this Court.

7. This Court has personal jurisdiction over the Defendants because Defendants regularly conduct business in the State of Texas, including the conduct that is the subject of this lawsuit.

8. Venue of this action is proper in Dallas County, Texas pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a) because Dallas County is the county where all or a substantial part of the events giving rise to Plaintiff's claims arose.

## IV. FACTUAL BACKGROUND

### A. Development of the Mandarin Oriental Hotel

9. On or about September 19, 2019, 2999TC Acquisitions, LLC (at that time known as MO 2999TC, LLC) ("***2999 Acquisitions***") acquired 2.47 acres of land located at 2999 Turtle Creek, Dallas, Texas ("***Land***") and shortly thereafter publicly announced the plan to develop the land into a 5-star Mandarin Oriental Hotel and branded residential project (the "***Project***").

10. As part of the closing on the acquisition of the land, 2999 Acquisitions executed a certain Deed of Trust, Security Agreement, and Fixture Filing (the "***Deed of Trust***") for the benefit of 2999 Turtle Creek, LLC ("***Lender***"), an affiliate of Madison Realty Capital ("***Madison***"), as well as a $32,500,000 Secured Promissory Note in favor of Lender (the "***Loan***"). The Deed of Trust and Loan are secured by the Land.

11. Both prior to and after closing on the Loan, 2999 Acquisitions, through its principal Timothy Barton, solicited investments, in the form of both equity and debt, in the development and construction of the Project.

### B. Defendants Misappropriate Plaintiff's Confidential Information

12. One such potential investor was Defendant Vipin Nambiar. In mid-January, Mr. Barton and Mr. Nambiar met for the purpose of discussing a potential investment by Mr. Nambiar

in the development of the Project. As part of that meeting, Mr. Barton shared confidential and proprietary information with Mr. Nambiar, including, but not limited to, the financial projections for the Project, the total amount of capital 2999 Acquisitions intended to raise, the amount of capital Madison expected to contribute to the Project, the amount of debt, and the identity of Plaintiff's Lender. Upon hearing the confidential plans, Mr. Nambiar confirmed his interest in investing in the Project.

13. Before, during, and after the meeting, Mr. Barton informed Mr. Nambiar that the information provided was confidential and proprietary and that Mr. Nambiar would need to execute a confidentiality agreement and term sheet that would outline the terms of his investment in the Project. Mr. Nambiar was informed that the term sheet would include a specific confidentiality and non-disclosure provision, which would formalize the existing agreement to keep all information regarding the Project confidential, and would restrict Mr. Nambiar from attempting to compete with the Project. Mr. Nambiar agreed to keep the information he learned about the Project confidential, agreed not to disclose the information, and agreed not to compete with Project. But Mr. Vipin did not disclose that he had an ownership interest in a special purpose entity that he previously created to gain an interest in and eventually take control of the Project.

14. In addition to Mr. Nambiar, Mr. Barton had previously met with other potential investors for the Project, including a foreign investor from Korea, Aju Hotels and Resorts ("Aju Hotels") and another investor, Daniel Minkowitz of Mink Development ("Minkowitz"), who had executed letters of intent to invest in the Project and had negotiated and finalized formal agreements to invest in the Project.

15. Shortly after the meeting in which Mr. Barton provided Mr. Nambiar with confidential information regarding the Project, 2999 Acquisitions received notice from the Lender

that on January 24, 2020 HNGH acquired a "$7,000,000.00 junior participation interest" in the Loan and Deed of Trust under the terms of a participation agreement between the Lender and HNGH. In its notice, Lender expressly informed 2999 Acquisitions that it "shall continue to coordinate directly with Lender in accordance with the Loan Documents with respect to the servicing and administration of the Loan." Attached hereto as **Exhibit 1** is a true and correct copy of the January 29, 2020 notice that HNGH acquired a participation interest in the Loan and Deed of Trust.

16. The participation interest acquired by HNGH was $7,000,000 – just slightly less than the amount Mr. Barton requested that Mr. Nambiar invest in the Project. At the time of the January 2020 meeting with Mr. Nambiar (and unbeknown to Mr. Barton), on information or belief, Mr. Nambiar already had formed HNGH in December 2019 as part of a scheme to acquire interest in the Project and ultimately replace Mr. Barton with another a real estate developer and competitor—Defendant William L. Hutchinson. Mr. Nambiar is a principal, owner, or otherwise exercises control of HNGH. On information and belief, since some period in mid to late 2019, Mr. Nambiar and Hutchinson had been devising a plan to overtake the Project from Mr. Barton after they became aware of Madison's agreement with Mr. Barton to develop the Project. But at no time during the January 2020 meeting did Mr. Nambiar disclose his true interest and plans regarding the Project.

17. Mr. Barton would not have shared any information regarding the Project with Mr. Nambiar but for Mr. Nambiar's representations that such information was only to be used by him to consider a possible investment in the Project and that he would keep such information secret, confidential and would not compete with the Project. Rather than keeping the information regarding the Project confidential, Mr. Nambiar collaborated with Mr. Hutchinson (a direct

competitor of Mr. Barton) to orchestrate a scheme to lure Mr. Barton into divulging confidential information about the Project and Mr. Barton's financial needs for the Project, misappropriated such information, and shared such information with Mr. Hutchinson and HNGH, and (in conjunction with HNGH) used such information to contact the Lender and acquire a participation in the Loan and Deed of Trust as part of Messrs. Messrs. Nambiar and Hutchinson's overall plan to take over the Project and cede control of development of the Project to Mr. Hutchinson.

