**2999TC ACQUISITIONS, LLC**

- and -

**MANDARIN ORIENTAL HOTEL COMPANY INC.**

# LICENCE AGREEMENT

in respect of

**Mandarin Oriental, Dallas**

EXHIBIT
tabbies
J

## Contents


| Clause | Heading | Page |
|---|---|---|
| 1 | DEFINITIONS | 1 |
| 2 | GRANT OF LICENCE | 5 |
| 3 | USE OF MOHG MARKS | 6 |
| 4 | ROYALTY PAYMENTS | 8 |
| 5 | TRADE MARKS AND RELATED RIGHTS | 9 |
| 6 | INDEMNITIES AND LITIGATION | 10 |
| 7 | TERMINATION | 11 |
| 8 | EFFECT OF TERMINATION OR EXPIRY | 13 |
| 9 | ASSIGNMENT AND TRANSFER | 14 |
| 10 | ARBITRATION | 14 |
| 11 | MISCELLANEOUS | 15 |

Schedule A – MOHG Marks

# LICENCE AGREEMENT

**THIS AGREEMENT** is made the 8th day of November 2019

**BY AND BETWEEN:**

**2999TC ACQUISITIONS, LLC**, a limited liability company formed in Delaware, the registered office of which is at 1755 Wittington Place, Suite 340, Dallas, Texas 75234 (**"Owner"**); and

**MANDARIN ORIENTAL HOTEL COMPANY INC.**, a company incorporated in Delaware, having an office at Ten 10th Street, Suite 350, Atlanta, Georgia 30309 (**"Licensor"**).

**WHEREAS:**

(A) Owner intends to construct and develop a Luxury Hotel to be located at Dallas, Texas (**"Hotel"**).

(B) Licensor is the owner of certain rights, title and interest in and to the MOHG Marks which are to be used in connection with the operation of the Hotel.

(C) Owner and Onshore Manager have executed an Onshore Management Agreement providing that Onshore Manager will manage and operate the Hotel as agent for Owner.

(D) Owner and Offshore Manager have executed an Offshore Management Agreement providing that Offshore Manager will manage and operate the Hotel outside the Territory as agent for Owner.

(E) The parties wish the Hotel to be called "Mandarin Oriental, Dallas".

(F) Owner wishes to obtain from Licensor, and Licensor wishes to grant to Owner, the right, licence and privilege to use the MOHG Marks in connection with the ownership, Management and Operation of the Hotel as part of the Mandarin Oriental Hotel Group.

**IT IS AGREED** as follows:

## CLAUSE 1

## 1 DEFINITIONS

**1.1** In this Agreement, the following words and expressions have the following meanings respectively:

**Affiliate** means with respect to a person or entity, any person, firm or entity that, directly or indirectly controls, is controlled by, or is under common control with such person or entity. The term "control" means (i) the ownership, directly or indirectly, of fifty percent (50%) or more of the beneficial interests in a firm or entity or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled person.

**Agreed Rate** means one and one half percent (1.5%) per month or the maximum amount as permitted by law, whichever is less.

**Annual Accounts** means the accounts for each Fiscal Year delivered to Owner by Onshore Manager pursuant to the Onshore Management Agreement.

**Business Day** means a day on which most banks are open for business in the Territory.

**Casualty** means fire, flood, earthquake, hurricane, tsunami, or any circumstance including Force Majeure by which the Hotel is damaged physically.

**Construct and Equip** means to design, develop, construct, finish, fit, furnish and equip the Hotel, and **Construction and Equipping** must be construed accordingly.

**Dollars** and **$** means United States dollars.

**Effective Date** means the date first above written.

**F&E** means hotel furnishings and equipment (including office equipment, recreational equipment and property management equipment).

**First Option Period** means the period of ten (10) Fiscal Years commencing on the expiration of the Initial Period.

**Fiscal Month** means a calendar month within a Fiscal Year; provided that the first Fiscal Month shall commence on the Opening Date and the last Fiscal Month shall end on the final day of the Term.

**Fiscal Year** means a period of one calendar year during the Term commencing on the expiry of the immediately preceding Fiscal Year; provided that the first Fiscal Year of the Initial Period commences on the Opening Date and ends on the next following 31 December unless such period is less than nine (9) months, in which event the first Fiscal Year ends on 31 December in the calendar year immediately following that in which the Opening Date occurs. Where the period from the Opening Date to the following 31 December is less than nine (9) months, that period will be referred to as "first partial Fiscal Year" and the period immediately thereafter to the next following 31 December will be referred to as the "first full Fiscal Year", which together comprise the "first Fiscal Year"; where the period from the Opening Date to the following 31 December is nine (9) months or more, then that period will be the "first Fiscal Year". The final Fiscal Year will end on the last day of the Term.

**Force Majeure** means acts of God, strikes, lock outs, acts of war, acts of terrorism, civil disorder, epidemics or other events or acts not within the control of the party concerned, and for these purposes an event will be deemed to be within the control of the party concerned if, in accordance with good business practices, it can be controlled by (i) the expenditure of money or (ii) other acts, but not on the ground that the party could have prevented that event by acceding to any unreasonable demands of a governmental or other authority, corporation, trade union, association or other person.

**Governmental Authority** means the governments or regulatory body of the United States, City of Dallas, the State of Texas or any other government or regulatory body having jurisdiction over the Hotel or any aspect of the operation of the Hotel, and with respect to the foregoing, any political subdivisions thereof, including county and municipal subdivisions, and any authority, agency, department, commission, bureau, district, board, court or instrumentality having jurisdiction or authority over the Hotel, Owner or Offshore Manager, as applicable, or any matters with respect thereto.

