REDACTED

Q And I'm just a bankruptcy lawyer. Can you walk me through the process of what you have to do, kind of, start to finish to acquire and develop a property like that?

I mean, what is there to zoning, permitting, raising money. What do you have to do to get from start to finish?

A You have to find the site that's suitable, select it, determine whether the zoning allows you to build the plan that you have in mind. And then, if not, you have to apply to get the zoning changed to what you do want to build. And then you have to employ architects, engineers and other vendors to help design the actual project. You have to get the construction

costs and a construction company to confirm what it'll cost to build.

And then you have to get, if it's going be a flag hotel with some third-party management, you have to get a third-party management agreement done. And once all that's done, you then have to get your production budgets, your debt construction and your investment equity all secured with a building permit and then start construction, build it and then start to occupy it and have the management company take over the running of it.

REDACTED

REDACTED

Q What are some other big and reputable brokers?

A I don't know. The Trammell Crow Group, BVRB (phonetic), Jones LaSalle.

REDACTED

REDACTED

Q Okay. So how do you finish raising equity? How do you get a construction loan?
A You take your construction package and you get a third party, like Concord, to give their market study on what the condos would do.
You interact with brokers that will be selling the condos for those condo sales. And then you interact with the hotel company and some other third party, such as HVS to do certain studies. And you put all that information together as what your estimates are and your estimates of cost, and then you take that proforma to the construction lender. And once that's approved, then you see what other items he would need, and that construction loan plus the equity completes

the process and then you're ready to start.

REDACTED

REDACTED

Q Okay. So I want to go through about what the Debtor has actually done and what is completed.

REDACTED

Q Does it have completed architectural plans?
A They are not what we call CD ready, construction drawings. There's still more work to do.
Q Why are they not CD ready?

A Well, it's a very long process because you have to come up with what the building could be built as. Then the interior architects opine on how they think it should be the best. You have a construction company with one viewpoint. You have your design people with another. And then you have the hotel management in this type of property, they have a lot of contractual rights to determine the design of the actual finished product because their name is going to be on it as management. So there's a lot of, let's say, normal -- longer than normal drawn out process to get your CDs done.
Q How long does it usually take?
A Sometimes, it takes 24 months.
Q Is 24 months typical or is that what it sometimes takes?
A Usually, in the these types of projects, luxury, it's 24 months.
Q Okay. So architectural not entirely complete. How about construction plans?
A Well, you have architectural plans and construction plans kind of go together.
Q Okay. So if architecture is not complete, construction's not complete?
A Correct.

REDACTED

Q What else needs to be done for construction to move forward?

A Finish the CDs, the plans and finalize the negotiations with a construction lender and fund the equity.

REDACTED

So between the pandemic and all the litigation and problems with Madison and the HNG Green Hollow lawsuits really, you know, drags down the project. All of that litigation problems make it very difficult to get things done, number one. And then on top of that, lenders and investors will look at that a always a problem. So when you're coming out of a pandemic, what do you want to see or do business with, something perfectly, you know, everything's great or anything with a little bit of a challenge is going to be on the second rack of decision making. So that first rack of opportunity has basically been cleared out and, now, we see a lot more activity. But that's very problematic when you try and do a deal like this.

Q So you're saying litigation is problematic?

A Yes.

Q Okay. Who started the litigation? Who filed suit? Who's the plaintiff?

REDACTED

REDACTED

A I know that we sued the lender, Madison. I don't know whether Madison got sued first or HNG or -- I don't know who got sued first sitting here today.

Q But can you tell me the parties that initiated that lawsuit, that filed the complaint?

A The Debtor, I believe.

REDACTED

REDACTED

Q Okay. How much do you think it would actually cost to complete development?

A For the whole project, the land and everything --

Q Yes.

A $383 million.

REDACTED

REDACTED

A Yes. In anticipation of this particular project from the date we started to the date we finish construction, estimated at no more than 30 months.

Q Okay. So no more than 30 months?
A Correct.
Q Do you know if any of these -- I mean, has anything been completed on this project?
A Well, none of the on-site construction. You have your predevelopment, which in so much of what you do before you start building is building the building in your plans and design but no construction has started.
Q Okay. But the building they are building in your plans is not completed either, is it?
A I have about another five and a half months to do it.

