| Creditor's Excerpts |
|---|
| 25:12 - 26:11 |
| 28:13 - 28:16 |
| 32:12 - 33:1 |
| 35:13 - 35:14, 35:22 - 36:25, 37:5 - 37:9 |
| 38:1 - 38:18 |
| 40:6 - 40:11 |
| 50:4 - 50:9 |
| 51:23 - 52:13 |
| 75:6 - 76:11 |
| 81:3 - 81:25 |
| 94:6 - 98:21 |
| 119:19 - 120:19 |
| 121:1 - 122:5, 123:7 - 123:14 |
| 136:9 - 136:11 |

| Debtor's Excerpts |
|---|
| 26:12 - 26:20 |
| 27:25 - 28:12, 28:17 - 28:20 |
| 33:2 - 33:25 |
| 35:15 - 35:21, 37:1 - 37:4, 37:10 - 37:25 |
| |
| 40:3 - 40:5, 40:12 - 40:14 |
| |
| 51:11 - 51:22, 52:14 - 53:3 |
| 74:16 - 75:5 |
| 80:17 - 81:2, 82:1 - 82:17 |
| 94:1 - 94:5 |
| 119:4 - 119:18, 120:20 - 120:24 |
| 122:6 - 123:6, 123:15 - 123:21 |
| 136:12 - 137:1 |

costs and a construction company to confirm what it'll cost to build.

And then you have to get, if it's going be a flag hotel with some third-party management, you have to get a third-party management agreement done. And once all that's done, you then have to get your production budgets, your debt construction and your investment equity all secured with a building permit and then start construction, build it and then start to occupy it and have the management company take over the running of it.

Q Okay. When you said the stuff about the -- if you're going to have a flag, you have to have a management company operating it, can you explain to me a little about what that means.

A If you're going to have a hotel, a luxury hotel, often, they want to be the management, as well as lending their brand name to the operations and the standards and quality that the property will be managed at.

Q Idea being you get consistent service at every Mandarin Oriental hotel?

A Correct.

Q Okay. So how do you go about raising money to make an acquisition of your site, once you found it

and ensure the permitting and zoning is all appropriate?

A Well, you get your budgets and plans together, and then you interact with people that want to invest and negotiate.

Q And how do you find people that want to -- that want to invest? You just -- you know, you have a long list of contacts? You use third-party services to help you find potential investors? How does that process work?

A Both.

Q Okay. So once you acquire the property -- first, how do you go about acquiring the property? Do you have to work through a broker to help identify a site in the first place, or do you already have in mind I want to find this site and now you find the owner and you try and make an offer to acquire?

A Normally, somebody calls me and says that they have a site they want to sell.

Q And is that common in the industry, brokers call certain developers or potential developers with here's an opportunity, let me know if you are interested?

A I would say yes.

Q Okay. Do you know who was marketing the

property that called you?
A Well, the general -- the managing member was Lincoln Properties.
Q Okay. They are a large national broker, correct, or property manager.
A I'm confused in what they are. They are owners, they are managers, they are brokers and they are -- you know, so, yeah. I don't know exactly what to design them as they are. They are a real estate company for sure.
Q Are they big and reputable?
A Yes.
Q What are some other big and reputable brokers?
A I don't know. The Trammell Crow Group, BVRB (phonetic), Jones LaSalle.
Q Is that about it?
A I mean, there's --
Q Those are the big boys?
A There's plenty of them out there.
Q Okay. So once -- once you have this and you've got your hypothetical property, have you already done the zoning and permitting, or do you start doing the zoning and permitting once you get your site in mind? How do you go through that process to ensure

the process and then you're ready to start.
Q Sorry for the pause. I'm just taking some notes. Like I said, I'm a lowly bankruptcy attorney. I don't have a lot of background in big development projects.
So you said you've got to do some analysis of what the condo sales would do. Is that finding out about revenue generation, so you can get how much this project would likely make for your investors over time?
A Correct.
Q And then you enter into an agreement with an entity to help sell the condos?
A Correct.
Q Okay. And then what is HVS?
A They are a hotel market study company that basically goes out and gives forecasts based on their expert opinion.
Q So that's -- are they projecting occupancy at the future hotel, likely revenue from operations, that kind of thing?
A Correct.
Q And that's an integral piece of the proforma that you're providing to the lender?
A Correct.

and he was very excited about the project and the site and the location. So it was basically his kind of niche of what he likes to do.

Q Okay. So was that the source of -- trying to understand. You said that was for the acquisition loan and the full construction loan.

A Correct.

Q That wasn't the acquisition loan that allowed you to acquire the property, though, was it?

A It was that loan before that. Madison, the acquisition loan that we finally took, was a different loan. That's correct.

