Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **2999TC ACQUISITIONS, LLC,** | § | **CASE NO. 21-31954-hdh11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

# 2999TC ACQUISITIONS, LLC'S EMERGENCY MOTION TO EXTEND TIME AND MOTION TO COMPEL

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

COMES NOW 2999TC Acquisitions, LLC (f/k/a MO2999 TC, LLC), Debtor in the above styled and numbered case ("**Acquisitions**" or "**Debtor**"), and files this, its Emergency Motion to Extend Time and Motion to Compel, collectively this "**Motion**"), and would show the Court the following:

## I. NATURE AND PROCEDURAL POSTURE OF THE CASE

1. The Debtor filed its voluntary petition commencing its Chapter 11 bankruptcy case on October 29, 2021.

2. Debtor sought to resolve its disputes with HNGH, Vipin Nambiar and HN Green Hollow Capital Partners, LLC pursuant to that certain Agreed Order [Doc. 64] Regarding Motion to Lift Stay [Doc. 10], Motion to Dismiss [Doc. 9], Motion for Sanctions [Doc. 15]and Motion to Enforce Stay [Doc. 14], signed by the Court December 10, 2021 (the "**Agreed Order**", constituting a "**Contracted Settlement Agreement**", and as such, and at times herein so called).

The Agreed Order, as amended by March 17, 2022 Agreed Order Modifying Order on Motion to Dismiss and For Relief from Stay [Doc. 94], provides in pertinent part: for a **Payoff Amount** (under seal), to be paid by Debtor to HNGH on or before the **Payoff Deadline** (May 30, 2022, extended to May 31, 2022, as the former being a holiday), and a "rescission deed" to be held by counsel for HNGH, which upon the **Payoff Event** and filing thereof, the special warranty deed to HNGH and recorded in the Dallas County property records by HNGH (hereafter, "Deed") "shall be deemed rescinded and avoided" and "(Debtor) shall retain all title to the Property." The Adversary was dismissed. An issue also arose over whether the state court guaranty suit should have also been dismissed which HNGH refused to dismiss even though they were made aware that this was creating a hurdle to obtaining financing.

## II. FACTUAL BASIS FOR MOTION:

3. Debtor contends that HNGH has failed to do all that it needs to do to satisfy its obligations under the Contractual Settlement Agreement and Agreed Order thus frustrating the Debtor's ability to perform thereunder; as more fully set forth herein. Debtor contends that HNGH's required performance is spelled out in detail in the letter sent by the Debtor's counsel to HNGH's counsel on May 30, 2022 attached hereto as Exhibit "1" and incorporated herein by this reference as if set forth in full for all purposes.

4. In addition, Debtor has now come to believe that HNGH, together with its control person(s), understood to be members of one of the most prominent and powerful families in the State of Texas, and certainly the Dallas business community, have sought to and indeed interfered with the Debtor's actual and prospective contractual relations with one or more third party debt and/or equity sources, with the intent and effect of frustrating and otherwise precluding the Debtor's ability to perform thereunder; as more fully set forth herein below.

5. Despite the potential and anticipatory contractual breaches and tortious interference that the Debtor contends exist, it has arranged both contractual (and prospective contractual) commitments for the necessary debt and or equity funds to source the Payoff Amount; provided that (a) HNGH delivers to the title company as escrow agent a rescission deed in form and substance so that Debtor may in turn deliver good and marketable title to the Property, for review and approval by their respective real estate counsel prior to funding, and (b) HNGH additionally delivers to the title company as escrow agent other items customarily requested and required in commercial real estate transactions such as this in Dallas County, Texas, including but not limited to a Bills Paid Affidavit, requested and required to satisfy the title insurer and the debt and or equity sources that there have been no intervening liens or potential “gap” lien claimants, and/or (c) HNGH agrees to reasonably extend (or the Court order such an extension of) the Payoff Deadline to allow for time to resolve the above, and for one particular lender, namely First Guaranty Bank (whose loan committee has approved to make a loan to substantially fund the Payoff Amount) to complete its requested third party review of status of title (***in light of the previously recorded Deed recording by HNGH that is a subject of this proceeding***).

6. When recently requested for such a rescission of the Deed instrument, that is the subject hereof, HNGH, by and through counsel, refused to provide the required instrument and instead insisted on a form of “special warranty deed” which contained conflicting language with the purpose of such a deed and which added a deed restriction in favor of HNGH. It was not until the day of the filing of this motion, after running out the clock on Debtor’s time to fund the Payoff Amount, that HNGH finally agreed to provide a form of a rescission of deed that is at least somewhat more consistent with the terms of the Agreed Order and applicable state law. Obviously as experienced real estate professionals, HNGH knows there are certain implied obligations in

closing such a transaction and they know that no third party will fund the financing of the Payoff Amount or incur the costs to fund over tens of millions of dollars an escrow account in preparation of closing on the payoff of the debt if the proper instruments and documents necessary to close are not held in escrow. Keep in mind, such funds are not sitting in some checking account and typically have to be converted into some sort of liquid asset which incur transaction costs and loss of daily interest (even at 4% this would result in the loss of multiple thousands of dollars per day). However, HNGH, has to date refused to extend the Payoff Date to provide the time now needed to complete review of the revised form including consent of the title company and Debtor's funding source including their counsel and thereafter to provide sufficient time to fund the Payoff Amount into escrow in preparation for closing, additional time made necessary in part by (i) HNGH's failure to consent to provide the ordered instruments and make the required deliveries in advance, (ii) HNGH's breach of the Agreed Order or alternatively, HNGH's anticipatory breach of the Agreed Order, and (iii) HNGH's tortious interference.

7. More particularly, attached as Exhibit "2", is a copy of the Term Sheet as approved by First Guaranty Bank. The loan officer of First Guaranty Bank recently had a discussion with HNGH, by and through counsel, to whom such loan officer confirmed his bank's commitment to make the loan, and its need for additional time to complete its third party review of title (which based on Exhibit "1" is a mess, due in part to the filing of the contested Deed) to which HNGH responded, that it would only do what is specifically stated in the order unless the Court ordered them to do otherwise including to allow additional time. HNGH's counsel also told the bank officer that the Debtor and its representatives were bad actors which did not help facilitate the closing of the deal or the obtaining of a loan.

8. Exhibit "1" sets forth in some detail why the "*Special Warranty Deed*" first proffered by HNGH needed to be made more consistent with the Agreed Order and Texas real property law (which provides that the goal of rescission is to avoid the contract and in this case, the Deed, from its inception, **placing the parties <u>in the position they occupied before</u> the …. instrument** was executed. *Ginn*, 472 S.W.3d at 837; *see Hunt County Oil Co. v. Scott*, 67 S.W. 451, 452 (Tex. Civ. App.—1902, writ ref'd). (emphasis added). A special warranty deed "conveys the land itself" which is completely contrary and in conflict with a rescission of a deed. *Chesapeake Exploration, L.L.C. v. Dallas Area Parkinsonism Soc'y High Plains Div. Inc*. No. 07-10-0397-CV at 6 (Tex. App. – Amarillo 2011). Thus the language proffered by HNGH in the special warranty deed is in direct conflict to a rescission likely resulting in a title defect and objection by a title company to insuring good title in the future. Furthermore, such a purported conveyance under the special warranty deed could create future tax issues such as resetting the basis in the Property and causing the Debtor to incur income tax on a future sale of the property instead of capital gains tax. Such letter made additional legitimate requests, each supported with adequate explanation, that the proffered instrument <u>need not</u> include a copy of the deed being rescinded, and <u>should not</u> include a copy of the Agreed Order. And further objected to a narrow use restriction sought to be imposed now by HNGH upon the Property which only they would be able to release in the future, despite the fact that such was not of record prior to the recordation of the Deed. Such a restriction serves to reduce the market value of the Property and hinder Debtor's ability to sell or otherwise develop the Property in the future and thus gives HNGH leverage over Debtor in the future which could be used to extract further payments for the release of the restriction or used to acquire the Property for themselves including reselling the Property without

the restriction at a higher price. Thus, the attempted inclusion of the restriction is in direct opposition to the purpose and intent of a "rescission".

9. Further, attached as Exhibit "3" is a Rescission of Deed instrument, as requested by Debtor, and counsel to its funding source therein, which remedies many of the objectionable provisions of the originally proffered Special Warranty Deed.

10. Further, Exhibit "1" describes the additional items to be delivered by HNGH to the title company as escrow agent as customarily requested and required in commercial real estate transactions such as this in Dallas County, Texas (the "**HNGH Deliverables**"), including but not limited to the above referenced Bills Paid Affidavit, as well as other instruments typically required by the title insurer in order to satisfy the title insurer that all Schedule C Requirements are satisfied, as a condition precedent to the issuance of clear and marketable title to the purchaser, and further to confirm the requisite authority of the parties executing the instrument(s) in satisfaction of the Requirements, and the closing documents generally. In response thereto, HNGH, by and through counsel, has requested that such Deliverables be limited to those it believes are necessary to close this transaction. The parties agreed to work together to facilitate a payoff to HNGH through the vehicle of a new loan. It is implicit in that transaction that detailed loan documents and corporate/authority documents and necessary affidavit(s) would be needed to complete such transaction to satisfy title requirements, as well as the reasonable requirements of any new lender, purchaser or its investor.

11. More particularly, HNGH's prior failure to deliver a rescission of the Deed in conformity with the Agreed Order, and applicable Texas law, which requires that the parties be placed in the position they occupied before the disputed Deed was recorded, is a clear first and

material breach of the Agreed Order, and the parties' Contractual Settlement Agreement; which has caused the desired Closing to be delayed**.**

12. Second, HNGH's failure to deliver any one or more of HNGH's Deliverables to the title company as escrow agent as customarily requested and required in commercial real estate transactions such as this in Dallas County, Texas, constitutes a further breach and/or anticipatory breach of the Agreed Order, and the parties' Contractual Settlement Agreement; which, again, has caused the desired Closing to be delayed.

13. Third, and more particularly, HNGH's failure to deliver a release of a certain Collateral Transfer of Note and Lien by HNGH to Happy State Bank, in form reasonably requested by Debtor, is, too, a further first and material breach of the Agreed Order, and the parties' Contractual Settlement Agreement, as such is necessary to clear title to the Property; which failure has caused and is continuing to cause the desired Closing to be delayed.

14. Fourth, as part of an earlier attempt to resolve the disputes herein, HNGH agreed to dismiss a pending state court action brought against Mr. Timothy Barton, one of the principals of the Debtor. To date that dismissal has not yet been filed by HNGH, in contravention of such earlier agreement, and moreover, with the evident intent and effect of further delaying or precluding the Debtor from sourcing the Payoff Amount and performing its obligations under the Agreed Order, as the mere pendency of such suit constitutes a cloud over Mr. Barton and his ability to source the anticipated debt and or equity funds; which failure by HNGH has caused the desired Closing to be delayed.

15. More particularly, Debtor asserts, on information and belief, that HNGH has on one or more occasion made false and otherwise actionable statements to third parties, which with whom Debtor had actual and/or prospective contractual relations so as to source the necessary

third party debt and/or equity, with the intent and/or effect of frustrating, tortiously interfering and otherwise precluding Debtor's ability to perform under such contracts and/or prospective contracts and tortiously interfering with Debtor's prospective contracts and/or contracts including lender(s) who are now or were at one time committed to advance a substantial amount of debt and/or equity funds in order to effectuate the Payoff Event respecting the Property, and funding sources who are now or were at one time committed to advance a substantial portion of the equity necessary to effectuate the Payoff Event respecting the Property.

16. HNGH's statements have at times included that the Debtor and associated principals have made false statements to them, are not trustworthy, cannot and will not perform their contractual obligations, are not credit-worthy, will fail with respect to the Property, that such person should not do business with the Debtor and related persons, but rather simply wait until HNGH and related persons have taken title to the Property and then, instead do business with HNGH respecting the Property, and other statements each of which made with the intent to interfere with such recipient's actual and or prospective contractual relations with Debtor, and each with the intent and/or effect of frustrating and otherwise precluding Debtor's ability to perform, and each without legal excuse or justification.

17. Debtor contends that but for such statements, it would be in a position to more fully perform its obligations under the Agreed Order. More particularly, Debtor contends that: (1) it has or had an actual contractual relationship and/or a reasonable probability that the Debtor would have entered into a business relationship; (2) an independently tortious or unlawful act by HNGH that interfered with such contractual relation or prevented the relationship from occurring; (3) HNGH did such act with a conscious desire to interfere with the relation or prevent the relationship from occurring or HNGH knew the interference was certain or substantially certain to occur as a

result of the conduct; and (4) that Debtor has suffered actual harm or damages as a result of HNGH's conduct. Debtor recognizes that such claims and related claims and causes of action are better presented in a complaint that may be filed against those who have participated in frustrating the transaction between the Debtor and HNGH. For purposes of this Motion the Debtor seeks the relief described herein.

