Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **2999TC ACQUISITIONS, LLC,** | § | **CASE NO. 21-31954-hdh11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

## DECLARATION OF JOEY HOWELL

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1. My name is Joey Howell, I am over the age of twenty-one, of sound mind and capable of making this declaration.

2. I have personal knowledge of the statements contained herein.

3. I, as the manager of Silverlake Capital, LLC, have been working with a number of debt and or equity sources in order to assist the Debtor in obtaining the Payoff Amount required pursuant to the Court's Order. My and our efforts in such regards has been materially delayed due in part to the earlier filing of a Deed-In-Lieu which has clouded title to the Property.

4. Particularly, that and the timing of the 05/18/2022 Order approving the plan, have occasioned one of my clients, namely Jeff VanNote, an officer and a principal owner of ReveriFinancing PM LLC, who had previously committed and or was then anticipated to commit

**EXHIBIT "D11"**

substantial funds in the amount of $30,000,000 toward the Payoff Amount, expressed his inability to complete his underwriting of the Property, and close on the loan before the Payoff Deadline, as he was delayed, and indeed stopped, by the potential delay occasioned by the fact that the Payoff Deadline was actually (apparently, inadvertently) set within 14 days of the 05/18/2022 Order most recently approving the Debtor's plan, as the Payoff Deadline was within the possible appeal period, ending 06/01/2022, as his title company, Chicago Title, had told him that they could not issue a clean title policy until 06/02/2022, after the possible appeal period has expired. See **Exhibit 1**, being a copy of the signed ReveriFinancing term sheet. See also, **Exhibit 2**, the then title commitment issued to ReveriFinancing. See also, **Exhibit 3**, correspondence from Mr. VanNote evidencing this concern, and inability to move forward at that time.

5. Additionally, upon information and belief, our efforts in such regards has been materially delayed as it appears that HNGH has failed to do all that it needs to do to satisfy its obligations under the Agreed Order, so that we could have an opportunity to review such in advance of the closing. Though some of the materials required have been, I understand, delivered over the holiday, and or are being belatedly delivered at this time, the fact is that neither I, nor my third-party debt and or equity sources have had, or will have time, today to adequately review those belatedly received materials.

6. Finally, my and our efforts, have been materially delayed as, upon information and belief, it appears that HNGH, have sought to and indeed interfered with the Debtor's actual and prospective contractual relations with one or more third party debt and/or equity sources, with the intent and effect of frustrating and otherwise precluding the Debtor's ability to perform thereunder; by making negative statements to third parties, which with whom Debtor had actual

and prospective contractual relations so as to source the necessary third party debt and/or equity, with the intent and/or effect of frustrating and otherwise precluding Debtor's ability to perform.

7. Sendera was retained by 2999TC Acquisitions, LLC ("2999TC") to serve as escrow agent and cause the issuance of a title insurance policy with regard to the closing of the transaction between the parties related to approximately 2.47 acres of undeveloped land located at 2999 Turtle Creek Blvd. located in the City of Dallas, Texas. (the "Property").

8. In order to close the above-described transaction I know the lenders I am working with who have provided loan commitments are requiring the following documents be placed into escrow

i. Release of the Deed of Trust, by HNGH;

a. Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019, by MO 2999TC, LLC in favor of Michael B. Massey, as Trustee for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253450 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

ii. Related to the immediately above, a Release of the prior collateral assignment of the Note and Deed of Trust and all Loan Documents fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the Note and Deed of Trust or other Loan Documents that were collaterally assigned (including Assignment of Leases and Rents);

iii. Release of the prior collateral assignment of the Note, Deed of Trust, and Assignment of Leases and Rents (3 documents) fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the Note and Deed of Trust;

iv. Release of Assignment of Leases and Rents dated as of September 20, 2019, by MO 2999TC, LUC for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253451 as assigned to HNGH Turtle Creek, LLC by 2999 Turtle Creek LLC under the Assignment of Deed of Trust and Assignment of Leases and Rents recorded on December 8, 2020 under instrument number 202000341904.

v. Release of the UCC, by HNGH (county and state) respecting the subject Property;

vi. Related to the immediately above, a Release of the prior assignment of the UCC fbo of Axos, to be signed by Axos, and other confirmation that Axos has no legal or equitable interest in the UCC filing;

vii. Release of the prior collateral assignment of the UCC fbo of Happy State Bank, to be signed by Happy State Bank, and other confirmation that Happy State Bank has no legal or equitable interest in the UCC filing; and

viii. The original Note, marked paid in full; delivered to title company to make sure original is provided.

These documents are necessary so the new lender can close a loan and be assured it has good clean and clear title to the assets that will secure its debt.

9. My name is Joey Howell, my date of birth is 01/24/1954, and my address is 622 Sorita Circle, Heath, Texas 75032, United States of America.

10. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on May 31, 2022.