18. After using HNGH to obtain a participation in the Loan and Deed of Trust, Mr. Nambiar began to contact other potential investors in the Project and told them that he "owned" the Loan on the Project. On information or belief, Mr. Nambiar had these discussions with Aju Hotels and with Minkowitz including at a meeting between them at the Virgin Hotels on or around March 4, 2020—both of whom backed out of investing in the Project at that time.

19. Separately, and in furtherance with the plans with Mr. Nambiar and HNGH, in March 2020, Mr. Hutchinson sent requests to the construction company retained by 2999 Acquisitions for development of the Project to request copies of current building plans and development plans for the Project. These plans would include demolition plans of the existing building, along with other confidential documents. Rather than contact Mr. Barton directly to request information about the Project, Mr. Hutchinson (a competitor) attempted to convince the Project's construction company to release confidential information to Mr. Hutchinson directly by claiming he had an interest in moving into the existing building that is located on the Land. On information or belief, Messrs. Nambiar and Hutchinson and HNGH had been working collaboratively for some time to obtain confidential information about the Project and lure potential investors away from the Project.

### C. Defendants Misappropriation of Confidential and Secret Information was Planned Far in Advance as Part of a Scheme to the Project

20. Defendants efforts to surreptitiously acquire confidential and secret information regarding the Project, and their subsequent acquisition of a participation interest in the Loan, were not done in isolation. Rather, they were part of a long-term scheme hatched by Messrs. Nambiar and Hutchinson to lure potential investors away from Mr. Barton and take control of the Project.

21. For many years, Mr. Nambiar worked as a managing director for Hunt Consolidated. In December of 2017, a Hunt Consolidated affiliate, Hunt Investment Group, and Mr. Nambiar formed HN Capital Partners. Mr. Nambiar is the managing director of HN Capital Partners operating with the financial backing of Hunt Investment Group. HN Capital's primary activity was investing in the acquisition and development of hospitality sector properties. For example, HN Capital Partners was the primary investor in the acquisition of the W Hotel in Dallas and the development of the Virgin Hotels in Dallas – both of which were properties developed by Mr. Hutchinson's company Dunhill Partners.

22. In August 2019, HN Capital Partners (and/or one of the related entities affiliated with Mr. Nambiar) entered into a joint-venture with James Glasgow and his company 5 Mile Capital Partners (and/or one of the related entities affiliated with Mr. Glasgow) to form HN Green Hollow Capital Partners, LLC, which owns Defendant HNGH. Like HN Capital Partners, 5 Mile Capital Partners specializes in hospitality projects. As with Mr. Nambiar's other projects, Hunt Investment Group served as the financier and sponsor of HN Green Hollow Capital Partners. With the financial backing of Hunt Investment Group, HN Green Hollow Capital Partners raised $42.5 million in September 2019. This amount – not coincidentally – was substantially the same amount Mr. Barton and Plaintiff sought to raise to develop the Project. In September 2019, Lender issued

a press release announcing it had closed the deal with Plaintiff for development of the Mandarin Hotel Project and that Mr. Barton's construction company would be the primary builder.

23. Rather than investing in Plaintiff, three months later, in December 2019, HN Green Hollow Capital Partners, LLC formed HNGH. HNGH's primary purpose was to acquire a participation interest in the Loan and ultimately gain control or ownership of the Loan and Project.

**D. Defendants Attempt to Steal the Project by Manufacturing a Default Under the Deed of Trust**

24. Under the Deed of Trust (an agreement between 2999 Acquisitions and Lender), 2999 Acquisitions is required to pay the property taxes that accrue on the Project. Dallas County property taxes are not due until January 31 the year following their accrual. On January 31, 2020, the Dallas County property taxes for 2019 became due on the Project. At the time, 2999 Acquisitions was facing cash shortages and was attempting to raise additional money from investors.

25. In the normal course of business, 2999 Acquisitions began discussions with the Dallas County tax assessors to extend the due date of the 2019 property taxes and enter into a payment structure. In the midst of organizing the payment structure for the 2019 property taxes, the global outbreak of the novel coronavirus, which has been designated as "COVID-19", resulted in delays in negotiating property tax extensions with the City of Dallas. Indeed, by the time the 2019 property taxes became due on January 31, 2020, the World Health Organization had COVID-19 a "Public Health Emergency of International Concern," and the United States Department of Health and Human Services and the United States Center of Disease Control declared COVID-19 pandemic as a "Public Health Emergency". Shortly thereafter, the Dallas County, along with other counties and municipalities and the governor of the State of Texas, entered varying emergency orders restricting public gatherings and shutting down business, other than "essential businesses."

26. As financial markets increasingly grew unstable, in February 2020, 2999 Acquisitions shared with the Lender its intent to enter into a payment plan for the 2019 taxes. Lender did not object to the payment plan and took no action under the Deed of Trust. By mid-March, the Dallas County had entered the first of a series of emergency orders mandating business shut downs and shelter-in-place orders. At the same time, state governors and city mayors across the United States entered similar orders, which have been amended over time to increase the duration of the state of emergency mandating social distancing, restricting public gatherings, and shutting down business operations. As a result of the unprecedented governmental orders arising from the COVID-19 pandemic, capital and lending markets across the United States crashed, which caused increased financial stress on 2999 Acquisitions.

27. Against this backdrop, even though Lender had not yet sent a default notice concerning the 2019 tax payments, 2999 Acquisitions began to contemplate requesting forbearance agreements with its various lenders and creditors, including Lender. On or around March 27, 2020, 2999 Acquisitions contacted Lender seeking a forbearance agreement regarding the payment of the 2019 taxes.