**Gross Revenue** means all revenue of every kind resulting from the Operation of the Hotel during the period in question, including Total Operating Revenue as defined in the Uniform System; all income and consideration received from (i) tenants, lessees, licensees and concessionaires and other persons occupying space at the Hotel or rendering service to Hotel guests, (ii) the utilization of Hotel facilities or services by the tenants, owners or occupants of the Residences or any other Project component, and (iii) from third parties for sales of products or services provided by the Hotel or its staff including at other locations such as retail outlets and outside catering. Gross Revenue shall exclude: (1) funds furnished by Owner for Operations, (2) excise, sales, value-added, and use taxes collected directly from patrons and guests or as part of the sales price of any goods, services or merchandise, (3) gratuities (being discretionary payments by guests or patrons of the Hotel upon receipt of certain services) collected by Onshore Manager on behalf of persons rendering services to guests and patrons of the Hotel to the extent such gratuities are paid over to such persons, (4) revenue received in settlement of claims for condemnation, expropriation or other loss or damage caused except to the extent such proceeds are intended to compensate for lost profits or revenues, (5) proceeds from the sale of surplus or obsolete F&E, (6) refunds, discounts and credits of a similar nature extended to guests and patrons of the Hotel, and (7) recoveries in legal actions (other than the portion of such awards or receipts representing compensation for lost profits or lost revenues).

**Hotel Agreements** means this Agreement, the Onshore Management Agreement, the Offshore Management Agreement and the Technical Services Agreement.

**Initial Period** means the period from the Opening Date until the end of the first Fiscal Year and continuing until the end of the twentieth (20th) Fiscal Year or the earlier termination of this Agreement; or if the Opening Date is before all of the Pre-Opening Events (as defined therein) have been completed, then the period from the Opening Date until the end of the Fiscal Year in which all of the Pre-Opening Events have been completed and continuing until the end of the twentieth (20th) Fiscal Year thereafter, or the earlier termination of this Agreement.

**Legal Requirements** means all public laws, statutes, ordinances, enactments, orders, rules, regulations, permits, licenses, authorizations, directions and requirements of applicable Governmental Authorities.

**Luxury Hotel Standard** means: (i) in respect of Owner's obligation to Construct and Equip the Hotel, the standard of Construction and Equipping of the leading luxury hotel in the same market as the Hotel, and as a minimum to the standard of Construction and Equipping required for MOHG Hotels as defined in the PS&G; and (ii) in respect of Operational standards for the Hotel, at any given time, the standard of operation of such other MOHG Hotels in the Americas region on the first anniversary of the Effective Date that from time to time are generally regarded in the international hotel industry as being of luxury standard. Such Luxury Hotel Standard includes Operation of the Hotel on a seven day per week, twenty-four hour per day basis, with adequate staffing to provide luxury service, and food, beverage, housekeeping, banqueting, parking, bellmen, concierge, security and porter services and the expression **"Luxury Hotel"** must be construed accordingly.

**Manage** means the day-to-day management and Operation of the Hotel and **Management** must be construed accordingly.

**Mandarin Oriental Hotel Group** or **MOHG** means the group of companies of which Licensor is a member, including Offshore Manager, Onshore Manager and their Affiliates.

**MOHG Hotels** means the collection of hotels which at any time are managed by MOHG.

**MOHG Marks** means the "Fan Device", the words and names "Mandarin", "Oriental" and "Mandarin Oriental", and such other trade marks, service marks, trade names, logos and designs used at MOHG Hotels in general as may be notified by Licensor from time to time.

**Monthly Statement** means the monthly statement prepared by Onshore Manager as set forth in the Onshore Management Agreement.

**Offshore Management Agreement** means the offshore management agreement of even date herewith between Offshore Manager and Owner.

**Offshore Manager** means Mandarin Oriental Hotel Group Limited, a company incorporated in Hong Kong.

**Onshore Management Agreement** means the onshore management agreement of even date herewith between Onshore Manager and Owner.

**Onshore Manager** means Mandarin Oriental Management (USA) Inc., a company incorporated in Delaware.

**Opening Date** means the date the Hotel is opened for use by the public in accordance with the Technical Services Agreement.

**Operate** means supervise, direct and control the day-to-day affairs of the Hotel including advertising, marketing, the granting of concessions, the institution, prosecution and compromising of legal and other proceedings, the acquisition and disposal of F&E and Operating Equipment, data collection and use, and the arrangement of maintenance, repairs and alterations to the Hotel, and **Operation** must be construed accordingly.

**Operating Equipment** means uniforms, tools, utensils, china, glassware, linen, bedding, towelling, silverware, cutlery, and other operating equipment and supplies.

**Premises** has the meaning set forth in the Onshore Management Agreement.

**Pre-Opening Period** has the meaning set forth in the Onshore Management Agreement.

**Project** has the meaning set out in the Onshore Management Agreement.

**PS&G** means the latest edition of "MOHG Product Standards and Guidelines", of which Owner acknowledges receipt.

**Residences** means the approximately 85 luxury residential units to be developed by Owner as part of the Project and branded under the "Mandarin Oriental" name pursuant to separate agreements and sold to the public.

**Residences Agreements** means the Residences Marketing Agreement and the Residences Property Management Agreement.

**Residences Marketing Agreement** means the residences marketing agreement of even date herewith between Owner and Mandarin Oriental Hotel Company Inc. relating to the marketing and branding of the Residences.

**Residences Property Management Agreement** means the residences property management agreement of even date herewith between Residences Owners' Association and Mandarin Oriental Management (USA) Inc., a Delaware corporation, relating to the

management of the Residences.

**Residences Owners** means Owner until such time as the Residences are sold to the public, and thereafter the individual owners of the Residences.