REDACTED

REDACTED

Q This estimated funding date was June 20th. I assume that's changed. Have you received an updated estimated funding date?
A This is going to take about 90 days from where the documents are signed. So where we're at now is let's get these documents where we've all agreed to them and that they are -- both parties have agreed to those documents, and then they would initiate when the closing date would be.
Q Does Axiom Financial know that the Debtor is in bankruptcy?
A I don't know if we notified them of that as of yet, yes.
Q Do you think that would material to their decision of whether to lend money or not?
A I don't know. Some people do, some people don't. My hope and goal was that there would be an agreement and that issue would not need to be brought up, but if it's going to need to be brought up, we'll bring it up.

Q I assume that Axiom is not aware or has not been made aware that the deed in lieu of foreclosure was filed and recorded with the Dallas County Clerk?

A Well, there's no reason to tell him that. It's not done correctly, so it's going to be overturned, and then why would we want to just tell them that HNG Green Hollow breached their forbearance agreement and all the other bad acts. I wouldn't want to do that to Bipin. Don't need to do that. Let's just get things back to where they are and get it funded.

REDACTED

REDACTED

Q Okay. On page 2, there's a reference to total development costs of $387,241,651?
A Yes.
Q Okay. Is that, to your recollection, accurate at the time?
A Yes.
Q I think you said earlier it's somewhere around 383 million today.
A Right. And when you get the capital stack and the fees that everybody charges, then that number goes up or down based on how much fees cost of running capital and soft costs.
Q And you think it's gone down?
A Well, sometimes, people want to charge a lot of fees and some people charge less fees. So when you charge a lot of fees, the budget goes up and that's why there's a difference in this budget.
Q Okay. So it could run a range, let's call it somewhere between 380 and 390 million, just depending on the cost of capital?
A Yes, sir.
Q That's fair?
A Yes, sir.

REDACTED

MR. KANE: Yeah, sure. So these are texts from Bipin's phone, so Bipin is green. And I'm asking if he recalls that his texts are in black?

A Looks familiar, yes.

Q And you don't have any reason to believe that this -- this isn't -- you know, you're not the Tim that's listed at the top, that you recall these exchanges?

A Sure. I would assume that to be true.

Q Okay. And the dates of these texts, you believe, are also accurate, so on October 18th, Bipin texted you, Any update on lender to refi us out?

A I believe those dates are correct, yes.

Q And so -- and what is that -- what does that suggest to you he's inquiring about. He's asking about payment in full by maturity?

A Correct.

Q Okay. And did you provide a response as to the status of refi?

A Yes. That the bank was looking at it and

I'll update it when I get back.
Q Which bank?
A Liberty Bank, the life insurance company.
Q When did you reach out to them to try and see if they would refinance this?
A I think it was -- I don't know sitting here today. I mean, it was somewhere in October.
Q So less than 30 days before maturity?
A Yes.
Q Had you reached out to other banks to determine whether a refi was possible for then?
A I mean, a refi of that type of loan within 30 days is very hard to do. And that's why we were negotiating the extension. And we had no reason to believe that we wouldn't secure the extension with Bipin.
Q Okay. I'll ask you to please answer my question.
A Repeat the question.
Q Did you reach out to any other banks regarding a refi of the note before you reached out to the bank you just referenced?
A I think, at the same time, we reached out to Collier's. It's another group here in town.
Q Did you reach out to Beal Bank?

A We did call Beal Bank, yes.
Q Okay. When did you call Beal Bank?
A I'd have to check but, I mean, that was, like, in the middle of October. Whenever -- whenever -- you know, I would say in the middle of October.

REDACTED

REDACTED

Q Okay. You entered into an forbearance extension on or around July 30th, correct?
A This one here?
Q Yes. Let me -- let me be -- let me clarify. That forbearance includes provisions for a three-month extension if certain conditions are met, correct?
A Correct.
Q So you have your initial forbearance and maturity date on July 30th. We'll call that the forbearance and maturity date.
A Right.
Q If you met certain extension agreements or requirements, then you could get 90 additional days; is that correct?
A Correct.
Q And that gets you to October 29th, 2021.
A Correct.
Q So let's call that the extended forbearance maturity date.