Q Okay. So I want to go through about what the Debtor has actually done and what is completed.

So, I mean, the Debtor has obviously acquired the 2999 Turtle Creek property. Has it completed all the permitting needs for development?

A Yes.

Q Has it completed all the zoning needs that it needs to accomplish for the development?

A Yes.

Q Does it have completed architectural plans?

A They are not what we call CD ready, construction drawings. There's still more work to do.

Q Why are they not CD ready?

Q Okay. But you do have all of your license agreements, management agreements with Mandarin Oriental Hotels?

A That is correct.

Q What else needs to be done for construction to move forward?

A Finish the CDs, the plans and finalize the negotiations with a construction lender and fund the equity.

Q And why haven't those things been accomplished?

A Well, there's a Chinese virus that came like a plague across the world and basically stopped everything for 18 months. And, certainly, the hotel industry has been put on pause, a lot of that. And so we're talking about close to two years of delays due to the pandemic.

And during that period, we kept moving along with the plans and designs and also moved forward with the construction lenders and all that negotiations but certainly was slowed down. And only in the last six months, maybe seven, has a lot of renewed interest in this type of sector. And Dallas, Texas, in particular, is seeing a big spike in the right direction now.

previously?
A I had never paid attention to that.
Q Okay. Did you direct the Debtor and you, in your personal capacity, to file a lawsuit against Bipin Nambiar and HNGH Turtle Creek?
A I know that we sued the lender, Madison. I don't know whether Madison got sued first or HNG or -- I don't know who got sued first sitting here today.
Q But can you tell me the parties that initiated that lawsuit, that filed the complaint?
A The Debtor, I believe.
Q Okay.
A That's not what initiated the lawsuit or litigation.
(Exhibit 5 marked.)
Q (BY MR. KANE) Passing you a document labeled Exhibit 5. It's entitled, Secured Promissory Note. Are you familiar with this document?
A I'll have to read it to be sure.
Q Just take your time.
A I'm a little confused because this is MO 299TC.
Q That's the Debtor's predecessor interest, isn't it?
A I believe there was a problem with the

schedule.

A Right.

Q Right. And there's a bunch of dates listed in these columns for start and finish.

A Yes.

Q They run for the next one, two, three, four pages of this document.

A Right.

Q Correct?

A Right.

Q Now, I know it's really hard to see because it's kind of cut off here, but there's, you know, Deck Complete, something complete, Dry in, Dry in, Structures, Basement, Shafts, Grade, Deck. Do you have any idea, Amenity Deck on the next page? Can you tell me what -- what you understand that these are?

A It's just a project schedule. It lists everything that needs to be done and the times that it'll take to do it.

Q Okay. So when it says something like, you know, Duration, 783 days, that's anticipating that it's going to take more than two years.

A Yes. In anticipation of this particular project from the date we started to the date we finish construction, estimated at no more than 30 months.

Q Okay. So no more than 30 months?
A Correct.
Q Do you know if any of these -- I mean, has anything been completed on this project?
A Well, none of the on-site construction. You have your predevelopment, which in so much of what you do before you start building is building the building in your plans and design but no construction has started.
Q Okay. But the building they are building in your plans is not completed either, is it?
A I have about another five and a half months to do it.
Q Okay. And do those need to be completed before you get a construction loan?
A You can have a construction loan. As I said, we had one in 2019 and then there conditions to fund. So one of the -- you could have the construction, all documents signed, you could have paid anything, the funds are ready to be disbursed and then there will be conditions to disburse. There be the CDs that Moss has signed that certain things have to happen. And then you would have your -- at that point, even then, the loan would be completely done, and you wouldn't draw any debt funds from the loan for close to nine to

eleven months because you'll be spending your equity before the bank's, as you know.

Q That makes sense.

Okay. So let me -- let me try and understand this construction loan that you previously had. You said you previously had a construction loan and a land loan from the group in England.

A Right.

Q So why didn't you use it?

A We got more favorable terms with Madison.

Q There was no construction loan with Madison, right?

A Actually, in the loan documents, there is a stipulation about them being the construction lender. And, in effect, there's financial incentives to us or penalties if we don't allow them to be the construction lender.

Q Okay. Can you -- do you have an idea of where that is, in what loan document?