## III. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Debtor respectfully requests, for the reasons stated herein, that the Court enter an Order as follows:

1) Compelling HNGH to deliver all documents needed to close the transaction contemplated by the Orders entered by this Court as described in Exhibit "1;"

2) Extending the Payoff Deadline to no sooner than thirty (30) days following the title company's receipt as escrow agent of the last of the HNGH Deliverables, as provided herein, as evidenced by title company's written confirmation of receipt of such; to allow for adequate time for counsel to the title insurer, purchaser and or its investor, to review and approve such;

3) Such other and further relief in law or in equity to which Debtor/Debtor may show itself entitled,

Dated: May 31, 2022

Respectfully submitted,

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
ATTORNEY FOR DEBTOR

Case 21-31954-hdh11 Doc 28 Filed 05/31/22 Entered 05/31/22 ... Page 10 of 88

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 31, 2022, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon the parties receiving electronic notice in this case listed below.

Katherine T. Hopkins
katherine.thomas@kellyhart.com

John J. Kane
jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com

Sherrel K. Knighton
Sherrel.Knighton@lgbs.com, Dora.Casiano-Perez@lgbs.com;Sean.French@lgbs.com;Dallas.Bankruptcy@lgbs.com

Joyce W. Lindauer
joyce@joycelindauer.com,
dian@joycelindauer.com;deann@joycelindauer.com;12113@notices.nextchapterbk.com

Steven C. Metzger
smetzger@pmklaw.com

Russell Hale Neilson
hneilson@parkinslee.com, hneilson@ecf.courtdrive.com

United States Trustee
ustpregion06.da.ecf@usdoj.gov

Kyle Woodard
kwoodard@krcl.com, KWoodard@ecf.courtdrive.com

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

**Attachments:**

| | |
|---|---|
| Exhibit "1" | copy of a letter recently directed to HNGH, by and through its counsel, listing the need for the HNGH Deliverables. |
| Exhibit "2" | copy of the Term Sheet as approved by First Guaranty Bank. |
| Exhibit "3" | Rescission of Deed instrument, as requested by Debtor, and counsel to its purchaser and/or investor therein. |
| Exhibit "4" | Redline version of Rescission of Deed instrument, as requested by Debtor, and counsel to its purchaser and/or investor therein. |
| Exhibit "5" | Happy State Bank Payoff – for Collateral Assignment of Note and Lien resolution |
| Exhibit "6" | Email from Julie Lyssy at Sendera Title requested Assignment from Axos Bank to 2999 Turtle Creek LLC |
| Exhibit "7" | Lender letter |
| Exhibit "8" | Declaration of Timothy Barton |
| Exhibit "9" | Declaration of Joey Howell |

# EXHIBIT “1”

**JOYCE W. LINDAUER ATTORNEY, PLLC**
Attorney & Mediator
1412 Main Street, Suite 500
Dallas, Texas 75202
Email: joyce@joycelindauer.com

Telephone No.
(972) 503-4033

Facsimile No.
(972) 503-4034

May 30, 2022

Via Email
To John Kane

**Re: File 2201814-VVJA 2999 Turtle Creek Blvd, Dallas, TX Closing Documents**

John, please confirm the following matters to ensure that title to the Property is clear, and particularly, not encumbered by any of the filings by the lender parties, and as such must be delivered or caused to be delivered by your client, HNGH (and in some instances, possibly third parties):

**1.0 <u>THE RECISSION OF DEED (fka SWD)</u>**

1.1 Rescission of Deed

1.2 In connection with the above, a standard form Bills Paid and Parties in Possession Affidavit of HNGH.

**2.0 <u>THE DEED OF TRUST</u>**

2.1 Release of the Deed of Trust, by HNGH;

a. Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019, by MO 2999TC, LLC in favor of Michael B. Massey, as Trustee for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253450 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

2.2 Related to the immediately above, a Release of the prior collateral assignment of the Note and Deed of Trust and all Loan Documents fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the Note and Deed of Trust or other Loan Documents that were collaterally assigned (including Assignment of Leases and Rents);

2.3 Release of the prior collateral assignment of the Note, Deed of Trust, and Assignment of Leases and Rents (3 documents) fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the Note and Deed of Trust;

2.4 Release of Assignment of Leases and Rents dated as of September 20, 2019, by MO 2999TC, LUC for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253451 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

2.5 Release of prepaid interest agreement to Madison (and release by HNGH if it was assigned).

3.0 **UCC FILING(S)**

3.1 Release of the UCC, by HNGH (county and state)

3.2 Related to the immediately above, a Release of the prior assignment of the UCC fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the UCC filing;

3.3 Termination of Loan participation agreement, executed by each of the parties thereto, and or other confirmation that the Loan participation agreement has been terminated, and is no longer of any force or effect

3.4 Release of whatever agreement Axos signed to permit the participation agreement (See excerpt from an email during negotiations between Madison and HNGH at the end)

3.5 Release of the prior collateral assignment of the UCC fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the UCC filing;

4.0 **NOTE**

4.1 The original Note, marked paid in full; delivered to title company to make sure original is provided. .

5.0 **AUTHORITY OF LENDER ENTITIES**

5.1 In connection with the above, Secretary or other Officer Certificate of HNGH, including copies of the governing documents of HNGH, and including consent resolutions of the director and or managers, and the consent of the shareholders and or members, to the execution and delivery of each of the above referenced closing documents,

5.2 Ratification of all prior acts and Consent of HN Green Hollow Capital Partners executed by Jim Glasgow who is the manager – he is the one that executed the participation agreement, so anything related to that agreement needs to especially come from him in addition to HN Capital Partners, LLC.

5.3 In connection with the above, Secretary or other Officer Certificate of Axos, including copies of the governing documents of Axos, and including consent resolutions of the director and or managers, and the consent of the shareholders and or members, to the execution and delivery of the Axos documents;

5.4 In connection with the above, Secretary or other Officer Certificate of Happy State Bank, including copies of the governing documents of Happy State Bank, and including consent resolutions of the director and or managers, and the consent of the shareholders and or members, to the execution and delivery of each of the above referenced closing documents executed by HSB; together with confirmation, together with confirmation that Happy State Bank (a) is and remains the holder of the collateral assignment from HNGH and that Happy State Bank has not further sold or encumbered the collateral itself, which they apparently had the right to do under the Collateral Assignment), and (b) authorized and consented to and or ratified HNGH's execution and delivery of the Order, as well as the Rescission of Deed.

5.5 Everything executed by HNGH should be executed by HN Green Hollow as the sole member or otherwise consented to by sole member and not just executed by Vipin

5.6 Need assurance Madison assigned the guaranties to HNGH as they asserted.

5.7 Also, HNGH was intervenor in the guaranty case so Madison is still a party - both will have to dismiss w prejudice.

5.8 Check if Madison assigned all the loan docs to HNGH not just the recorded documents.

5.9 Look at the collateral assignment to HSB to be sure HNGH even had the authority to do what they did including agreeing to the BK order.

## 6.0 <u>LITIGATION AND MATTERS</u>

6.1 Dismissal of the Guaranty litigation, with prejudice provided to the Guarantor

## 7.0 <u>GENERALLY</u>

7.1 Sequencing Agreement, and or Joint Closing Instructions, respecting the effect and timing each of the above instruments, to be signed by HNGH, Debtor (Seller), and purchaser, either directly or by and through counsel.

7.2 If any potential lenders/investors on our side are exposed or names are released, John Kane to sign agreement that neither he nor HNGH have communicated with them.

John, please specifically confirm which of the above items have already been delivered to the Title Company (and provide me with copies of such please for review), and when the balance of the items will be delivered, in advance of the closing.

Thank you.

Joyce Lindauer

Cc: Client

Case 21-31954-hdh11 Doc 141-1 Filed 06/07/22 Entered 06/07/22 15:32:23 Page 17 of 88

# EXHIBIT "2"

**FIRST GUARANTY BANK** Member FDIC

HOME OF FANATICAL BANKING

# COMMITMENT LETTER

TO: Enoch Investments, LLC
c/o Randy Marx, Esq
The Marx Firm, LLC
2999 Turtle Creek Blvd.
Dallas, Texas 75219
randy@themarxfirm.com.

The foregoing Commitment represents the representation of First Guaranty Bank that it has committed to lend on the following terms:

| | |
|---|---|
| Borrower: | Enoch Investments LLC |
| Guarantors: | The TLB 2012 Irrevocable Trust Dated March 16, 2012; Timothy Lynch Barton; Maximilien Enoch Barton; D4FR LLC; D4DDS LLC; D4IN LLC; D4OP LLC |
| Purpose: | Loan to Purchase 2.473 Acres of Land and Office Building located at 2999 Turtle Creek Blvd, Dallas, TX 75219 |
| Loan Amount: | $33,840,000 |
| Collateral: | Perfected First Lien on approx. 2.473 acres of land and improvements at 2999 Turtle Creek Blvd, Dallas, TX 75219 |

**Terms for Commercial Real Estate Loan:**

| | |
|---|---|
| Rate: | Variable Rate using Wall Street Journal Prime Rate Currently at 4.00% + 1% Margin and the rate is floating daily; Floor Rate of 5% |
| Amortization: | 6 months IO followed by 240 Months P&I amortized |
| Repayment term: | 6 Months Interest Only Payments. 240 Months Principal and Interest Payments after initial Interest Only Period. Monthly Escrow of Taxes and Insurance |
| Fees: | 1% Origination Cash at closing; 2% Origination Fee if financed; $350 Document Fee |
| Prepayment: | 3% Prepayment Penalty |

**Closing Checklist:**

| | |
|---|---|
| Pre Closing: | Verification of Funds used for Equity Injection |
| | Satisfactory receipt of documentation showing that any outstanding liens and d judgements reported on background check for Timothy Barton have been cleared/released |
| | Signed and Dated Personal Financial Statement for Guarantor(s) |
| | Attorney Review of Borrower Ownership Structure, including authority, Trust powers, Trustee Duties, and Relationship to the Borrowing Entity |
| | Full Title Exam on Building and Land; Third Party Attorney Review of Transaction |
| Recurring Covenants: | Quarterly Company Prepared Financial Statements for Enoch Investments LLC to be provided to FGB |
| | Audited Annual Financial Statements for Enoch Investments LLC to be provided to FGB |
| Estimated Closing Date: | The estimated date of closing is 10 (ten) business days from the Acknowledgement Date of this Commitment, subject to any additional time identified in order to obtain good title, insurance, legal review, or other common and ordinary needs identified by First Guaranty Bank to complete closing. |

[[[[REST OF THIS PAGE INTENTIONALLY BLANK]]]]

## *SIGNATURE PAGE*

**FIRST GUARANTY BANK**

BY: /s/ Jordan Montgomery Lewis___

Its: _Texas Area President_________

_Jordan Montgomery Lewis__________

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS COMMITMENT. BORROWER ACCEPTS AND AGREES TO THE TERMS OF THE COMMITMENT AS OF ____5/27/22___________________.

**BORROWER**: Enoch Investments LLC

By: ________________________ (Signature)

Its: ________________________ (Title)

________________________ (Printed Name)

Date: ________________________

# EXHIBIT "3"

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE OUT ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER

**AGREED RESCISSION**
**OF**
**SPECIAL WARRANTY DEED**
***(Instrument number 2021 003 271 72***
***recorded in the real property records of Dallas County, Texas on November 1, 2021)***

THE STATE OF TEXAS
KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF DALLAS

WHEREAS Turtle Creek Dickason, Ltd conveyed certain property located at 2999 Turtle Creek Blvd, Dallas, Dallas County, Texas as further described on Exhibit A and incorporated herein including all improvements ("**Property**") to 2999TC Acquisitions, LLC, f/k/a MO 2999TC, LLC, a Delaware limited liability company, as evidenced by the Special Warranty Deed executed on September 20, 2019 and recorded on September 23, 2019 as instrument number 201900253449 in the real property records of Dallas county, Texas on which was subject to a Deed of Trust, Security Agreement, and Fixture Filing to 2999 Turtle Creek, LLC recorded on September 23, 2019 as instrument number 201900253450 in the real property records of Dallas County, Texas.

WHEREAS 2999TC Acquisitions, LLC, a Delaware limited liability company (the "**Grantor**") and HNGH Turtle Creek, LLC, a Delaware limited liability company (the "**Grantee**") as the successor in interest to and/or as the assignee of 2999 Turtle Creek, LLC (the "Original Lender") entered into a written agreement ("Agreement") under which Grantor agreed to convey the Property to Grantee upon the occurrence of certain agreed conditions.