Joey Howell, Declarant

<u>Attachments:</u>

Exhibit 1 Term sheet

Exhibit 2 Title commitment

Exhibit 3 Email

Exhibit 1 Term sheet

reverifinancing

34 Prospect Street
Jersey City, NJ 07307

May 20, 2022

***VIA ELECTRONIC MAIL***

Tim Barton
c/o K. Walji
TCC 2002, LLC
2999 Turtle Creek Boulevard
Dallas, Texas 75219

**Re: Potential Financing Proposal for 2999 Turtle Creek Blvd, Dallas Tx, 75219**

Dear Mr. Barton & Mr. Walji:

The Prospective Lender is pleased to advise the Borrower Parties (defined below) of the terms and conditions set forth in this letter (this "Proposal Letter") upon which Prospective Lender would consider making available to the Borrower a senior secured short-term mortgage Loan not to exceed FORTY-SEVEN MILLION DOLLARS AND ZERO CENTS ($47,000,000.00) to be collateralized by, *inter alia*, the Property, and guaranteed by the Guarantors, and a pledge of 100% of the ownership interests in Borrower (the "Loan"; and together with the transactions related thereto, the "Transaction").

1. Summary of Certain Proposed Terms and Conditions. The following is an outline, in summary format, of certain proposed terms and conditions of the proposed Transaction and does not purport to include or summarize all terms and conditions that would be expected to be contained in definitive Loan documentation for the proposed Transaction and is subject to change, modification, amendment, supplementation, and withdrawal by the Prospective Lender (defined below), in its sole and absolute discretion, in whole or in part:

| | |
|---|---|
| **Loan Borrower:** | TCC 2022, LLC, a Delaware Limited Liability Company, a single purpose, bankruptcy remote entity acceptable to Prospective Lender ("Borrowing Entity") |
| **Property:** | 2999 Turtle Creek Boulevard, Dallas, Texas 75219 |
| **Loan Guarantors:** | Tim Barton and any other individual owner with a 10% or greater ownership stake in the Borrowing Entity (the "Guarantor" or "Guarantors"; together with the Borrower, the "Borrower Parties"). The Guaranty shall have all California Civil Code 2856 waivers of security first rule, one action rule, and other standard waivers. Guarantor shall consent to personal jurisdiction in California or New York at Lender's choice in addition to Texas. Lender shall have the choice of forum for any enforcement of the Guaranty. |
| **Prospective Lender:** | ReveriFinancing pm LLC or an affiliate or designee of ReveriFinancing pm LLC. |
| **Loan Documentation:** | The Loan will be subject to the terms and conditions set forth in definitive Loan documentation, including, without limitation, a loan agreement, a mortgage, a note, a security agreement, a payment guaranty, an assignment of leases and rents, an environmental indemnity agreement, a pledge of 100% of the ownership interests in Borrower, non-disturbance, and attornment agreements (as required by the Prospective Lender), lien filings, and other agreements, instruments, and documents, all of which will be acceptable to Prospective Lender and its legal counsel (collectively, the "Loan Documents"). |
| **Closing Date:** | The date on which the funding of the Loan occurs, which is anticipated to be one (1) week after completion of the Prospective Lender's due diligence (the "Closing Date"), with a Closing Date of no later than 5:00 pm CST on Friday, May 27, 2022. |
| **Loan Amount:** | Up to $47,000,000.00 |
| **Security:** | The subject Loan shall be secured by; (i) a First Mortgage on Subject Property, (ii) An assignment of and security interest in all current and future leases, rents and other income related to the Property and (iii) UCC I - Liens on all personal property, equipment and fixtures, as well as a first priority pledge of 100% |

of the ownership interests in Borrower. Additionally, the Operating Agreement of the Borrowing Entity shall be amended, in a manner acceptable to Prospective Lender, to provide that the Borrowing Entity shall not be able to additionally pledge, secure, lease or transfer the properties or equity interests until such time that the Prospective Lender is paid in full. No additional senior, secondary or mezzanine financing will be permitted during the term of the Loan, either secured or unsecured, without Prospective Lender's consent. Any foreclosure of the pledged membership interests may be conducted in New York or California consistent with the New York or California uniform commercial code. Any action to enjoin a foreclosure of the membership interests shall only be brought in New York or California upon completion of the closing docs.

**Use of Proceeds:** Pay off 1st Lien Holder (approx. $41,000,000), Chapter 11 Bankruptcy Trustee, the Unsecured Creditors under the Bankruptcy Plan and Property taxes for 2022 (approx. $1,000,000), with the remainder used to fund the Interest Reserve (defined below) and other costs and fees set forth herein.

**Interest Reserve:** Borrower shall fund at Closing a 12 month interest reserve on the Closing Date. Borrower shall pay the monthly interest each month after the Interest Reserve has been used.

**Origination Fee:** An amount equal to 4-percent (4.00%) of the Loan Amount, which shall be earned in full, non-refundable, and due and payable on the Closing Date.

**Interest Rate:** The Loan shall accrue interest at a twelve percent (12.00%) per annum (interest only), which shall be payable monthly and calculated based on a 360-day year. In the event of a Default, the Default rate shall be 17% which is the base rate plus 5%.

**Maturity:** On the date that is twelve (12) months after the Closing Date (the "Maturity Date"), the outstanding principal amount of the Loan, plus all accrued and unpaid interest, and all other amounts owed to the Prospective Lender with respect to the Loan shall be due and payable in full. All interest payments after the ) month following the Closing Date shall be paid in cash directly by the Borrower to the Prospective Lender. If there is a maturity default, a 5% maturity late fee shall be added to the principal balance.