28. Instead of Lender replying to 2999 Acquisitions' request for a forbearance, 2999 Acquisitions received a letter from HNGH's counsel on April 6, 2020, claiming that HNGH was exercising certain rights under the participation agreement (which 2999 Acquisitions was not a party), and that HNGH was paying the 2019 taxes as a protective "Tax Advance" in the amount of $345,907.84. Apparently, in a letter dated March 24, 2020, HNGH purported to give notice to 2999 Acquisitions that an event of default for failure to pay the 2019 taxes occurred under the Deed of Trust, which demanded such default be cured by April 1, 2020. Because 2999 Acquisitions was not a party to the participation agreement between Lender and HNGH, had not

seen such agreement, and had no privity with HNGH, 2999 Acquisitions did not respond to HNGH. Indeed, Lender's January 2020 notice to Plaintiff regarding the "participation agreement," Lender expressly instructed 2999 Acquisitions to "continue to coordinate directly with Lender in accordance with the Loan Documents with respect to the servicing and administration of the Loan."

29. 2999 Acquisitions was surprised by HNGH's demand because the Loan with Lender did not confer rights on HNGH to demand tax payment information (or other potential default remedies) from 2999 Acquisitions. Yet, in its April 6 letter, HNGH made "formal demand upon Borrower to immediately pay to [HNGH] the Tax Advance in the amount of $345,907.84." along with default interest. HNGH referred to itself as "Participant" but did not claim to represent the Lender under the Loan or Deed of Trust. Attached hereto as **Exhibit 2** is a true and correct copy of the April 6, 2020 correspondence. 2999 Acquisitions was shocked and appalled at the April 6 letter from HNGH's counsel. HNGH is a stranger to the Loan and Deed of Trust, involve only the Lender and 2999 Acquisitions. Further, 2999 Acquisitions did not consent to HNGH's participation in the Loan and would not have consented to such participation knowing that it was done using misappropriated confidential information. Moreover, the notice of the participation that was provided to 2999 Acquisitions (which did not include the participation agreement) made clear, as it was required, that "Borrower shall continue to coordinate directly with Lender in accordance with the Loan Documents with respect to the servicing and administration of the Loan." *See* Exhibit 1.

30. In addition to demanding that 2999 Acquisitions pay the $345,907.84 tax advance, which HNGH was not authorized to do and which 2999 Acquisitions did not approve or consent, HNGH demanded that 2999 Acquisitions pay default interest under the Deed of Trust. HNGH

further threatened that if the tax advance and default interest were not paid by April 10, 2019 (a mere four days later) "foreclosure proceedings" may be initiated.

31. Then, on April 9, 2020, HNGH sent a letter to Plaintiff that included a purported "pre-negotiation" agreement between itself and 2999 Acquisitions (notably, the Lender itself was not included) that, among other things, required 2999 Acquisitions to sign, bind itself to the laws of the State of New York (although neither party is a New York entity or located in New York), confirm the validity of the unseen "participation agreement" and certain representations of and rights purportedly conferred onto HNGH under the "participation agreement." Nonetheless, the "pre-negotiation agreement" purported to waive any claims 2999 Acquisitions may have against Lender and HNGH, HNGH claimed to be the "Lender" under the Loan Documents, and HNGH claimed that Lender was the "Senior Participant" in the Loan Documents. Even though 2999 Acquisitions made a forbearance request to *Lender*, *HNGH* boldly demanded that before any discussions regarding any forbearance could take place, 2999 Acquisitions had to agree to the certain unilateral terms pursuant the alleged "participation agreement" between Lender and HNGH. Both HNGH and the Lender have refused to provide a copy of their purported "participation agreement" to 2999 Acquisitions despite multiple requests for a copy.

32. Relying on the hidden "participation agreement", HNGH attempted to coerce Plaintiff into agreeing to onerous terms in the "pre-negotiation" agreement as a prerequisite to engaging in good-faith discussions about any forbearance with ***Lender***. For example, HNGH demanded that Plaintiff agree that:

> Borrower and Guarantor acknowledge that they have received written notice of Lender's junior participation in the Loan ***and agree that no discussions between Lender [defined as HNGH Turtle Creek LLC therein] and Senior Participant [defined as 2999 Turtle Creek, LLC therein] can be used in a court of law as a claim of wrongdoing and acknowledges that each of Senior Participant and***

> ***Lender have the right to have discussions and agreements concerning the Borrower and the Property***.
>
> Borrower and Guarantor acknowledge and agree that continuing throughout the pendency of the Discussions, ***Lender shall have the right, in its sole discretion pursuant to the terms of the Participation Agreement***, to administer, enforce, and otherwise deal with the Loan, the Loan Documents, and the Default Correspondence, notwithstanding the Discussions, and notwithstanding the fact that there exist Defaults under the Loan as more fully described in the Default Correspondence.
>
> By entering into the Discussions, Lender is making no promise or commitment to do anything or to refrain from exercising any or all available remedies under the Loan or the Default Correspondence, and ***Borrower and Guarantor may not rely on the Discussions continuing nor may they rely on the Discussions resulting in any outcome to restructure, forebear, or modify the obligations of the Borrower or Guarantor under the Loan Documents. . .***
>
> * * *
>
> ***Borrower and Guarantor represent and warrant to Lender that neither of them have any claim or cause of action of any kind with respect to the Loan Documents or Obligations thereunder against Senior Participant or Lender***.