**Residences Owners' Association** means the association of unit owners formed to provide the orderly governance of the Residences Owners.

**Royalty** means the royalty payable to Licensor pursuant to Clause 4.1.

**Second Option Period** means the period of ten (10) Fiscal Years commencing on the expiration of the First Option Period.

**Technical Services Agreement** means the Technical Services Agreement of even date herewith between Owner and Mandarin Oriental Management (USA) Inc. relating to the provision of certain technical assistance, development, planning and other pre-opening services in connection with the Construction and Equipping of the Hotel.

**Term** means the period the licence under this Agreement is effective as set forth in Clause 2.2.

**Territory** means the United States of America.

**Uniform System** means the eleventh revised edition (or later edition from time to time if Licensor gives notice to Owner to this effect) of the "Uniform System of Accounts for The Lodging Industry" published by Hotel Association of New York City, Inc. The parties agree that no amendment to the Uniform System after the Effective Date will apply in relation to the calculation of Gross Revenue or any Royalty payable to Licensor or its Affiliates.

**1.2** References to Owner, Offshore Manager, Onshore Manager and Licensor include their successors and permitted assignees. This Agreement is binding upon the respective successors and permitted assignees of the parties.

**1.3** References to Clauses, except where expressly stated to the contrary, are references to Clauses of this Agreement.

**1.4** Headings to Clauses are for convenience only and do not affect the interpretation hereof.

**1.5** References to the singular number include references to the plural and *vice versa*, and references to persons include references to bodies corporate and *vice versa*.

## CLAUSE 2

## 2 GRANT OF LICENCE

**2.1** **Grant.** Licensor grants to Owner a non-exclusive licence (to the extent permitted by law) to use the MOHG Marks as trade marks, service marks or trade names in connection with the ownership, Management or Operation of the Hotel, subject to and in accordance with the terms and conditions of this Agreement, and Owner accepts such licence. Owner shall use the MOHG Marks in connection with the ownership, Management or Operation of the Hotel subject to the control of Licensor as provided in this Agreement. Licensor and its Affiliates own and control the MOHG Marks in certain jurisdictions worldwide and grant rights to other hotel and residence developments and projects in certain jurisdictions worldwide; Licensor agrees that Owner may, in marketing the Hotel, utilize the MOHG Marks outside the Territory and

agrees that such use will not be contested by those Affiliates in those jurisdictions where any such Affiliate owns or controls the MOHG Marks, provided that such MOHG Marks are used in accordance with the terms of this Agreement.

2.2 **Effectiveness.** Subject to earlier termination as provided in Clause 7, the licence granted in Clause 2.1 is effective for the Pre-Opening Period and the Initial Period ("**Term**"), and the Term will be automatically extended together with the other Hotel Agreements then in effect for the First Option Period and Second Option Period, unless at any time more than six (6) months before the end of the Initial Period or the First Option Period, Licensor notifies Owner in writing that the licence will not be extended and cease at the end of the Initial Period or First Option Period, as the case may be. If any such notice is given, the licence granted under this Agreement will not be extended and will expire accordingly. The license granted under this Agreement will also cease upon the termination of this Agreement irrespective of the reason for such termination. Nothing in this Clause shall derogate from Owner's rights set out in Clause 8.

2.3 **Name of Hotel.** During the Term the Hotel shall at all times be known as Mandarin Oriental, Dallas, or by such other name as Licensor and Owner may subsequently agree. In using the name of the Hotel, reference will be made indicating that the Hotel is part of the Mandarin Oriental Hotel Group.

2.4 **Form of Mark.** Owner shall use the MOHG Marks only in the form approved in writing by Licensor for use by Owner in connection with the Hotel.

2.5 **Reservation of Licensor's Rights.** Owner acknowledges that its rights hereunder are non-exclusive, and that Licensor reserves the right to use, and to grant to any other licensee the right to use, the MOHG Marks in connection with any and all products and services within the Territory or anywhere else in the world.

2.6 **Warranty.**

Licensor represents to Owner that, as of the date hereof, (i) Licensor or its Affiliate owns and has registered the MOHG Marks in the Territory as shown on Schedule A, and (ii) to Licensor's actual knowledge, no person or entity is contesting the Licensor's registrations or use of the MOHG Marks in the Territory. So long as the registration of the MOHG Marks have not been successfully contested by a third party or Licensor or its Affiliate have not been prohibited by an applicable legal authority from renewing registration of the MOHG Marks in the Territory, Licensor shall, or shall cause its Affiliate to, maintain the registrations of the MOHG Marks in the Territory as set out in Schedule A (or such other MOHG Marks as Licensor may determine from time to time). Except as set forth in this Agreement, there are no implied warranties by the parties.

## CLAUSE 3

## 3 USE OF MOHG MARKS

3.1 **Use.** Owner shall adhere to the established prestige and goodwill of Licensor in the ownership, Management and Operation of the Hotel to a Luxury Hotel Standard. Owner shall not use any of the MOHG Marks or use, employ or otherwise release any advertising or

business materials relating to or referencing the Hotel, unless and until approved by Licensor in writing. Such approval may be given or withheld in the absolute discretion of Licensor; provided that upon withholding of approval or disapproval, Licensor will provide guidance as to changes that may render the materials acceptable, to the extent the materials may be modified to be acceptable. Licensor shall notify approval or disapproval of any such proposed use as promptly as reasonably practicable after receipt of Owner's written request in connection therewith, but in all cases within fourteen (14) days after receipt by Licensor of Owner's request. If neither approval nor disapproval has been given within such time, approval will be deemed to have been given. Any such express or deemed approval will be effective for not longer than six (6) months thereafter, unless otherwise specified by Licensor in advance; provided that following such period Owner may continue to use any remaining stock of items or materials previously approved or deemed approved unless otherwise notified by Licensor. Owner shall, at the option of Licensor, include in any use of any of the MOHG Marks or on its advertising and business materials an indication of the relationship of the parties hereto in a form approved by Licensor.