A Correct.
Q So from the forbearance maturity date to the extended forbearance maturity date, what efforts did you take to try to refinance the note?
A Well, we didn't take much because we had Nitya was working forward and, you know, Bipin as the lender, we didn't see any reason why they wouldn't extend. We had talked about it. He said he needed a $9 million payoff. I said that's a little -- not a payoff, paid down. And I said that would not be very easy to do but 5 million was doable. So when you have a lender, and he was making a pretty good spread on the money, it's best to keep the lender that you have than incurring new costs and starting up with a new lender when you're -- you know, you feel that you're going to be paying him off in that period of time.
Q Do you have any -- any documents that show that Bipin or HNGH agreed to an extension or an additional forbearance extension in exchange for $5 million?
A Well, as I said, he asked for nine.
Q Do you have any evidence to support that?
A I know that we talked about it, and I don't know. He said he had a board meeting. And I don't know if he responded in any email or text. But since

that time, I've had a phone that got broke, so I don't have all my text messages with him.

Q Okay. So was that a preliminary discussion then?

A Correct.

Q And he hadn't gone to Board yet?

A He had gone to Board and his -- first, there was a discussion before Board, and I reminded him, hey, Board is coming up. We're going to need that other 90 days. And he said, okay. I'll see what I can do. And then he came back and he said, okay, you know, the good news is I'm able to get the extension. The bad news is they want a $9 million pay down.

Q Okay. And you don't know if you went back for it after that to get the five --

A No, because we never came to him and said officially we would do five. We started -- you know, at that time, we had Nitya. And then we ultimately came back to him and said we needed the 90 days extension. But not that -- there was no need to go back for the 5 million, in other words.

REDACTED

REDACTED

Q Is the property generating any revenue?
A No.
Q Okay. Is -- are the improvements habitable that are on that property? In other words --
A Yes.
Q Let me clarify. Someone can move in and operate on this?

A Yes, sir.
Q Okay. Is anybody officing in that space?
A Yes.
Q Who is?
A JMJ Development.
Q Is it paying any rent to the Debtor?
A No.
Q Why not?
A Neither party required it or offered it.
Q So it's getting free use -- what is -- what would you say market rent would be for that space?
A I couldn't opine on that sitting here today, but it is very nice office space.
Q Do you think there's significant demand for that office space?
A Yes.
Q Do you think you could have a replacement tenant in that office space in short order?
A Yes.

REDACTED

Do you believe that you had a payment obligation under the forbearance agreement at 1:00 p.m. New York time on October 29th?

A No.

Q Why not?

A Because the forbearance agreement says that it needs to be paid on the 29th.

Q Does the forbearance agreement modify all terms of the notes?

A You'd have to ask the lawyers. And in addition, Mr. Bipin Nambiar told me I had a 10-day grace period on it anyway. Which I didn't correct him that there was no 10-day grace period.

Q So you knew there was no 10-day grace period?

A Yes. Even though he said I had one.

Q Okay. So you knew that he was mistaken about his understanding of the forbearance agreement?

A In that particular point. I don't know whether -- why --

Q And that was before October 29th?

A When we sat with his lawyer in the W Hotel, in front of his lawyer and his lawyer did not correct him. He said, Tim, don't worry about it. You've got 10 days anyway.

Q And you did not say anything.

A I didn't say anything until I went and checked.

Q And when did you correct him?

A I don't know when but certainly before the 29th.

REDACTED

REDACTED

A Yes, sir.
Q Okay. So how long -- let me go back to that prior question of how long do you think it will take you to finish raising equity and get a construction loan so that you can begin on construction?
A Five months for the plans, and so everything would take -- call it six to seven months before we break ground.

REDACTED

REDACTED

Q (BY MR. KANE) So the Debtor doesn't owe any money to Nitya?
A That's the case in part, yeah.

REDACTED