A I don't know which loan document it is, but it certainly speaks to the exit fees and everything else if they are being used. You know, their goal was to do the construction loan. I mean, this one small loan for a year is not what they do. They do big construction loans. They -- they support developers

your personal attorney, correct?
A You should ask him that.
MR. METZGER: Yes.
Q (BY MR. KANE) Vance McMurry hasn't filed a an application for retention by the Debtor in the bankruptcy case, has he?
A No.
Q Okay. So is there an engagement agreement or some other agreement that suggests he has a right to payment from the Debtor?
A No.
Q And I'm sorry, on this Exhibit 10, there's no date, but if you look at the Bates stamp down here, it says, Produced by the Debtor. Do you know when this was drafted, when this was circulated?
A I do know that, you know, this has been -- this is work that he's been working on to get finished while, you know, we've got a lot of other things to deal with. And, again, when you're getting a project like this done with a funding source, having the problems with -- that we're going through now with the lender, it causes problems. So, you know, the hope was that we would have the extension from Bipin, like we talked about, for 60 days, and in that period of time, this would be finalized.

To finalize this, you know, you would always want to have it in the best light as the borrower. So there's some timing issues. I'm trying to get the documents all done and when you would want to go forward with it.

Q This estimated funding date was June 20th. I assume that's changed. Have you received an updated estimated funding date?

A This is going to take about 90 days from where the documents are signed. So where we're at now is let's get these documents where we've all agreed to them and that they are -- both parties have agreed to those documents, and then they would initiate when the closing date would be.

Q Does Axiom Financial know that the Debtor is in bankruptcy?

A I don't know if we notified them of that as of yet, yes.

Q Do you think that would material to their decision of whether to lend money or not?

A I don't know. Some people do, some people don't. My hope and goal was that there would be an agreement and that issue would not need to be brought up, but if it's going to need to be brought up, we'll bring it up.

Oriental. I though you said that JPA brought them to you.

A Mandarin brought us Chris Green. Tall Ships came from Chris Green, so Chris Green was introduced to us by Mandarin.

Q All right. So let me understand. So Mandarin, was that -- did you request their assistance in raising equity?

A No. They said that this group was the equity partner in funding. They were doing one in Chicago. And they were going to do other Mandarin Oriental projects. And they thought that they might have an interest in the Dallas one. And they put us in touch Chris Green.

Q Okay. That was unsolicited?

A Unsolicited by me, yes, sir.

Q I'm going hand you a document labeled Exhibit 12.

(Exhibit 12 marked.)

Q (BY MR. KANE) It's the initial Tall Ship proposal.

A I believe so, yeah.

Q Is this date accurate, you guys were negotiating in February of 2021?

A I -- I -- I'm assuming so. My memory, you

know, with all that's going on. But if that's the date or not, I don't know. It's on the document.

Q Okay. On page 2, there's a reference to total development costs of $387,241,651?

A Yes.

Q Okay. Is that, to your recollection, accurate at the time?

A Yes.

Q I think you said earlier it's somewhere around 383 million today.

A Right. And when you get the capital stack and the fees that everybody charges, then that number goes up or down based on how much fees cost of running capital and soft costs.

Q And you think it's gone down?

A Well, sometimes, people want to charge a lot of fees and some people charge less fees. So when you charge a lot of fees, the budget goes up and that's why there's a difference in this budget.

Q Okay. So it could run a range, let's call it somewhere between 380 and 390 million, just depending on the cost of capital?

A Yes, sir.

Q That's fair?

A Yes, sir.

Q Okay. And, now, as part of this on page 3, Tall Ship intended to pay off the existing land loan, $40 million. Do you see that?

A Hold on a minute.

Yeah, so there it is, 40 -- that is with no discount to Mr. Bipin Nambiar. To your point earlier, there was no discount.

Q And over here, you've got land loan lender and land loan. There's an acknowledgment that land loan is in default. Amount due, including penalty and interest, it will cost an exit fee of an estimated $40,073,071.

A Yeah. I don't know where this forbearance agreement -- no, the forbearance was in place, so it wouldn't be in default at that time. If that's under the forbearance. Seems like we must have had a forbearance at that time.

Q Tell you what, why don't you take a look at document No. 6.

A Okay.

Q You see on that very first paragraph?

A Uh-huh.

Q Made effective as of this first day of March 2021.

A I'm still -- oh, yeah. On the top,

Q (BY MR. KANE) This is going to be Exhibit 15.

Do you remember seeing these texts?

MR. METZGER: Could you advise again who's who on these?

MR. KANE: Yeah, sure. So these are texts from Bipin's phone, so Bipin is green. And I'm asking if he recalls that his texts are in black?

A Looks familiar, yes.

Q And you don't have any reason to believe that this -- this isn't -- you know, you're not the Tim that's listed at the top, that you recall these exchanges?

A Sure. I would assume that to be true.

Q Okay. And the dates of these texts, you believe, are also accurate, so on October 18th, Bipin texted you, Any update on lender to refi us out?

A I believe those dates are correct, yes.

Q And so -- and what is that -- what does that suggest to you he's inquiring about. He's asking about payment in full by maturity?