WHEREAS Grantor executed the undated special warranty deed (the "**Deed**") on March 1, 2021, and delivered to Grantee to be held in escrow and to be effective and recorded only upon the occurrence of such agreed conditions as set forth in the Agreement;

WHEREAS Grantee dated the Deed as of October 29, 2021 (which dating was not consented to by Grantor) and recorded the Deed as **instrument number 2021 003 271 72** in the real property records of Dallas County, Texas on November 1, 2021 (which recordation, too, was not consented to by Grantor, and made the subject of an adversary proceeding in the Bankruptcy Court, defined below);

WHEREAS Grantor filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Texas ("Bankruptcy Court") on October 29, 2021 (Case no. 21-31954-hdh11) wherein Grantor disputed the right of Grantee to record the Deed and alleged that such recording was improper;

WHEREAS Grantor has retained sole and exclusive possession of the Property at all times and Grantee never occupied nor took possession of the Property; and

WHEREAS Grantee and Grantor have agreed as ordered by the Bankruptcy Court by Order signed December 10, 2021 (Dkt 64), as amended on March 17 2022, for the Grantee to rescind and avoid the Deed, which shall be retroactive and effective as of October 29, 2021, and acknowledging and agreeing that no grant, sale, bargain, transfer, or conveyance of the Property occurred to the same extent as if the Deed had never been executed or recorded.

NOW THEREFORE Grantor and Grantee hereby incorporate by reference the recitals above, and **HEREBY RESCIND AND AVOID** in full, ***ab initio***, the execution, delivery, granting, and recording of the Deed and any and all grants, bargains, sales, transfers, and conveyances related to the Property otherwise effected in the hereby rescinded Deed, including any and all restrictions made therein, are HEREBY **EXPRESSLY RESCINDED** in full, ***ab initio***.

Further, as a result of such rescission, ***ab initio***, the parties hereto hereby expressly covenant, confirm, and agree that the lien(s) in favor of Grantee encumbering the Property prior to the recordation of the Deed rescinded hereby, namely:

(a) that certain Secured Promissory Note dated September 20, 2019 (the "Note"), in the original principal amount of $32,500,000, payable by the Grantor, as maker, to the order of Original Lender, as assigned to HNGH, the current payee and holder of the Note, and

(b) the lien on and security interest against the Property created by that certain Deed of Trust, Security Agreement and Fixture Filing dated September 20, 2019 and recorded on September 23, 2019 as instrument number 201900253450 in the real property records of Dallas County, Texas;

**SHALL BE AND ARE HEREBY REINSTATED** and did not merge into the greater fee estate of the Grantee upon the recordation of the Deed rescinded hereby.

Grantee represents, warrants, and affirms (i) that it never occupied nor took possession of the Property; (ii) that it has not caused or permitted the Property to be encumbered in any way except which have otherwise been fully released as recorded in the property records of Dallas County, Texas; (iii) that it has no claims related to the Property; (iv) and that it has acquired no rights, title, or interests of any kind in the Property.

The effect of this rescission shall be as if any conveyance, transfer, sale, bargain, or grant of the Property by way of the Deed never happened and Grantor and Grantee and as such, the Deed is void and of no force and effect, from the beginning.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, Grantor has executed this AGREED RESCISSION OF SPECIAL WARRANTY DEED on the____ day of _________________ 2022.

**2999TC ACQUISITIONS, LLC,**
a Delaware limited liability company
formerly known as MO 2999TC, LLC

By: ______________________________
Name: Timothy Barton
Title: President

STATE OF TEXAS

COUNTY OF ________________

BEFORE ME, the undersigned Notary Public, on this day personally appeared Timothy Barton, known to me to be the person and officer whose name is subscribed to the foregoing instrument on behalf of 2999TC Acquisitions, LLC, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, as the act and deed of said limited liability company and in the capacity therein stated, and furthermore represents he has such authority.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of______________ 2022.

___________________________
Notary Public in and for the State of ________________
My Commission Expires: _________________

Case 21-31954-hdh11 Doc 214 Filed 06/07/22 Entered 06/07/22 ... Page 26 of 88

IN WITNESS WHEREOF, Grantee has executed this AGREED RESCISSION OF SPECIAL WARRANTY DEED on the____ day of _________________ 2022.

**HNGH TURTLE CREEK, LLC**
a Delaware limited liability company

By: ______________________________
Name: ______________________________
Title: ______________________________

STATE OF TEXAS

COUNTY OF ________________

BEFORE ME, the undersigned Notary Public, on this day personally appeared ____________________known to me to be the person and officer whose name is subscribed to the foregoing instrument on behalf of HNGH Turtle Creek, LLC, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, as the act and deed of said limited liability company and in the capacity therein stated and furthermore represents he and it has such authority, as the successor in interest of the Original Lender (as defined hereinabove), and the sole owner and holder of the Note and associated liens.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of______________ 2022.

___________________________
Notary Public in and for the State of ________________
My Commission Expires: _________________

# EXHIBIT A
# PROPERTY DESCRIPTION

**BEING** a tract of land situated in the James A. Sylvester Survey Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an Addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Deed Records, Dallas County, Texas.

# EXHIBIT “4”

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE OUT ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER

**AGREED RESCISSION**
**OF**
**SPECIAL WARRANTY DEED (the "DEED-IN-LIEU")**
***(Instrument number 2021 003 271 72***
***recorded in the real property records of Dallas County, Texas on November 1, 2021)***

Formatted: Underline, Font color: Auto

THE STATE OF TEXAS

KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF DALLAS

WHEREAS Turtle Creek Dickason, Ltd conveyed certain property located at 2999 Turtle Creek Blvd, Dallas, Dallas County, Texas as further described on Exhibit A and incorporated herein including all improvements ("**Property**") to 2999TC Acquisitions, LLC, f/k/a MO 2999TC, LLC, a Delaware limited liability company, as evidenced by the Special Warranty Deed executed on September 20, 2019 and recorded on September 23, 2019 as instrument number 201900253449 in the real property records of Dallas county, Texas on which was subject to a Deed of Trust, Security Agreement, and Fixture Filing to 2999 Turtle Creek, LLC recorded on September 23, 2019 as instrument number 201900253450 in the real property records of Dallas County, Texas.

WHEREAS 2999TC Acquisitions, LLC, a Delaware limited liability company (the "**Grantor**") and HNGH Turtle Creek, LLC, a Delaware limited liability company (the "**Grantee**") as the successor in interest to and/or as the assignee of 2999 Turtle Creek, LLC (the "Original Lender") entered into a written agreement ("Agreement") under which Grantor agreed to convey the Property to Grantee upon the occurrence of certain agreed conditions.

WHEREAS Grantor executed the undated special warranty deed (the "**Deed-in-Lieu**") on March 1, 2021, and delivered to Grantee to be held in escrow and to be effective and recorded only upon the occurrence of such agreed conditions as set forth in the Agreement;

WHEREAS Grantee dated the Deed-in-Lieu as of October 29, 2021 (which dating was not consented to by Grantor) and on that same date filed the Deed with the Dallas County Clerk to be recorded the Deed-in-Lieuin the real property records of Dallas County, Texas. Later that same day, Grantor filed a petition for bankruptcy relief under Chapter 11 of Title 11 of the United States Code, commencing bankruptcy case no. 21-31954-hdh11 (the "Bankruptcy Case"). On November 1, 2021, the Deed was recorded as **instrument number 2021 003 271 72** in the real property records of Dallas County, Texas;.

WHEREAS on November 1, 2021 (which recordation, too, was not consented to by in its Bankruptcy Case, Grantor, contested the filing and made the subject of an adversary proceeding in the Bankruptcy Court, defined below);
recording of the Deed by Grantee, and Grantee asserted that the filing and recording of the Deed was valid and enforceable;

Formatted: Font color: Black

Formatted: Font color: Black

WHEREAS Grantor filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Texas ("Bankruptcy Court") on October 29, 2021 (Case no. 21-31954-hdh11) wherein Grantor disputed the right of Grantee to record the Deed-in-Lieu and alleged that such recording was improper;

WHEREAS Grantor has retained sole and exclusive possession of the Property at all times and Grantee never occupied nor took possession of the Property; and

WHEREAS Grantee and Grantor have agreed as ordered by the Bankruptcy Court by Order signed December 10, 2021 (Dkt 64), as amended on March 17, 2022, for (Dkt 940) (the "**Agreed Orders**"), that Grantee toshall rescind and avoid the Deed-In-Lieu, which shall be retroactive and effective as of October 29, 2021 upon effectuation of all conditions precedent set forth in the Agreed Order, and acknowledging and agreeing that no grant, sale, bargain, transfer, or conveyance of the Property occurred to the same extent as if the Deed-In-Lieu had never been executed or recorded.

NOW THEREFORE Grantor and Grantee hereby incorporate by reference the recitals above, and **HEREBY RESCIND AND AVOID** in full, ***ab initio***, the execution, delivery, granting, and recording of the Deed-In-Lieu and any and all grants, bargains, sales, transfers, and conveyances related to the Property otherwise effected in the hereby rescinded Deed-In-Lieu, including any and all restrictions made therein, are HEREBY **EXPRESSLY RESCINDED** in full, ***ab initio***.

Further, as a result of such rescission, ***ab initio***, the parties hereto hereby expressly covenant, confirm, and agree that the lien(s) in favor of Grantee encumbering the Property prior to the recordation of the Deed-In-Lieu rescinded hereby, namely:

(a) that certain Secured Promissory Note dated September 20, 2019 (the "Note"), in the original principal amount of $32,500,000, payable by the Grantor, as maker, to the order of Original Lender, as assigned to HNGH, the current payee and holder of the Note, and

(b) the lien on and security interest against the Property created by that certain Deed of Trust, Security Agreement and Fixture Filing dated September 2920, 2019, and recorded on September 23, 2019 as Document # ______________ instrument number 201900253450 in the real property records of Dallas County, Texas, (the "First Lien Deed of Trust");

Formatted: Font: Not Bold

**SHALL BE AND ARE HEREBY REINSTATED** and did not merge into the greater fee estate of the Grantee upon the recordation of the Deed-In-Lieu rescinded hereby.

Grantee represents, warrants, and affirms (i) that it never occupied nor took possession of the Property; (ii) that it has not caused or permitted the Property to be encumbered in any way except which have otherwise been fully released as recorded in the property records of Dallas County, Texas; (iii) that it has no claims related to the Property except as set forth herein through reinstatement of its Note and First Lien Deed of Trust; (iv) and that upon rescission it ~~has~~shall have acquired no rights, title, or interests of any kind in the Property other than the reinstatement of its Note and First Lien Deed of Trust in accordance with the Agreed Orders.

The effect of this rescission shall be as if any conveyance, transfer, sale, bargain, or grant of the Property by way of the Deed ~~in Lieu~~ never happened and Grantor and Grantee and as such, the Deed ~~in Lieu~~ is void and of no force and effect, from the beginning.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, Grantor has executed this AGREED RESCISSION OF SPECIAL WARRANTY DEED on the____ day of ________________ 2022.

**2999TC ACQUISITIONS, LLC,**
a Delaware limited liability company
formerly known as MO 2999TC, LLC

By: ____________________________
Name: Timothy Barton
Title: President

STATE OF TEXAS

COUNTY OF _______________

BEFORE ME, the undersigned Notary Public, on this day personally appeared Timothy Barton, known to me to be the person and officer whose name is subscribed to the foregoing instrument on behalf of 2999TC Acquisitions, LLC, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, as the act and deed of said limited liability company and in the capacity therein stated, and furthermore represents he has such authority.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of_____________ 2022.

_________________________
Notary Public in and for the State of _______________
My Commission Expires: ________________

IN WITNESS WHEREOF, Grantee has executed this AGREED RESCISSION OF SPECIAL WARRANTY DEED on the____ day of _________________ 2022.

**HNGH TURTLE CREEK, LLC**
a Delaware limited liability company

By: ______________________________
Name: ______________________________
Title: ______________________________

STATE OF TEXAS

COUNTY OF ________________

BEFORE ME, the undersigned Notary Public, on this day personally appeared ____________________known to me to be the person and officer whose name is subscribed to the foregoing instrument on behalf of HNGH Turtle Creek, LLC, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, as the act and deed of said limited liability company and in the capacity therein stated and furthermore represents he and it has such authority, as the successor in interest of the Original Lender (as defined hereinabove), and the sole owner and holder of the Note and associated liens.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of______________ 2022.

___________________________
Notary Public in and for the State of ________________
My Commission Expires: _________________

Case 21-31954-hdh11 Doc 128-1 Filed 05/31/22 Entered 05/31/22 13:... Page 35 of 88

EXHIBIT A
PROPERTY DESCRIPTION

BEING a tract of land situated in the James A. Sylvester Survey Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an Addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Deed Records, Dallas County, Texas.