**Other Debt:** None permitted.

**Title Insurance:** Lender shall have a first lien position guaranteed by Chicago Title as a condition of closing. Chicago Title to issue a 104.3 endorsement and lender's title policy.

**Prepayment:** Borrower may prepay, without penalty, any, or all of the outstanding balance of the Loan only after six (6) months following the Closing Date. If Borrower decides to prepay prior to 12 months, Borrower shall pay a 1% fee for early termination of the loan.

**Guaranty:** The Guarantor shall guaranty payment of 100% of the outstanding Loan, plus any accrued and unpaid interest, fees, and costs, real estate taxes, and all costs of enforcement of the Loan. Guarantor represents and warrants that there are no major credit issues. Guarantor shall provide 2020 tax returns and shall consent to a current credit report.

**Broker Fee:** Prospective Lender acknowledges that Jeff VanNote/Damian Albergo are the brokers of record on the transaction.

**Expense Deposit:** Payment in the amount of Twenty-Five Thousand Dollars ($25,000), shall be delivered to Prospective Lender simultaneously with the submission of this term sheet, to be applied towards Prospective Lender's underwriting expenses in connection with the Loan, including, but not limited to credit and background check and any other expenses incurred by Prospective Lender while conducting due diligence. Upon request, Borrower will immediately reimburse Prospective Lender for all such costs, including Prospective Lender's Legal Fees, which may exceed the Expense Deposit. If, after Borrower has satisfied all conditions precedent to the closing of the Proposed Loan, Prospective Lender fails to provide the Proposed Loan to Borrower, Prospective Lender shall return the expense deposit to Borrower (less processing fee, legal fee and any other such costs and expenses incurred by Prospective Lender) subject to Borrower's execution of Lender's standard release letter. If all terms and conditions are met (or Prospective Lender elects, in its sole discretion, to waive any such terms and conditions) then at the closing,

Prospective Lender shall contribute the Expense Deposit (less the processing fee and any such costs and expenses incurred by Prospective Lender) toward closing costs. In the event a closing does not occur, the Expense Deposit shall be retained by Prospective Lender as liquidated damages, in addition to any Break-up Fee, if applicable.

**Insurance:** The Borrower shall maintain at all times, and at the Borrower's expense, paid-up policies of liability, property damage, casualty, rent loss insurance, ordinance and law, pollution insurance, and all other insurance that may be required by the Prospective Lender. Upon the Closing Date, each policy of insurance shall name the Prospective Lender as first mortgagee, additional insured, and loss payee. In the event the Property is located in a flood hazard area, the Borrower shall also provide flood insurance naming the Prospective Lender as an additional insured and first mortgagee in the maximum available amount.

**Survey:** Borrower shall provide Prospective Lender a current as-built survey of the Property certified to Prospective Lender, the title insurer and such other parties as may be designated by Prospective Lender. The survey shall be in all respects acceptable to Lender in its sole discretion.

**Leases & Rents:** If there are any leases in existence affecting the collateral Property(s) at the time of the closing of the Loan, those leases must contain a satisfactory subordination clause whereby they are subject and subordinate in all respects to the lien of the Prospective Lender's mortgage. Additionally, Prospective Lender shall receive an assignment of and security interest in all current and future leases, rents and other income related to the Property(s). Lender will require executed estoppels. Prospective Lender shall have in its sole discretion the reasonable right to approve all future leases in it. Borrower to provide an estoppel signed by all tenants and a rent roll.

**Zoning Review:** Borrower shall provide Prospective Lender with a Zoning Review that will, among other items, confirm allowable buildable square feet under the Property's current zoning, as well as allowances, development rights, and restrictions.

**Environmental Review:** Borrower shall provide Lender with a Phase I, Phase II (if recommended in Phase I), or other environmental report satisfactory to Lender confirming there are no environmental issues or risks at Property.

**Power of Attorney:** The use of a Power of Attorney is not acceptable.

**Financial Reporting:** The Borrower and Guarantors agree to provide Lender with updated financial information, including but not limited to, copies of personal tax returns, personal financial statements, and tax returns of other ownership entities, as requested.

**Compliance:** This provision will survive the closing of the Loan contemplated herein and you shall have a continuing obligation to furnish any documents, forms, authorizations, releases, signatures, or any information related to the mortgage application or to the mortgage closing (collectively the documents). In the event of any mistake, omission form, or loss of any document, either by you or by Lender, whether before or after the closing, you shall cooperate fully with Lender, in correcting or resupplying such document(s).

**Due Diligence:** Prospective Lender's obligations hereunder are contingent on Prospective Lender completing, to its sole and absolute satisfaction, a complete review of the Borrower's financials (personal and corporate), the subject Property(s) and the surrounding market. At any time, Prospective Lender may elect in its sole and absolute discretion to terminate discussions in connection with the proposed financing transaction.