Attached hereto as **Exhibit 3** is a true and correct copy of the April 9, 2020 correspondence.

33. Troubled by HNGH's escalating demands and inserting itself into the role of "Lender" without consent of 2999 Acquisitions, in letters to Lender dated April 10 and April 13, 2020, 2999 Acquisitions questioned why it was receiving a demand letter from HNGH – a stranger to the Loan and Deed of Trust – and emphasizing that the Dallas County's Shelter in Place: Safer at Home Order and Executive Order GA-14 of Texas Governor Greg Abbott were causing disruptions in responsiveness and operations. 2999 Acquisitions also renewed its request with Lender to negotiate a forbearance for any payment obligations under the Loan.

34. To date, HNGH has not withdrawn its demands or threat to foreclose on the Project and continues to interfere with the business relationship and agreements between Lender and 2999 Acquisitions.

35. Based on HNGH's interference, on April 14, 2020, Lender sent 2999 Acquisitions a letter insisting that Plaintiff comply with HNGH's demands outlined in its April 6 and 9 letters.

## V. CAUSES OF ACTION

### Count One: Tortious Interference with Existing Contract

36. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

37. Plaintiff entered into a loan transaction with the Lender, including but not limited to the Loan and Deed of Trust.

38. HNGH has willfully and intentionally interfered with the loan between Lender and 2999 Acquisitions, including but not limited to the Loan and Deed of Trust by, among other things, misusing Plaintiff's confidential information, paying the 2019 taxes for the Land and asserting rights under the Deed of Trust to which it is a stranger, demanding the payment of default interest under the Deed of Trust to which it is a stranger, and threatening to foreclose on the Project without the right to do so. HNGH's interference has proximately caused injury to Plaintiff.

39. Plaintiff had also entered into an agreement with Minkowitz under which Minkowitz agreed to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH. And Plaintiff had entered into an agreement with Aju Hotels under which Aju Hotels agreed to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH.

40. Mr. Nambiar discussed the Project with Minkowitz and Aju Hotels, including at a meeting with Minkowitz, Aju Hotels, and others at the Virgin Hotels, knowing of Minkowitz's and Aju Hotels' agreements and/or intentions to invest into the Project and misrepresented to them that he owned the "Note" and made other statements and claims regarding the Project in order to persuade Minkowitz and Aju Hotels to back out of their investment in the Project.

41. As a direct and proximate result of Mr. Nambiar's actions, Minkowitz and Aju Hotels each terminated their investment in the Project at that time, and Plaintiff has been damaged, including, but not limited to, the loss of the investment by Minkowitz or Aju Hotels.

**Count Two: Tortious Interference with Prospective Business Relations**

42. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

43. A prospective business relationship existed between Plaintiff and Minkowitz under which there was a reasonable probability that Plaintiff would have entered into an agreement with Minkowitz for him invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH. Likewise, a prospective business relationship existed between Plaintiff and Aju Hotels under which there was a reasonable probability that Plaintiff would have entered into an agreement with Aju Hotels for it to invest certain sums in the Project including sufficient amounts to pay the Tax Advance asserted by HNGH.

44. Mr. Nambiar discussed the Project with Minkowitz and with Aju Hotels, including at a meeting with Minkowitz, Aju Hotels, and others at the Virgin Hotels, knowing of Minkowitz's agreement and/or intention to invest into the Project and misrepresented to such person that he owned the "note" and made other statements and claims regarding the Project in order to persuade Minkowitz and Aju Hotels each to back out of their investment in the Project.

45. As a direct and proximate result of Mr. Nambiar's actions, Minkowitz terminated his investment in the Project and Plaintiff has been damaged including but not limited to the loss of the investment by Minkowitz. Likewise, as a direct and proximate result of Mr. Nambiar's actions, Aju Hotels terminated its investment in the Project and Plaintiff has been damaged including but not limited to the loss of the investment by Aju Hotels.

**Count Three: Misappropriation of Confidential Information**

46. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

47. As a result of misrepresentations made by Mr. Nambiar, HNGH and Mr. Nambiar were provided with confidential information regarding the Project. HNGH and Mr. Nambiar used and disclosed the confidential information without authorization.

48. As a direct and proximate result of HNGH and Mr. Nambiar's misuse of confidential information, Plaintiff has suffered and will continue to suffer injury, loss, harm or damage, and will continue to suffer such injury, loss, harm or damage.

**Count Four: Misappropriation of Trade Secrets in Violation of the Texas Uniform Trade Secrets Act**

49. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

50. As set forth above, HNGH, Mr. Hutchinson, and Mr. Nambiar used, received and had knowledge of the confidential information of Plaintiff that constitute trade secrets. Plaintiff has made and continues to make reasonable efforts to maintain the secrecy of the trade secrets.

51. HNGH, Mr. Hutchinson, and Mr. Nambiar have actually misappropriated the trade secrets without the express or implied consent of Plaintiff to use, have access to, communicate, transmit, or disclose the trade secrets.

52. Further, at the time of the disclosure, to the present, HNGH. Mr. Hutchinson, and Mr. Nambiar knew or had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

53. HNGH, Mr. Hutchinson, and Mr. Nambiar's theft, disclosure, communication, transmission and/or misappropriation of the trade secrets was willful and/or malicious.

54. As a direct and proximate result of HNGH, Mr. Hutchinson, and Mr. Nambiar's theft, disclosure, communication, transmission and/or misappropriation of the trade secrets, Plaintiff has suffered damages, including attorneys' fees, which continue to accrue, in an amount to be proved at trial.