3.2 **Quality Standards.** Owner shall procure that the nature and quality of all services rendered and goods sold or used by Owner, its employees, agents and subcontractors in connection with the MOHG Marks or the Hotel conform to a Luxury Hotel Standard.

3.3 **Other Marks.** Owner shall not use the name "Mandarin" or "Oriental" or any other of the MOHG Marks as part of its corporate or trade name or otherwise use any of the MOHG Marks in a way so as to give the impression that any of the MOHG Marks, or any modification thereof, is the property of Owner. No name or names may be conjoined or used by Owner in connection with any of the MOHG Marks in any advertising, publicity, promotional materials, supplies or equipment used by Owner or sold by Owner without prior approval of Licensor in writing as provided above.

3.4 **Internet.** Licensor has the exclusive right to select, register and own all domain names and web sites used in connection with the Hotel. Owner shall not register or use any domain names or web sites for the Hotel or any related services containing any of the MOHG Marks. Except as expressly set forth in this Agreement, this Clause 3.4 will not operate to deprive Owner of the right to select, register and own all domain names and web sites used in connection with the other elements of the Project without using the MOHG Marks. Owner shall have the right to use the Hotel name and address solely to identify the Hotel as part of the Project on the Project website; provided, however, any use of the MOHG Marks or advertisement or other promotion of the Hotel on the Project website must be approved in advance by Licensor, which approval may be withheld in its sole and absolute discretion.

3.5 **Owner's Cooperation.** Owner agrees to cooperate with Licensor in facilitating control by Licensor of the nature and quality of the services rendered and goods sold or used by Owner in connection with Licensor's control of the MOHG Marks and the Hotel, to permit reasonable inspection of Owner's operations, and to supply Licensor with specimens of all uses of the MOHG Marks upon request.

3.6 **Rules and Regulations.** To the extent permitted by applicable law, Licensor may from time to time, and in writing, promulgate uniform rules and regulations applicable to MOHG Hotels in general (which may be subject to local and regional variations) to Owner relating to the manner of use of the MOHG Marks.

3.7 **Use by Offshore Manager or Onshore Manager.** Owner has entered into, and shall comply with, the Offshore Management Agreement and the Onshore Management Agreement for the Management and Operation of the Hotel by Offshore Manager and by Onshore Manager respectively, each an Affiliate of Licensor. Licensor may from time to time designate a person, and has initially designated Offshore Manager, to control on behalf of Licensor the use of the MOHG Marks and the nature and quality of all services rendered and goods used or sold in connection with the MOHG Marks and the Hotel. All rights of Licensor under this Agreement may be exercised by any such designee as agent on behalf of Licensor.

## CLAUSE 4

## 4 ROYALTY PAYMENTS

4.1 **Royalty.** Owner shall pay Licensor in respect of each Fiscal Year a royalty of one percent (1%) per annum of Gross Revenue (**"Royalty"**).

4.2 **Instalment Payments.** On each date on which a Monthly Statement relating to the affairs of the Hotel is delivered to Owner, Owner shall pay to Licensor on account of the Royalty an amount equal to the appropriate percentage of Gross Revenue in respect of the Fiscal Month to which the Monthly Statement relates.

4.3 **Annual Adjustments.** Within thirty (30) days after delivery to Owner of the Annual Accounts, Owner shall pay Licensor any shortfall in the aggregate of the monthly instalments paid under this Clause and the aggregate amount of the Royalty to which Licensor is entitled under this Clause in respect of that Fiscal Year; or if applicable Licensor shall reimburse Owner for any excess.

4.4 **Set-Off.** Owner may deduct any applicable withholding tax which it is obliged to deduct by the laws of the Territory from payments of the Royalty due to Licensor under Clause 4.1 or 4.2. If Owner is obliged by Legal Requirements to deduct any withholding tax from any other payment due to Licensor or its Affiliates under this Agreement, Owner shall add an additional sum to the amount of such payment so that the amount received by Licensor or its Affiliates is the same as if no such deduction had been made. Owner shall deliver to Licensor tax certificates or other evidence relating to such deduction as Licensor may require. Owner shall otherwise make all payments under this Agreement in full, free from any set-off, counterclaim or other deduction whatsoever. The provisions of this Clause 4.4 are not applicable to any tax (other than withholding tax) or cost to Licensor on its income or other receipts pursuant to or in relation to this Agreement, including, without limitation, income tax, corporation tax or corporate franchise tax.

4.5 **Late Payment.** If Owner does not pay any sum payable to Licensor under this Agreement when due and payable in accordance with this Agreement, it shall pay interest thereon at the Agreed Rate until payment in full.

4.6 **Payment Requirements.** Owner shall pay all amounts payable to Licensor under this Agreement as and when the amounts in question are due and payable pursuant to the relevant Monthly Statements or Annual Accounts, as applicable. All sums due to Licensor under this Agreement must be paid in Dollars to the account (whether within or outside the Territory) and otherwise in accordance with the written directions of Licensor so far as the laws of the Territory permit. All conversions of sums due to Licensor must be made in and

converted into Dollars at the rates applied by the bank at which the Operating Account is held on the date such payments are made; provided that if any payment is delayed due to insufficient funds in the Operating Account and/or failure by Owner to provide sufficient funds, Licensor may apply the relevant exchange rate at the time such payment was due.