A Correct.

Q Okay. And did you provide a response as to the status of refi?

A Yes. That the bank was looking at it and

A Yes, sir.
Q Haven't seen it yet?
A That is correct.
Q So you're basing your valuation on your understanding of appreciation in the market?
A Yes.
Q And in your statement of financial affairs, you listed the value of the property at $51 million (as heard); is that correct?
A I think it was -- I don't know if that's been corrected or not but, you know, we feel the value is $55 million for the dirt and another $3 million for the plan --
Q Okay.
A And make sure it's ready to go.
Q Okay. So you think a combined package is $58.5 million?
A Yes.
Q Is the property generating any revenue?
A No.
Q Okay. Is -- are the improvements habitable that are on that property? In other words --
A Yes.
Q Let me clarify. Someone can move in and operate on this?

A Yes, sir.
Q Okay. Is anybody officing in that space?
A Yes.
Q Who is?
A JMJ Development.
Q Is it paying any rent to the Debtor?
A No.
Q Why not?
A Neither party required it or offered it.
Q So it's getting free use -- what is -- what would you say market rent would be for that space?
A I couldn't opine on that sitting here today, but it is very nice office space.
Q Do you think there's significant demand for that office space?
A Yes.
Q Do you think you could have a replacement tenant in that office space in short order?
A Yes. Mr. Bill Hutchison wanted to lease it out.
Q I don't know who that is.
A Mr. Bipin Nambiar's partner in the Virgin that's been put under arrest for child molestation. That Bill Hutchison.
Q That's not good.

A I didn't say anything until I went and checked.

Q And when did you correct him?

A I don't know when but certainly before the 29th.

Q Okay. What makes you believe that the payment deadline wasn't 1:00 p.m. New York time?

A Because the forbearance agreement says the 29th. There is no time.

Q So can you point me to a provision that the forbearance agreement, which is Exhibit 6, that modifies the date payments need to be made under the note?

A I think I'd leave that up to the lawyers.

Q So the basis of your understanding is lawyers now?

A That is correct.

Q Okay. How long do you think it will take you to obtain enough equity financing to get a construction loan and begin construction?

Cancel. Wrong question. You said it would take about five months to complete plans.

A Correct.

Q How does that affect your ability to raise equity and get a construction loan?

A It does not.
Q So you can get a construction loan even without the completion of plans?
A As I said before, you can have a construction loan but you can't --
Q You just can't draw on it?
A Yes, sir.
Q Okay. So how long -- let me go back to that prior question of how long do you think it will take you to finish raising equity and get a construction loan so that you can begin on construction?
A Five months for the plans, and so everything would take -- call it six to seven months before we break ground.
Q Okay. How long do you think it would take before you have sufficient equity to obtain a construction loan?
A I mean --
Q Go ahead.
A -- you could have a term sheet from an equity source signed and done within 45 days from today.
Q Okay. And do you think that's realistic even where you currently are?
A I don't think it's very easy, but you have two sets -- there's a lot of sets of investors.

Q Okay. So did the Debtor, is it your understanding that the Debtor breached its company agreement when it took on the Nitya Capital debt?

A Well, the Nitya Capital debt -- do we have that agreement here somewhere? Let's look at it. Yeah.

Q And that's -- will you show me that again?

MR. METZGER: This is what it says.

Q (BY MR. KANE) So the Debtor doesn't owe any money to Nitya?

A That's the case in part, yeah.

Q So then the amended $20 million (phonetic) in unsecured credit is incorrect?

A That is something that came to my attention just recently, that that's another -- especially since the money went directly to pay it, yet when I finally reviewed this and then saw this, and I was a little shocked that nobody else picked up on this.

But -- because when I went through the process, I said, you know, this is actually incorrect and that has to be corrected.

Q So then the only debts that are owed by the Debtor are -- there isn't any creditor that has a debt over $60,000?

A I don't know about 60,000, but there are

vendors, architects, engineers and those listed folks.
Q Are there any of those folks whose debt is less than 60 days past due?
A 60 days, no.
Q They are all --
A I would assume --
Q I know I keep talking in the negative.
A They are more than 60 days past due or I would assume so, yeah.
Q Debtor has no employees?
A Correct.
Q Do you receive any salary from the Debtor?
A No.
Q How does the Debtor intend to pay Ms. Lindauer's legal fees?
A Well, they have already been paid, the appropriate amount that we sent to get her engaged. And, you know, we'll pay off all the creditors and pay off whatever bills we have.
Q So Ms. Lindauer is on a contingency fee?
A I don't know what the document or what that states, you know. I can't speak for her. I need to go back and look at what the documents says.
Q So if this is accurate, then Debtor only has $299 in change?