# EXHIBIT "5"

# PAYOFF STATEMENT

**HAPPY STATE BANK**
A DIVISION OF CENTENNIAL BANK
701 S. Taylor, LB 120, Amarillo, Texas 79101
Ph. 806-358-5110

REQUEST DATE: 5/27/2022
RECEIVED BY: ☐ Mail ☑ E-mail ☐ Facsimile

RESPONSE DATE: 5/31/2022
SENT BY: ☐ Mail ☑ E-mail

TO: Happy State Bank

ATTN: Julie Blakely

FROM: Tammy Blake
Address: 701 S Taylor LB 120 Amarillo, TX 79101
E-mail Address: tblake@happybank.com
Fax No.: (806) 356-4263

## LOAN INFORMATION

BORROWER: HNGH TURTLE CREEK LLC

COLLATERAL ADDRESS OR LEGAL DESCRIPTION: 2999 Turtle Creek Boulevard
CD 6037007306

LOAN NO.: 4000017910 NEXT PAYMENT DUE: 6/4/2022

## AMOUNT DUE

CLOSING DATE: 5/31/2022

THIS STATEMENT REFLECTS THE TOTAL AMOUNT DUE UNDER THE TERMS OF THE NOTE/SECURITY INSTRUMENT THROUGH THE CLOSING DATE STATED ABOVE. If this obligation is not paid in full by this date, then you should obtain from us an updated payoff amount before closing.

Total Principal, Interest, and other amounts due under the Note/Security Instrument:

| | |
|---|---|
| Principal Balance: | $ 26,194,484.99 |
| Interest through 5/31/2022: | $ 102,776.97 |
| Late charges: | $ |
| Less insurance rebate: | $ |
| Processing Fee: | $ 35.00 |
| OTHER: | $ |
| **TOTAL AMOUNT DUE:** | $ 26,297,296.96 |

Funds received after 5/31/2022 will be subject to an additional $ 3820.03 of interest per day. FUNDS MUST BE RECEIVED BY 3:00PM FOR SAME-DAY PROCESSING. PAYOFFS ARE NOT POSTED ON WEEKENDS OR HOLIDAYS. INTEREST WILL BE ADDED TO THE ACCOUNT FOR THESE DAYS.

## WHERE TO SUBMIT PAYOFF FUNDS

**WIRE:** **Happy State Bank**
**100 E. Main, P.O. Box 68**
**Happy, Texas 79042**
**Ph. 806-558-2265 Fax 806-558-2214**
**ROUTING NO.: 111310870**

**MAIL/DELIVERY:** **Happy State Bank**
**Attn: Loan Administration Payoffs**
**701 South Taylor, LB 120**
**Amarillo, Texas 79101**

**Release of Lien Processing:**

☑ Happy State Bank **will NOT** prepare the release of lien. Please prepare release of lien and forward for signature to 701 S. Taylor, Attn: Loan Operations, LB 120, Amarillo, TX 79101. Please include HSB loan number on the Release or attach payoff form that was provided.

☑ This Note/Security Instrument is due for payment on 6/4/2022. If payment is not received within ____ days of the current payment due date, a **late charge** of $____ will be assessed. Please add that amount to the payoff total.

☐ This is an **Adjustable Rate Mortgage**. Under the terms of this loan the next **Change Date** for the interest rate charged is ________. We will only issue a payoff good through the next Change Date. If the closing date is past the next Change Date an updated Payoff Statement from us will be required.

☐ **Escrow Disbursement Amounts & Dates:**

| | | |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |

## LEGAL NOTICES

| | | |
|---|---|---|
| TEXAS FINANCE CODE § 343.106 REQUIRES PAYOFF STATEMENT CONTAIN CLOSING DATE AND DATE THROUGH WHICH PAYOFF AMOUNT IS VALID. THESE REQUIREMENTS CANNOT BE DELETED FROM PAYOFF STATEMENT. | ANY AMOUNT HELD IN ESCROW AT CLOSING WILL BE SETTLED IN ACCORDANCE WITH APPLICABLE FEDERAL LAW. | TEXAS FINANCE CODE § 343.106 REQUIRES THE IMPLEMENTING RULE TO ALLOW MORTGAGE SERVICERS AT LEAST SEVEN (7) BUSINESS DAYS FROM THE DATE OF RECEIPT OF PAYOFF REQUEST TO RESPOND TO A REQUEST MADE UNDER THE STATUTE. |

# EXHIBIT "6"

**From:** Julie Lyssy <jlyssy@senderatitle.com>
**Sent:** Tuesday, May 31, 2022 11:22 AM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jeanie Acord <jacord@senderatitle.com>
**Subject:** RE: 2999TC Acquisitions Closing - HSB Payoff Statement [IWOV-iManage.FID2137592]

Joyce,

I still need the Assignment from Axos Bank to 2999 Turtle Creek LLC.

Julie Lyssy,
Escrow Officer
**SENDERA TITLE**
**1800 Valley View Ln. # 160**
**Farmers Branch, Texas 75234**
jlyssy@senderatitle.com
Tel 972-428-2855
Fax 972-428-2901

**WARNING – FRAUDULENT FUNDING INSTRUCTIONS: Email hacking and fraud are on the rise to fraudulently misdirect funds. Please call your escrow officer immediately using contact information found from an independent source, such as the sales contract or internet, to verify any funding instructions received. We are not responsible for any wires sent by you to an incorrect bank account.**

**CONFIDENTIALITY NOTICE:**
The information contained in this message is privileged and confidential; intended only for the use of the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify me and you are hereby instructed to delete all electronic copies and destroy all printed copies.

# EXHIBIT "7"

PLN THE PRIVATE LENDER NETWORK

9050 Capital of Texas Hwy. Ste. 100
Austin, TX 78759
512.637.2891

May 31, 2022

To Khudabuksh Walji

Law Office of K. Walji, P.C.

By Email: k. walji@waljilaw.com

Lack of Satisfactory Documentation to Clear Title

for 2999 Turtle Creek Blvd, Dallas, Texas 75219

Mr. Walji,

While we intended to close and fund this loan in an expedited manner, from an underwriting standpoint, we could not properly proceed with this loan given the ambiguity in title. Per our counsel, the Special Warranty Deed was in defect and the loan assignment documents were and still are not available. As such, there was no possibility to close the loan by May 30, 2022. Only once an executed recission deed, as provided, is in place and we have received the loan collateral assignment documentation, can we properly document there are no pending title concerns.

Assuming these issues are to be resolved today (May 31st, 2022) and we have received confirmation from the title company, our underwriting department will require five (5) business days to close and fund the transaction for $40,882,500 plus costs and fees as per our Term Sheet.

Finally, our underwriting stated that the May 18, 2022, Court Order has a 14-day appeal period, and that would be after May 30, 2022, i.e., June 1, 2022, and thus May 30, 2022, could not have been possible to satisfy our underwriter.

Feel free to contact me should you have any questions.

Regards,

Garrison Kickham

Garrison Kickham - Managing Director
512.375.0842
9050 Capital of Texas Hwy, Suite 100
Austin, TX 78759

# EXHIBIT “8”

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>2999TC ACQUISITIONS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 21-31954-hdh |

## DECLARATION OF TIMOTHY BARTON

1. "My name is Timothy Barton. I am over the age of 18 years, of sound mind, and am competent and otherwise qualified to make this Declaration. I have personal knowledge of the matters stated herein and they are all true and correct.

2. I am the president of 2999TC Acquisitions, LLC, the debtor in the above-referenced case (the "Debtor"). During the case I have acted as the Debtor's primary decision maker and manager of operations.

3. Debtor sought to resolve its disputes with HNGH Turtle Creek, LLC ("HNGH"), Vipin Nambiar and HN Green Hollow Capital Partners, LLC pursuant to that certain Agreed Order [Doc. 64] Regarding Motion to Lift Stay [Doc. 10], Motion to Dismiss [Doc. 9], Motion for Sanctions [Doc. 15] and Motion to Enforce Stay [Doc. 14], signed by the Court December 10, 2021 (the "**Agreed Order**", constituting a "**Contracted Settlement Agreement**", and as such, and at times herein so called).

4. HNGH has failed to do all that it needs to do to satisfy its obligations under the Contractual Settlement Agreement and Agreed Order thus frustrating the Debtor's ability to perform thereunder.

5. HNGH's required performance is spelled out in detail in the letter sent by the Debtor's counsel to HNGH's counsel on May 30, 2022 attached hereto as **Exhibit "1"** and incorporated herein by this reference as if set forth in full for all purposes.

6. In addition, I believe that HNGH, together with its control person(s), understood to be members of one of the most prominent and powerful families in the State of Texas, and certainly the Dallas business community, have sought to and indeed interfered with the Debtor's actual and prospective contractual relations with one or more third party debt and/or equity sources, with the intent and effect of frustrating and otherwise precluding the Debtor's ability to perform thereunder; as more fully set forth herein below.

7. Despite the potential contractual breaches and interference that the Debtor contends exist, it has arranged both contractual (and prospective contractual) commitments for the necessary debt and or equity funds to source the Payoff Amount; provided that (a) HNGH delivers to the title company as escrow agent a rescission deed in form and substance so that Debtor may in turn deliver good and marketable title to the real property located at 2999 Turtle Creek Blvd. located in the City of Dallas, Texas (the "Property"), for review and approval by their respective real estate counsel prior to funding, and (b) HNGH additionally delivers to the title company as escrow agent other items customarily requested and required in commercial real estate transactions such as this in Dallas County, Texas, including but not limited to a Bills Paid Affidavit, requested and required to satisfy the title insurer and the debt and or equity sources that there have been no intervening liens or potential "gap" lien claimants, and/or (c) HNGH agrees to reasonably extend (or the Court order such an extension of) the Payoff Deadline to allow for time to resolve the above, and for one particular lender, namely First Guaranty Bank (whose loan committee has approved to make a loan to substantially fund the Payoff Amount) to complete its requested third party review of status of

title (*in light of the previously recorded Deed-In-Lieu recording by HNGH that is a subject of this proceeding*).

8. When recently requested for such a rescission of the Deed-In-Lieu instrument, that is the subject hereof, HNGH, by and through counsel, finally agreed to provide a form of deed that is at least somewhat more consistent with the terms of the Agreed Order, and applicable state law. However, HNGH, has to date refused to extend the Payoff Date to provide the time now needed to complete review of the revised form, additional time made necessary in part by (i) HNGH's failure to make the required deliveries in advance, (ii) HNGH's potential breach of the Agreed Order, and (iii) HNGH's potential interference.

9. Attached as **Exhibit "2"** is a copy of the Term Sheet as approved by First Guaranty Bank. The loan officer of First Guaranty Bank recently had a discussion with HNGH, by and through counsel, in which such loan officer confirmed his bank's commitment to make the loan, and its need for additional time to complete its third party review of title (which based on Exhibit "1" is a mess, due in part to the filing of the contested Deed-In-Lieu) to which HNGH responded, that it would only allow additional time if the Court were to order such. HNGH's counsel also told the bank officer that the Debtor and its representatives were bad actors which did not help facilitate the closing of the deal or the obtaining of a loan.

10. Exhibit "1" describes the additional items to be delivered by HNGH to the title company as escrow agent as customarily requested and required in commercial real estate transactions such as this in Dallas County, Texas (the "HNGH Deliverables"), including but not limited to the above referenced Bills Paid Affidavit, as well as other instruments typically required by the title insurer in order to satisfy the title insurer that all Schedule C Requirements are satisfied, as a condition precedent to the issuance of clear and marketable title to the purchaser, and further

to confirm the requisite authority of the parties executing the instrument(s) in satisfaction of the Requirements, and the closing documents generally. In response thereto, HNGH, by and through counsel, has requested that such Deliverables be limited to those it believes are necessary to close this transaction. The parties agreed to work together to facilitate a payoff to HNGH through the vehicle of a new loan.

11. HNGH's prior failure to deliver a rescission of the Deed-In-Lieu in conformity with the Agreed Order has caused the desired Closing to be delayed.

12. HNGH's failure to deliver any one or more of the HNGH Deliverables to the title company as escrow agent as customarily requested and required in commercial real estate transactions such as this in Dallas County, Texas, has caused the desired Closing to be delayed.

13. HNGH's failure to deliver a release of a certain Collateral Transfer of Note and Lien by HNGH to Happy State Bank, in form reasonably requested by Debtor, has caused and is continuing to cause the desired Closing to be delayed.