**Governing Law:** The Loan Documentation shall be governed by, and construed in accordance with, the laws of the State of New York (without regard to the choice of law rules thereof) and California for the Guaranty to the extent California law is more favorable.

**Loan Sale Cooperation:** The Prospective Lender reserves the right to, including, without limitation, participate, sell, or assign its interest (or any portion thereof) in the Loan (or any portion thereof), and the Borrower Parties agree to cooperate and to execute any documentation necessary to facilitate this.

**Other Conditions:** In addition to completion of Prospective Lender's due diligence as outlined above, Prospective Lender's obligations hereunder are contingent on satisfactory completion, in Lender's sole and absolute discretion; (i) site inspection, (ii) title review, (iii) survey review, (iv) review of borrower background and credit, (v) building permits and zoning approval review, (vi) title insurance policy acceptable to Lender, (vii) any other reasonable information necessary for Lender to perform due diligence in efforts to make the proposed Loan, and (viii) the Borrower's execution of Loan documents. The Borrower shall be responsible to pay all attorney's fees and costs incurred by Lender due to any dispute that arises in connection with this Agreement.

2. Confidentiality. The parties acknowledge and agree that this Proposal Letter, its existence, and its contents are confidential and proprietary and that damages could result to the Prospective Lender if such information is disclosed by the Borrower Parties to any third-party person. Accordingly, this Proposal Letter is being provided to the Borrower Parties on the condition that, except as required by law, this Proposal Letter, its existence, and its contents, in whole or in part, will not be disclosed by the Borrower Parties publicly or privately, except on a confidential basis to those individuals who are their officers, employees, or advisors, who have a need to know of such information as a result of their being specifically involved in evaluating the proposed Transaction under consideration, and who agree to maintain the confidentiality of such information, and then only on the condition that such information may not, except as required by law, be further disclosed. The Borrower Parties' obligations under this Section 2 shall survive any occurrence of the Termination Date (as defined hereinafter).

3. Exclusivity. Until such time as the Prospective Lender notifies the Borrower in writing that the Prospective Lender is fully committed and clear to close on the Transaction (the "Exclusivity Date"), the Borrower (including its affiliates, subsidiaries, and any of their respective directors, officers, employees, members, financial advisors, attorneys, accountants, or other representatives) may, directly or indirectly, (a) accept any proposal, letter of intent, offer, or other commitment from, or enter into any agreement with, any other person to consummate a competing transaction, or (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction. Should the Borrower enter into any final and binding agreement with another lender with respect to the Transaction prior to the Exclusivity Date, this shall constitute the immediate termination of the relationship between the Prospective Lender and Borrower set forth herein ("Termination" and the date such Termination occurs, the "Termination Date"). For the avoidance of doubt, once the Prospective Lender notifies the Borrower in writing that the Prospective Lender is fully committed and clear to close, the relationship between the Prospective Lender and Borrower becomes exclusive and the Borrower is prohibited from speaking to or otherwise engaging with any other lenders about the Transaction. This Section 3 shall be binding on the Guarantor and Borrower and their respective affiliates.

4. Indemnification. The Borrower Parties shall indemnify and hold harmless the Prospective Lender, its affiliates, and their respective officers, directors, employees, agents, advisors, auditors, attorneys, controlling persons, partners, participants, funding sources, and other representatives and advisors (each, an "Indemnified Person"), from and against all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements and other reasonable costs of investigation or defense, including, without limitation, those incurred upon any appeal), which may be instituted or asserted against or incurred by any such Indemnified Person in connection with, or arising out of, this Proposal Letter, the proposed Transaction, any due diligence or documentation related to the proposed Transaction, any actions or failures to act in connection with the due diligence or proposed Transaction, or any dispute, investigation, litigation, proceeding, or environmental matter related to the proposed Transaction. The Borrower Parties' obligations under this Section 4 shall survive the closing of the Loan and/or any occurrence of the Termination Date.

5. Costs. The Borrower Parties shall be responsible (whether or not the proposed Transaction is consummated) for the payment or reimbursement of all of the Prospective Lender's costs, fees, and expenses (including, without limitation, attorneys' fees and costs) incurred by the Prospective Lender in connection with this Proposal Letter, the proposed Transaction, the Prospective Lender's due diligence, and/or the preparation, negotiation, review, execution, administration, modification, waiver, or enforcement by the Prospective Lender of any document relating to the proposed Transaction, and a non-refundable Loan processing fee in the amount of $5,000 (collectively, the "Costs"). The Borrower Parties' obligations under this Section 5 shall survive any occurrence of the Termination Date.

6. Termination of Discussions. The Prospective Lender may, in its sole discretion, terminate discussions of the proposed Transaction for any reason or no reason whatsoever without liability (the date such Termination occurs, the "Termination Date"). In no event shall the Prospective Lender incur obligations with regard to the proposed Transaction unless and until the Prospective Lender executes and delivers definitive Loan documents reflecting those obligations.