55. As a result of the harm caused by HNGH, Mr. Hutchinson, and Mr. Nambiar's willful and/or malicious conduct, Plaintiff is entitled to exemplary damages.

**Count Five: Fraud**

56. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

57. Mr. Nambiar made false representations to Plaintiff. Namely, that he was considering an investment in the Project, agreeing to use the confidential information provided by Mr. Barton on for the purpose of considering such investment, and agreeing to keep confidential such information regarding the Project that was provided by Mr. Barton.

58. Mr. Nambiar made these statements as an attempt to induce Mr. Barton (as agent for 2999 Acquisitions) to share confidential information regarding the Project.

59. Plaintiff justifiably relied on such misrepresentations by sharing confidential information with Mr. Nambiar, and Plaintiff has suffered damages as a result.

60. Mr. Nambiar's conduct described herein was both willful and malicious. As a result, Plaintiff is entitled to recover punitive damages from Mr. Nambiar.

**Count Six: Fraud by Nondisclosure**

61. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

62. Mr. Nambiar and Mr. Hutchinson concealed or failed to disclose facts from Plaintiff. Specifically, Mr. Nambiar and Mr. Hutchinson sought confidential and secret

information from Plaintiff while concealing that they had formed HNGH for the purpose of orchestrating a scheme to wrongfully foreclose on the Project. Mr. Nambiar and Mr. Hutchinson had a duty to disclose these facts to Plaintiff because Plaintiff had provided confidential and secret information to Mr. Nambiar, including such information that Mr. Nambiar provided to Mr. Hutchinson.

63. Mr. Nambiar and Mr. Hutchinson knew that Plaintiff was ignorant of these facts and did not have an equal opportunity to discover these facts.

64. Mr. Nambiar and Mr. Hutchinson were deliberately silent when they had a duty to inform Plaintiff that they had formed HNGH for the purpose of orchestrating a scheme to wrongfully foreclose on the Project. By failing to disclose this information, Mr. Nambiar and Mr. Hutchinson intended to, and in fact did, induce Plaintiff to disclose confidential and secret information. Plaintiff relied upon Mr. Nambiar and Mr. Hutchinson's nondisclosure and suffered injury as a result.

**Count Seven: Conspiracy**

65. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth herein.

66. HNGH, Mr. Hutchinson, and Mr. Nambiar, acting in concert and in combination sought to unlawfully and deceptively obtain secret information about Plaintiff's business dealings, use that information to surreptitiously acquire an interest in the Loan, and then unlawfully foreclose on the Project.

67. As a result of the aforementioned unlawful acts taken in pursuance of the goal of foreclosing on the Project, Plaintiff has proximately suffered harm.

## VI. REQUEST FOR DISCLOSURES

68. Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants serve responses to the disclosures listed in Rule 194 within fifty (50) days of the service of this Petition.

## VI. JURY DEMAND AND JURY FEE

69. Pursuant to Tex. R. Civ. P. 216(a), Plaintiff demands a jury trial on all issues so triable. Plaintiff intends to deposit with the Clerk of the Court the required jury fee.

## VI. RULE 193.7 NOTICE

70. Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiff here gives actual notice to Defendants that any and all documents produced may be used against Defendants, producing the document at any pre-trial proceeding and/or at the trial of this matter without the necessity of authenticating the documents.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiff prays that Defendants be cited to appear and show cause and make answer herein and that the Court award to Plaintiff, on final trial of this cause, the actual damages incurred by Plaintiff because of Defendants' conduct, punitive damages, prejudgment and post-judgment interest at the maximum lawful rate, expenses, including attorneys' fees incurred in enforcing Plaintiff's rights, and all costs of court; and any such other and further relief, whether at law or in equity, to which Plaintiff may show itself to be justly entitled.

Dated: April 20, 2020.

Respectfully submitted,

By: */s/ Elizabeth Brandon*

Elizabeth Brandon (State Bar No. 24049580)
Bradley J. Purcell (State Bar No. 24063965)
**REED SMITH LLP**
2501 N. Harwood St, Ste. 1700
Dallas, TX 75201
T: 469.680.4200
F: 469.680.4299
ebrandon@reedsmith.com
bpurcell@reedsmith.com

*Attorneys for Plaintiff*

# EXHIBIT 1

**2999 TURTLE CREEK LLC**
c/o Madison Realty Capital
520 Madison Avenue, Suite 3501
New York, New York 10022

January 29, 2020

**VIA EMAIL AND OVERNIGHT FEDERAL EXPRESS**

MO 2999TC, LLC
13901 Midway Road, Suite 102-243
Dallas, Texas 75244
Attention: Tim Barton
Email: tbarton@jmjdevelopment.com

McMURRY LAW, PLLC
508 W. Lookout Drive, Ste 14-74
Richardson, Texas 75080
Attention: Vance McMurry
Email: vance@mcmurrylegal.com

Re: $32,500,000.00 Loan (the "**Loan**") made by 2999 Turtle Creek LLC ("**Lender**") to MO 2999TC, LLC ("**Borrower**") secured by that certain Deed of Trust, Security Agreement and Fixture Filing (the "**Deed of Trust**") dated as of September 19, 2019 by and among Lender, Borrower and Michael B. Massey (as trustee)

To Whom It May Concern:

Reference is hereby made to the above referenced Loan. Capitalized terms not defined herein shall have the meanings ascribed to them in the Deed of Trust.