## CLAUSE 5

### 5 TRADE MARKS AND RELATED RIGHTS

5.1 **Ownership of Marks.** Owner acknowledges that the MOHG Marks have acquired valuable secondary meanings and goodwill in the minds of the trade and the public and that services and products bearing the MOHG Marks have acquired a reputation of the highest quality of hotel service. Owner acknowledges that it has no claim to any right, title and interest in and to the MOHG Marks or any and all forms or embodiments thereof nor to the goodwill attached to the MOHG Marks in connection with the business, operations and goods in relation to which the same have been and may be used by Owner or Licensor or its Affiliates. The use of the MOHG Marks in connection with the Management and Operation of the Hotel will be deemed to have been made by and for the benefit of the Licensor for purposes of trade mark registration and otherwise. Owner shall not at any time do or suffer to be done any act or thing which may, in any way, impair the rights of Licensor in and to the MOHG Marks or which may affect the validity of the MOHG Marks or which may depreciate the value of the "Mandarin" or "Oriental" names or any of the other MOHG Marks or the established prestige and goodwill connected with any of the same.

5.2 **Registration Rights.** Owner acknowledges that only Licensor or its Affiliates may file and prosecute a trade mark, service mark, copyright or other application to register the MOHG Marks or any other proprietary rights related thereto in any jurisdiction. Owner shall (at Licensor's expense) do such things as Licensor may reasonably require in connection with the registration or protection in the Territory of the MOHG Marks or any other proprietary rights related thereto including without limitation entering into and filing with the relevant authority a registered user agreement. This Clause 5.2 will not operate to deprive Owner of the right to file and prosecute a trade mark, service mark, copyright or other application to register the marks or any other proprietary rights related thereto in any jurisdiction in connection with the other elements of the Project without using the MOHG Marks or any other proprietary rights related thereto.

5.3 **Compliance with Laws.** Owner agrees and undertakes to use the MOHG Marks strictly in compliance with and observance of any and all trade mark and copyright laws and to use such markings in connection with the MOHG Marks as may reasonably be required by Licensor. Each party agrees to use best efforts to comply with all Legal Requirements applicable to it in respect of the performance of such party's obligations under this Agreement, including the use of the MOHG Marks in compliance with and observance of any and all trade mark and copyright laws, and shall cooperate with the other party as necessary for performance of the contemplated activities hereunder in accordance with all applicable Legal Requirements.

5.4 **Assignment.** To the extent any rights in and to the MOHG Marks are deemed to accrue to Owner or otherwise form part of Owner's Interest pursuant to this Agreement or otherwise, Owner hereby assigns any and all such rights, at such time as they may be deemed to accrue, to Licensor. Owner shall, at Licensor's expense, execute any and all documents and

instruments which Licensor may deem necessary, proper or appropriate to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance will be without consideration other than the mutual agreements contained herein. Upon expiration or termination of this Agreement for any reason whatsoever, Owner shall, at Licensor's expense, execute and file any and all documents and instruments which Licensor may request to terminate any and all of Owner's rights under any trade mark registrations, registered user agreements and other documents regarding the MOHG Marks.

5.5 **No Challenge.** Owner shall never (a) challenge the validity or ownership of any of the MOHG Marks by Licensor or any application for registration thereof or any registrations thereof in any jurisdiction by Licensor or its Affiliates or (b) contest the fact that Owner's rights under this Agreement terminate upon expiry and termination of this Agreement.

## CLAUSE 6

## 6 INDEMNITIES AND LITIGATION

6.1 **Conduct of Litigation.** The conduct of any legal or other action, including any proceeding before any court or Governmental Authority, arising from any dispute with any third party (other than Licensor, Owner, or their Affiliates) concerning use of any of the MOHG Marks (a "**Relevant Action**") will upon written notice by Licensor at its option, be under the absolute control of Licensor even if (i) Licensor may not be a party to such suit, or (ii) Owner is responsible for costs thereof. Upon Licensor exercising its option, Licensor has the sole power to conduct any Relevant Action and to determine whether and when any settlement should be made in respect of any Relevant Action, and Owner is not entitled to conduct any Relevant Action or to make or pay any such settlement without the consent of Licensor. Licensor has the sole power and absolute discretion to determine what action, if any, will be taken with respect to any unauthorised use, infringement or act of unfair competition by third parties to stop such use, infringement or act or otherwise to protect any of the MOHG Marks. Owner shall cooperate with Licensor with respect to any Relevant Action, and if requested by Licensor, Owner shall join with Licensor as a party to any action brought by Licensor for such purpose. Any recovery as a result of such action will belong solely to Licensor, and Owner shall account to Licensor in respect of any amounts received by it as a result thereof.

A party seeking indemnification under any Clause of this Agreement shall promptly notify the other party in writing of such claim. Without derogating from either party's indemnification obligations hereunder, if neither party has accepted indemnification responsibility with respect thereto, then, and subject always to non-interference with any insurance defence being provided and subject to the obligation to cooperate with the other party as set out above, each party shall be entitled to participate in the defence of any such claim, initially at its own expense but with the benefit of subsequent indemnification pursuant to Clauses 6.2 and 6.3 (as applicable). If the indemnifying party has assumed the defence of any claim and has acknowledged its indemnification obligations with respect thereto, the indemnified party shall be entitled to participate in such defence on its own behalf and at its own expense, subject to non-interference with insurance defence and the duty to cooperate with the indemnifying party as set out above.

6.2 **Indemnification by Licensor.** Subject to Clause 6.1, Licensor shall indemnify Owner and keep it indemnified against all costs, claims, liabilities and expenses (including the legal fees

and other costs arising out of any judicial or other proceedings or otherwise) arising from any infringement or similar action brought against Owner by any third party (other than Licensor or its Affiliates) concerning use of any of the MOHG Marks by Owner. Notwithstanding the foregoing, Licensor is not liable under this Clause in respect of (i) any amounts paid to third parties pursuant to any settlement made without the prior written approval of Licensor, or (ii) any use of MOHG Marks not made pursuant to and within the scope of this Agreement.