14. Furthermore, as part of an earlier attempt to resolve the disputes herein, HNGH agreed to dismiss a pending state court action brought against me as one of the principals of the Debtor. To date that dismissal has not yet been filed by HNGH, in contravention of such earlier agreement, and moreover, with the evident intent and effect of further delaying or precluding the Debtor from sourcing the Payoff Amount and performing its obligations under the Agreed Order, as the mere pendency of such suit constitutes a cloud over me and my ability to source the anticipated debt and or equity funds; which failure by HNGH has caused the desired Closing to be delayed.

15. I and the Debtor believe that HNGH has on one or more occasions made false and otherwise actionable statements to third parties, which with whom Debtor had actual and

prospective contractual relations so as to source the necessary third party debt and/or equity, with the intent and/or effect of frustrating and otherwise precluding Debtor's ability to perform, including lender(s) who are now or were at one time committed to advance a substantial amount of debt and/or equity funds in order to effectuate the Payoff Event respecting the Property, and investor(s) who are now or were at one time committed to advance a substantial portion of the equity necessary to effectuate the Payoff Event respecting the Property.

16. Those statements have at times included that the Debtor and associated principals have made false statements to them, are not trustworthy, cannot and will not perform their contractual obligations, are not credit-worthy, will fail with respect to the Property, that such person should not do business with the Debtor and related persons, but rather simply wait until HNGH and related persons have taken title to the Property and then, instead do business with HNGH respecting the Property, and other statements each of which made with the intent to interfere with such recipient's actual and or prospective contractual relations with Debtor, and each with the intent and/or effect of frustrating and otherwise precluding Debtor's ability to perform, and each without legal excuse or justification.

17. But for such statements, the Debtor would be in a position to more fully perform its obligations under the Agreed Order. More particularly, the Debtor has or had an actual contractual relationship and/or a reasonable probability that i\t would have entered into a business relationship, which was interfered with by unlawful acts by HNGH such that prevented the relationship from occurring; and the Debtor has suffered actual harm or damages as a result of HNGH's conduct.

I declare under penalty of perjury that the statements contained herein are within my personal knowledge and are true and correct."



Timothy Barton

**JOYCE W. LINDAUER ATTORNEY, PLLC**
Attorney & Mediator
1412 Main Street, Suite 500
Dallas, Texas 75202
Email: joyce@joycelindauer.com

Telephone No.
(972) 503-4033

Facsimile No.
(972) 503-4034

May 30, 2022

Via Email
To John Kane

**Re: File 2201814-VVJA 2999 Turtle Creek Blvd, Dallas, TX Closing Documents**

John, please confirm the following matters to ensure that title to the Property is clear, and particularly, not encumbered by any of the filings by the lender parties, and as such must be delivered or caused to be delivered by your client, HNGH (and in some instances, possibly third parties):

**1.0 <u>THE RECISSION OF DEED (fka SWD)</u>**

1.1 Rescission of Deed

1.2 In connection with the above, a standard form Bills Paid and Parties in Possession Affidavit of HNGH.

**2.0 <u>THE DEED OF TRUST</u>**

2.1 Release of the Deed of Trust, by HNGH;

a. Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019, by MO 2999TC, LLC in favor of Michael B. Massey, as Trustee for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253450 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

2.2 Related to the immediately above, a Release of the prior collateral assignment of the Note and Deed of Trust and all Loan Documents fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the Note and Deed of Trust or other Loan Documents that were collaterally assigned (including Assignment of Leases and Rents);



**EXHIBIT "1"**

2.3 Release of the prior collateral assignment of the Note, Deed of Trust, and Assignment of Leases and Rents (3 documents) fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the Note and Deed of Trust;

2.4 Release of Assignment of Leases and Rents dated as of September 20, 2019, by MO 2999TC, LUC for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253451 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

2.5 Release of prepaid interest agreement to Madison (and release by HNGH if it was assigned).

3.0 **UCC FILING(S)**

3.1 Release of the UCC, by HNGH (county and state)

3.2 Related to the immediately above, a Release of the prior assignment of the UCC fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the UCC filing;

3.3 Termination of Loan participation agreement, executed by each of the parties thereto, and or other confirmation that the Loan participation agreement has been terminated, and is no longer of any force or effect

3.4 Release of whatever agreement Axos signed to permit the participation agreement (See excerpt from an email during negotiations between Madison and HNGH at the end)

3.5 Release of the prior collateral assignment of the UCC fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the UCC filing;

4.0 **NOTE**

4.1 The original Note, marked paid in full; delivered to title company to make sure original is provided. .

5.0 **AUTHORITY OF LENDER ENTITIES**

5.1 In connection with the above, Secretary or other Officer Certificate of HNGH, including copies of the governing documents of HNGH, and including consent resolutions of the director and or managers, and the consent of the shareholders and or members, to the execution and delivery of each of the above referenced closing documents,

5.2 Ratification of all prior acts and Consent of HN Green Hollow Capital Partners executed by Jim Glasgow who is the manager – he is the one that executed the participation agreement, so anything related to that agreement needs to especially come from him in addition to HN Capital Partners, LLC.

5.3 In connection with the above, Secretary or other Officer Certificate of Axos, including copies of the governing documents of Axos, and including consent resolutions of the director and or managers, and the consent of the shareholders and or members, to the execution and delivery of the Axos documents;

5.4 In connection with the above, Secretary or other Officer Certificate of Happy State Bank, including copies of the governing documents of Happy State Bank, and including consent resolutions of the director and or managers, and the consent of the shareholders and or members, to the execution and delivery of each of the above referenced closing documents executed by HSB; together with confirmation, together with confirmation that Happy State Bank (a) is and remains the holder of the collateral assignment from HNGH and that Happy State Bank has not further sold or encumbered the collateral itself, which they apparently had the right to do under the Collateral Assignment), and (b) authorized and consented to and or ratified HNGH's execution and delivery of the Order, as well as the Rescission of Deed.

5.5 Everything executed by HNGH should be executed by HN Green Hollow as the sole member or otherwise consented to by sole member and not just executed by Vipin

5.6 Need assurance Madison assigned the guaranties to HNGH as they asserted.

5.7 Also, HNGH was intervenor in the guaranty case so Madison is still a party - both will have to dismiss w prejudice.

5.8 Check if Madison assigned all the loan docs to HNGH not just the recorded documents.

5.9 Look at the collateral assignment to HSB to be sure HNGH even had the authority to do what they did including agreeing to the BK order.

**6.0 <u>LITIGATION AND MATTERS</u>**

6.1 Dismissal of the Guaranty litigation, with prejudice provided to the Guarantor

**7.0 <u>GENERALLY</u>**

7.1 Sequencing Agreement, and or Joint Closing Instructions, respecting the effect and timing each of the above instruments, to be signed by HNGH, Debtor (Seller), and purchaser, either directly or by and through counsel.

7.2 If any potential lenders/investors on our side are exposed or names are released, John Kane to sign agreement that neither he nor HNGH have communicated with them.

John, please specifically confirm which of the above items have already been delivered to the Title Company (and provide me with copies of such please for review), and when the balance of the items will be delivered, in advance of the closing.

Thank you.

Joyce Lindauer

Cc: Client

FIRST GUARANTY BANK Member FDIC

HOME OF FANATICAL BANKING

# COMMITMENT LETTER

TO: Enoch Investments, LLC
c/o Randy Marx, Esq
The Marx Firm, LLC
2999 Turtle Creek Blvd.
Dallas, Texas 75219
randy@themarxfirm.com.

The foregoing Commitment represents the representation of First Guaranty Bank that it has committed to lend on the following terms:

| | |
|---|---|
| Borrower: | Enoch Investments LLC |
| Guarantors: | The TLB 2012 Irrevocable Trust Dated March 16, 2012; Timothy Lynch Barton; Maximilien Enoch Barton; D4FR LLC; D4DDS LLC; D4IN LLC; D4OP LLC |
| Purpose: | Loan to Purchase 2.473 Acres of Land and Office Building located at 2999 Turtle Creek Blvd, Dallas, TX 75219 |
| Loan Amount: | $33,840,000 |
| Collateral: | Perfected First Lien on approx. 2.473 acres of land and improvements at 2999 Turtle Creek Blvd, Dallas, TX 75219 |

**Terms for Commercial Real Estate Loan:**

| | |
|---|---|
| Rate: | Variable Rate using Wall Street Journal Prime Rate Currently at 4.00% + 1% Margin and the rate is floating daily; Floor Rate of 5% |
| Amortization: | 6 months IO followed by 240 Months P&I amortized |
| Repayment term: | 6 Months Interest Only Payments. 240 Months Principal and Interest Payments after initial Interest Only Period. Monthly Escrow of Taxes and Insurance |
| Fees: | 1% Origination Cash at closing; 2% Origination Fee if financed; $350 Document Fee |
| Prepayment: | 3% Prepayment Penalty |



EXHIBIT "2"

**Closing Checklist:**

Pre Closing:

Verification of Funds used for Equity Injection

Satisfactory receipt of documentation showing that any outstanding liens and d judgements reported on background check for Timothy Barton have been cleared/released

Signed and Dated Personal Financial Statement for Guarantor(s)

Attorney Review of Borrower Ownership Structure, including authority, Trust powers, Trustee Duties, and Relationship to the Borrowing Entity

Full Title Exam on Building and Land; Third Party Attorney Review of Transaction

Recurring Covenants:

Quarterly Company Prepared Financial Statements for Enoch Investments LLC to be provided to FGB

Audited Annual Financial Statements for Enoch Investments LLC to be provided to FGB

Estimated Closing Date:

The estimated date of closing is 10 (ten) business days from the Acknowledgement Date of this Commitment, subject to any additional time identified in order to obtain good title, insurance, legal review, or other common and ordinary needs identified by First Guaranty Bank to complete closing.

[[[[REST OF THIS PAGE INTENTIONALLY BLANK]]]]

## *SIGNATURE PAGE*

**FIRST GUARANTY BANK**

BY: /s/ Jordan Montgomery Lewis___

Its: _Texas Area President_________

_Jordan Montgomery Lewis__________

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS COMMITMENT. BORROWER ACCEPTS AND AGREES TO THE TERMS OF THE COMMITMENT AS OF ____5/27/22___________________.

**BORROWER**: Enoch Investments LLC

By: ________________________ (Signature)

Its: ________________________ (Title)

________________________ (Printed Name)

Date: ________________________

# EXHIBIT "9"

Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **2999TC ACQUISITIONS, LLC,** | § | **CASE NO. 21-31954-hdh11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

**DECLARATION OF JOEY HOWELL**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1. My name is Joey Howell, I am over the age of twenty-one, of sound mind and capable of making this declaration.

2. I have personal knowledge of the statements contained herein.

3. I, as the manager of Silverlake Capital, LLC, have been working with a number of debt and or equity sources in order to assist the Debtor in obtaining the Payoff Amount required pursuant to the Court's Order. My and our efforts in such regards has been materially delayed due in part to the earlier filing of a Deed-In-Lieu which has clouded title to the Property.

4. Particularly, that and the timing of the 05/18/2022 Order approving the plan, have occasioned one of my clients, namely Jeff VanNote, an officer and a principal owner of ReveriFinancing PM LLC, who had previously committed and or was then anticipated to commit

substantial funds in the amount of $30,000,000 toward the Payoff Amount, expressed his inability to complete his underwriting of the Property, and close on the loan before the Payoff Deadline, as he was delayed, and indeed stopped, by the potential delay occasioned by the fact that the Payoff Deadline was actually (apparently, inadvertently) set within 14 days of the 05/18/2022 Order most recently approving the Debtor's plan, as the Payoff Deadline was within the possible appeal period, ending 06/01/2022, as his title company, Chicago Title, had told him that they could not issue a clean title policy until 06/02/2022, after the possible appeal period has expired. See **Exhibit 1**, being a copy of the signed ReveriFinancing term sheet. See also, **Exhibit 2**, the then title commitment issued to ReveriFinancing. See also, **Exhibit 3**, correspondence from Mr. VanNote evidencing this concern, and inability to move forward at that time.

5. Additionally, upon information and belief, our efforts in such regards has been materially delayed as it appears that HNGH has failed to do all that it needs to do to satisfy its obligations under the Agreed Order, so that we could have an opportunity to review such in advance of the closing. Though some of the materials required have been, I understand, delivered over the holiday, and or are being belatedly delivered at this time, the fact is that neither I, nor my third-party debt and or equity sources have had, or will have time, today to adequately review those belatedly received materials.

6. Finally, my and our efforts, have been materially delayed as, upon information and belief, it appears that HNGH, have sought to and indeed interfered with the Debtor's actual and prospective contractual relations with one or more third party debt and/or equity sources, with the intent and effect of frustrating and otherwise precluding the Debtor's ability to perform thereunder; by making negative statements to third parties, which with whom Debtor had actual

and prospective contractual relations so as to source the necessary third party debt and/or equity, with the intent and/or effect of frustrating and otherwise precluding Debtor's ability to perform.