7. Breakup Fee. There shall be no "breakup fee" upon the occurrence of any event causing the Termination of the parties' relationship under this Proposal Letter. Notwithstanding anything to the contrary contained in this Proposal Letter, in consideration of the significant time, cost and effort expended by Prospective Lender in connection with the proposed Transaction,

if either (x) Borrower and/or Guarantor shall breach the terms of Section 3 of this Proposal Letter, or (y) Borrower (or any affiliate thereof) and/or Guarantor shall elect to pursue financing with another party (other than Prospective Lender) or elect not to pursue financing with Prospective Lender before the end of the Exclusivity Period, then Borrower and Guarantor, jointly and severally, shall be liable for a breakup fee of 1% of Loan Amount (the "Breakup Fee"). The Breakup Fee shall be immediately due and payable by the Borrower Parties to Prospective Lender. The Borrower Parties' obligations under this Section 7 shall survive any occurrence of the Termination Date. The breakup fee shall only apply upon the unequivocally commitment by Lender to fund.

8. Assignment. This Proposal Letter shall inure to the benefit of the successors and assigns of the Prospective Lender but shall not be assignable (whether by merger, consolidation, succession, assignment, or otherwise) by the Borrower or Guarantor without the prior written consent of the Prospective Lender in each instance (and any purported assignment without such consent shall be null and void).

9. Counterparts; Governing Law. To facilitate execution, this Proposal Letter may be executed in as many counterparts as may be convenient or required. All counterparts shall collectively constitute a single instrument. A facsimile or electronic copy of this Proposal Letter shall be considered an original. This Proposal Letter shall be governed by the laws of the State of New York (without regard to the choice of law rules thereof).

10. Proposal Letter is Non-Binding. Due to the general nature of this Proposal Letter, it is agreed to and understood by the parties that the terms and provisions of this Proposal Letter are completely non-binding upon Prospective Lender and the Borrower Parties, except the foregoing Sections 2, 3, 4, 5, 6, 7, 8, & 9 hereof shall be binding on the Borrower Parties and shall survive any occurrence of the Termination Date.

11. Conditions Precedent. Closing and funding of the Loan will be subject to the satisfaction, as determined by the Prospective Lender in its sole and absolute discretion, of all conditions precedent set forth during due diligence.

The terms and provisions of this Proposal Letter are, except as expressly set forth in this Proposal Letter, non-binding and are intended solely for discussion purposes. This Proposal Letter does not represent a commitment (either express or implied) to provide financing and should not be relied on as an indication of the availability of the proposed financing. There is absolutely no obligation on Prospective Lender to issue a commitment or to make a Loan on the terms of this Proposal Letter or on any other terms. In the event that the Loan is funded by Prospective Lender, the terms and conditions contained in this Proposal Letter shall be superseded by the Loan Documents (as hereinafter defined), and the Loan Documents shall govern the terms and conditions of the Loan without reference to this Proposal Letter.

If the terms and conditions outlined in this Proposal Letter are acceptable to the Borrower Parties, and the Borrower Parties desire for the Prospective Lender to commence its Due Diligence process, please indicate the Borrower Parties' acceptance of, and intention to be legally bound by, such terms and conditions by signing in the appropriate space below, returning an executed copy of this Proposal Letter to the Prospective Lender, and wiring the Expense Deposit on or before **5:00 P.M. Eastern Standard Time on May 20, 2022**. This Proposal Letter shall expire at such time unless the Prospective Lender has received the fully executed Proposal Letter and the wire of the Expense Deposit.

Your signature below authorizes ReveriFinancing PM, LLC and/or its assigns to order full and complete credit reports and background checks in efforts to verify credit and background history and gather whatever financial information is considered necessary for consideration of this Loan.

This agreement is not effective under reviewed and approved by the Prospective Lender who will not review it until it is signed by both the Borrower and the Guarantor.

[SIGNATURES ON FOLLOWING PAGE]

**The undersigned has been duly authorized to execute this Proposal Letter on behalf of the Borrower and/or Guarantor, as the case may be.**

AGREED AND ACCEPTED THIS 20th DAY OF MAY 2022

Entity: TCC 2022, LLC, a Delaware Limited Liability Company

By: ______________________________
Name:
Title: PRESIDENT

GUARANTOR:

______________________________
Tim Barton, an individual

Date: May 20, 2022

Date of Birth: 8/17/1963

Social Security #: 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

Phone #: 214-673-8714

GUARANTOR:

______________________________
If necessary, an individual

Date: ______________________________

Date of Birth: ______________________________

Social Security #: ______________________________

Phone #: ______________________________

Please furnish us with the name, address, email, and telephone number of your attorney below:

Firm: Law Office of K. Walji, P.C.