Please be advised that as of January 24, 2020, Lender has sold a $7,000,000.00 junior participation interest (the "**Participation**") in the Loan to HNGH Turtle Creek, LLC, a Delaware limited liability company ("**HN Green Hollow**"). This letter does hereby constitute written notice of the sale of the Participation Interest to HN Green Hollow. For so long as HN Green Hollow owns the Participation, HN Green Hollow shall have the right to communicate with the Borrower and Guarantor with respect to the Loan. Notwithstanding the foregoing, unless and until otherwise directed by Lender in writing, Borrower shall continue to coordinate directly with Lender in accordance with the Loan Documents with respect to the servicing and administration of the Loan.

This notice is delivered without prejudice to Lender's rights and remedies, at law, in equity, under the Loan Documents.

Sincerely,

**2999 TURTLE CREEK LLC,**
a Delaware limited liability company

By: ______________________
Name: **Joshua Zegen**
Title: **Authorized Signatory**

# EXHIBIT 2

Wick Phillips
ATTORNEYS & COUNSELORS

**Michael Bailey**
**214.740.4058 | Direct Dial**
mbailey@wickphillips.com
www.wickphillips.com

April 6, 2020

*VIA UPS OVERNIGHT and*
*FEDEX OVERNIGHT*

MO 2999TC, LLC
13901 Midway Road, Suite 102-243
Dallas, Texas 75244

Re: Indebtedness (the "Indebtedness" and/or the "Loan") evidenced by that certain Secured Promissory Note (the "Note"), executed by MO 2999TC, LLC, a Delaware limited liability company ("Borrower"), dated September 20, 2019 in the original principal amount of $32,500,000.00 payable to the order of 2999 Turtle Creek LLC, a Delaware limited liability company ("Lender"), said Note being secured by, among other things, that certain Deed of Trust, Security Agreement and Fixture Filing (the "Deed of Trust," together with the Note and any and all other documents and agreements entered into in connection therewith, the "Loan Documents"), dated of even date with the Note executed by Borrower to Michael B. Massey, Trustee, for the benefit of Lender, filed in the Real Property Records of Dallas County, Texas, granting a first priority security interest in that certain real property identified therein (the "Property");

Correspondence dated March 24, 2020 from Lender to Borrower (the "Default Correspondence") describing Borrower's Event of Default under the Loan Documents for failure to pay the real estate taxes due on the Property (the "Tax Default").

Dear Sir/Madam:

This firm represents HNGH Turtle Creek, LLC, a Delaware limited liability company ("Participant"), a participant in the Loan. This correspondence is being sent pursuant to the terms of a Participation Agreement by and between Lender and Participant dated January 24, 2020, notice of which was provided to Borrower on January 29, 2020. Pursuant to the terms of the Participation Agreement, Borrower is hereby instructed to provide all communication related to the Loan going forward to Participant, whether by phone, e-mail, or written correspondence, as

appropriate, copying Lender and copying this firm at the following address: Wick Phillips Gould & Martin, LLP, 3131 McKinney Avenue, Suite 100, Dallas, Texas 75204, Attention: Michael Bailey, E-mail: michael.bailey@wickphillips.com, on any e-mail or written correspondence.

As you are aware pursuant to the Default Correspondence, you have failed to pay the real estate taxes for the Property when due on February 1, 2020, and have been, and remain, in default under the terms of the Loan Documents. Lender informed Borrower in the Default Correspondence that failure to cure the Tax Default by making a full and complete payment of the past-due real property taxes, together with all penalties and fees, by April 1, 2020 could result in Lender exercising its rights and remedies under the Loan Documents, including, but not limited to, making a protective advance to pay the past due taxes, together with any and all fees and penalties related thereto (the "Tax Advance").

You failed to make the necessary tax payment by April 1, 2020. Pursuant to our client's rights as set forth in the Participation Agreement, Participant hereby informs Borrower that it is making the Tax Advance today, April 6, 2020.

This letter constitutes formal demand upon Borrower to immediately pay to Participant the Tax Advance in the amount of **$345,907.84**, default interest from February 1, 2020 to April 7, 2020 in the amount of **$302,430.63**, per diem default interest in the amount of **$4,561.93** per day for each day after April 7, 2020, and all costs, expenses and attorneys' fees incurred by Participant in connection with the Tax Default (collectively, the "Cure Payment"). Default interest will continue to accrue on the Indebtedness until the Tax Advance has been paid. Additionally, Participant requires Borrower to enter into a Pre-Negotiation Agreement, in form and substance satisfactory to Participant, which agreement Participant will provide to Borrower.

By copy hereof, Participant hereby advises all guarantors and other parties obligated to pay all or any portion of the Indebtedness of the Tax Default and this letter constitutes formal notice to and demand upon such guarantors and other obligors to cure such default as herein specified.

In the event Borrower does not pay to Participant the Cure Payment on or before 12 p.m. on April 10, 2020 then Borrower is advised that foreclosure proceedings in accordance with the Deed of Trust may be instituted, and additional attorneys' fees and other costs of collection of Participant shall accrue for which Borrower is liable. In the event the properties securing the Note are sold at foreclosure for an amount insufficient to satisfy the entire unpaid balance of principal and accrued but unpaid interest, including default interest, and all applicable charges, trustee's fees, attorneys' fees, costs and expenses incurred in connection therewith, Borrower and the guarantors will be liable for the deficiency.