6.3 **Indemnification by Owner.** Except as provided in Clause 6.2 above, Owner shall indemnify Licensor and its Affiliates and their officers, directors, agents and employees and keep them indemnified against all costs, claims, liabilities and expenses (including the legal fees and other costs arising out of any judicial or other proceedings or otherwise), resulting from or connected with any acts, whether of omission or commission, that may be committed or suffered by Owner or any of its agents or employees in connection with Owner's use of the MOHG Marks under this Agreement. Notwithstanding the foregoing, Owner shall not be liable under this Clause in respect of any liability not covered by insurance which results from the gross negligence, willful misconduct or fraud of Licensor.

## CLAUSE 7

## 7 TERMINATION

7.1 **Termination by Licensor.** If at any time, either:

(i) Owner breaches any material provision of this Agreement or any of the other Hotel Agreements (which will also be deemed a breach hereunder) which cannot be remedied, or, in the case of a breach which is capable of remedy, such breach is not remedied within thirty (30) days of the date of service upon Owner of a notice given by the Licensor requiring that it be remedied (or if the breach cannot be remedied within such 30-day period, then as soon as reasonably practicable thereafter); or

(ii) the performance by Licensor or by Owner of any of their respective obligations under this Agreement is illegal under the laws of the city, state or Territory in which the Hotel is located and such obligation is not severable in accordance with Clause 11.4; or

(iii) an effective resolution is passed, or an effective order made by a court of competent jurisdiction, for the bankruptcy, dissolution, liquidation or winding up of Owner or any event having similar consequences occurs in any jurisdiction in which a material part of its assets is held, or a receiver or similar officer is appointed of the Hotel or any other material part of its assets, proceedings begin for enforcement of any court order, mortgage or charge over the Hotel or any part of it, or Owner becomes bankrupt, insolvent or is unable to pay its debts as they fall due or suspends payment of its debts or enters into any composition or arrangement for the benefit of its creditors; or

(iv) the Residences Marketing Agreement is terminated (which will also be deemed a breach hereunder) prior to the natural expiration of the agreement; or

(v) Owner or its Affiliates control the Residences Owners' Association and the Residences Property Management Agreement is terminated (which will also be deemed a breach hereunder) by the Residences Owners' Association prior to the natural expiration of the term other than due to a breach by Onshore Manager or its Affiliates;

then Licensor may, by not less than thirty (30) days' notice, (or immediately in the case (iii) above where Owner is insolvent or unable to pay its debts or suspends payment of its debts), terminate this Agreement with effect from the expiration of such notice.

7.2 **Termination by Owner.** If at any time, either:

(i) Licensor breaches any material provision of this Agreement which cannot be remedied or, in the case of a breach which is capable of remedy, such breach is not remedied within thirty (30) days of the date of service upon Licensor requiring that it be remedied (or if the breach cannot be remedied within such 30-day period, then as soon as reasonably practicable thereafter); or

(ii) the performance by Licensor or by Owner of any of their respective obligations under this Agreement is illegal under the laws of the city, state or Territory in which the Hotel is located and such obligation is not severable in accordance with Clause 11.4; or

(iii) an effective resolution is passed, or an effective order made by a court of competent jurisdiction, for the bankruptcy, dissolution, liquidation or winding up of Licensor or any event having similar consequences occurs in any jurisdiction in which a material part of its assets is held, or a receiver or similar officer is appointed of any material part of its assets, or Licensor becomes bankrupt, insolvent or is unable to pay its debts as they fall due or suspends payment of its debts or enters into any composition or arrangement for the benefit of its creditors; or

then Owner may, by thirty (30) days' notice in writing, (or immediately in the case (iii) above where Licensor is insolvent or unable to pay its debts or suspends payment of its debts), terminate this Agreement with effect from the expiration of such notice.

7.3 **Termination of Related Agreements.** If notice of termination of any of the other Hotel Agreements is served or if any of the other Hotel Agreements is terminated (for whatever reason), either party may, upon or at any time following such notice or termination, by written notice terminate this Agreement with effect from the same termination date. Either party's right to terminate as above or elsewhere in this Agreement is without prejudice to its right to terminate for repudiatory breach at common law. For the avoidance of doubt, termination as above does not apply to expiry of the Technical Services Agreement on completion of the Hotel by the normal passage of time.

7.4 **Termination on Destruction of the Hotel.** In the event that the Offshore Management Agreement and/or the Onshore Management Agreement is terminated pursuant to a Casualty, and as a consequence this Agreement is terminated, upon such termination Owner shall pay to Licensor, to the extent of the insurance proceeds actually received by Owner, an amount equal to:

(i) if two (2) or more Fiscal Years have been completed at the date of the Casualty, the aggregate Royalties to which Licensor was entitled under Clause 4.1 in respect of the immediately preceding two (2) completed Fiscal Years; or

(ii) if only the first Fiscal Year has been completed at the date of the Casualty, two times the Royalties to which Licensor was entitled under Clause 4.1 in respect of the first Fiscal Year; or

(iii) if the first Fiscal Year has not been completed at the date of the Casualty, two times the Royalties to which Licensor would have been entitled under Clause 4.1 in respect

of the first Fiscal Year on the basis of the Operating Budget for the first Fiscal Year delivered to Owner.