7. Sendera was retained by 2999TC Acquisitions, LLC ("2999TC") to serve as escrow agent and cause the issuance of a title insurance policy with regard to the closing of the transaction between the parties related to approximately 2.47 acres of undeveloped land located at 2999 Turtle Creek Blvd. located in the City of Dallas, Texas. (the "Property").

8. In order to close the above-described transaction I know the lenders I am working with who have provided loan commitments are requiring the following documents be placed into escrow

i. Release of the Deed of Trust, by HNGH;

a. Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019, by MO 2999TC, LLC in favor of Michael B. Massey, as Trustee for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253450 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

ii. Related to the immediately above, a Release of the prior collateral assignment of the Note and Deed of Trust and all Loan Documents fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the Note and Deed of Trust or other Loan Documents that were collaterally assigned (including Assignment of Leases and Rents);

iii. Release of the prior collateral assignment of the Note, Deed of Trust, and Assignment of Leases and Rents (3 documents) fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the Note and Deed of Trust;

iv. Release of Assignment of Leases and Rents dated as of September 20, 2019, by MO 2999TC, LUC for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253451 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

v. Release of the UCC, by HNGH (county and state) respecting the subject Property;

vi. Related to the immediately above, a Release of the prior assignment of the UCC fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the UCC filing;

vii. Release of the prior collateral assignment of the UCC fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the UCC filing; and

viii. The original Note, marked paid in full; delivered to title company to make sure original is provided.

These documents are necessary so the new lender can close a loan and be assured it has good clean and clear title to the assets that will secure its debt.

9. My name is Joey Howell, my date of birth is 01/24/1954, and my address is 622 Sorita Circle, Heath, Texas 75032, United States of America.

10. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on May 31, 2022.

Joey Howell
Joey Howell, Declarant

Attachments:

Exhibit 1 Term sheet

Exhibit 2 Title commitment

Exhibit 3 Email

Exhibit 1 Term sheet

reverifinancing

34 Prospect Street
Jersey City, NJ 07307

May 20, 2022

***VIA ELECTRONIC MAIL***

Tim Barton
c/o K. Walji
TCC 2002, LLC
2999 Turtle Creek Boulevard
Dallas, Texas 75219

**Re: Potential Financing Proposal for 2999 Turtle Creek Blvd, Dallas Tx, 75219**

Dear Mr. Barton & Mr. Walji:

The Prospective Lender is pleased to advise the Borrower Parties (defined below) of the terms and conditions set forth in this letter (this "Proposal Letter") upon which Prospective Lender would consider making available to the Borrower a senior secured short-term mortgage Loan not to exceed FORTY-SEVEN MILLION DOLLARS AND ZERO CENTS ($47,000,000.00) to be collateralized by, *inter alia*, the Property, and guaranteed by the Guarantors, and a pledge of 100% of the ownership interests in Borrower (the "Loan"; and together with the transactions related thereto, the "Transaction").

1. Summary of Certain Proposed Terms and Conditions. The following is an outline, in summary format, of certain proposed terms and conditions of the proposed Transaction and does not purport to include or summarize all terms and conditions that would be expected to be contained in definitive Loan documentation for the proposed Transaction and is subject to change, modification, amendment, supplementation, and withdrawal by the Prospective Lender (defined below), in its sole and absolute discretion, in whole or in part:

| | |
|---|---|
| **Loan Borrower:** | TCC 2022, LLC, a Delaware Limited Liability Company, a single purpose, bankruptcy remote entity acceptable to Prospective Lender ("Borrowing Entity") |
| **Property:** | 2999 Turtle Creek Boulevard, Dallas, Texas 75219 |
| **Loan Guarantors:** | Tim Barton and any other individual owner with a 10% or greater ownership stake in the Borrowing Entity (the "Guarantor" or "Guarantors"; together with the Borrower, the "Borrower Parties"). The Guaranty shall have all California Civil Code 2856 waivers of security first rule, one action rule, and other standard waivers. Guarantor shall consent to personal jurisdiction in California or New York at Lender's choice in addition to Texas. Lender shall have the choice of forum for any enforcement of the Guaranty. |
| **Prospective Lender:** | ReveriFinancing pm LLC or an affiliate or designee of ReveriFinancing pm LLC. |
| **Loan Documentation:** | The Loan will be subject to the terms and conditions set forth in definitive Loan documentation, including, without limitation, a loan agreement, a mortgage, a note, a security agreement, a payment guaranty, an assignment of leases and rents, an environmental indemnity agreement, a pledge of 100% of the ownership interests in Borrower, non-disturbance, and attornment agreements (as required by the Prospective Lender), lien filings, and other agreements, instruments, and documents, all of which will be acceptable to Prospective Lender and its legal counsel (collectively, the "Loan Documents"). |
| **Closing Date:** | The date on which the funding of the Loan occurs, which is anticipated to be one (1) week after completion of the Prospective Lender's due diligence (the "Closing Date"), with a Closing Date of no later than 5:00 pm CST on Friday, May 27, 2022. |
| **Loan Amount:** | Up to $47,000,000.00 |
| **Security:** | The subject Loan shall be secured by; (i) a First Mortgage on Subject Property, (ii) An assignment of and security interest in all current and future leases, rents and other income related to the Property and (iii) UCC I - Liens on all personal property, equipment and fixtures, as well as a first priority pledge of 100% |

Case 21-31954-hdh11 Doc 141-17 Filed 05/31/22 Entered 05/31/22 17:30:25 Desc

of the ownership interests in Borrower. Additionally, the Operating Agreement of the Borrowing Entity shall be amended, in a manner acceptable to Prospective Lender, to provide that the Borrowing Entity shall not be able to additionally pledge, secure, lease or transfer the properties or equity interests until such time that the Prospective Lender is paid in full. No additional senior, secondary or mezzanine financing will be permitted during the term of the Loan, either secured or unsecured, without Prospective Lender's consent. Any foreclosure of the pledged membership interests may be conducted in New York or California consistent with the New York or California uniform commercial code. Any action to enjoin a foreclosure of the membership interests shall only be brought in New York or California upon completion of the closing docs.

**Use of Proceeds:** Pay off 1st Lien Holder (approx. $41,000,000), Chapter 11 Bankruptcy Trustee, the Unsecured Creditors under the Bankruptcy Plan and Property taxes for 2022 (approx. $1,000,000), with the remainder used to fund the Interest Reserve (defined below) and other costs and fees set forth herein.

**Interest Reserve:** Borrower shall fund at Closing a 12 month interest reserve on the Closing Date. Borrower shall pay the monthly interest each month after the Interest Reserve has been used.

**Origination Fee:** An amount equal to 4-percent (4.00%) of the Loan Amount, which shall be earned in full, non-refundable, and due and payable on the Closing Date.

**Interest Rate:** The Loan shall accrue interest at a twelve percent (12.00%) per annum (interest only), which shall be payable monthly and calculated based on a 360-day year. In the event of a Default, the Default rate shall be 17% which is the base rate plus 5%.

**Maturity:** On the date that is twelve (12) months after the Closing Date (the "Maturity Date"), the outstanding principal amount of the Loan, plus all accrued and unpaid interest, and all other amounts owed to the Prospective Lender with respect to the Loan shall be due and payable in full. All interest payments after the ) month following the Closing Date shall be paid in cash directly by the Borrower to the Prospective Lender. If there is a maturity default, a 5% maturity late fee shall be added to the principal balance.

**Other Debt:** None permitted.

**Title Insurance:** Lender shall have a first lien position guaranteed by Chicago Title as a condition of closing. Chicago Title to issue a 104.3 endorsement and lender's title policy.

**Prepayment:** Borrower may prepay, without penalty, any, or all of the outstanding balance of the Loan only after six (6) months following the Closing Date. If Borrower decides to prepay prior to 12 months, Borrower shall pay a 1% fee for early termination of the loan.

**Guaranty:** The Guarantor shall guaranty payment of 100% of the outstanding Loan, plus any accrued and unpaid interest, fees, and costs, real estate taxes, and all costs of enforcement of the Loan. Guarantor represents and warrants that there are no major credit issues. Guarantor shall provide 2020 tax returns and shall consent to a current credit report.

**Broker Fee:** Prospective Lender acknowledges that Jeff VanNote/Damian Albergo are the brokers of record on the transaction.

**Expense Deposit:** Payment in the amount of Twenty-Five Thousand Dollars ($25,000), shall be delivered to Prospective Lender simultaneously with the submission of this term sheet, to be applied towards Prospective Lender's underwriting expenses in connection with the Loan, including, but not limited to credit and background check and any other expenses incurred by Prospective Lender while conducting due diligence. Upon request, Borrower will immediately reimburse Prospective Lender for all such costs, including Prospective Lender's Legal Fees, which may exceed the Expense Deposit. If, after Borrower has satisfied all conditions precedent to the closing of the Proposed Loan, Prospective Lender fails to provide the Proposed Loan to Borrower, Prospective Lender shall return the expense deposit to Borrower (less processing fee, legal fee and any other such costs and expenses incurred by Prospective Lender) subject to Borrower's execution of Lender's standard release letter. If all terms and conditions are met (or Prospective Lender elects, in its sole discretion, to waive any such terms and conditions) then at the closing,

Prospective Lender shall contribute the Expense Deposit (less the processing fee and any such costs and expenses incurred by Prospective Lender) toward closing costs. In the event a closing does not occur, the Expense Deposit shall be retained by Prospective Lender as liquidated damages, in addition to any Break-up Fee, if applicable.

**Insurance:** The Borrower shall maintain at all times, and at the Borrower's expense, paid-up policies of liability, property damage, casualty, rent loss insurance, ordinance and law, pollution insurance, and all other insurance that may be required by the Prospective Lender. Upon the Closing Date, each policy of insurance shall name the Prospective Lender as first mortgagee, additional insured, and loss payee. In the event the Property is located in a flood hazard area, the Borrower shall also provide flood insurance naming the Prospective Lender as an additional insured and first mortgagee in the maximum available amount.

**Survey:** Borrower shall provide Prospective Lender a current as-built survey of the Property certified to Prospective Lender, the title insurer and such other parties as may be designated by Prospective Lender. The survey shall be in all respects acceptable to Lender in its sole discretion.

**Leases & Rents:** If there are any leases in existence affecting the collateral Property(s) at the time of the closing of the Loan, those leases must contain a satisfactory subordination clause whereby they are subject and subordinate in all respects to the lien of the Prospective Lender's mortgage. Additionally, Prospective Lender shall receive an assignment of and security interest in all current and future leases, rents and other income related to the Property(s). Lender will require executed estoppels. Prospective Lender shall have in its sole discretion the reasonable right to approve all future leases in it. Borrower to provide an estoppel signed by all tenants and a rent roll.

**Zoning Review:** Borrower shall provide Prospective Lender with a Zoning Review that will, among other items, confirm allowable buildable square feet under the Property's current zoning, as well as allowances, development rights, and restrictions.

**Environmental Review:** Borrower shall provide Lender with a Phase I, Phase II (if recommended in Phase I), or other environmental report satisfactory to Lender confirming there are no environmental issues or risks at Property.

**Power of Attorney:** The use of a Power of Attorney is not acceptable.

**Financial Reporting:** The Borrower and Guarantors agree to provide Lender with updated financial information, including but not limited to, copies of personal tax returns, personal financial statements, and tax returns of other ownership entities, as requested.

**Compliance:** This provision will survive the closing of the Loan contemplated herein and you shall have a continuing obligation to furnish any documents, forms, authorizations, releases, signatures, or any information related to the mortgage application or to the mortgage closing (collectively the documents). In the event of any mistake, omission form, or loss of any document, either by you or by Lender, whether before or after the closing, you shall cooperate fully with Lender, in correcting or resupplying such document(s).

**Due Diligence:** Prospective Lender's obligations hereunder are contingent on Prospective Lender completing, to its sole and absolute satisfaction, a complete review of the Borrower's financials (personal and corporate), the subject Property(s) and the surrounding market. At any time, Prospective Lender may elect in its sole and absolute discretion to terminate discussions in connection with the proposed financing transaction.

**Governing Law:** The Loan Documentation shall be governed by, and construed in accordance with, the laws of the State of New York (without regard to the choice of law rules thereof) and California for the Guaranty to the extent California law is more favorable.

**Loan Sale Cooperation:** The Prospective Lender reserves the right to, including, without limitation, participate, sell, or assign its interest (or any portion thereof) in the Loan (or any portion thereof), and the Borrower Parties agree to cooperate and to execute any documentation necessary to facilitate this.