Name: Khudabuksh K. Walji

Address: 10701 Corporate Drive, Suite 350, Stafford, Texas 77477

Telephone: 281-401-9672 (Office) and 713-562-6875 (Mobile)

Email: k.walji@waljilaw.com

Exhibit 2 Title commitment

THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data"). Title Data owns and maintains land title plants for various Texas counties. Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information. The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**

WIRE SAFE™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.
- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.
- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.
- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

***Federal Bureau of Investigation:***
*http://www.fbi.gov*

***Internet Crime Complaint Center:***
*http://www.ic3.gov*


*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

# COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

**Chicago Title Insurance Company**

Commitment Number:

**4300112206494**

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

We (Chicago Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Chicago Title Insurance Company**
By:

**Issued By:**

**Chicago Title of Texas, LLC**

Michael J. Nolan, President

Attest:

CHICAGO TITLE INSURANCE COMPANY CORPORATE SEAL

Melanie Fey

Marjorie Nemzura, Secretary

**CONDITIONS AND STIPULATIONS**

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.
2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

# SCHEDULE A

Effective Date: May 18, 2022 at 8:00 AM
Commitment No.: 4300112206494

GF No.: SCT-47-4300112206494-MF
Issued: May 26, 2022 at 8:00 AM

1. The policy or policies to be issued are:

   a. OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
   (Not applicable for improved one-to-four family residential real estate)

   Policy Amount:
   PROPOSED INSURED:

   b. TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
   ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

   Policy Amount:
   PROPOSED INSURED:

   c. LOAN POLICY OF TITLE INSURANCE (Form T-2)

   Policy Amount: $47,000,000.00
   PROPOSED INSURED:
   Proposed Borrower: 2999TC Acquisitions, LLC f/k/a MO 2999TX, LLC, a Delaware limited liability company and HNGH Turtle Creek, LLC, a Texas limited liability company

   d. TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   e. LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   f. OTHER

   Policy Amount:
   PROPOSED INSURED:

2. The interest in the land covered by this Commitment is:

   Fee Simple

3. Record title to the land on the Effective Date appears to be vested in:

   2999TC Acquisitions, LLC f/k/a MO 2999TX LLC, a Delaware limited liability company and HNGH Turtle Creek, LLC, a Texas limited liability company, as their interests may appear

4. Legal description of land:

   Being a tract of land situated in the James A. Sylvester Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Plat Records, Dallas County, Texas.

**END OF SCHEDULE A**

# SCHEDULE B
# EXCEPTIONS FROM COVERAGE

Commitment No.: 4300112206494 GF No.: SCT-47-4300112206494-MF

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1. The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

   under Clerk's File No(s). 201900253449 and 202100327172, Real Property Records, Dallas County, Texas

   Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2. Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3. Homestead or community property or survivorship rights, if any of any spouse of any insured.

   (Applies to the Owner Policy only.)

4. Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

   a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

   b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

   c. to filled-in lands, or artificial islands, or

   d. to statutory water rights, including riparian rights, or

   e. to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

      (Applies to the Owner Policy only.)

5. Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2022 and subsequent years.")

6. The terms and conditions of the documents creating your interest in the land.

7. Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

8. Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage.

   (Applies to Mortgagee Policy (T-2) only.)

9. The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R).

10. The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

    a. All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

    b. Those liens created at closing, if any, pursuant to lender instructions.

    c. Rights of parties in possession.

    d. Visible or apparent easement(s) and/or rights of way on, over, under or across the Land.

    e. If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

       Owner and Loan Policy(ies): Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of County, Texas, prior to the date hereof.

       Owner Policy(ies) Only: Liability hereunder at the date hereof is limited to $ 0.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

       Loan Policy(ies) Only: Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

    f. The following exception will appear in any policy issued (other than the T-1R Residential Owner Policy of Title Insurance and the T-2R Short-Form Residential Mortgagee Policy) if the Company is not provided a survey of the Land, acceptable to the Company, for review at or prior to closing:

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.

g. Rights of tenants in possession, as tenants only, under unrecorded lease agreements.

h. Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat;

Purpose:

Corner clip, ten feet by ten feet (10' x 10') near southeast corner;

Eight foot (8') street easement along Northeast portion of the property line;

Three foot (3') street easement along western most property line; and

Fifteen foot (15') utility along southern property line.

Recording No: Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

i. Easement(s) and rights incidental thereto, as granted in a document:

Granted to: City of Dallas
Purpose: As provided in said document
Recording Date: October 23, 1953
Recording No: Volume 3936, Page 472, Real Property Records, Dallas County, Texas, shown on plat recorded in Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

j. Easement(s) and rights incidental thereto, as granted in a document:

Granted to: City of Dallas
Purpose: As provided in said document
Recording Date: September 21, 1960
Recording No: Volume 5413, Page 660, Real Property Records, Dallas County, Texas, shown on plat recorded in Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

k. Easement(s) and rights incidental thereto, as granted in a document:

Granted to: City of Dallas
Purpose: As provided in said document
Recording Date: November 1, 1960
Recording No: Volume 5450, Page 72, Real Property Records, Dallas County, Texas, shown on plat recorded in Volume 2003162, Page 48, Real Property Records, Dallas County, Texas

## SCHEDULE C

Commitment No.: 4300112206494 GF No.: SCT-47-4300112206494-MF

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1. Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2. Satisfactory evidence must be provided that:

    a. no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

    b. all standby fees, taxes, assessments and charges against the property have been paid,

    c. all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

    d. there is legal right of access to and from the land,

    e. (on a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3. You must pay the seller or borrower the agreed amount for your property or interest.

4. Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5. Prior approval from Regional Underwriting must be obtained if the subject transaction involves the proposed issuance of (i) an Owner's Policy to a person or entity who purchased the subject property at a foreclosure sale, or (ii) a Loan Policy insuring a lien granted by such person or entity on the subject property.