This letter confirms that neither Participant nor Lender has waived the Tax Default, and Participant expressly reserves all of its rights, powers, privileges and remedies under the Note, the Deed of Trust, the Participation Agreement, the other Loan Documents, applicable law or otherwise with respect to any Event of Default (including, without limitation, the Tax Default) now existing or hereafter arising under the Loan Documents, including without limitation the right to foreclose on

the Property and take other action with respect to any or all collateral, including the liquidation thereof. The failure of Participant to exercise any such rights, powers, privileges and remedies is not intended, and shall not be construed, to be a waiver of any such Event of Default (including, without limitation, the Tax Default). Participant may elect to exercise any or all of the rights of Lender, at its option, at any time hereafter, without the necessity of any further notice, demand or other action on the part of Lender or Participant.

Nothing contained in this letter or any delay by Participant or Lender in exercising any rights, powers, privileges and remedies under the Loan Documents, or applicable law with respect to the Tax Default or any other Event of Default now existing or hereafter arising under any of the Loan Documents shall be construed as a waiver or modification of such rights, powers, privileges and remedies. This letter is not, and shall not be deemed to be, a waiver of, or a consent to, any default, noncompliance, Event of Default (including, without limitation, the Tax Default) now existing or hereafter arising under any of the Loan Documents. This letter shall not entitle the Borrower to any other or further notice or demand.

The holding of any discussions between or among any or all of Participant, Lender, Borrower and/or any other party to any Loan Document regarding the administration of the Loan Documents or proposals regarding amendments to, or modifications or restructurings of any Loan Document shall not constitute any waiver of any Event of Default (including, without limitation, the Tax Default), or an agreement to forbear from the exercise of Participant or Lender's rights and remedies under any Loan Document, or applicable law, nor shall it be construed as an undertaking by Participant or Lender to continue such discussions or to enter into any such amendments, modifications or restructurings.

Very truly yours,



Michael W. Bailey, Esq.

cc: Timothy Lynch Barton
13901 Midway Road, Suite 102-243
Dallas, Texas 75244

McMurry Law, PLLC
508 W. Lookout Drive, Suite 14-74
Richardson, Texas 75080
Attention: Vance McMurry, Esq.

2999 Turtle Creek LLC
c/o Madison Realty Capital
520 Madison Avenue, Suite 3501
New York, New York 10022
Attention: Brian Shatz and Joshua Zegen

Kriss & Feuerstein LLP
360 Lexington Ave., Suite 1200
New York, New York
Attention: Jerold Feuerstein

HNGH Turtle Creek, LLC
c/o HN Green Hollow Capital Partners LLC
600 5th Avenue, 2nd Floor
New York, New York 10020
Attention: Jim Glasgow

# EXHIBIT 3

**HNGH TURTLE CREEK LLC**
c/o HN Green Hollow Capital Partners LLC
600 5th Ave., 2nd Floor
New York, New York 10020

April 9, 2020

*VIA ELECTRONIC MAIL*
*VIA UPS OVERNIGHT and*
*FEDEX OVERNIGHT*

MO 2999TC, LLC
13901 Midway Road, Suite 102-243
Dallas, Texas 75244
tbarton@jmjdevelopment.com

Timothy Lynch Barton
13901 Midway Road, Suite 102-243
Dallas, Texas 75244
tbarton@jmjdevelopment.com

Re: Indebtedness (the "Indebtedness" and/or the "Loan") evidenced by that certain Secured Promissory Note (the "Note"), executed by MO 2999TC, LLC, a Delaware limited liability company ("Borrower"), dated September 20, 2019 in the original principal amount of $32,500,000.00 payable to the order of 2999 Turtle Creek LLC, a Delaware limited liability company ("Senior Participant"), said Note being secured by, among other things, that certain Deed of Trust, Security Agreement and Fixture Filing (the "Deed of Trust," together with the Note and any and all other documents and agreements entered into in connection therewith, the "Loan Documents"), dated of even date with the Note executed by Borrower to Michael B. Massey, Trustee, for the benefit of Senior Participant, filed in the Real Property Records of Dallas County, Texas, granting a first priority security interest in that certain real property identified therein (the "Property"), guaranteed by that certain Guaranty, dated as of September 20, 2019, by and between Timothy Lynch Barton, an individual ("Guarantor") and Senior Participant (the "Guaranty"), a portion of such interest in the Loan and Loan Documents being sold by Senior Participant to HNGH Turtle Creek, LLC, a Delaware limited liability company ("Lender") pursuant to that certain Participation Agreement, by and between Senior Participant and Lender, dated as of January 24, 2020 (the "Participation Agreement").

Ladies and Gentlemen:

Borrower and Guarantor have requested Lender to enter into certain discussions with representatives of the Borrower and Guarantor (the "Discussions") to explore the possibility of

restructuring the terms of the Loan pursuant to Lender's rights as set forth in the Participation Agreement.

The Loan is evidenced, *inter alia*, by the Loan Agreement and the Loan Documents, and is secured by the Property more particularly described in the Deed of Trust. All capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Loan Documents.

Borrower and Guarantor acknowledge they have received (i) the correspondence dated March 24, 2020 from Senior Participant to Borrower (the "First Notice") describing Borrower's Event of Default under the Loan Documents for failure to pay the real estate taxes due on the Property (the "Tax Default"), and (ii) the correspondence dated April 6, 2020 from Lender's counsel to Borrower regarding the Tax Default (the "Second Notice", and together with the First Notice, the "Default Correspondence").

Borrower and Guarantor have requested that Lender engage in Discussions with them concerning the Default Correspondence and other matters related to the Loan. Lender has agreed to engage in such Discussions, which shall include, for purposes of this letter agreement, meetings, conferences and written communications subject to the terms, conditions, and limitations set forth in this letter agreement.