In the event Onshore Manager or Offshore Manager elects to terminate pursuant to Clause 13.2 of the Onshore Management Agreement or Clause 11.2 of the Offshore Management Agreement, respectively, Owner shall have no obligation to make payment to Licensor of any amount in excess of amounts available to Owner under the Property Insurance. If, within two (2) years of the termination of this Agreement pursuant to this Clause, Owner commences the restoration of the Hotel or the construction on the Premises of a hotel, then Owner shall promptly give notice thereof to Licensor, and Licensor may, within sixty (60) days of receipt of such notice, by notice to Owner reinstate this Agreement for the remainder of the Term.

## CLAUSE 8

## 8 EFFECT OF TERMINATION OR EXPIRY

**8.1 Discontinuance of Use of Marks.** Upon the termination or expiry of this Agreement for whatever reason, Owner shall forthwith discontinue all use of any of the MOHG Marks and any variation or simulation thereof, or any mark, name, logo or design similar to any of the MOHG Marks (including use of "Mandarin", "Oriental", or their combination, or any similar name or term for the Hotel), or any other proprietary rights related thereto and shall forthwith cease to use (and shall upon request deliver up to Licensor or destroy on oath) any business materials, advertising or promotional materials, and Operating Equipment bearing any of the MOHG Marks, any variation or simulation thereof, or any mark, name logo or design similar to any of the MOHG Marks. Upon such expiration or termination, Owner shall also comply with the provisions of Clause 5, and hereby irrevocably releases and disclaims any right or interest in or to any and all of the MOHG Marks and proprietary rights related thereto, and agrees that all rights in the MOHG Marks, proprietary rights related thereto and goodwill connected therewith remain the property of Licensor. Notwithstanding the preceding provisions of this Clause, Owner will be permitted for a period of three (3) months from the date of expiration or termination to use Operating Equipment or other Hotel-related items bearing any of the MOHG Marks, any variation or simulation thereof, or any mark, name, logo or design similar to any of the MOHG Marks, only within the Hotel, but not otherwise or thereafter. At any time during such three (3) month period, Licensor may elect, by written notice to Owner, to purchase from Owner, at book value, all or any items not constituting Operating Equipment bearing any of the MOHG Marks, any variation or simulation thereof, or any mark, name, logo or design similar to any of the MOHG Marks.

**8.2 Effect of Termination or Expiry.** The termination or expiry of this Agreement will not affect any liability of either party in respect of any rights, entitlements or obligations arising or accrued prior to the effective date of termination or expiry or for any antecedent breach of this Agreement nor any rights, entitlements or obligations under Clauses 3.3, 4 - 6, 7.4 and 8 - 11 which Clauses will apply after termination or expiry.

**8.3 Non-Exclusive Remedies.** The rights of the parties under this Clause are in addition to, and not in substitution for or limitation of, any other rights and remedies.

## CLAUSE 9

### 9 ASSIGNMENT AND TRANSFER

The rights and powers of the parties under this Agreement are not assignable or otherwise transferable, except that:

(i) Owner is entitled to assign all (but not some only) of its rights and powers under this Agreement to any person simultaneously with the completion of any sale to that person of Owner's Interest in accordance with the Onshore Management Agreement, provided also that all (but not some only) of its rights and powers under the other Hotel Agreements are simultaneously conveyed to such person;

(ii) Licensor is entitled to assign or transfer any of its rights and powers under this Agreement to any of its Affiliates that are capable of performing Licensor's obligations hereunder. In the event of such an assignment or transfer, Licensor will provide notice of such assignment or transfer within a reasonable period of time thereafter.

## CLAUSE 10

### 10 ARBITRATION

**10.1 Submission to Arbitration.** Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity hereof, must be settled by arbitration in accordance with the Rules of the American Arbitration Association as at present in force. The place of arbitration will be Dallas, Texas. The language to be used in the arbitral proceedings will be English. The number of arbitrators will be three. All arbitrators appointed must have at least ten (10) years' experience in hotel management and operations matters or in the preparation of hotel budgets and accounting. One arbitrator will be appointed by each of the parties, and the third chosen by the two arbitrators so appointed. After appointment by a party ("**Appointing Party**") of its arbitrator, the Appointing Party shall give the other party written notice setting out the name and *curriculum vitae* of that arbitrator. If the other party fails to appoint an arbitrator by fourteen (14) days after receipt of such notice, then the Appointing Party may by written notice to that party appoint the Appointing Party's arbitrator to act as sole arbitrator, in which case the award of such arbitrator will be binding on both parties. Disputes under any of the Hotel Agreements may be consolidated in one arbitration at the request of any party. Pending an award pursuant to this Clause, the parties shall continue to carry out their obligations under this Agreement as if the dispute, controversy or claim had not occurred.

**10.2 Action Before Award.** Notwithstanding the above or anything else in this Agreement, Owner acknowledges that Licensor will suffer great and irreparable harm as a result of the breach by Owner of any covenant to be performed by Owner under this Agreement other than the covenants to make monetary payments, and, whether such breach occurs before or after the termination of this Agreement, Owner acknowledges that Licensor is entitled to apply for and receive from any court of competent jurisdiction a temporary restraining order, preliminary injunction or permanent injunction, without any necessity of proving actual damages or any requirement for the posting of a bond or other security, enjoining Owner from further breach of this Agreement, including any further infringement or impairment of Licensor's rights in and to

any of the MOHG Marks. Accordingly, Owner waives any objection to the venue of any proceedings and to such court having jurisdiction over Owner. Such relief is in addition to, and not in substitution for or limitation of, any other rights and remedies.

## CLAUSE 11

## 11 MISCELLANEOUS

**11.1 Confidentiality of Information**. Neither of the parties shall at any time, whether before or after the termination of this Agreement, use or communicate to any person (other than in the course of the proper performance of its duties under this Agreement, or to appropriate professional advisers, or as required by law, or by the applicable regulations of any stock exchange) the terms of this Agreement or any of the trade secrets or confidential information of the other party which it may receive during the Term.