**Other Conditions:** In addition to completion of Prospective Lender's due diligence as outlined above, Prospective Lender's obligations hereunder are contingent on satisfactory completion, in Lender's sole and absolute discretion; (i) site inspection, (ii) title review, (iii) survey review, (iv) review of borrower background and credit, (v) building permits and zoning approval review, (vi) title insurance policy acceptable to Lender, (vii) any other reasonable information necessary for Lender to perform due diligence in efforts to make the proposed Loan, and (viii) the Borrower's execution of Loan documents. The Borrower shall be responsible to pay all attorney's fees and costs incurred by Lender due to any dispute that arises in connection with this Agreement.

2. Confidentiality. The parties acknowledge and agree that this Proposal Letter, its existence, and its contents are confidential and proprietary and that damages could result to the Prospective Lender if such information is disclosed by the Borrower Parties to any third-party person. Accordingly, this Proposal Letter is being provided to the Borrower Parties on the condition that, except as required by law, this Proposal Letter, its existence, and its contents, in whole or in part, will not be disclosed by the Borrower Parties publicly or privately, except on a confidential basis to those individuals who are their officers, employees, or advisors, who have a need to know of such information as a result of their being specifically involved in evaluating the proposed Transaction under consideration, and who agree to maintain the confidentiality of such information, and then only on the condition that such information may not, except as required by law, be further disclosed. The Borrower Parties' obligations under this Section 2 shall survive any occurrence of the Termination Date (as defined hereinafter).

3. Exclusivity. Until such time as the Prospective Lender notifies the Borrower in writing that the Prospective Lender is fully committed and clear to close on the Transaction (the "Exclusivity Date"), the Borrower (including its affiliates, subsidiaries, and any of their respective directors, officers, employees, members, financial advisors, attorneys, accountants, or other representatives) may, directly or indirectly, (a) accept any proposal, letter of intent, offer, or other commitment from, or enter into any agreement with, any other person to consummate a competing transaction, or (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction. Should the Borrower enter into any final and binding agreement with another lender with respect to the Transaction prior to the Exclusivity Date, this shall constitute the immediate termination of the relationship between the Prospective Lender and Borrower set forth herein ("Termination" and the date such Termination occurs, the "Termination Date"). For the avoidance of doubt, once the Prospective Lender notifies the Borrower in writing that the Prospective Lender is fully committed and clear to close, the relationship between the Prospective Lender and Borrower becomes exclusive and the Borrower is prohibited from speaking to or otherwise engaging with any other lenders about the Transaction. This Section 3 shall be binding on the Guarantor and Borrower and their respective affiliates.

4. Indemnification. The Borrower Parties shall indemnify and hold harmless the Prospective Lender, its affiliates, and their respective officers, directors, employees, agents, advisors, auditors, attorneys, controlling persons, partners, participants, funding sources, and other representatives and advisors (each, an "Indemnified Person"), from and against all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements and other reasonable costs of investigation or defense, including, without limitation, those incurred upon any appeal), which may be instituted or asserted against or incurred by any such Indemnified Person in connection with, or arising out of, this Proposal Letter, the proposed Transaction, any due diligence or documentation related to the proposed Transaction, any actions or failures to act in connection with the due diligence or proposed Transaction, or any dispute, investigation, litigation, proceeding, or environmental matter related to the proposed Transaction. The Borrower Parties' obligations under this Section 4 shall survive the closing of the Loan and/or any occurrence of the Termination Date.

5. Costs. The Borrower Parties shall be responsible (whether or not the proposed Transaction is consummated) for the payment or reimbursement of all of the Prospective Lender's costs, fees, and expenses (including, without limitation, attorneys' fees and costs) incurred by the Prospective Lender in connection with this Proposal Letter, the proposed Transaction, the Prospective Lender's due diligence, and/or the preparation, negotiation, review, execution, administration, modification, waiver, or enforcement by the Prospective Lender of any document relating to the proposed Transaction, and a non-refundable Loan processing fee in the amount of $5,000 (collectively, the "Costs"). The Borrower Parties' obligations under this Section 5 shall survive any occurrence of the Termination Date.

6. Termination of Discussions. The Prospective Lender may, in its sole discretion, terminate discussions of the proposed Transaction for any reason or no reason whatsoever without liability (the date such Termination occurs, the "Termination Date"). In no event shall the Prospective Lender incur obligations with regard to the proposed Transaction unless and until the Prospective Lender executes and delivers definitive Loan documents reflecting those obligations.

7. Breakup Fee. There shall be no "breakup fee" upon the occurrence of any event causing the Termination of the parties' relationship under this Proposal Letter. Notwithstanding anything to the contrary contained in this Proposal Letter, in consideration of the significant time, cost and effort expended by Prospective Lender in connection with the proposed Transaction,

if either (x) Borrower and/or Guarantor shall breach the terms of Section 3 of this Proposal Letter, or (y) Borrower (or any affiliate thereof) and/or Guarantor shall elect to pursue financing with another party (other than Prospective Lender) or elect not to pursue financing with Prospective Lender before the end of the Exclusivity Period, then Borrower and Guarantor, jointly and severally, shall be liable for a breakup fee of 1% of Loan Amount (the "Breakup Fee"). The Breakup Fee shall be immediately due and payable by the Borrower Parties to Prospective Lender. The Borrower Parties' obligations under this Section 7 shall survive any occurrence of the Termination Date. The breakup fee shall only apply upon the unequivocally commitment by Lender to fund.

8. Assignment. This Proposal Letter shall inure to the benefit of the successors and assigns of the Prospective Lender but shall not be assignable (whether by merger, consolidation, succession, assignment, or otherwise) by the Borrower or Guarantor without the prior written consent of the Prospective Lender in each instance (and any purported assignment without such consent shall be null and void).

9. Counterparts; Governing Law. To facilitate execution, this Proposal Letter may be executed in as many counterparts as may be convenient or required. All counterparts shall collectively constitute a single instrument. A facsimile or electronic copy of this Proposal Letter shall be considered an original. This Proposal Letter shall be governed by the laws of the State of New York (without regard to the choice of law rules thereof).

10. Proposal Letter is Non-Binding. Due to the general nature of this Proposal Letter, it is agreed to and understood by the parties that the terms and provisions of this Proposal Letter are completely non-binding upon Prospective Lender and the Borrower Parties, except the foregoing Sections 2, 3, 4, 5, 6, 7, 8, & 9 hereof shall be binding on the Borrower Parties and shall survive any occurrence of the Termination Date.

11. Conditions Precedent. Closing and funding of the Loan will be subject to the satisfaction, as determined by the Prospective Lender in its sole and absolute discretion, of all conditions precedent set forth during due diligence.

The terms and provisions of this Proposal Letter are, except as expressly set forth in this Proposal Letter, non-binding and are intended solely for discussion purposes. This Proposal Letter does not represent a commitment (either express or implied) to provide financing and should not be relied on as an indication of the availability of the proposed financing. There is absolutely no obligation on Prospective Lender to issue a commitment or to make a Loan on the terms of this Proposal Letter or on any other terms. In the event that the Loan is funded by Prospective Lender, the terms and conditions contained in this Proposal Letter shall be superseded by the Loan Documents (as hereinafter defined), and the Loan Documents shall govern the terms and conditions of the Loan without reference to this Proposal Letter.

If the terms and conditions outlined in this Proposal Letter are acceptable to the Borrower Parties, and the Borrower Parties desire for the Prospective Lender to commence its Due Diligence process, please indicate the Borrower Parties' acceptance of, and intention to be legally bound by, such terms and conditions by signing in the appropriate space below, returning an executed copy of this Proposal Letter to the Prospective Lender, and wiring the Expense Deposit on or before **5:00 P.M. Eastern Standard Time on May 20, 2022**. This Proposal Letter shall expire at such time unless the Prospective Lender has received the fully executed Proposal Letter and the wire of the Expense Deposit.

Your signature below authorizes ReveriFinancing PM, LLC and/or its assigns to order full and complete credit reports and background checks in efforts to verify credit and background history and gather whatever financial information is considered necessary for consideration of this Loan.

This agreement is not effective under reviewed and approved by the Prospective Lender who will not review it until it is signed by both the Borrower and the Guarantor.

[SIGNATURES ON FOLLOWING PAGE]

**The undersigned has been duly authorized to execute this Proposal Letter on behalf of the Borrower and/or Guarantor, as the case may be.**

AGREED AND ACCEPTED THIS 20th DAY OF MAY 2022

Entity: TCC 2022, LLC, a Delaware Limited Liability Company

By: ______________________
Name:
Title: PRESIDENT

GUARANTOR:

______________________
Tim Barton, an individual

Date: MAY 20, 2022

Date of Birth: 8/17/1963

Social Security #: 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

Phone #: 214-673-8714

GUARANTOR:

______________________
If necessary, an individual

Date: ______________________

Date of Birth: ______________________

Social Security #: ______________________

Phone #: ______________________

Please furnish us with the name, address, email, and telephone number of your attorney below:

Firm: Law Office of K. Walji, P.C.

Name: Khudabuksh K. Walji

Address: 10701 Corporate Drive, Suite 350, Stafford, Texas 77477

Telephone: 281-401-9672 (Office) and 713-562-6875 (Mobile)

Email: k.walji@waljilaw.com

Case 21-31954-hcm11 Doc 141-1 Filed 06/07/22 Entered 06/07/22 Page 68 of 88

Exhibit 2 Title commitment

THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data"). Title Data owns and maintains land title plants for various Texas counties. Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information. The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**

WIRE SAFE™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.
- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.
- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.
- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

***Federal Bureau of Investigation:***
http://www.fbi.gov

***Internet Crime Complaint Center:***
http://www.ic3.gov


*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

# COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

**Chicago Title Insurance Company**

Commitment Number:

**4300112206494**

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

We (Chicago Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Chicago Title Insurance Company**
By:

Michael J. Nolan, President

**Issued By:**

**Chicago Title of Texas, LLC**

Attest:

Melanie Fey

Marjorie Nemzura, Secretary

CHICAGO TITLE INSURANCE COMPANY CORPORATE SEAL

### CONDITIONS AND STIPULATIONS

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.
2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

# SCHEDULE A

Effective Date: May 18, 2022 at 8:00 AM
Commitment No.: 4300112206494

GF No.: SCT-47-4300112206494-MF
Issued: May 26, 2022 at 8:00 AM

1. The policy or policies to be issued are:

   a. OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
   (Not applicable for improved one-to-four family residential real estate)

   Policy Amount:
   PROPOSED INSURED:

   b. TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
   ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

   Policy Amount:
   PROPOSED INSURED:

   c. LOAN POLICY OF TITLE INSURANCE (Form T-2)

   Policy Amount: $47,000,000.00
   PROPOSED INSURED:
   Proposed Borrower: 2999TC Acquisitions, LLC f/k/a MO 2999TX, LLC, a Delaware limited liability company and HNGH Turtle Creek, LLC, a Texas limited liability company

   d. TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   e. LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   f. OTHER

   Policy Amount:
   PROPOSED INSURED:

2. The interest in the land covered by this Commitment is:

   Fee Simple

3. Record title to the land on the Effective Date appears to be vested in:

   2999TC Acquisitions, LLC f/k/a MO 2999TX LLC, a Delaware limited liability company and HNGH Turtle Creek, LLC, a Texas limited liability company, as their interests may appear

4. Legal description of land:

   Being a tract of land situated in the James A. Sylvester Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Plat Records, Dallas County, Texas.

**END OF SCHEDULE A**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Commitment No.: 4300112206494 GF No.: SCT-47-4300112206494-MF

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1. The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

   under Clerk's File No(s). 201900253449 and 202100327172, Real Property Records, Dallas County, Texas

   Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2. Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3. Homestead or community property or survivorship rights, if any of any spouse of any insured.

   (Applies to the Owner Policy only.)

4. Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

   a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

   b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

   c. to filled-in lands, or artificial islands, or

   d. to statutory water rights, including riparian rights, or

   e. to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

   (Applies to the Owner Policy only.)

5. Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2022 and subsequent years.")

6. The terms and conditions of the documents creating your interest in the land.

7. Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

8. Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage.

   (Applies to Mortgagee Policy (T-2) only.)

9. The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R).

10. The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

    a. All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

    b. Those liens created at closing, if any, pursuant to lender instructions.

    c. Rights of parties in possession.

    d. Visible or apparent easement(s) and/or rights of way on, over, under or across the Land.

    e. If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

       Owner and Loan Policy(ies): Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of County, Texas, prior to the date hereof.