6. As to any document creating your title or interest that will be executed or recorded electronically, or notarized pursuant to an online notarization, the following requirements apply:

    • Confirmation prior to closing that the County Clerk of Dallas County, Texas has approved and authorized electronic recording of electronically signed and notarized instruments in the form and format that is being used.

    • Electronic recordation of the instruments to be insured in the Official Public Records of Dallas County, Texas.

    • Execution of the instruments to be insured pursuant to the requirements of the Texas Uniform Electronic Transactions Act, Chapter 322 of the Business and Commerce Code.

    • Acknowledgement of the instruments to be insured by a notary properly commissioned as an online notary public by the Texas Secretary of State with the ability to perform electronic and online notarial acts under 1 TAC Chapter 87.

7. The Company and its policy issuing agents are required by Federal law to collect additional information about certain transactions in specified geographic areas in accordance with the Bank Secrecy Act. If this transaction is required to be reported under a Geographic Targeting Order issued by FinCEN, the Company or its policy issuing agent must be supplied with a completed ALTA Information Collection Form ("ICF") prior to closing the transaction contemplated herein.

8. A deed of trust to secure an indebtedness in the amount shown below,

## SCHEDULE C
(continued)

| | |
|---|---|
| Amount: | $32,500,000.00 |
| Dated: | September 20, 2019 |
| Trustor/Grantor: | MO 2999TC, LLC, a Delaware limited liability company |
| Trustee: | Michael B. Massey |
| Beneficiary: | 2999 Turtle Creek LLC, a Delaware limited liability company |
| Loan No.: | n/a |
| Recording Date: | September 23, 2019 |
| Recording No: | under Clerk's File No. 201900253450, Real Property Records, Dallas County, Texas |

Assignment of Rents and Leases

| | |
|---|---|
| Assigned to: | 2999 Turtle Creek LLC |
| Assigned by: | MO 2999TC, LLC |
| Recording Date: | September 23, 2019 |
| Recording No: | under Clerk's File No. 201900253451, Real Property Records, Dallas County, Texas |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | HNGH Turtle Creek, LLC |
| Loan No.: | n/a |
| Recording Date: | December 8, 2020 |
| Recording No: | under Clerk's File No. 202000341904, Real Property Records, Dallas County, Texas |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | Happy State Bank |
| Loan No.: | n/a |
| Recording Date: | December 8, 2020 |
| Recording No: | under Clerk's File No. 202000341906, Real Property Records, Dallas County, Texas |

Appointment of Substitute Trustee

| | |
|---|---|
| Recording Date: | July 6, 2020 |
| Recording No.: | under Clerk's File No. 202000168289, Real Property Records, Dallas County, Texas |

Notice of Foreclosure

| | |
|---|---|
| Recording Date: | August 10, 2020 |
| Recording No.: | under Clerk's File No. 202000206703, Real Property Records, Dallas County, Texas |

Appointment of Substitute Trustee

| | |
|---|---|
| Recording Date: | August 10, 2020 |
| Recording No.: | under Clerk's File No. 202000206704, Real Property Records, Dallas County, Texas |

9. A financing statement as follows:

| | |
|---|---|
| Debtor: | MO 2999TC, LLC |
| Secured Party: | 2999 Turtle Creek LLC |
| Recording Date: | September 23, 2019 |
| Recording No: | under Clerk's File No. 201900253452, Real Property Records, Dallas County, Texas |

A change to the above financing statement was filed

## SCHEDULE C
(continued)

Nature of Change: Assignment
Recording Date: December 8, 2020
Recording No: under Clerk's File No. 202000341907, Real Property Records, Dallas County, Texas

A change to the above financing statement was filed

Nature of Change: Amendment
Recording Date: December 8, 2020
Recording No: under Clerk's File No. 202000341908, Real Property Records, Dallas County, Texas

10. A pending court action as disclosed by a recorded lis pendens notice:

Plaintiff: 2999TC Acquisitions, LLC
Defendant: HNGH Turtle Creek, LLC
County: Dallas
Court: US Bankruptcy Court for the Northern District of Texas (Dallas Division)
Cause No.: 21-31954-hdh11
Nature of Action: set aside deed, void the deed and avoid the transfer of property via deed recorded under Clerk's File No. 202100327172, Real Property Records, Dallas County, Texas
Attorney: n/a
Recording Date: November 5, 2021
Recording No: under Clerk's File No. 202100333511, Real Property Records, Dallas County, Texas

The suit must be dismissed with prejudice and the lis pendens notice must be released.

11. 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, a Delaware limited liability company , subject to proceedings pending in the bankruptcy court where a petition for relief was filed.