1. The Discussions are voluntary in nature, are entered into in reliance upon the understandings set forth herein and may be terminated by written notice sent in accordance with this letter agreement by either Lender, Borrower, or Guarantor at any time without cause or prior notice and without liability of any kind. By way of illustration and not limitation, Lender may determine not to undertake further Discussions, or may terminate the Discussions, at any time and for any reason whatsoever without prior notice to the Borrower or Guarantor and without liability for such termination.

2. Borrower and Guarantor acknowledge and agree that the Tax Default exists under the Loan as described in the Default Correspondence. Borrower and Guarantor further acknowledge that the Maturity Date of the Loan is October 1, 2020, and hereby ratify and affirm all representations and warranties made under the Loan Documents.

3. Neither the Discussions nor any oral or written statements, memoranda, or letters of Lender, Borrower or Guarantor in connection therewith shall be binding upon any such Party. It is expressly agreed that any binding agreement between the parties hereto in connection with the Loan must be contained in a formal written agreement approved by Lender and signed by all Parties. It is acknowledged and agreed by the parties hereto that the Discussions are settlement negotiations and may not be used by any party for any purpose, including as an admission for evidentiary purposes.

4. Notwithstanding the Discussions, the Loan Documents are and shall remain in full force and effect without change unless and until modified by appropriate instruments executed by Lender. None of the Discussions or any other action taken or not taken by Lender before, during, or after the Discussions, including the acceptance of partial payment or performance by Borrower or Guarantor, shall be deemed a waiver of, limitation on, or forbearance from, any of the rights and remedies of Lender whether under the Loan Documents, pursuant to the Participation Agreement, pursuant to the Default Correspondence, at law, or in equity, it being the understanding and agreement of the parties

hereto that Lender may exercise any and all of such rights and remedies at any time and from time to time.

In agreeing to attend any meeting or undertake any Discussions, Lender is not explicitly or implicitly agreeing to forebear from taking any action pending such meeting or Discussions, including without limitation any action that may be appropriate pursuant to, or in connection with, the Default Correspondence. Lender expressly reserves all rights and remedies available under the Loan Documents, at law and in equity.

5. Borrower and Guarantor acknowledge that they have received written notice of Lender's junior participation in the Loan and agree that no discussions between Lender and Senior Participant can be used in a court of law as a claim of wrongdoing and acknowledges that each of Senior Participant and Lender have the right to have discussions and agreements concerning the Borrower and the Property.

6. Borrower and Guarantor acknowledge and agree that continuing throughout the pendency of the Discussions, Lender shall have the right, in its sole discretion pursuant to the terms of the Participation Agreement, to administer, enforce, and otherwise deal with the Loan, the Loan Documents, and the Default Correspondence, notwithstanding the Discussions, and notwithstanding the fact that there exist Defaults under the Loan as more fully described in the Default Correspondence.

7. By entering into the Discussions, Lender is making no promise or commitment to do anything or to refrain from exercising any or all available remedies under the Loan or the Default Correspondence, and Borrower and Guarantor may not rely on the Discussions continuing nor may they rely on the Discussions resulting in any outcome to restructure, forebear, or modify the obligations of the Borrower or Guarantor under the Loan Documents. Therefore, Borrower and Guarantor may, at their option, throughout the term of the Discussions, pursue alternative resolutions to the dispute, including the opportunity to repay the Loan in full through the refinancing or sale of the Property, subject, however, in all events to the terms, covenants, and conditions contained in the Loan Documents.

8. Borrower and Guarantor represent and warrant to Lender that in entering into this letter agreement, each of them has been advised by legal counsel and that each of them fully understands the terms hereof.

9. Borrower and Guarantor represent and warrant to Lender that neither of them have any claim or cause of action of any kind with respect to the Loan Documents or Obligations thereunder against Senior Participant or Lender.

10. Borrower represents that it is duly authorized to execute this letter agreement in accordance with its Limited Liability Company Agreement executed as of September 4th, 2019.

11. Borrower shall pay, as and when billed, all fees, costs, and expenses, including without limitation, reasonable attorneys' fees, appraisal fees, and engineering and environmental fees, reasonably incurred by Lender in connection with the negotiation of this letter agreement and for all sums incurred by Lender in connection with all matters contemplated by this letter agreement.

12. This letter agreement may be executed in counterparts which together shall constitute the entire agreement of the parties concerning the Discussions. Delivery of an executed counterpart of a signature page to this letter agreement by facsimile or in electronic ("pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this letter agreement. All prior or contemporaneous understandings or representations made by Lender, Borrower or Guarantor concerning the agreements made herein shall be superseded hereby. This letter agreement shall become effective when executed and delivered by the Lender after Lender shall have received counterparts hereof that together bear the signatures of each and every party hereto.

13. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

14. By signing below and delivering this letter agreement, each of the parties acknowledges and agrees to the terms of this binding letter agreement. Please execute this agreement in the space provided below and return it to the undersigned no later than April 13, 2020.

[SIGNATURE PAGE FOLLOWS]

Sincerely,

**HNGH TURTLE CREEK, LLC**,
a Delaware limited liability company

By: HN Green Hollow Capital Partners LLC,
its Authorized Signatory

By: ______________________________
Name: James Glasgow
Title: Manager

Accepted and agreed to this April ___, 2020,

**MO 2999TC LLC,**
a Delaware limited liability company

By: ______________________________
Name: ______________________________
Title: ______________________________

______________________________
**TIMOTHY LYNCH BARTON**, Guarantor