**11.2 Right to Make Agreement.** Each party warrants, with respect to itself, that it has full power and authority to execute this Agreement, and that neither the execution of this Agreement nor the finalisation of the transactions contemplated hereby, violates any provision of existing law or any existing judgment, writ, injunction, order or decree of any court or Governmental Authority having jurisdiction over it, or will result in or constitute a breach or default under any contract, other commitment or restriction to which it is a party or by which it is bound, or requires any consent, vote or approval which has not been taken, or at the time of the transaction involved will not have been given or taken. The parties shall take any action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

**11.3 No Waiver.** The failure of either party to insist upon a strict performance of any of the terms or provisions of this Agreement, or to exercise any option, right or remedy under this Agreement, may not be construed as a waiver or as a relinquishment of such term, provision, option, right or remedy, which will continue and remain in full force and effect. No waiver by either party of any term or provision hereof is effective unless expressed in writing and signed by such party.

**11.4 Severability.** If any provision of this Agreement is declared invalid by order, decree or judgment of a court of competent jurisdiction, this Agreement must be construed as if such term had not been inserted herein, except when such construction would constitute a substantial deviation from the general intent and purpose of the parties as reflected in this Agreement, in which case the parties shall negotiate in good faith to replace any unenforceable provision by an enforceable provision that has an effect nearest to that of the provision being replaced. If the parties fail to agree to a substitute provision within sixty (60) days from the relevant order, decree or judgment, then either party may within the thirty (30) day period immediately thereafter terminate this Agreement by sixty (60) days' notice.

**11.5 Entire Agreement**. This Agreement and the agreements referred to herein constitute the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written. Each of the parties confirms that in entering into this Agreement it has not relied on any statement, warranty or other representation made or information supplied, by or on behalf of the other party (other than those set out in the Hotel Agreements and the Residences Agreements).

11.6 **Notices.** Any notice under this Agreement must be in writing in the English language and must be delivered to a party at its address stated below or to such other address as that party may notify for the purposes of this Clause. Any notice will be deemed to have been delivered upon confirmation of receipt, and otherwise:

(i) if delivered by hand (including delivery by courier) upon delivery; and

(ii) if sent by registered mail, upon proof of receipt.

The addresses of the parties are as follows:

| | | |
|---|---|---|
| Owner | : | 2999TC Acquisitions, LLC<br>1755 Wittington Place, Suite 340<br>Dallas, Texas 75234<br>Attn: Mr. Tim Barton |
| Licensor | : | Mandarin Oriental Hotel Company Inc.<br>Ten 10th Street NE, Suite 350<br>Atlanta, Georgia 30309<br>Attn: Legal Department<br><br>with a copy to:<br>Mandarin Oriental Hotel Group<br>8/F One Island East<br>Taikoo Place<br>18 Westlands Rd<br>Quarry Bay<br>Hong Kong<br>Attn: Group Counsel |

11.7 **Multiple Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will be deemed to constitute one and the same Agreement. This Agreement may be delivered by facsimile or electronic transmission, and copies of such executed signature pages shall be binding as originals.

11.8 **Estoppel Certificates.** Upon written request of either party, the other party shall provide a certificate stating whether this Agreement is in full force and effect, whether there are any uncured defaults of which it is aware under this Agreement, whether such party claims any offsets, counter-claims or defences through an action by the other party, and whether all sums due and owing under this Agreement have been paid. If the other party fails to deliver such certificate to the requesting party within thirty (30) days after such request, such other party will be deemed to have certified that this Agreement is in full force and effect, that there are no uncured defaults of the requesting party of which the requested party is aware, and that there are no sums due and owing by requesting party to the other party.

11.9 **Applicable Law.** This Agreement and any dispute, controversy or claiming arising out of this Agreement between the parties, or the breach, termination or invalidity of this Agreement is governed by and construed in accordance with the laws of the State of Texas.

[SIGNATURE PAGE FOLLOWS]

**THIS LICENCE AGREEMENT** is executed on the __ day of November 2019.

| **OWNER** | **LICENSOR** |
| --- | --- |
| **2999TC Acquisitions, LLC** | **Mandarin Oriental Hotel Company Inc.** |
| By: | By: ____________________ |
| Name: Timothy Barton | Name: ____________________ |
| Its: President | Its: ____________________ |

**THIS LICENCE AGREEMENT** is executed on the 8th day of November 2019.

| **OWNER** | **LICENSOR** |
|---|---|
| **2999TC Acquisitions, LLC** | **Mandarin Oriental Hotel Company Inc.** |
| By: ____________ | By: [signature] |
| Name: ____________ | Name: Keith Hansen |
| Its: ____________ | Its: President |

## SCHEDULE A

**MOHG Marks**

| Trademark | Specimen | Class | Registration No. |
|---|---|---|---|
| FAN DEVICE | | 16, 18, 35, 42 | 1963684 |
| | | 36 | 3192790 |
| MANDARIN ORIENTAL | | 03, 30 | 2733666 |
| MANDARIN ORIENTAL | | 16, 18, 35, 42 | 2046905 |
| MANDARIN ORIENTAL | MANDARIN ORIENTAL | 35, 42 | 1764807 |
| MANDARIN ORIENTAL | | 36 | 3192795 |
| MANDARIN ORIENTAL | | 44 | 4052416 |
| MANDARIN ORIENTAL & FAN DEVICE | | 30 | 2619340 |
| MANDARIN ORIENTAL & FAN DEVICE | MANDARIN ORIENTAL | 35 | 2385157 |
| | | 43 | 3317907 |