       Owner Policy(ies) Only: Liability hereunder at the date hereof is limited to $ 0.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

       Loan Policy(ies) Only: Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

    f. The following exception will appear in any policy issued (other than the T-1R Residential Owner Policy of Title Insurance and the T-2R Short-Form Residential Mortgagee Policy) if the Company is not provided a survey of the Land, acceptable to the Company, for review at or prior to closing:

Case 21-31954-hdh11 Doc 128-17 Filed 05/31/22 Entered 05/31/22 17:30:25 Page 75 of 88



## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.

g. Rights of tenants in possession, as tenants only, under unrecorded lease agreements.

h. Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat;

Purpose:

Corner clip, ten feet by ten feet (10' x 10') near southeast corner;

Eight foot (8') street easement along Northeast portion of the property line;

Three foot (3') street easement along western most property line; and

Fifteen foot (15') utility along southern property line.

Recording No: Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

i. Easement(s) and rights incidental thereto, as granted in a document:

Granted to: City of Dallas
Purpose: As provided in said document
Recording Date: October 23, 1953
Recording No: Volume 3936, Page 472, Real Property Records, Dallas County, Texas, shown on plat recorded in Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

j. Easement(s) and rights incidental thereto, as granted in a document:

Granted to: City of Dallas
Purpose: As provided in said document
Recording Date: September 21, 1960
Recording No: Volume 5413, Page 660, Real Property Records, Dallas County, Texas, shown on plat recorded in Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

k. Easement(s) and rights incidental thereto, as granted in a document:

Granted to: City of Dallas
Purpose: As provided in said document
Recording Date: November 1, 1960
Recording No: Volume 5450, Page 72, Real Property Records, Dallas County, Texas, shown on plat recorded in Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

## SCHEDULE C

Commitment No.: 4300112206494 GF No.: SCT-47-4300112206494-MF

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1. Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2. Satisfactory evidence must be provided that:

   a. no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

   b. all standby fees, taxes, assessments and charges against the property have been paid,

   c. all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

   d. there is legal right of access to and from the land,

   e. (on a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3. You must pay the seller or borrower the agreed amount for your property or interest.

4. Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5. Prior approval from Regional Underwriting must be obtained if the subject transaction involves the proposed issuance of (i) an Owner’s Policy to a person or entity who purchased the subject property at a foreclosure sale, or (ii) a Loan Policy insuring a lien granted by such person or entity on the subject property.

6. As to any document creating your title or interest that will be executed or recorded electronically, or notarized pursuant to an online notarization, the following requirements apply:

   • Confirmation prior to closing that the County Clerk of Dallas County, Texas has approved and authorized electronic recording of electronically signed and notarized instruments in the form and format that is being used.

   • Electronic recordation of the instruments to be insured in the Official Public Records of Dallas County, Texas.

   • Execution of the instruments to be insured pursuant to the requirements of the Texas Uniform Electronic Transactions Act, Chapter 322 of the Business and Commerce Code.

   • Acknowledgement of the instruments to be insured by a notary properly commissioned as an online notary public by the Texas Secretary of State with the ability to perform electronic and online notarial acts under 1 TAC Chapter 87.

7. The Company and its policy issuing agents are required by Federal law to collect additional information about certain transactions in specified geographic areas in accordance with the Bank Secrecy Act. If this transaction is required to be reported under a Geographic Targeting Order issued by FinCEN, the Company or its policy issuing agent must be supplied with a completed ALTA Information Collection Form ("ICF") prior to closing the transaction contemplated herein.

8. A deed of trust to secure an indebtedness in the amount shown below,

## SCHEDULE C
(continued)

| | |
|---|---|
| Amount: | $32,500,000.00 |
| Dated: | September 20, 2019 |
| Trustor/Grantor: | MO 2999TC, LLC, a Delaware limited liability company |
| Trustee: | Michael B. Massey |
| Beneficiary: | 2999 Turtle Creek LLC, a Delaware limited liability company |
| Loan No.: | n/a |
| Recording Date: | September 23, 2019 |
| Recording No: | under Clerk's File No. 201900253450, Real Property Records, Dallas County, Texas |

Assignment of Rents and Leases

| | |
|---|---|
| Assigned to: | 2999 Turtle Creek LLC |
| Assigned by: | MO 2999TC, LLC |
| Recording Date: | September 23, 2019 |
| Recording No: | under Clerk's File No. 201900253451, Real Property Records, Dallas County, Texas |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | HNGH Turtle Creek, LLC |
| Loan No.: | n/a |
| Recording Date: | December 8, 2020 |
| Recording No: | under Clerk's File No. 202000341904, Real Property Records, Dallas County, Texas |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | Happy State Bank |
| Loan No.: | n/a |
| Recording Date: | December 8, 2020 |
| Recording No: | under Clerk's File No. 202000341906, Real Property Records, Dallas County, Texas |

Appointment of Substitute Trustee

| | |
|---|---|
| Recording Date: | July 6, 2020 |
| Recording No.: | under Clerk's File No. 202000168289, Real Property Records, Dallas County, Texas |

Notice of Foreclosure

| | |
|---|---|
| Recording Date: | August 10, 2020 |
| Recording No.: | under Clerk's File No. 202000206703, Real Property Records, Dallas County, Texas |

Appointment of Substitute Trustee

| | |
|---|---|
| Recording Date: | August 10, 2020 |
| Recording No.: | under Clerk's File No. 202000206704, Real Property Records, Dallas County, Texas |

9. A financing statement as follows:

| | |
|---|---|
| Debtor: | MO 2999TC, LLC |
| Secured Party: | 2999 Turtle Creek LLC |
| Recording Date: | September 23, 2019 |
| Recording No: | under Clerk's File No. 201900253452, Real Property Records, Dallas County, Texas |

A change to the above financing statement was filed

## SCHEDULE C
(continued)

Nature of Change: Assignment
Recording Date: December 8, 2020
Recording No: under Clerk's File No. 202000341907, Real Property Records, Dallas County, Texas

A change to the above financing statement was filed

Nature of Change: Amendment
Recording Date: December 8, 2020
Recording No: under Clerk's File No. 202000341908, Real Property Records, Dallas County, Texas

10. A pending court action as disclosed by a recorded lis pendens notice:

Plaintiff: 2999TC Acquisitions, LLC
Defendant: HNGH Turtle Creek, LLC
County: Dallas
Court: US Bankruptcy Court for the Northern District of Texas (Dallas Division)
Cause No.: 21-31954-hdh11
Nature of Action: set aside deed, void the deed and avoid the transfer of property via deed recorded under Clerk's File No. 202100327172, Real Property Records, Dallas County, Texas
Attorney: n/a
Recording Date: November 5, 2021
Recording No: under Clerk's File No. 202100333511, Real Property Records, Dallas County, Texas

The suit must be dismissed with prejudice and the lis pendens notice must be released.

11. 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, a Delaware limited liability company , subject to proceedings pending in the bankruptcy court where a petition for relief was filed.

Name of Debtor: 2999TC Acquisitions, LLC
Date of Filing: October 29, 2021
U.S. District Court: Northern
Case No: 21-31954-hdh11

12. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company: 2999TC Acquisitions, LLC f/k/a MO 2999TX LLC, a Delaware limited liability company

a. A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b. If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c. If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d. A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e. If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

## SCHEDULE C
(continued)

13. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company: HNGH Turtle Creek, LLC, a Texas limited liability company

a. A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b. If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c. If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d. A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e. If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

14. The following note is for informational purposes only:

The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

| | |
|---|---|
| Grantor: | 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, a Delaware limited liability company |
| Grantee: | HNGH Turtle Creek, LLC, a Texas limited liability company |
| Recording Date: | November 1, 2021 |
| Recording No: | under Clerk's File No. 202100327172, Real Property Records, Dallas County, Texas |

Deed found of record affecting the Land was recorded September 23, 2019 at under Clerk's File No. 201900253449, Real Property Records, Dallas County, Texas, wherein the grantee acquired the subject property.

15. The Company must be furnished with a properly executed Affidavit of Debts and Liens from the owner(s).

16. The Company must be furnished with a properly executed Waiver of Inspection from the purchaser(s).

17. This file must be updated prior to closing.

## SCHEDULE D

Commitment No.: 4300112206494 GF No.: SCT-47-4300112206494-MF

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1. The issuing Title Insurance Company, **Chicago Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

   **Shareholders**: Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.

   **Directors**: Raymond Randall Quirk, Anthony John Park, Marjorie Nemzura, Michael J. Nolan, Edson N. Burton, Jr.

   **Officers**: Raymond Randall Quirk (President), Anthony John Park (Executive Vice President), Marjorie Nemzura (Secretary), Daniel Kennedy Murphy (Treasurer)

2. The following disclosures are made by the Title Insurance Agent issuing this Commitment:

   **Chicago Title of Texas, LLC**

   (a) A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

   **Owners**: FNTS Holdings, LLC owns 100% of Alamo Title Holding Company, which owns 100% of **Chicago Title of Texas, LLC**

   (b) A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

   **Owners**: FNTG Holdings, LLC owns 100% of FNTS Holdings, LLC

   (c) If the Agent is a corporation: (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

   **Officers**: Raymond Randall Quirk (President), Brian K. Baize (President), Gayle Brand (President), Jennifer Clarke (President), Michael J. DeBault (President), John Tannous (President), Anthony John Park (Executive Vice President and Chief Financial Officer), Joseph William Grealish (Executive Vice President), John Ernst (Executive Vice President), Todd Rasco (Executive Vice President), Jeffrey Colby (Senior Vice President), Winford Dubose (Vice President), Brewer Gregory (Vice President), Marjorie Nemzura (Vice President and Secretary)

   (d) The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive. NONE.

   (e) For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3. You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates. Upon your request, such disclosure will be made to you. Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

   You are further advised that the estimated title premium* is:

| | | | |
|---|---|---|---|
| **Loan Policy** | | **$** | **117,435.00** |
| **Endorsement Charges** | | **$** | **11,768.50** |
| | **Total** | **$** | **129,203.50** |

   Of this total amount: 15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

| Percent/Amount | To Whom | For Services |
|---|---|---|

   *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance. Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

## TEXAS TITLE INSURANCE INFORMATION

| |
|---|
| Title insurance insures you against loss resulting from certain risks to your title.<br>The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date. |
| El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propriedad.<br>El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción. |

Your Commitment for Title insurance is a legal contract between you and us. The Commitment is not an opinion or report of your title. It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable. This determination has already been made. Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

**--MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy. Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them. You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

**---EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

**---EXCLUSIONS** are title risks that a Policy generally does not cover. Exclusions are contained in the Policy but not shown or discussed in the Commitment.

**---CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company. They are contained in the Policy but not shown or discussed in the Commitment. The Policy Conditions are not the same as the Commitment Conditions.

## TEXAS TITLE INSURANCE INFORMATION

(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment. The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy. Some of the changes to consider are:

---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2). To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy. Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

---Allow the Company to add an exception to "rights of parties in possession." If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection. If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued. You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

Case 21-31954-hdh11 Doc 141-17 Filed 06/07/22 Entered 06/07/22 13:30:35 Desc Exhibit Page 83 of 88

# DELETION OF ARBITRATION PROVISION

(Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution. It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company. However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process. In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below). It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less. If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued. You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

> "Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

______________________________ ______________________________
Signature Date

## FIDELITY NATIONAL FINANCIAL
## PRIVACY NOTICE

Effective January 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

Case 21-31954-hcm11 Doc 128-17 Filed 05/31/22 Entered 05/31/22 17:30:25 Page 85 of 88

**Use of Personal Information**

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

**When Information Is Disclosed**

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18). We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**

FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 934-3354 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

Case 21-31954-hdh11 Doc 141-1 Filed 06/07/22 Entered 06/07/22 15:32:23 Page 87 of 88

Exhibit 3 Email

---

**From:** Jeff VanNote <jeff@jeffvannote.com>
**Sent:** Monday, May 30, 2022 5:19 PM
**To:** Joey Howell <joey@sterlingone.us>; K Walji <k.walji@waljilaw.com>
**Cc:** Andy Anand <andy@theanandteam.com>
**Subject:** To whom it may concern

This email is intended for the appropriate legal parties regarding 2999 Turtle Creek, Dallas Tx. Please note, we have an executed term sheet and deposit from borrowing entity and were anticipating a Tuesday, 5/31/2022 closing and funding date, until Chicago title notified us on friday afternoon a clear title policy would not be able to be issued due to the 14 day appeal period in reference to the 5/18/2022 bankruptcy order. Due to this now falling into June, we need a few more days to update our loan documents and complete title review and clearance from Chicago Title. We have confirmed a $12,500,000 escrow deposit into representing counsel's escrow account of which will more than satisfy the outstanding debts combined with our $30,000,000. Please note, until final written approval is granted for an extension no further work on this loan will be conducted. We look forward to receiving this extension in writing signed by all parties no later than 5/31/2022.

Jeff VanNote