Name of Debtor: 2999TC Acquisitions, LLC
Date of Filing: October 29, 2021
U.S. District Court: Northern
Case No: 21-31954-hdh11

12. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company: 2999TC Acquisitions, LLC f/k/a MO 2999TX LLC, a Delaware limited liability company

a. A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b. If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c. If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d. A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e. If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

## SCHEDULE C
(continued)

13. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company: HNGH Turtle Creek, LLC, a Texas limited liability company

a. A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b. If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c. If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d. A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e. If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

14. The following note is for informational purposes only:

The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

| | |
|---|---|
| Grantor: | 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, a Delaware limited liability company |
| Grantee: | HNGH Turtle Creek, LLC, a Texas limited liability company |
| Recording Date: | November 1, 2021 |
| Recording No: | under Clerk's File No. 202100327172, Real Property Records, Dallas County, Texas |

Deed found of record affecting the Land was recorded September 23, 2019 at under Clerk's File No. 201900253449, Real Property Records, Dallas County, Texas, wherein the grantee acquired the subject property.

15. The Company must be furnished with a properly executed Affidavit of Debts and Liens from the owner(s).

16. The Company must be furnished with a properly executed Waiver of Inspection from the purchaser(s).

17. This file must be updated prior to closing.

# SCHEDULE D

Commitment No.: 4300112206494 GF No.: SCT-47-4300112206494-MF

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1. The issuing Title Insurance Company, **Chicago Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

   **Shareholders**: Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.

   **Directors**: Raymond Randall Quirk, Anthony John Park, Marjorie Nemzura, Michael J. Nolan, Edson N. Burton, Jr.

   **Officers**: Raymond Randall Quirk (President), Anthony John Park (Executive Vice President), Marjorie Nemzura (Secretary), Daniel Kennedy Murphy (Treasurer)

2. The following disclosures are made by the Title Insurance Agent issuing this Commitment:

   **Chicago Title of Texas, LLC**

   (a) A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

   **Owners**: FNTS Holdings, LLC owns 100% of Alamo Title Holding Company, which owns 100% of **Chicago Title of Texas, LLC**

   (b) A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

   **Owners**: FNTG Holdings, LLC owns 100% of FNTS Holdings, LLC

   (c) If the Agent is a corporation: (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

   **Officers**: Raymond Randall Quirk (President), Brian K. Baize (President), Gayle Brand (President), Jennifer Clarke (President), Michael J. DeBault (President), John Tannous (President), Anthony John Park (Executive Vice President and Chief Financial Officer), Joseph William Grealish (Executive Vice President), John Ernst (Executive Vice President), Todd Rasco (Executive Vice President), Jeffrey Colby (Senior Vice President), Winford Dubose (Vice President), Brewer Gregory (Vice President), Marjorie Nemzura (Vice President and Secretary)

   (d) The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive. NONE.

   (e) For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3. You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates. Upon your request, such disclosure will be made to you. Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

   You are further advised that the estimated title premium* is:

| | | | |
|---|---|---|---|
| **Loan Policy** | | **$** | **117,435.00** |
| **Endorsement Charges** | | **$** | **11,768.50** |
| | **Total** | **$** | **129,203.50** |

   Of this total amount: 15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

| Percent/Amount | To Whom | For Services |
|---|---|---|

   *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance. Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

# TEXAS TITLE INSURANCE INFORMATION

| |
|---|
| Title insurance insures you against loss resulting from certain risks to your title.<br>The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date. |
| El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propriedad.<br>El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción. |

Your Commitment for Title insurance is a legal contract between you and us. The Commitment is not an opinion or report of your title. It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable. This determination has already been made. Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

**--MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy. Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them. You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

**---EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

**---EXCLUSIONS** are title risks that a Policy generally does not cover. Exclusions are contained in the Policy but not shown or discussed in the Commitment.

**---CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company. They are contained in the Policy but not shown or discussed in the Commitment. The Policy Conditions are not the same as the Commitment Conditions.

# TEXAS TITLE INSURANCE INFORMATION

(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment. The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy. Some of the changes to consider are:

---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2). To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy. Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

---Allow the Company to add an exception to "rights of parties in possession." If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection. If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued. You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

# DELETION OF ARBITRATION PROVISION

(Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution. It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company. However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process. In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below). It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less. If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued. You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

> "Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

______________________________________ ______________________________________
Signature Date

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

**When Information Is Disclosed**

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18). We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**

FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 934-3354 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

Exhibit 3 Email

---

**From:** Jeff VanNote <jeff@jeffvannote.com>
**Sent:** Monday, May 30, 2022 5:19 PM
**To:** Joey Howell <joey@sterlingone.us>; K Walji <k.walji@waljilaw.com>
**Cc:** Andy Anand <andy@theanandteam.com>
**Subject:** To whom it may concern

This email is intended for the appropriate legal parties regarding 2999 Turtle Creek, Dallas Tx. Please note, we have an executed term sheet and deposit from borrowing entity and were anticipating a Tuesday, 5/31/2022 closing and funding date, until Chicago title notified us on friday afternoon a clear title policy would not be able to be issued due to the 14 day appeal period in reference to the 5/18/2022 bankruptcy order. Due to this now falling into June, we need a few more days to update our loan documents and complete title review and clearance from Chicago Title. We have confirmed a $12,500,000 escrow deposit into representing counsel's escrow account of which will more than satisfy the outstanding debts combined with our $30,000,000. Please note, until final written approval is granted for an extension no further work on this loan will be conducted. We look forward to receiving this extension in writing signed by all parties no later than 5/31/2022.

Jeff VanNote